# EXHIBIT B

2013-43841 / Court: 189

CAUSE NO. _____

| | | |
|---|---|---|
| THE CITY OF HOUSTON, TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| **XEROX STATE AND LOCAL** | § | |
| **SOLUTIONS, INC., a/k/a and f/k/a** | § | |
| **ACS STATE AND LOCAL** | § | |
| **SOLUTIONS, INC.** | § | |
| | § | |
| **Defendant.** | § | ___th JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff the City of Houston, Texas (the "City") files this Original Petition, and in support hereof, would respectfully show the Court as follows:

### SUMMARY OF THIS CASE

1.     As part of its services to citizens, the City's Fire Department provides Emergency Medical Services, ambulance services and related items and services (collectively, "EMS Services") to people who need them. The City contracted with and paid millions of dollars to Xerox, which holds itself out as an expert in such processes, to handle billing and collections for EMS Services provided by the City. Xerox has not done the things it was obligated to do, made many misrepresentations, wrongfully withheld information the City owns and engaged in misconduct that goes to the very core of the services it was engaged to perform. The City seeks remedies for Xerox's many wrongful acts, concealments and failures to act that have caused, and will continue to cause, substantial harm to the City.

PLAINTIFF'S ORIGINAL PETITION                                                      PAGE 1

Certified Document Number: 56748570 - Page 1 of 22

Certified Document Number: 56748570 - Page 2 of 22

## PARTIES

2.     The City of Houston is a Texas home rule municipal corporation, established by and functioning under its City Charter with its place of business in Houston, Harris County, Texas.

3.     Xerox State and Local Solutions, Inc., also and formerly known as ACS State and Local Solutions, Inc. ("Xerox") is a foreign, for-profit corporation incorporated in the State of New York and doing business in Harris County, Texas, and with an office in Dallas, Texas, and it can be served with process by delivering the Citation and a copy of this Petition to its Registered Agent or an officer of the corporation.   The Registered Agent information for Xerox is as follows:

> **Corporation Service Company**
> **211 E. 7th St., Suite 620**
> **Austin, TX 78701-3218**

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Xerox because this action arose from, or is connected with, Xerox's purposeful acts committed in Texas and Xerox is amenable to service of process by a Texas court, and this Court in particular.  In addition, Xerox agreed the Contract is subject to the laws of Texas, and that venue for any litigation relating to the Contract is Harris County, Texas.

5.     This Court has jurisdiction over the claims in this matter because the amount in controversy is within the jurisdictional limits of the Court.

6.     Venue is proper in Harris County, Texas, because it is the county in which all or a substantial part of the events or omissions giving rise to the claims in this matter occurred.  TEX. CIV. PRAC. & REM. CODE §15.002(1).

Certified Document Number: 56748570 - Page 3 of 22

## DISCOVERY LEVEL

7.     Plaintiff intends to conduct discovery under Level 3 of Rule 190 of the Texas Rules of Civil Procedure.

## FACTUAL BACKGROUND

8.     The City provides EMS Services through the Houston Fire Department ("HFD") for residents and visitors in its jurisdiction who are in need. Private and governmental health insurance programs, other third parties, and the people who receive such services are billed for them. The data collection, documentation, coding, billing, and collection processes ("EMS Billing Processes") and standards for EMS Services are complex and require specialized expertise.

9.     Xerox holds itself out as having the expertise necessary to perform EMS Billing Processes properly, in compliance with applicable law and standards, accurately and professionally.

10.     The City contracted with Xerox[1] to perform EMS Billing Processes on its behalf. The initial contract, called the Contract for EMS Ambulance Fee Collection Services, was entered into effective on or about October 31, 2002, and is attached to this Petition as Exhibit A. It was amended by the First Amendment to the Contract for EMS Ambulance Collection Services effective on or about November 2, 2007, which is attached to this Petition as Exhibit B. The agreement was amended again by the Second Amendment to a Contract for EMS

---

[1] The contracts at issue were between the City and ACS State and Local Solutions, Inc. The name of that entity was changed to Xerox State and Local Solutions Inc. after a corporate transaction; in the City's dealings with it, the entity has used both names and now uses the latter, so the City refers to the entity accordingly in this Petition.

PLAINTIFF'S ORIGINAL PETITION                                                    PAGE 3

Certified Document Number: 56748570 - Page 4 of 22

Ambulance Fee Collection Services effective on or about August 11, 2011, which is attached to this Petition as Exhibit C. In this Petition, the City refers to the initial contract and the amendments collectively as the "Contract."

11.     Xerox publicly and widely represents that it has vast expertise in EMS Billing Processes. For example, Xerox has stated that "[i]n 2011, we processed 500,000 emergency transports and accurately applied and accounted for more that [sic] $80 million in EMS payments." Xerox has stated that emergency medical services personnel should focus on helping people in need, not filing paperwork, so it provides (a) Tools to help workers compile data; (b) Software to handle billing and collections; and, importantly for the issues here, (c) "Detailed knowledge of constantly changing Medicare and Medicaid requirements, regulations and reimbursement rules. By making administration simple, EMS billing services free EMS professionals to focus on what they do best: saving lives." These are misrepresentations that deceive customers like the City to develop an unwarranted sense of security about Xerox's EMS Billing Processes. They also confirm that Xerox claims to know the challenges that cities face, why they need competent outside help with such processes and what can happen when the contractor proves to be incompetent or worse.

12.     Xerox also touts the quality and extent of its services to its customers, and has publicly trumpeted its healthcare expertise, representing, for example:

> By applying our deep healthcare expertise and heritage of innovation expertise across virtually every member of the healthcare ecosystem–providers and payers, employers and government agencies, we help you focus on what matters–the real business of improving people's lives through better, more accessible and more affordable healthcare–which leads to better health and wellness. That's what we mean by the freedom to care.

Xerox has also declared: "Better care, better bottom line. We improve accuracy in billing third-party payers, including Medicaid and Medicare, and decrease the amount of unpaid debt from

Certified Document Number: 56748570 - Page 5 of 22

ambulance transport fees." Xerox has fallen woefully short of its represented "expertise" in providing the City with EMS Billing Processes that are at issue in this lawsuit.

13.     The City reasonably reposed trust and confidence in Xerox, especially because Xerox represented to it on many occasions that it had expertise in EMS Billing Processes. The City also appointed Xerox as its agent to perform EMS Billing Processes and to represent its interests with health insurance programs, government agencies, auditors and people who received EMS Services. Xerox exploited and took advantage of the City's trust and comparative lack of knowledge and experience about EMS Billing Processes. When the City questioned the accuracy, correctness, or propriety of Xerox's EMS Billing Processes, Xerox repeatedly made representations to the City to the effect that it knew what it was doing and the City did not, and that Xerox was doing everything properly. Xerox also made numerous representations that it would engage in remedial measures and provide information that the City needed, and thereafter failed and refused to do so. Xerox also concealed or obfuscated information such that the City could not determine the extent Xerox to which was engaging in unsound EMS Billing Processes. In fact, to this day, most of the evidence of Xerox's wrongdoing is in Xerox's sole possession, even though it is contained in information that legally and contractually belongs to the City and is information that the City has asked for repeatedly.

14.     The Contract generally provides that Xerox was to receive a fee for its services that would be calculated as a percentage of the amounts collected for the City's EMS Services. Xerox also was to receive fees for processing claims for EMS Services that might not be collectable and Xerox had the opportunity to obtain performance bonuses as well. Xerox generated the information on which its fees were to be based. The City asserts that Xerox calculated its fees incorrectly, resulting in overpayments by the City. Moreover, it appears that

**PLAINTIFF'S ORIGINAL PETITION**                                                    **PAGE 5**

Xerox submitted claims for payment of EMS Services in a manner that may have caused the City to be overpaid, which means that Xerox's fees based on a percentage of collections were overstated. The City is entitled to a refund of fees paid to Xerox in both these and other circumstances, and also because the services Xerox did provide were inadequate and deficient.

15.     Xerox has materially breached the Contract in several independent ways. For example, it has not:

a.  Complied with its express warranties as to performance under the Contract.

b.  Dedicated adequate systems and services, and properly qualified personnel, necessary to deliver the services covered by the Contract.

c.  Maintained a program of education and training as required by the Contract.

d.  Ensured that submissions for reimbursement were accurate and compliant with applicable standards.

e.  Complied with all applicable state and federal laws, regulations, legal requirements, business practices and codes of conduct applicable to the activities under the Contract, a third-party billing company and otherwise.

f.  Timely performed its obligations.

g.  Properly calculated its fees under the Contract.

h.  Provided the reports required by the Contract.

i.  Provided the data platform and access required by the Contract, including, but not limited to:

    i.  the Data Warehouse;

    ii.  the user-friendly, continuous, open web-based access to the billing and collections data down to the individual claim, transaction, and clinical data elements;

Certified Document Number: 56748570 - Page 6 of 22

Certified Document Number: 56748570 - Page 7 of 22

iii. the replicated database; or the multitude of reporting options to users that support the ability to drill down into the layers of account details, including a report toolkit;

iv. the replicated database of raw information – both clinical and financial – for the City's internal analytics to deliver complete data transparency;

v. online access to the data store for internal analysis and reporting;

vi. rapid reporting via data cubing and expedited searching capabilities in the Report Writer and data mining tool along with advanced Visual Informatics reporting module;

vii. ad-hoc reporting capability; and

viii. a web-based reporting tool to generate ad-hoc reports at any time, without the need to code or structure database queries.

j. Provided a mechanism to ensure that internal rules, regulations and policies are revised to comply with applicable regulatory and legal changes.

16.     The Contract provides that Xerox shall indemnify the City and hold it harmless for all claims, causes of action, liabilities, fines and expenses for damage or loss to property sustained with or incidental to performance under the Contract. Xerox's representative affirmed this obligation to the City's representatives on May 21, 2013. The City has incurred and will continue to incur substantial expenses in connection with Xerox's performance, and lack thereof, under the Contract. It has notified Xerox of its intention to continue to hold Xerox responsible for such expenses and for all of the other elements covered by Xerox's indemnity obligations, which extend beyond the termination of the Contract.

17.     The City has been compelled to engage outside counsel and consultants, and to devote tremendous internal resources, to its efforts to see that Xerox performed its services properly, that its fees were correct and that its EMS Billing Processes were accurate and compliant with applicable standards. The City has also had to acquire substitute services due to

**Xerox 007**

Xerox's failures and refusals to perform its obligations under the Contract. Xerox is legally and contractually obligated to reimburse and to indemnify the City for the costs of doing so, and the City seeks to enforce that obligation in this lawsuit.

18.     The City suspended payments to Xerox because of Xerox's prior material breaches of the Contract and because it was deprived of the benefit that could have been reasonably anticipated from full performance. Moreover, Xerox did not comply with the City's demand to provide the basis for all of the fees that it had billed to, and collected from, the City. Based on the limited information that Xerox has provided, it appears that Xerox has been grossly overpaid.

19.     The City has endeavored to review Xerox's work, as is its right under the Contract, and Xerox discouraged the City from doing so, suggested that any such review should be extremely limited, and provided only limited data for the City to review.

20.     The City has disputed the fee invoices that Xerox has submitted to it and has placed Xerox on notice that it intends to conduct a full accounting and reconciliation of the basis for the invoices, the amounts paid to Xerox and amounts that Xerox might claim to be owing. Xerox has not provided the information necessary for the City to perform this accounting.

21.     In light of Xerox's multiple material breaches and the other wrongful acts and omissions described in this Petition, the City instructed Xerox to suspend the submission and resubmission of all claims for payment of EMS Services provided by the City. On information and belief, Xerox complied with the City's requests.

22.     The City provided notice of default to Xerox in the May 30, 2013 correspondence that is attached to this Petition as Exhibit D, in which it described a number of obligations Xerox had previously or was then failing to perform. Also in that correspondence, the City requested

Certified Document Number: 56748570 - Page 8 of 22

**Xerox 008**

information that Xerox is required to provide to the City under the Contract, including the following:

a. A copy of Xerox's Professional Liability Policy, Declarations and Certificates designating the City as an Additional Insured, from the inception of the Contract to the present, along with a letter confirming that the Certificates accurately reflect the insurance coverage maintained.

b. A copy of the Transport master database file, as described in the Contract, along with the means to access the data it contains.

c. Copies of the contents of the fully auditable billing, collections and accounts receivable systems that Xerox was required to maintain and to provide, along with the provision of full access to them, as set forth in the Contract.

d. All records of inquiries and complaints, as described in the Contract.

e. All of the reports that Xerox was obligated to provide either as a matter of course or upon the City's request, as set forth in the Contract. The reports were requested to be monthly for each month the Contract had been in effect, along with annual reports for each contract year.

f. Copies of all "Change Logs" relating to claims submitted on behalf of the City.

g. A complete reconciliation of all present or past credit balances owed to any third party.

h. Copies of all of the claims audits conducted by Xerox.

23. Xerox flatly rejected the City's notice, ignored the City's request for the City's own information and data and Xerox demanded continued payment under the Contract for Xerox's insufficient services, as illustrated in the June 6, 2013 correspondence attached to this

Petition as Exhibit E. Xerox disingenuously contended that the City's correspondence was vague and ambiguous, even though it was well aware of the many deficiencies, material defaults, inaccuracies, misrepresentations and concealments in which it had engaged. In fact, because Xerox is purportedly the world's largest "expert" in EMS Billing Processes and because it has all of the detailed information about its lack of performance under the Contract (which it has withheld from the City, in spite of demands that it be produced), Xerox is in the position to understand the depth and breadth of its misconduct.

24.     The City provided additional notice and time for Xerox to perform its delinquent obligations. Based on assurances from Xerox, the City extended the time for Xerox to cure its default in the June 28, 2013 correspondence that is attached to this Petition as Exhibit F. The City reiterated its demand for information and data that Xerox is required to provide under the Contract in the July 18, 2013 correspondence that is attached to this Petition as Exhibit G. Xerox did not cure its many defaults or provide information and data as required by the City's notice of default, subsequent correspondence and the Contract.

25.     Xerox failed to cure its defaults and perform its obligations, and the City gave Xerox notice of termination of the Contract in the July 25, 2013 correspondence that is attached to this Petition as Exhibit H.

## RECITATIONS APPLICABLE TO ALL COUNTS

26.     In the interest of brevity, the City hereby incorporates the foregoing paragraphs into each of the following Counts by reference, as if they were fully set forth in each Count.

27.     The Attachments to this Petition are incorporated into this Petition by reference for all purposes, as if they were fully set forth.

Certified Document Number: 56748570 - Page 10 of 22

PLAINTIFF'S ORIGINAL PETITION

Xerox 010

Certified Document Number: 56748570 - Page 11 of 22

28.     All conditions precedent for which the City might have any burden have occurred or have been waived or excused, or Xerox is estopped to rely on their non-occurrence.

29.     The City does not make any elections of remedies, but rather reserves its right to do so at the appropriate point.

30.     The City seeks to recover all lawful pre-judgment and post-judgment interest to which it is entitled and as applicable to sums awarded to it in this action.

31.     References to acts and omissions of Xerox are intended to include the acts and omissions of its employees, authorized representatives, persons with apparent authority to act for it, or its agents.

32.     In the unlikely event the City is found to owe any amount to Xerox, the City claims a right of offset against any such amount for the amounts awarded to the City in this action.

33.     The City is a proper party to bring these claims and causes of action against Xerox.

## COUNT I
## BREACH OF CONTRACT

34.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

35.     The Contract was valid and enforceable.

36.     The City performed its duties and obligations under the Contract, or was excused from performing one or more of them due to Xerox's prior material breach or otherwise.

37.     Xerox materially breached the Contract in one or more of the following independent manners:

Xerox 011

Certified Document Number: 56748570 - Page 12 of 22

a. By neglecting or refusing to perform its obligations; and

b. By repudiating the performance of its obligations.

38. Xerox was given notice of its breaches, notice of the City's intent to terminate the Contract, an opportunity to cure and an extension of the cure period. Nonetheless, Xerox failed and refused to cure its breaches.

39. The City has suffered, and will continue to suffer, damages that are compensable under the Contract and law as a result of Xerox's breaches. They include, but are not limited to, the following:

a. The cost of replacement services;

b. Fees and penalties based on Xerox's breaches of the Contract;

c. Costs and attorneys' fees; and

d. Other actual and economic damages and costs.

40. The City seeks to recover for all injuries that were natural, probable and foreseeable consequences of Xerox's breaches.

**COUNT II**
**FRAUD**

41. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

42. Xerox made false material written and oral representations to the City about EMS data collection, documentation, coding and billing, and its abilities and expertise in performing EMS Billing Processes.

43.     Xerox and its personnel knew or should have known that the representations were false or they were reckless with respect to their knowledge of the truth and were made as a positive assertion.

44.     Xerox made these material representations about various EMS data collection, documentation, coding, and billing issues, including Xerox's experience and performance of EMS Billing Services with the intent that the City rely on those representations.

45.     The City relied on the misrepresentations of Xerox to its detriment.

46.     The City suffered actual damages as a result of its reasonable reliance on the foregoing misrepresentations and it seeks to recover all actual damages and equitable remedies to which it is entitled from Xerox, including actual and exemplary damages in an amount to be determined by the trier of fact.

**COUNT III**
**FRAUD BY NONDISCLOSURE OR CONCEALMENT**

47.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

48.     Xerox deliberately concealed from or failed to disclose to the City certain material facts about EMS Billing Processes and Xerox's experience and expertise, which facts Xerox had a duty to disclose.

49.     Xerox knew that the City was bereft of those facts and the City did not have an equal opportunity to discover the facts through reasonable diligence, which the City exercised.

50.     Xerox concealed or failed to disclose those facts with the intent that the City take some action or refrain from acting.

51.     The City relied on Xerox's nondisclosure to the City's detriment.

Certified Document Number: 56748570 - Page 13 of 22

52. The City suffered actual damages as a result of Xerox's actions and it seeks to recover all actual damages and equitable remedies to which it is entitled from Xerox, including actual and exemplary damages in an amount to be determined by the trier of fact.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

53. Xerox provided information about EMS Billing Processes and its capabilities and expertise to the City in the course of its business, in which Xerox has a pecuniary interest.

54. The information Xerox supplied was false.

55. Xerox and its agents did not exercise reasonable care or competence in obtaining or communicating the information.

56. The City justifiably relied on the information provided by Xerox.

57. The City suffered damages that were proximately caused by its reliance on the false information. The City seeks to recover actual and exemplary damages to which it is entitled in connection with Xerox's negligent misrepresentations.

## COUNT V
## BREACH OF WARRANTY

58. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

59. In the Contract and in written and oral communications, Xerox made representations and warranties to the City regarding (a) its qualifications and capabilities to render the services it was required to perform under the Contract; (b) the quality of such services; and (c) various other matters involving the EMS Billing Processes. Those representations and

Certified Document Number: 56748570 - Page 15 of 22

warranties were part of the basis of the bargain between the City and Xerox, and the City reasonably relied on them to its detriment.

60.     Xerox breached its representations, warranties and covenants.

61.     The City has suffered, and will continue to suffer, damages as a result of Xerox's breaches of warranty. The City seeks to recover all damages to which it is entitled in connection with Xerox's breaches of warranty, including actual and other damages provided by contract.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

62.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

63.     Xerox owed a fiduciary duty to the City by reason of trust and confidence the City reasonably reposed in Xerox, the agency of Xerox to act on behalf of the City in important and complex financial matters, and Xerox's representations that it had superior expertise and competence in these matters.

64.     Xerox had a duty to act in the City's best interests and with complete candor and fairness.

65.     Xerox breached this duty.

66.     Xerox's breach proximately caused injury to the City and benefit to Xerox. The City seeks to recover all actual and exemplary damages and equitable relief to which it is entitled in connection with Xerox's breach of fiduciary duty.

## COUNT VII
## CONSTRUCTIVE FRAUD

67.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

Xerox 015

68. Xerox owed a fiduciary duty to the City. Accordingly, Xerox's misrepresentations and concealment of information amounted to constructive fraud, which does not require the City to demonstrate that Xerox possessed any intent to defraud.

69. As described above, Xerox willfully breached the fiduciary duties owed to the City by failing to perform its duties and obligations to the City and by disregarding the express terms of the Contract.

70. Xerox's breach has resulted in injury to the City. The City seeks to recover all actual and exemplary damages and equitable relief to which it is entitled in connection with Xerox's constructive fraud.

**COUNT VIII**
**CONSTRUCTIVE TRUST**

71. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

72. Xerox owed a fiduciary duty to the City.

73. Xerox and its agents and affiliates wrongfully and fraudulently hold funds, which, in equity and good conscience, belong to the City.

74. Xerox has been and continues to be unjustly enriched by its possession of money and other property belonging to the City.

75. Xerox's acts were willful.

76. The City has been injured by being deprived of its money and property by Xerox.

77. The City has no adequate remedy at law to compensate it for the damage caused by Xerox's actions. Accordingly, the City seeks the imposition of a constructive trust over the

Certified Document Number: 56748570 - Page 16 of 22

Xerox 016

money and property in Xerox's possession that was misappropriated, as well as all proceeds of such money and property.

**COUNT IX**
**ACCOUNTING**

78.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

79.     As set forth more fully above, Xerox breached the fiduciary duty it owed to the City.  Xerox also breached the Contract and misappropriated property and funds from the City. As a result of those unlawful actions, Xerox owes the City damages.

80.     The amount of damages Xerox owes the City is disputed and can be determined by an accounting.

81.     The City requests an accounting and request that the Court order Xerox to produce the documents and information that will allow the City to determine the amount of its damages, including but not limited to:

     a.     An accounting of all money received by the City under the Contract;

     b.     Any audits or assessments of profitability under the Contract; and

     c.     Any additional information the City may so request by amendment or otherwise.

82.     Due to the urgent need for the information and the nature of the entities to which the information relates, the City requests an order expediting Xerox's provision of such information.

**Xerox 017**

## COUNT X
## MONEY HAD AND RECEIVED

83.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

84.     The City transferred funds into Xerox's possession to which Xerox was not entitled.

85.     Xerox wrongfully continues to hold funds that belong to the City in equity and good conscience and by which Xerox has been and is unjustly enriched.

86.     As a result of Xerox's actions, the City has suffered injury.

87.     The City seeks equitable and legal remedies in connection with Xerox's wrongful conduct, including actual and exemplary damages and injunctive relief.

## COUNT XI
## CONVERSION

88.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

89.     The City owns or otherwise has the right of immediate possession of the specific funds being wrongfully held by Xerox and the confidential business and health records, data and information it refuses to provide the City.

90.     Xerox wrongfully, willfully, and without authorization assumed dominion and control over property belonging to the City to the exclusion of and inconsistent with the rights of the City.

91.     The City demanded the return of the City's property held by Xerox.

92.     Xerox has failed to return the property and continues to wrongfully exercise dominion and control over the City's property.

Xerox 018

93.     As a result of Xerox's actions, the City has suffered injury. The City seeks actual and exemplary damages and appropriate equitable relief in connection with Xerox's wrongful conduct.

## COUNT XII
## NEGLIGENCE AND GROSS NEGLIGENCE

94.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

95.     Xerox had a duty to perform its activities with reasonable care. Xerox also owed duties to the City by reason of the special relationship between the parties.

96.     As demonstrated above, Xerox failed to satisfy its duties. In fact, Xerox's failures involved an extreme degree of risk, considering the probability and magnitude of the potential harm to the City and others, and Xerox had actual subjective awareness of the risk involved but nevertheless proceeded in conscious indifference of the rights and welfare of the City and others.

97.     The City has been damaged by Xerox's failure to exercise reasonable care in its dealings with the City, particularly where Xerox has held itself out as an expert in EMS Billing Processes.

98.     The City seeks all appropriate remedies in connection with Xerox's negligence and gross negligence, including actual and exemplary damages.

## COUNT XIII
## UNJUST ENRICHMENT

99.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

100.    Xerox obtained funds from the City by fraud and by taking undue advantage.

Certified Document Number: 56748570 - Page 19 of 22

101.    The City seeks equitable return of all amounts by which Xerox was unjustly enriched and any and all other relief to which it may be entitled.

**COUNT XIV**
**REQUEST FOR DECLARATORY RELIEF**

102.    The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

103.    In the Contract, Xerox agreed to perform a variety of EMS claims and billing services.

104.    There is an actual controversy regarding whether and to what extent Xerox is required to indemnify and hold the City harmless for a number of items including, but not limited to, the following:

    a.    The cost of replacement services;

    b.    Fees and penalties based on Xerox's breaches of the Contract;

    c.    Costs and attorneys' fees; and

    d.    Other damages and costs.

105.    The City requests that the Court declare that Xerox is required to indemnify and hold the City harmless for all damages, costs, penalties and other expenses arising out of Xerox's failure to perform its obligations under the Contract, including, but not limited to, the damages and costs listed above.

**COUNT XV**
**ATTORNEYS' FEES AND COSTS**

106.    The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

Certified Document Number: 56748570 - Page 20 of 22

**Xerox 020**

107. The City's claims are founded upon a written agreement and pursuant to Section 38.001 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE, the City is entitled to recover its costs and reasonable and necessary attorneys' fees from Xerox.

108. Furthermore, the City has requested relief pursuant to the Texas Declaratory Judgments Act. Pursuant to Section 37.009 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE, the City is entitled to recover its costs and reasonable and necessary attorneys' fees from Xerox.

109. All conditions precedent to the City's recovery of its costs and attorneys' fees have occurred, or will occur prior to entry of judgment in this suit.

## JURY DEMAND

110. The City requests a jury trial in this action.

## PRAYER FOR RELIEF

**WHEREFORE,** PREMISES CONSIDERED, the City requests that the Court require Xerox to appear and to answer, and that upon disposition, the Court enter a judgment in favor or the City for the following:

(1)   actual damages;

(2)   exemplary damages;

(3)   a declaration that Xerox is required to indemnify and hold the City as requested above;

(5)   the City's reasonable and necessary attorneys' fees and costs of suit;

(6)   lawful prejudgment and post-judgment interest; and

(7)   such other and further relief, both legal and equitable, to which the City may be justly entitled.

Certified Document Number: 56748570 - Page 21 of 22

PLAINTIFF'S ORIGINAL PETITION

Xerox 021

Respectfully submitted,

DAVID M. FELDMAN
City Attorney
LYNETTE K. FONS
First Assistant City Attorney
JUDITH L. RAMSEY
Chief, General Litigation Section

David M. Feldman
City Attorney
Texas Bar No. 06886700
David.feldman@houstontx.gov
Lynette K. Fons
First Assistant City Attorney
Texas Bar No. 13268100
Judith L. Ramsey
Chief, General Litigation Section
Texas Bar No. 16519550
Lisa A. Ketai
Senior Assistant City Attorney
Texas Bar No. 11362400
City of Houston Legal Department
900 Bagby Street, Fourth Floor
Houston, Texas 77002
832.393.6491 (telephone)
832.393.6259 (facsimile)

ATTORNEYS FOR PLAINTIFF
THE CITY OF HOUSTON, TEXAS

Certified Document Number: 56748570 - Page 22 of 22

**Xerox 022**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748570 Total Pages:  22

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

Xerox 023

# CIVIL CASE INFORMATION SHEET (REV. 2/13)

CAUSE NUMBER *(FOR CLERK USE ONLY):* **2013-43841 / Court: 189** COURT *(FOR CLERK USE ONLY):*

STYLED City of Houston vs. Xerox State & Local Solutions, Inc., A/K/A & F/K/A ACS State & Local Solutions, Inc.

*(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)*

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

## 1. Contact information for person completing case information sheet:

| | | Names of parties in case: | Person or entity completing case information sheet is: |
|---|---|---|---|
| Name: David Feldman | Email: David.Feldman@houstontx.gov | Plaintiff(s)/Petitioner(s): City of Houston | ☐ Attorney for Plaintiff/Petitioner ☐ Pro Se Plaintiff/Petitioner ☐ Title IV-D Agency ☐ Other: |
| Address: 900 Bagby, 4th Floor | Telephone: 832-393-6416 | | Additional Parties in Child Support Case: |
| City/State/Zip: Houston, Texas 77002 | Fax: 832-393-6259 | Defendant(s)/Respondent(s): Xerox State & Local Solutions, Inc., A/K/A & F/K/A ACS State and Local Solutions, Inc. | Custodial Parent: Non-Custodial Parent: |
| Signature: /s/ David M. Feldman | State Bar No: 06886700 | | Presumed Father: |

*(Attach additional page as necessary to list all parties)*

## 2. Indicate case type, or identify the most important issue in the case *(select only 1):*

| Civil | | | Family Law | |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions (non-Title IV-D)** |
| *Debt/Contract* ☐ Consumer/DTPA ☒ Debt/Contract ☐ Fraud/Misrepresentation ☐ Other Debt/Contract: *Foreclosure* ☐ Home Equity—Expedited ☐ Other Foreclosure ☐ Franchise ☐ Insurance ☐ Landlord/Tenant ☐ Non-Competition ☐ Partnership ☐ Other Contract: | ☐ Assault/Battery ☐ Construction ☐ Defamation *Malpractice* ☐ Accounting ☐ Legal ☐ Medical ☐ Other Professional Liability: ☐ Motor Vehicle Accident ☐ Premises *Product Liability* ☐ Asbestos/Silica ☐ Other Product Liability List Product: ☐ Other Injury or Damage: | ☐ Eminent Domain/ Condemnation ☐ Partition ☐ Quiet Title ☐ Trespass to Try Title ☐ Other Property: **Related to Criminal Matters** ☐ Expunction ☐ Judgment Nisi ☐ Non-Disclosure ☐ Seizure/Forfeiture ☐ Writ of Habeas Corpus— Pre-indictment ☐ Other: | ☐ Annulment ☐ Declare Marriage Void *Divorce* ☐ With Children ☐ No Children **Other Family Law** ☐ Enforce Foreign Judgment ☐ Habeas Corpus ☐ Name Change ☐ Protective Order ☐ Removal of Disabilities of Minority ☐ Other: | ☐ Enforcement ☐ Modification—Custody ☐ Modification—Other **Title IV-D** ☐ Enforcement/Modification ☐ Paternity ☐ Reciprocals (UIFSA) ☐ Support Order **Parent-Child Relationship** ☐ Adoption/Adoption with Termination ☐ Child Protection ☐ Child Support ☐ Custody or Visitation ☐ Gestational Parenting ☐ Grandparent Access ☐ Parentage/Paternity ☐ Termination of Parental Rights ☐ Other Parent-Child: |
| **Employment** | **Other Civil** | | | |
| ☐ Discrimination ☐ Retaliation ☐ Termination ☐ Workers' Compensation ☐ Other Employment: | ☐ Administrative Appeal ☐ Antitrust/Unfair Competition ☐ Code Violations ☐ Foreign Judgment ☐ Intellectual Property | ☐ Lawyer Discipline ☐ Perpetuate Testimony ☐ Securities/Stock ☐ Tortious Interference ☐ Other: | | |
| **Tax** | *Probate & Mental Health* | | | |
| ☐ Tax Appraisal ☐ Tax Delinquency ☐ Other Tax | *Probate/Wills/Intestate Administration* ☐ Dependent Administration ☐ Independent Administration ☐ Other Estate Proceedings | ☐ Guardianship—Adult ☐ Guardianship—Minor ☐ Mental Health ☐ Other: | | |

## 3. Indicate procedure or remedy, if applicable *(may select more than 1):*

| | | |
|---|---|---|
| ☐ Appeal from Municipal or Justice Court ☐ Arbitration-related ☐ Attachment ☐ Bill of Review ☐ Certiorari ☐ Class Action | ☐ Declaratory Judgment ☐ Garnishment ☐ Interpleader ☐ License ☐ Mandamus ☐ Post-judgment | ☐ Prejudgment Remedy ☐ Protective Order ☐ Receiver ☐ Sequestration ☐ Temporary Restraining Order/Injunction ☐ Turnover |

## 4. Indicate damages sought *(do not select if it is a family law case):*
☐ Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
☐ Less than $100,000 and non-monetary relief
☐ Over $100, 000 but not more than $200,000
☐ Over $200,000 but not more than $1,000,000
☐ Over $1,000,000

Certified Document Number: 56748571 - Page 1 of 2

**Xerox 024**

# Instructions for Completing the Texas Civil Case Information Sheet

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing. If the original petition, application or post-judgment petition or motion is e-filed, the case information sheet must not be the lead document.

This sheet, required by Rule 78a of the Texas Rules of Civil Procedure, is intended to collect information that will be used for statistical and administrative purposes only. It neither replaces nor supplements the filings or service of pleading or other documents as required by law or rule. The sheet does not constitute a discovery request, response, or supplementation, and it is not admissible at trial.

The attorney or self-represented (*pro se*) plaintiff/petitioner filing the case or post-judgment petition or motion should complete the sheet as follows:

## 1. Contact information

   **a) Contact information for person completing case information sheet.** Enter the following information:
   - name;
   - address;
   - city, state, and zip code;
   - email address;
   - telephone number;
   - fax number, if available;
   - State Bar number, if the person is an attorney; and
   - signature. (*NOTE: When a case information sheet is submitted electronically, the signature may be a scanned image or "/s/" and the name of the person completing the case information sheet typed in the space where the signature would otherwise appear.*)

   **b) Names of parties in the case.** Enter the name(s) of the:
   (*NOTE: If the name of a party to a case is confidential, enter the party's initials rather than the party's name.*)
   - plaintiff(s) or petitioner(s);
   - defendant(s) or respondent(s); and
   - in child support cases, additional parties in the case, including the:
     - custodial parent;
     - non-custodial parent; and
     - presumed father.

   Attach an additional page as necessary to list all parties.

   **c) Person or entity completing sheet is.** Indicate whether the person completing the sheet, or the entity for which the sheet is being completed, is:
   - an attorney for the plaintiff or petitioner;
   - a *pro se* (self-represented) plaintiff or petitioner;
   - the Title IV-D agency; or
   - other (provide name of person or entity).

## 2. Case type.
   Select the case category that best reflects the most important issue in the case. *You must select only one.*

## 3. Procedure or remedy.
   If applicable, select any of the available procedures or remedies being sought in the case. You may select more than one.

## 4. Damages sought.
   Select the damages being sought in the case:
   (*NOTE: If the claim is governed by the Family Code, do **not** indicate the damages sought.*)
   - only monetary relief of $100,000 or less, including damages of any kind, penalties, costs, expenses, pre-judgment interest and attorney fees;
   - monetary relief over $100,000 or less and non-monetary relief;
   - monetary relief over $100,000 but nor more than $200,000;
   - monetary relief over $200,000 but less than $1,000,000; or
   - monetary relief over $1,000,000.

Rev 2/13

Certified Document Number: 56748571 - Page 2 of 2

**Xerox 025**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748571 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

**Xerox 026**

# CONTRACT

\#  _C54484_

# VENDOR
# NAME _ACS State and Local Solutions, Inc_

# ORDINANCE #

_02-0952_

Certified Document Number: 56748573 - Page 1 of 71



# CITY OF HOUSTON

**54484**     **Interoffice**

City Secretary

Correspondence

**To:**    Ms. Sylvia Garcia
City Controller

**From:**    Anna Russell
City Secretary

*F & A*
*N/A*
*Terms: CS date for 5 yrs*
**Attn:** *Renewal: Automatic 3-1yr terms*

**Date:**    October 29, 2002

**Subject:**    Contract

CONTROLLER'S
02 OCT 30 PM 3:16

Dear Ms. Garcia:

The following are sent to you for handling to completion:

5 copies of Contract

*CS= 10/31/02*

between City and ACS State and Local Solutions, Inc.

for Ambulance Fee Collection Services for the Finance & Administration and Fire Department

Authorized by Ordinance 2002-0952

Passed on October 23, 2002

Executed by Mayor October 29, 2002

*NO Tax ID #*

Yours Truly,

*Anna Russell*

Anna Russell
City Secretary

AR/bg

cc:    Mr. Hall
Dr. Scheps
Chief Connealy

*4*     **COPIES PICKED UP**

**BY** *James E. John*

**DEPT REPRESENTATIVE**

*10/31/2002*

**DATE**

Certified Document Number: 56748573 - Page 2 of 71

Xerox 028

FORM 132
(Approving & Authorizing Services Contract)

<u>Controller's Office</u>

To the Honorable Mayor and City Council of the City of Houston:

I hereby certify, with respect to the money required for the contract, agreement, obligation or expenditure contemplated by the ordinance set out below that:

( )   Funds have been encumbered out of funds previously appropriated for such purpose.

( )   Funds have been certified and designated to be appropriated by separate ordinance to be approved prior to the approval of the ordinance set out below.

( )   Funds will be available out of current or general revenue prior to the maturity of any such obligation.

(✓)   No pecuniary obligation is to be incurred as a result of approving the ordinance set out below.

( )   The money required for the expenditure or expenditures specified below is in the treasury, in the fund or funds specified below, and is not appropriated for any other purposes.

( )   A certificate with respect to the money required for the expenditure or expenditures specified below is attached hereto and incorporated herein by this reference.

( )   Other - Grant Funds Available

Date: _October 14_, _2002_   City Controller of the City of Houston

FUND REF: _NA-65-10_      AMOUNT: _$ 0.00_      ENCUMB. NO.: _NF65005-03_

City of Houston Ordinance No. _2002-952_

AN ORDINANCE APPROVING AND AUTHORIZING A CONTRACT BETWEEN THE CITY OF HOUSTON AND ACS STATE AND LOCAL SOLUTIONS, INC. FOR AMBULANCE FEE COLLECTION SERVICES FOR THE FINANCE AND ADMINISTRATION AND FIRE DEPARTMENTS; MAKING VARIOUS FINDINGS AND PROVISIONS RELATING TO THE SUBJECT AND DECLARING AN EMERGENCY.

Certified Document Number: 5674857 - Page 2 of 71

**FORM 132**
**(Approving & Authorizing Services Contract)**

\*   \*   \*   \*

### BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON:

Section 1. The City Council hereby approves and authorizes the contract, agreement or other undertaking described in the title of this ordinance, in substantially the form as shown in the document which is attached hereto and incorporated herein by this reference. The Mayor is hereby authorized to execute such document and all related documents on behalf of the City of Houston. The City Secretary is hereby authorized to attest to all such signatures and to affix the seal of the City to all such documents.

Section 2. The Mayor is hereby authorized to take all actions necessary to effectuate the City's intent and objectives in approving such agreement, agreements or other undertaking referenced in the title of this ordinance, in the event of changed circumstances.

Section 3. The City Attorney is hereby authorized to take all action necessary to enforce all legal obligations under said contract without further authorization from Council.

Section 4. There exists a public emergency requiring that this Ordinance be passed finally on the date of its introduction as requested in writing by the Mayor; therefore, this Ordinance shall be passed finally on such date and shall take effect immediately upon its passage and approval by the Mayor; however, in the event that the Mayor fails to sign this Ordinance within five days after its passage and adoption, it shall take effect in accordance with Article VI, Section 6, Houston City Charter.

**PASSED AND ADOPTED** this *23rd* day of *October*, 20 *02*.

**APPROVED this** _____ day of _____, 20 _____.

_____
Mayor of the City of Houston

- 2 -

Certified Document Number: 56748573 - Page 4 of 71

Xerox 030

**FORM 132**
**(Approving & Authorizing Services Contract)**

Pursuant to Article VI, Section 6, Houston City Charter, the effective date of the foregoing Ordinance is _____ OCT 2 9 2002 _____.

_City Secretary_

(Prepared by Legal Dept.
(MR:WHU: October 11, 2002)        _Assistant City Attorney_
(Requested by Purchasing Agent)
u:\wpdocs\whor2169.wpd
L.D.# 034-0200123-001

| | AYE | NO | 2002-952 |
|---|---|---|---|
| | ✔ | | MAYOR BROWN |
| | • • • • | • • • • | COUNCIL MEMBERS |
| | ✔ | | TATRO |
| | ✔ | | GALLOWAY |
| | ✔ | | GOLDBERG |
| | ✔ | | EDWARDS |
| | ✔ | | WISEMAN |
| | ✔ | | ELLIS |
| | ✔ | | KELLER |
| | ✔ | | VASQUEZ |
| | ✔ | | ALVARADO |
| | ✔ | | PARKER |
| | ✔ | | QUAN |
| | ✔ | | SEKULA-GIBBS |
| | ✔ | | BERRY |
| | ✔ | | ROBINSON |
| | CAPTION | ADOPTED | |

MAY 017 Rev. 7/02

CAPTION PUBLISHED IN DAILY COURT REVIEW
DATE:   OCT 2 9 2002

- 3 -

Certified Document Number: 56748573 - Page 5 of 71

Xerox 031

THE STATE OF TEXAS   §
                     §
COUNTY OF HARRIS     §

02-0952
D54484

## CONTRACT FOR EMS AMBULANCE FEE COLLECTION SERVICES

### I. PARTIES

**A.**   **Address**

THIS CONTRACT FOR EMS AMBULANCE FEE COLLECTION SERVICES

("Contract") is made on the Countersignature Date by and between the **CITY OF HOUSTON,**

**TEXAS** ("City"), a municipal corporation and home-rule body, the City Council and **ACS STATE**

**AND LOCAL SOLUTIONS** ("Contractor"), a corporation doing business in the State of Texas.

The initial addresses of the parties, which one party may change by giving written notice

of its changed address to the other party, are as follows:

| **City** | **Contractor** |
|---|---|
| Director of Finance | ACS State and Local Solutions, Inc. |
| & Administration | 1200 K Street, N.W. |
| City of Houston | Washington, D.C. 20005 |
| P.O Box 1562 | |
| Houston, TX 77251 | |

Certified Document Number: 56748573 - Page 6 of 71

Xerox 032

**B.**    **Index**

The City and the Contractor hereby agree to the terms and conditions of this Contract.

This Contract consists of the following sections:

| Section | Description | Page |
|---|---|---|
| 1. | Signature Page | 4 |
| 2. | Definitions | 5 |
| 3. | Duties of Contractor | 7 |
| 4. | Duties of City | 15 |
| 5. | Term and Termination | 16 |
| 6. | Miscellaneous Provisions | 19 |

Exhibits

A. Scope of Services

B. Payment of Fees

C. Performance Requirements

D. Buy-Out Detail Pricing Matrix

E. Equal Employment Opportunity

F. Drug Policy Compliance Agreement

G. Drug Policy Compliance Declaration

H. Certification of no safety impact positions in performance of a city contract

I. MWBE Subcontract Terms

J. Depreciation Schedule

Certified Document Number: 56748573 - Page 7 of 71

Xerox 033

## C.    Parts Incorporated

All of the above described sections and documents are hereby incorporated into this Contract by this reference for all purposes.

## D.    Controlling Parts

If a conflict among the sections and exhibits arises, the sections control over the exhibits.

Certified Document Number: 56748573 - Page 8 of 71

Xerox 034

Certified Document Number: 56748573 - Page 9 of 71

E. **Signatures**

IN WITNESS HEREOF, the City and the Contractor have made and executed this Contract in multiple copies, each of which is an original.

ATTEST/SEAL (if a corporation):
WITNESS (if not a corporation):

By: _Richard J. Russin_
Name:  Richard J. Russin
Title:  Asst. Corporate Secretary

ACS STATE AND LOCAL SOLUTIONS

By: _____
Name: _____
Title: _____

ATTEST/SEAL:

_____
City Secretary

CITY OF HOUSTON, TEXAS
Signed by:

_____
Mayor

APPROVED:

_____
Director, Finance and Administration

_____
City Purchasing Agent

APPROVED:

_____
Chief, HFD

COUNTERSIGNED BY:

_____
City Controller

APPROVED AS TO FORM:

_____
Assistant City Attorney
L.D. File No. 034020012300

DATE COUNTERSIGNED:

_____10/31/0V_____

4

## II. DEFINITIONS

As used in this Contract, the following terms shall have meanings set out below:

"Adjustments to Transport Fees" is defined in Exhibit "A", Section D.3.

"Billable Accounts" is defined in Exhibit "A", Section D.1.b.

"City" is defined in the preamble of this Contract and includes its successors and assigns.

"Contract" means the agreement between the Contractor and City.

"Contract Term" is defined in Article V.

"Contractor's Office" is defined in Exhibit "A", Scope of Services.

"Countersignature Date" means that date shown as the date countersigned by the City Controller on the signature page of this Contract.

"Database" is defined in Exhibit "A", Scope of Services.

"Data Center" is defined in Exhibit "A", Scope of Services.

"Director" means the Director of the Department of Finance and Administration, or such person as he or she shall designate.

"EMS Patient" is defined in Exhibit "A", Scope of Services.

"Fire Department" means the City of Houston Fire Department represented by the City Fire Chief or such person as he or she shall designate.

Certified Document Number: 56748573 - Page 10 of 71

Xerox 036

"Performance Requirements" means the performance measures detailed in Exhibit "C".

"Proposal" means the Proposal submitted by ACS State and Local Solutions to the Finance & Administration Department, Materials Management Division, for Billing and Collection of Emergency Ambulance Services fees, dated _____

"Transport Fees" is defined in Exhibit "A", Scope of Services.

"Transport Month" means the month in which a Transport occurs.

"Tape" is defined in Exhibit "A", Scope of Services.

"Unbillable Accounts" is defined in Exhibit "A", Section D.2.b.

"Uncollectible Accounts" is defined in Exhibit "A", Section E.3.k.

Certified Document Number: 56748573 - Page 11 of 71

Xerox 037

# III. DUTIES OF CONTRACTOR

### A.    Scope of Services

For and in consideration of the payments specified in this Contract, Contractor shall provide all labor, material, and supervision necessary to perform services as fully described in the Scope of Services attached hereto as Exhibit "A".

### B.    Schedule of Performance

Contractor's services shall commence upon the date specified in a written Notice to Proceed from the Director.

### C.    Contractor's Duty to Pay

Contractor shall make timely payments to all persons and entities supplying labor, materials or equipment for the execution of this Contract. Contractor agrees to protect, defend, and indemnify the City from any claims or liability arising out of Contractor's failure to make such payments.

### D.    Release

CONTRACTOR AGREES TO AND SHALL RELEASE THE CITY, ITS AGENTS, EMPLOYEES, OFFICERS, AND LEGAL REPRESENTATIVES (COLLECTIVELY THE "CITY") FROM ALL LIABILITY FOR INJURY, DEATH, DAMAGE, OR LOSS TO PERSONS OR PROPERTY SUSTAINED IN CONNECTION WITH OR INCIDENTAL TO PERFORMANCE UNDER THIS AGREEMENT, EVEN IF THE INJURY, DEATH, DAMAGE, OR LOSS IS CAUSED BY THE CITY'S SOLE OR CONCURRENT NEGLIGENCE AND/OR THE CITY'S PRODUCTS LIABILITY OR STRICT STATUTORY LIABILITY.

Certified Document Number: 56748573 - Page 12 of 71

Xerox 038

## E.    Indemnification

CONTRACTOR AGREES TO AND SHALL DEFEND, INDEMNIFY, AND HOLD THE CITY, ITS AGENTS, EMPLOYEES, OFFICERS, AND LEGAL REPRESENTATIVES (COLLECTIVELY THE "CITY") HARMLESS FOR ALL CLAIMS, CAUSES OF ACTION, LIABILITIES, FINES, AND EXPENSES (INCLUDING, WITHOUT LIMITATION ATTORNEY'S FEES, COURT COSTS, AND ALL OTHER DEFENSE COSTS AND INTEREST) FOR INJURY, DEATH, DAMAGE, OR LOSS TO PERSONS OR PROPERTY SUSTAINED IN CONNECTION WITH OR INCIDENTAL TO PERFORMANCE UNDER THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THOSE CAUSED BY:

(1)    CONTRACTOR'S AND/OR ITS AGENTS', EMPLOYEES', OFFICERS', DIRECTORS', CONTRACTORS', OR SUBCONTRACTORS' (COLLECTIVELY IN NUMBERED PARAGRAPHS 1-3, "CONTRACTOR") ACTUAL OR ALLEGED NEGLIGENCE OR INTENTIONAL ACTS OR OMISSIONS, WHETHER CONTRACTOR IS IMMUNE TO LIABILITY OR NOT FOR HAVING PROVIDED WORKERS COMPENSATION COVERAGE TO ANY INJURED EMPLOYEE(S).

(2)    THE CONTRACTOR'S ACTUAL OR ALLEGED STRICT PRODUCTS LIABILITY OR STRICT STATUTORY LIABILITY, WHETHER CONTRACTOR IS IMMUNE FROM LIABILITY OR NOT.

CONTRACTOR SHALL DEFEND, INDEMNIFY, AND HOLD THE CITY HARMLESS DURING THE TERM OF THIS AGREEMENT AND FOR FOUR YEARS AFTER THE AGREEMENT TERMINATES. CONTRACTOR'S INDEMNIFICATION IS LIMITED TO

Certified Document Number: 56748573 - Page 13 of 71

Xerox 039

$1,000,000 PER OCCURRENCE. CONTRACTOR SHALL NOT INDEMNIFY THE CITY FOR

THE CITY'S SOLE NEGLIGENCE.

**F.** **Subcontractor's Indemnity**

CONTRACTOR SHALL REQUIRE ALL OF ITS SUBCONTRACTORS (AND THEIR

SUBCONTRACTORS) TO RELEASE AND INDEMNIFY THE CITY TO THE SAME EXTENT

AND IN SUBSTANTIALLY THE SAME FORM AS ITS RELEASE AND INDEMNITY TO THE

CITY.

**G.** **Insurance**

Contractor shall maintain in effect certain insurance coverage, which is described as follows:

(1)   <u>Risks and Limits of Liability</u>: Contractor shall maintain the following coverages and limits

of liability:

| (Coverage) | (Limit of Liability) |
|---|---|
| Workers' Compensation | Statutory for Workers' Compensation |
| Employer's Liability | Bodily injury by accident $ 1,000,000 (each accident) |
| Commercial General Liability: Including Broad Form Coverage, Contractual Liability, Bodily and Personal Injury, and Completed Operations | Bodily Injury and Property Damage, Combined Limits of $1,000,000 each Occurrence and $ 2, 000, 000 general aggregate |
| Automobile Liability Insurance (for vehicles Contractor uses in performing under this Agreement, including Employer's Non-Ownership and Hired Auto Coverage) | $1,000,000 combined single limit |
| Professional Liability Coverage | $1,000,000 per claim $2,000,000 aggregate. (The policy shall include a one year extended reporting period following the contract expiration date.) |

Certified Document Number: 56748573 - Page 14 of 71

Xerox 040

Defense costs are excluded from the face amount of the policy.
Aggregate Limits are per 12-month policy period
unless otherwise indicated.

(2) <u>Form of Policies</u>. The Director may approve the form of the insurance policies, but nothing the Director does or fails to do relieves Contractor from its duties to provide the required coverage under this Agreement. The Director's actions or inactions do not waive the City's rights under this Agreement.

(3) <u>Issuers of Policies</u>. The issuer of any policy (1) shall have a Certificate of Authority to transact business in Texas or (2) shall be an eligible non-admitted insurer in the State of Texas and have a Best rating of at least Best's Financial Size Category of Class VI or better, according to the most current edition <u>Best's Key Rating Guide</u>.

(4) <u>Insured Parties</u>. Each policy, except those for Workers' Compensation, Employer's Liability, and Professional Liability, must name the City (and its officers, agents, and employees) as Additional Insured parties on the original policy and all renewals or replacements.

(5) <u>Deductibles</u>. Contractor shall be responsible for and pay any claims or losses to the extent of any deductible amounts and waives any claim it may have for the same against the City, its officers, agents, or employees.

(6) <u>Cancellation</u>. Each policy must state that it may not be canceled, materially modified, or nonrenewed unless the insurance company gives the Director 30 days' advance written notice. Contractor shall give written notice to the Director within five days of the date on which total claims by any party against Contractor reduce the aggregate amount of coverage

Certified Document Number: 56748573 - Page 15 of 71

Xerox 041

below the amounts required by this Agreement. In the alternative, the policy may contain an endorsement establishing a policy aggregate for the particular project or location subject to this Agreement.

(7)     Subrogation. Each policy must contain an endorsement to the effect that the issuer waives any claim or right of subrogation to recover against the City, its officers, agents, or employees.

(8)     Endorsement of Primary Insurance. Each policy, except Workers' Compensation and Professional Liability, must contain an endorsement that the policy is primary to any other insurance available to the Additional Insured with respect to claims arising under this Agreement.

(9)     Liability for Premium. Contractor shall pay all insurance premiums, and the City shall not be obliged to pay any premiums.

(10)    Subcontractors. Contractor shall require all subcontractors to carry insurance naming the City as an additional insured and meeting all of the above requirements except amount. The amount must be commensurate with the amount of the subcontract, but in no case less than $500,000 per occurrence. Contractor shall provide copies of insurance certificates to the Director.

(11)    Proof of Insurance.

(a)     On the Effective Date and at any time during the Term of this Agreement, Contractor shall furnish the Director with standard Certificates of Insurance, along with a letter from Contractor confirming that the Certificates accurately reflect the insurance coverage maintained. If requested in writing by the Director, Contractor shall make available at Contractor's local insurance broker's office for the Director to review copies of applicable

Certified Document Number: 56748573 - Page 16 of 71

Xerox 042

portions of the insurance policy in Houston, Texas within 60 days.

(b)     Contractor shall continuously and without interruption, maintain in force the required insurance coverages specified in this Section.   If Contractor does not comply with this requirement, the Director, at his or her sole discretion, may

>   (1)     immediately suspend Contractor from any further performance under this Agreement and begin procedures to terminate for default, or

>   (2)     purchase the required insurance with City funds and deduct the cost of the premiums from amounts due to Contractor under this Agreement.

The City shall never waive or be estopped to assert its right to terminate this Agreement because of its acts or omissions regarding its review of insurance documents.

(12)     <u>Other Insurance</u>.  If requested by the Director, Contractor shall furnish adequate evidence of Social Security and Unemployment Compensation Insurance, to the extent applicable to Contractor's operations under this Agreement.

## H.     Warranties

Contractor's performance shall conform to the professional standards prevailing in Harris County, Texas with respect to the scope, quality, due diligence, and care of the services and products Contractor provides under this Agreement.

## I.     Confidentiality

The Contractor shall keep all materials to be prepared hereunder and all City data it receives in strictest confidence.  The Contractor shall not divulge such information except as approved in writing by the Director or as otherwise required by law.

## J.     Licenses and Permits

Contractor shall obtain, maintain, and pay for all licenses, permits, and certificates including

Certified Document Number: 56748573 - Page 17 of 71

Xerox 043

all professional licenses required by any statute, ordinance, rule, or regulation. Contractor shall immediately notify the Director of any suspension, revocation, or other detrimental action against his or her license.

### K. **Compliance with Laws**

Contractor shall comply with all applicable state and federal laws and regulations and the City Charter and Code of Ordinances.

### L. **Compliance with Equal Employment Opportunity Ordinance**

Contractor shall comply with the City's Minority and Women Business Enterprise ("MWBE) programs as set out in Chapter 15, Article V of the City of Houston Code of Ordinances. Contractor shall make good faith efforts to award subcontracts or supply agreements in at least 12% of the value of this Agreement to MWBEs. Contractor acknowledges that it has reviewed the requirements for good faith efforts on file with the City's Affirmative Action Division and will comply with them.

Contractor shall require written subcontracts with all MWBE subcontractors and shall submit all disputes with MWBEs to binding arbitration to be conducted in Houston, Texas, if directed to do so by the Affirmative Action Division Director. MWBE subcontracts must contain the terms set out in Exhibit "I". If Contractor is an individual person (as distinguished from a corporation, partnership, or other legal entity), and the amount of the subcontract is $50,000 or less, the subcontract must also be signed by the attorneys of the respective parties.

### M. **Drug Abuse Detection and Deterrence**

(a)     It is the policy of the City to achieve a drug-free workforce and workplace. The manufacture, distribution, dispensation, possession, sale, or use of illegal drugs or alcohol by contractors while on City Premises is prohibited. Contractor shall comply with all the requirements and procedures set forth in the Mayor's Drug Abuse

Certified Document Number: 56748573 - Page 18 of 71

Xerox 044

Detection and Deterrence Procedures for Contractors, Executive Order No. 1-31 ("Executive Order"), which is incorporated into this Agreement and is on file in the City Secretary's Office.

(b)     Before the City signs this Agreement, Contractor shall file with the Contract Compliance Officer for Drug Testing ("CCODT"):

   1     a copy of its drug-free workplace policy.

   2     the Drug Policy Compliance Agreement substantially in the form set forth in Exhibit "F", together with a written designation of all safety impact positions and,

   3     if applicable (e.g. no safety impact positions), the Certification of No Safety Impact Positions, substantially in the form set forth in Exhibit "G".

If Contractor files a written designation of safety impact positions with its Drug Policy Compliance Agreement, it also shall file every 6 months during the performance of this Agreement or on completion of this Agreement if performance is less than 6 months, a Drug Policy Compliance Declaration in a form substantially similar to Exhibit "G". Contractor shall submit the Drug Compliance Declaration to the CCODT within 30 days of the expiration of each 6-month period of performance and within 30 days of completion of this Agreement. The first 6-month period begins to run on the date the City issues its Notice to Proceed or if no Notice to Proceed is issued, on the first day Contractor begins work under this Agreement.

(c)     Contractor also shall file updated designations of safety impact positions with the CCODT if additional safety impact positions are added to Contractor's employee work force.

Certified Document Number: 56748573 - Page 19 of 71

Xerox 045

(d)     Contractor shall require that its subcontractors comply with the Executive Order, and Contractor shall secure and maintain the required documents for City inspection.

## IV. DUTIES OF THE CITY

### A.     Payment Terms

Subject to all terms and conditions of this Contract, the City agrees to pay for the services rendered by the Contractor pursuant to Exhibit "B". Any and all fees paid to Contractor under this Contract shall be paid solely from the funds collected by Contractor in accordance with this Contract. The Contractor acknowledges and agrees that the City's liability for payment of such fees shall be limited thereby. No funds are or will be appropriated or allocated for the Contractor's performance hereunder. The City's duties to pay money to the Contractor for any purpose under this Contract are limited in their entirety by the provisions of this Section IV. A.

### B.     Method of Payment

Contractor will be paid on the basis of invoices submitted by the Contractor and approved by the Director showing the services performed and the fee for such services, as provided in Exhibit "B". The City will make payment to the Contractor within thirty (30) days of the receipt by the Director of such invoices. If any items in any invoices submitted by the Contractor are disputed by the City for any reason, including lack of supporting documentation, the City shall temporarily delete the disputed item and pay the remaining amount of the invoice. The City will promptly notify the Contractor of the dispute and request clarification and/or remedial action. After any dispute shall have been settled, the Contractor shall include the disputed amount on a subsequent regularly scheduled invoice or on a special invoice for the disputed item only, as determined by the Director.

Certified Document Number: 56748573 - Page 20 of 71

**Xerox 046**

### C.   Performance Requirements

Contractor shall be responsible for meeting the requirements set forth in Subsection 1 titled "Billing and Collections" of Exhibit A, "Scope of Services". Contractor's compliance with the Performance Requirements detailed in Exhibit "C" shall be the measure of whether it has met the requirements set out in the first sentence of the section.

### D.   Liquidated Damages

Time is of the essence of this Agreement. If Contractor fails to file claims, or fails to file claims within the deadlines set by third party payers, the City will suffer harm, although the actual damages from that harm are difficult to estimate. Therefore, if Contractor fails to file claims or does not meet the deadlines, Contractor shall pay to the City the amounts stipulated in Exhibit "C" as liquidated damages. The amounts listed for each event of delay or failure to file as detailed in Exhibit "C" are a reasonable forecast of just compensation for the harm to the City. Contractor shall pay the amount stipulated for each event of delay beyond the third payer deadline or failure to file a claim during the Term of this Agreement.

## V. TERM AND TERMINATION

### A.   Termination Date

This Contract shall become effective on the date of countersignature by the City Controller, and shall remain in effect for five (5) years immediately thereafter, unless sooner terminated as provided for in this Contract.

### B.   Notice to Proceed

Contractor shall begin performance under this Contract upon receipt of a written notice to proceed from the Director.

Certified Document Number: 56748573 - Page 21 of 71

Xerox 047

Certified Document Number: 56748573 - Page 22 of 71

**C. Renewals - Automatic**

Upon expiration of the initial term, this Contract shall be automatically renewed for three successive one-year terms upon the same terms and conditions unless the Director gives Contractor written notice of non-renewal at least thirty days before expiration of the then-current term.

**D. Termination for Convenience**

Upon expiration of the Contract Cancellation Moratorium Period, the Director may terminate this Agreement at any time by giving 30 days written notice to Contractor. The City's right to terminate this Agreement for convenience is cumulative of all rights and remedies which exist now or in the future.

On receiving the notice, Contractor shall, unless the notice directs otherwise, immediately discontinue all services under this Agreement and cancel all existing orders and subcontracts that are chargeable to this Agreement. As soon as practicable after receiving the termination notice, Contractor shall submit an invoice showing in detail the services performed under this Agreement up to the termination date. The City shall then pay the fees to Contractor for services actually performed, but not already paid for, in the same manner as prescribed in Section IV (B) unless the fees exceed the allocated funds remaining under this Agreement. The Contractor shall be entitled to fees as defined in this agreement for a period of 90 days after the termination for convenience becomes effective, on Billable Accounts that the Contractor has previously noticed or billed.

TERMINATION OF THIS AGREEMENT AND RECEIPT OF PAYMENT FOR SERVICES RENDERED ARE CONTRACTOR'S ONLY REMEDIES FOR THE CITY'S TERMINATION FOR CONVENIENCE, WHICH DOES NOT CONSTITUTE A DEFAULT OR BREACH OF THIS AGREEMENT. CONTRACTOR WAIVES ANY CLAIM (OTHER THAN ITS CLAIM FOR PAYMENT AS SPECIFIED IN THIS SECTION), IT MAY HAVE NOW OR IN

Xerox 048

THE FUTURE FOR FINANCIAL LOSSES OR OTHER DAMAGES RESULTING FROM THE
CITY'S TERMINATION FOR CONVENIENCE.

**E.**     **Termination for Cause**

Either party may terminate its performance under this Agreement if the other party defaults
and fails to cure the default after receiving notice of it. Default occurs if a party fails to perform one
or more of its material duties under this Agreement. If a default occurs, the injured party shall
deliver a written notice to the defaulting party describing the default and the proposed termination
date. The date must be at least 30 days after the defaulting party's receipt of the notice. The injured
party, at its sole option, may extend the proposed termination date to a later date. If the defaulting
party cures the default before the proposed termination date, the proposed termination is ineffective.
If the defaulting party does not cure the default before the proposed termination date, the injured
party may terminate its performance under this Agreement on the termination date. The Director
shall act on behalf of the City to notify the Contractor of a default and to effect termination.

In case of default by the Contractor for not meeting the requirements of this Agreement, the
City may procure the articles or services from other sources and hold the Contractor responsible for
any excess reprocurement cost occasioned or incurred thereby. In no event, however, shall either the
City or Contractor be liable for incidental, consequential or special damages under this Agreement.

**F.**     **Limitation of Liability for Default**

The Contractor's total liability for default under this Agreement shall not exceed the 125%
annual value (Gross Collections) of this Agreement. The Limitation of Liability for default as used
under this Agreement shall not apply to any liability arising out of events that are covered separately
through indemnification or insurance as defined elsewhere in this Agreement.

**G.**     **Contract Cancellation Moratorium**

Certified Document Number: 56748573 - Page 23 of 71

Xerox 049

The City agrees that it will not cancel or terminate this Agreement in relation to the technical solution during the first eighteen months of the contract term (Contract Cancellation Moratorium Period) for any reason other than for cause. This minimum eighteen- month moratorium has been agreed to for the purpose of allowing the Contractor time to recover its investment in the technical solution, which is scheduled to be amortized over the life of the contract.

### H. City's Buy-Out Option

After the eighteen- month cancellation moratorium, the City may initiate the buy-out option of the equipment in accordance with the Buy-Out Detail Pricing Matrix attached to and made a part of this Contract as Exhibit "D". In the event that the City elects to exercise this option, it is understood that the purchase must be for the entire list of equipment as quoted in the Buy-Out detail, depreciated according to the Depreciation Schedule attached as Exhibit." J." Contractor shall then transfer Title to the equipment and assign all related software licenses and existing original equipment and software warranties to the City according to the Depreciation Schedule. The buy-out price for the last year of the schedule is $1.00.

### VII. MISCELLANEOUS

### A. Independent Contractor

Contractor is an independent contractor and shall perform the services provided for in this Agreement in that capacity. The City has no control or supervisory powers over the manner or method of Contractor's performance under this Agreement. All personnel Contractor uses or provides are its employees or subcontractors and not the City's employees, agents, or subcontractors for any purpose whatsoever. Contractor is solely responsible for the compensation of its personnel, including but not limited to: the withholding of income, social security, and other payroll taxes and all workers' compensation benefits coverage.

Certified Document Number: 56748573 - Page 24 of 71

Xerox 850

**B.** **Force Majeure**

(i). Timely performance by both parties is essential to this Agreement. However, neither party is liable for delays or other failures to perform its obligations under this Agreement to the extent the delay or failure is caused by Force Majeure. Force Majeure means fires, floods, explosions, and other acts of God, war, terrorist acts, riots, court orders, and the acts of superior governmental or military authority.

(ii). This relief is not applicable unless the affected party does the following:

(a) uses due diligence to remove the Force Majeure as quickly as possible;

(b) provides the other party with prompt written notice of the cause and its anticipated effect; and

(c) provides the other party with written notice describing the actual delay or non-performance incurred within 7 days after the Force Majeure ceases.

(iii) The City may perform contract functions itself or contract them out during periods of Force Majeure. Such performance does not constitute a default of this Agreement by the City.

(iv) If the Force Majeure continues for more than fifteen (15) days, the Director may terminate this Agreement by giving 7 days' written notice to Contractor. This termination is not a default or breach of this Agreement. CONTRACTOR WAIVES ANY CLAIM IT MAY HAVE FOR FINANCIAL LOSSES OR OTHER DAMAGES RESULTING FROM THE TERMINATION EXCEPT FOR AMOUNTS DUE UNDER THE AGREEMENT AT THE TIME OF THE TERMINATION.

(v) Contractor is not relieved from performing its obligations under this Agreement due to a strike or work slowdown of its employees. Contractor shall employ only fully trained and qualified personnel during a strike.

Certified Document Number: 56748573 - Page 25 of 71

Xerox 051

## C.   Severability

If any part of this Agreement is for any reason found to be unenforceable, all other parts remain enforceable unless the result materially prejudices either party.

## D.   Entire Agreement

This Agreement merges the prior negotiations and understandings of the Parties and embodies the entire agreement of the Parties. No other agreements, assurances, conditions, covenants (express or implied), or other terms of any kind, exist between the Parties regarding the Agreement.

## E.   Written Amendment

Unless otherwise specified elsewhere in this Agreement, this Agreement may be amended only by written instrument executed on behalf of the City (by authority of an ordinance adopted by the City Council) and Contractor. The Director is only authorized to perform the functions specifically delegated to him or her in this Agreement.

## F.   Applicable Laws

This Agreement is subject to the laws of the State of Texas, the City Charter and Ordinances, the laws of the federal government of the United States, and all rules and regulations of any regulatory body or officer having jurisdiction.

Venue for any litigation relating to this Agreement is Harris County, Texas.

## G.   Notice

All notices required or permitted by this Agreement must be in writing and are deemed delivered on the earlier of the date actually received or the third day following: (1) deposit in a United States Postal Service post office or receptacle; (2) with proper postage (certified mail, return receipt requested); and (3) addressed to the other party at the address set out in the

Certified Document Number: 56748573 - Page 26 of 71

Xerox 052

preamble of this Agreement or at such other address as the receiving party designates by proper notice to the sending party.

**H.**     <u>Captions</u>

Captions contained in this Agreement are for reference only, and, therefore, have no effect in construing this Agreement. The captions are not restrictive of the subject matter of any section in this Agreement.

**I.**     <u>Non-Waiver</u>

If either party fails to require the other to perform a term of this Agreement, that failure does not prevent the party from later enforcing that term and all other terms. If either party waives the other's breach of a term, that waiver does not waive a later breach of this Agreement.

An approval by the Director, or by any other employee or agent of the City, of any part of Contractor's performance does not waive compliance with this Agreement or establish a standard of performance other than that required by this Agreement and by law. The Director is not authorized to vary the terms of this Agreement.

**J.**     <u>Inspections and Audits</u>

City representatives may perform, or have performed, (1) audits of Contractor's books and records, and (2) inspections of all places where work is undertaken in connection with this Agreement. Contractor shall keep its books and records available for this purpose for at least 3 years after this Agreement terminates. This provision does not affect the applicable statute of limitations.

In no event shall the Contractor be required to disclose any information related to it's cost or profits or of it's subcontractors.

Certified Document Number: 5674857J - Page 27 of 71

Xerox 053

**K.      Enforcement**

The City Attorney or his or her designee may enforce all legal rights and obligations under this Agreement without further authorization. Contractor shall provide to the City Attorney all documents and records that the City Attorney requests to assist in determining Contractor's compliance with this Agreement, with the exception of those documents made confidential by federal or state law or legislation.

**L.      Ambiguities**

If any term of this Agreement is ambiguous, it shall not be construed for or against any party on the basis that the party did or did not write it.

**M.      Survival**

Contractor shall remain obligated to the City under all clauses of this Agreement that expressly or by their nature extend beyond the expiration or termination of this Agreement, including but not limited to, the indemnity provisions.

**N.      Publicity**

Contractor shall make no announcement or release of information concerning this Agreement unless the release has been submitted to and approved, in writing, by the Director.

**O.      Parties in Interest**

This Agreement does not bestow any rights upon any third party, but binds and benefits the City and Contractor only.

**P.      Successors and Assigns**

Contractor shall not assign this Agreement at law or otherwise or dispose of all or substantially all of its assets without the Director's prior written consent. Nothing in this clause, however, prevents the assignment of accounts receivable or the creation of a security interest as described in §9.406 of the

Certified Document Number: 56748573 - Page 28 of 71

Xerox 054

Texas Business & Commerce Code. In the case of such an assignment, Contractor shall immediately furnish the City with proof of the assignment and the name, telephone number, and address of the Assignee and a clear identification of the fees to be paid to the Assignee.

Contractor shall not delegate any portion of its performance under this Agreement without the Director's prior written consent.

### Q. Remedies Cumulative

Unless otherwise specified elsewhere in this Agreement, the rights and remedies contained in this Agreement are not exclusive, but are cumulative of all rights and remedies which exist now or in the future. Neither party may terminate its duties under this Agreement except in accordance with its provisions.

Certified Document Number: 56748573 - Page 29 of 71

Xerox 055

Certified Document Number: 56748573 - Page 30 of 71

**EXHIBIT "A"**

**SCOPE OF SERVICES**

Exhibit "A", <u>Scope of Services</u> consists of two (2) sub-sections, (I) Billing and Collections and (II) Technology .

**I.    BILLING AND COLLECTIONS**

Contractor shall provide billing and collection services for ambulance services fees ("Transport Fees") charged by the City to an emergency medical service patient ("EMS Patient") who was transported by a Houston Fire Department (the "Fire Department") ambulance to a receiving hospital ("Transport").  Transport Fees charged to hospitals that transport EMS Patients by Fire Department ambulance to a receiving hospital shall be included in the definition of Transport under this Contract.  Contractor shall provide the following services to the City:

A.    General

1.    Contractor shall furnish all services, materials, equipment, office space and personnel necessary to complete the services described herein.

2.    Contractor shall maintain a client service manager in Houston with appropriate staffing levels to 1) Verify patient billing information with the hospital the patient was transported to; 2) Research Accurint database or mutually agreed upon database or records to locate and verify patient name and address; 3) Utilize as mutually agreed to, the ACS National Collection Center to research and initiate normal debt collection processes.  A Business Process Outsource center shall operate outside the City.  Contractor shall notify City in writing of any change in the location of Contractor's Office

3.    Contractor shall retrieve media from the Fire Department containing records of each and every Transport and transfer such data to Contractor's computer system ("Data Center") and transfer the data into a Transport master database file ("Database").  Contractor's start date for each Transport Month shall match that of the Fire Department, which is after 12:00 midnight on the first day of each month.  Contractor's database shall directly receive all patient care and billing data via CDPD transmission.  Contractor shall reconcile the number of transports recorded by the City with that listed in the Contractor's database.  However, Contractor shall provide occasional

Page 25

Xerox 056

transport manual data entry, whenever the new computer equipment fails to capture such data.

4. The Database, (which the City shall own) shall be a perpetual record of all Transports by account number. The account number shall consist of the calendar date on which the Transport occurred and a daily sequential transport number shall be used to track billing and collection information on each Transport.

5. Contractor shall, on a monthly basis, provide reports on billing, collection and Contractor's performance as specified herein or as requested from time to time by the Director and mutually agreed to. If a report cannot be mutually agreed to, then the Director may request a cost and time estimate quotation from the Contractor to produce the requested report. Such cost quotation shall not exceed $125 per hour. If the Director authorizes the Contractor to produce the requested report at the quoted price, then the Contractor shall produce the report and bill the City in the normal monthly billing process upon completion of the report.

6. Contractor shall establish fully auditable billing, collection and accounts receivable systems in accordance with generally accepted accounting principles which shall be accessible to the City or its designated agents at all times.

7. Contractor shall establish <u>HIPAA compliant</u> security systems to protect all information provided or computed in regards to Transports and all billing, collection and accounts receivables generated or derived there from.

8. All data provided to Contractor, or derived there from, the Database and all reports generated hereunder are and shall remain the property of the City.

B. BILLING SERVICES

1. Contractor shall mail notices and bill Transport Fees to each EMS Patient and to transporting hospitals in accordance with City ordinances governing Transports.

2. Contractor shall provide a monthly reconciliation of total Transports to total Billable Accounts (including a report of the ongoing status of any unbilled Transport Fees). This reconciliation shall be based on data provided by the City retrieved from its CAD/RMS system. Such reconciliation shall be done on a numerical basis as well as dollar value basis, for billed and unbilled Transport Fees. The City shall

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 31 of 71

Xerox 057

provide manually prepared data for these reports.

3. Contractor shall respond to and resolve all EMS Patient inquiries and complaints regarding the billing and collection of Transport Fees in a timely and satisfactory manner. Contractor shall provide a local or toll free number for citizens to call for customer service inquiries related to billing. Contractor shall maintain a record of all such inquiries and complaints. Contractor shall refer all complaints involving quality of care provided during transports to the Fire Department's Emergency Medical Service to the person designated by the Director.

4. Contractor shall receive and process for payment all insurance, Medicare and Medicaid claim information submitted by EMS Patients.

5. Contractor shall contact the hospital the patient was transported to for obtaining insurance and/or updated billing information at two stages of the billing process: 1) Within 10 business days after the transport date for all accounts without Medicare, Medicaid or Private Insurance billing information and 2) Within 120 days after the transport date for all remaining unpaid accounts with a second request for updated insurance and/or billing information. In order to increase the number of billable accounts, contractor shall develop a close business relationship with all area hospitals to which patients are transported to by the Houston Fire Department.

6. Contractor shall deposit, at least once each day, into a City bank account as instructed by the Director, the gross receipts from Transport Fees. Contractor shall retain a bonded carrier to deliver deposits to the bank. Said carrier shall maintain a minimum bonding capacity of $500,000 per daily pickup.

## COLLECTION SERVICES
### I **General**

7. Contractor shall provide collection services on all accounts in accordance with procedures and time schedules established in this Contract.

8. Contractor shall develop and implement guidelines for a write-off policy for EMS Patients unable to pay Transport Fees. Such guidelines shall be developed in conjunction with the Director. The guidelines so developed shall conform to all applicable Federal and State laws and the City's policy of sensitivity toward EMS Patients. The guidelines shall be implemented only upon approval by the Director. Contractor shall not use Director-approved write-off guidelines to calculate the Net Collection Rate, but shall use the

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 32 of 71

Xerox 058

guidelines to determine accounts that will no longer be pursued for collection.

9. Contractor shall mail at least nine recurring (other than special notices to be mailed during Sweeps as required under Section II, Special Collections) collection notices to each unpaid account unless the unpaid account has adequate billing information to bill Medicare, Medicaid or Private Insurer or until the account is fully paid. Contractor shall submit notice materials and collection notices mail plan proposal to Director for approval. Director may authorize changes to mail plan in use with 30 days written notice to Contractor so long as the total number of notices to unpaid accounts sent under the direct mail plan in use has not yet exceeded nine. If the Director instructs Contractor to send more than nine regular notices (other than the special notices during the Sweep period) then Contractor may invoice City for postage, printing, envelopes, set-up charges and any associated programming/computer charges incurred in sending out the additional notices. Contractor shall pay for all follow-up notices sent as part of its collection efforts including reminder notices to payment plan payers. Contractor shall send follow-up notices in addition to the nine required notices to be sent as per this Section.

10. Contractor shall pursue Medicare, Medicaid, private insurers and third party billing companies aggressively by exhausting all appeals, re-billing accounts and initiating suits through the City's legal department.

## II    Special Collections

1. Twice a year Contractor shall initiate special follow-up notices to unpaid accounts that already received at least 9 mail notices or exceed one year in age from the transport date. These special notices are referred to as "SWEEPS".

2. Accounts included in the SWEEPS shall not exceed three (3) years in age. The City, at its discretion, may initiate additional SWEEPS at its own cost in any given fiscal year and choose to include any account, regardless of age.

3. SWEEPS conducted at the City's direction involving accounts beyond three (3) years of age from the transport date shall be solely at the City's expense. However, Contractor's contingency fee shall be reduced to five percent (5%) for all City-initiated SWEEPS that include accounts beyond three (3) years in age. For City-initiated SWEEPS, the City shall pay for postage, printing, envelopes, set-up charges and

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 33 of 71

Xerox 060

any associated programming /computer costs for creating the mailing lists.

## D. ACCOUNTS

1. Billable Accounts

   a. Contractor shall calculate a Transport Fee for each Transport for reporting and billing purposes.

   b. Contractor shall bill an EMS Patient or transporting hospital for each Transport, unless such Transport is an unbillable account as provided in 2 below ("Unbillable Accounts.")

   c. Contractor shall perform all billing services in accordance with the standards set in Exhibit C, <u>Performance Requirements</u>.

   d. The co-pay portion of approved Insurance and Medicare claims as well as Insurance and Medicare denials and rejections will be billed to the patient or to the patient's appropriate other insurance.

2. Unbillable Accounts

The following unbillable account categories shall be used to calculate the net collection rate.

In addition, all contractual write-offs for Medicare and Medicaid shall be used to calculate the net collection rate.

   a. The following Transports are exempt from billing (Unbillable Accounts):

      i. Transports expressly exempted in this Contract or otherwise agreed to in writing by the Fire Department as being exempt from billing;

      ii. Transports missing only name and/or address and for which the Fire Department can verify that no name and/or address exists (including wrong names and addresses that cannot be verified – commonly referred to as "Nixies"). Notwithstanding the foregoing, Contractor shall make every attempt to obtain such information through its usual and customary procedures, including, but not limited to, methods specifically mentioned in the Contract.

Page 29

Certified Document Number: 56748573 - Page 34 of 71

Xerox 060

Certified Document Number: 56748573 - Page 35 of 71

        iii.     Transports of EMS Patients who are subsequently adjudged by a Court of competent jurisdiction to be bankrupt;

        iv.     Transports of EMS Patients who die and it has been determined by a court of competent jurisdiction that the EMS Patient has no assets;

        v.     Transports billed to Medicare and/or Medicaid and for which further collection efforts are barred by federal or other applicable law or Medicare and/or Medicaid provisions require certain billed amounts to be written off.

    b.  All capitated agreements with insurance companies that offer discounted fast payment procedures must be approved by Director.

    c.   No other Transports are unbillable, except as otherwise approved by the Director in writing. Any reference in the Contract to "write-offs" shall mean Unbillable Accounts and shall be limited to the types of accounts defined above.

3.     Adjustments to Transport Fees shall be

    a.     overpayment of a Transport Fee.

    b.     refund of all or part of a Transport Fee or unidentified amount received which cannot be posted to an EMS Patient's account.

    c.     amount posted to an EMS Patient's account, which was paid by a check that was not honored by the bank.

    d.     Contractor's posting errors.

E.    REPORTS

The following reports shall be available upon Director's request:

1.     Contractor shall provide the Director, on a monthly basis and in the form prescribed, the reports required under the terms of this Contract.

H:\MR\ACS-A.DOC

Xerox 061

2. The Director may request additional reports or modifications to such reports from time to time, and Contractor shall provide such additional reports and/or modified reports to Director in the form, method and time frame requested by the Director. Upon implementation of the Data Warehouse System, the City shall have access to all data collected in a relational Database and shall be able to generate adhoc reports at will.

3. Contractor shall prepare:

    a.    one or more reports to reconcile the Transport records contained in the data transferred to the Database. Such report(s) shall provide the following information:

    (Note:    Data from City's CAD/RMS System are required in addition to manually prepared data from the City database).

        i.    Number of Transports on Tape.

        ii.    Transport Fees for all Transports regardless of whether a Transport is a Billable Account or an Unbillable Account.

        iii.    Unbilled Accounts and reason for not billing Transport Fees.

    b.    one or more reports on billing activity, shall include the following information:

        i.    Number of Transports on Tape.

        ii.    Transport Fees for all Billed Transports.

        iii.    Transport Fees for all Unbillable Accounts.

        iv.    Net Amount Billed.

        v.    Net Amount Collected

        vi.    Percentage of Net Amount Collected compared to Net Amount Billed

        vii.    Source of payment of Transport Fees, i.e., whether Transport Fees were paid by EMS Patient, Medicare, Medicaid, or insurance.

        viii.    Any adjustment to such payment of Transport Fees.

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 36 of 71

Xerox 862

c.  A report of Unbilled Accounts, listed by date of Transport and identifying the reason the Transport Fees were not billed, as provided in Section D.2. above.

d.  One or more reports to reconcile amounts billed, payments received, daily deposits and Contractor's monthly invoice for services provided to the City under this Contract. Such reports shall include the following information:

  i.  Net Amount Billed

  ii.  Net Amount Collected

  iii.  Source of payment of Transport Fees, i.e., whether Transport Fees were paid by EMS Patient, Medicare, Medicaid, Insurance.

e.  A report listing payments received for Transport Fees, and date of deposit of each such payment by date of Transport.

f.  A report of aged accounts receivable, listed by source of payment, i.e., EMS Patient, Medicare, Medicaid, or insurance.

g.  A report of Medicare and Medicaid billing, and payment activity, which shall include the following information:

  1.  Total Transport Fees billed to Medicaid.

  2.  Total Transport Fees billed to Medicare.

  3.  Total Transfer Fees billed to Medicaid, which were rejected for payment.

  4.  Total Transport Fees billed to Medicare, which were rejected for payment.

  5.  Total Transport Fees billed and Paid by Medicaid.

  6.  Total Transport Fees billed and Paid by Medicare.

Page 32

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 37 of 71

Xerox 063

7. Total Transport Fees billed to Medicaid, which are barred, in whole or in part, by statute.

8. Total Transport Fees billed to Medicare, which are barred, in whole or in part, by statute.

This report shall provide total amounts for the Transport Month and cumulative total amounts from date of Notice to Proceed to ending date of report.

h. A report reconciling payment activities, shall include the following information:

1. Net amount collected.

2. Payments deposited which have not been posted to an EMS Patient's account.

3. Previously unidentified payments, which have been deposited and posted to a particular EMS Patient's account.

4. Other adjustments allowed by the Director.

i. A monthly report listing all refunds of payments for Transport Fees giving the following information:

1. Date refund was issued.

2. Account number to which such refund was charged.

3. Amount of refund.

4. Reason for refund.

j. A monthly report of all checks not honored for payment by a bank, including the following information:

1. Account number to which such payment was posted.

2. EMS Patient name.

Page 33

Certified Document Number: 56748573 - Page 38 of 71

Xerox 064

3. Check amount.

4. Date(s) check was deposited.

5. Date(s) check was returned by bank.

k. If requested by the Director, a report by account number, of all accounts considered uncollectible by Contractor and including the following information:

1. EMS Patient.

2. Date of Transport.

3. Transport Fee Billed.

4. Transport Fee unpaid.

5. Reason for Being Classified as Uncollectible: Contractor shall make every reasonable effort to collect each Transport Fee for each account. Contractor shall make additional attempts to collect such inactive accounts upon request of the Director. An account is uncollectible if one or more of the following conditions exist:

   i. Contractor has failed to locate EMS Patient (Nixie).

   ii. Balance of Transport Fee remaining unpaid is too small to justify additional collection efforts.

   iii. EMS Patient has no assets from which Transport Fees can be paid.

   iv. City exempts EMS Patient from payment.

   v. City is statutorily barred from collecting payment of Transport Fees.

l. A monthly listing of daily deposit amounts and bank adjustments to deposit amount.

m. If requested by the Director, a report of Transports for which

Certified Document Number: 56748573 - Page 39 of 71

Xerox 065

there was no name and/or address provided on the Tape, listed by EMS technician or paramedic.

1.     Contractor shall provide any and all reports and data on which such reports were based on a floppy disk formatted to be compatible with City computer equipment and Lotus spreadsheet software.

2.     All reports shall contain information for one Transport Month and shall be prepared for each Transport Month during the term of this Contract unless otherwise provided herein.

n.  Contractor shall provide the City, as and when requested, with all billing and collection data for Medicare/Medicaid paid accounts, which are subsequently disputed by Medicare/Medicaid auditors as overpayments, to enable the City to respond to the auditors' demands for refunds.

o.  Other reports as mutually agreed by the parties.

## II TECHNOLOGY

### (a) Software, Hardware, and Wireless Interface

Contractor shall provide the City with its EMS Billing and Hand-Held Solution that includes the following four system components: (1) Mobile Computers in the ambulances (Hammerhead's HH3 units), (2) a Custom Logic/Motorola Interface to the City's CAD, (3) Local Printing at Houston area hospitals, and (4) Contractor's back-end Billing and Ad-Hoc/Data Warehouse.

| Four System Components | Description |
|---|---|
| Mobile Computers in the Ambulances | Contractor shall provide 101 Walkabout Hammerhead HH3 computers and additional WHH3 computers for each EMS Unit added during the contract term, at cost. These devices shall be configured with Open Inc.'s SafetyPAD data collection software. Additionally, Contractor shall upgrade 96 MW520 mobile computer terminals. Further, the City must provide Motorola MW520 mobile computer terminals for the reserve fleet to support a USB interface with the HH3 Hammerhead computers supplied by Contractor. Contractor shall provide the network connectivity to the MW520s via the USB port. Contractor shall also upgrade the MW520 mobile computer terminals for the reserve fleet. |
| Custom Logic/Motorola Interface to CAD | Contractor shall provide an application from Custom Logic Design that interfaces with the City's PRC CAD that supports outbound/inbound MDT status messaging and transmits |

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 40 of 71

Xerox 066

Certified Document Number: 56748573 - Page 41 of 71

| | completed Patient Care Reports (PCR's) via the City's RD-LAP Motorola Network. |
|---|---|
| **Local Printing at Area Hospitals** | Contractor shall provide 40 Printers (HP2200DN units) to be placed at Houston Area Hospitals (desktop docking stations and/or infra-red capabilities required) and 101 mobile field printers for each WHH3 computer installation. Contractor shall provide additional printers as new EMS apparatus are added to the fleet (Canon BJC-85 units). Contractor shall support all hardware, software, and supplies it provides to the City under the terms of this Contract. |
| **ACS' Back-End Processing** | Contractor shall provide the City with its existing Billing and Ad-hoc/Data Warehouse system. |

The system diagram, on the following page, represents these system components graphically.

H:\MR\ACS-A.DOC

Xerox 067

# Houston EMS System Diagram



Certified Document Number: 56748573 - Page 42 of 71

The system configuration, represented in the above diagram, shall comprise the following.

Contractor shall provide all of the following hardware, software, wireless network connectivity, as well as related licenses and documentation to the City (Technology), and upon the City's exercise of its Buy-Out option, Contractor shall transfer title to the Technology and assign all warranties as set out in Article VI, Section H of the Contract and in the Depreciation Schedule

### Hardware

| | |
|---|---|
| **101** | Hammerhead HH3 computers with Windows 2000 Pro OS |
| **126** | Hammerhead Vehicle Docks (including reserve apparatus) |
| **126** | Hammerhead Vehicle Dock Installations (including reserve apparatus) |
| **40** | HP2200DN Printers for Area Hospital Printing of PCR Data (docking stations or infra-red) |
| **101** | Canon BJC-85 Printers for Mobile/Back-Up Printing of PCR Data |

Any additional equipment over and above that itemized in Exhibit D that is required by the City during the term of the contract, e.g. to support additions to the fleet, will be at the City's cost. The Contractor will provide an itemized invoice detailing the various components that are required and the prices charged will be those reflected in Exhibit D. Any changes, reductions or increases, in price from Contractor's suppliers will be passed on to the city. Contractor shall maintain, and support any and all additional equipment and software as required under the terms of this Contract.

The parties understand that the City is responsible for procuring, installing, and maintaining dedicated MDT devices, the Motorola MW520 units, in its ambulance fleet. The success of Contractor's technical solution depends upon the City's completing this task. Contractor warrants the functionality of the enhanced MDT software provided by Custom Logic Design and resident on the MW520 device. Contractor shall also provide maintenance services for the software. Notwithstanding the foregoing, Contractor expressly excludes maintenance responsibility of the MW520 from its contractual obligations. No penalties, holdback payments, etc. may be assessed against Contractor for hardware failure(s) of City-owned MW520 devices.

Contractor understands that the City intends to Equip **9** Supervisor and **6** Physician vehicles. If City equips these vehicles, Contractor shall work with the City at additional costs to define and implement an appropriate solution for these units. Compaq iPAQ devices should be sufficient equipment for these positions. However, Contractor shall procure Compaq iPAQs_and the necessary software to allow individuals to enter a minimal record. The parties shall decide at what stage of the

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 43 of 71

Xerox 069

project to implement a solution for the additional vehicles.

**Quantity**    **Mobile Software Component**

101    **User Licenses for Custom Logic Design's ZClient Application:**
Contractor shall provide user licenses for a modified Custom Logic ZClient application that interfaces with the City's PRC CAD. The City must purchase the base license for ZClient32 and ZMap from Custom Logic Design as part of the City's Emergency Alerting System (EAS) Project. The City's purchase of these base licenses is a pre-requisite to Contractor's contract offering. Contractor shall provide the modified Zclient application capable of supporting outbound/inbound MDT status messaging and the transmission of completed encrypted Patient Care Reports (PCR's) via the City's RD-LAP Motorola Network. Contractor shall provide, at cost, additional licenses as new EMS apparatus are added to the fleet.

101    **User Licenses for OPEN Incorporated's *Safety*PAD® Mobile Application:**
Contractor shall provide user licenses for Open's SafetyPAD mobile software. Contractor shall provide, at cost, additional licenses as new EMS apparatus are added to the fleet.

2    **User Licenses for OPEN Incorporated's *Safety*PAD® Base Application:**
Contractor shall provide user licenses for Open's SafetyPAD base software. The City must host an instance of the software at a location of its choice. Contractor shall host an additional instance of the application at Contractor's Data Center in Tarrytown, NY. All networking and maintenance responsibilities, associated with the City-hosted instance of SafetyPAD Base, shall be the responsibility of the City.

101    **User Licenses for OPEN Incorporated's *iDelivery* Application:**
Contractor shall provide user licenses for Open's iDelivery mobile software. Contractor shall provide, at cost, additional licenses as new EMS apparatus are added to the fleet.

Contractor shall transmit completed PCR's via binary transfer over the City's wireless RD-LAP data communications network. Specifically, Contractor shall modify the ZClient32 application running on the MW520 workstation to conform to the City's specification for binary file transfer. Contractor shall encrypt all data within the Zclient application using its encryption routine.

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 44 of 71

Xerox 070

Contractor shall transmit an additional set of completed PCRs via a public data carrier selected by Contractor. Contractor may select a public CDPD network provider such as Verizon. Contractor shall send completed PCR's via the public network directly from a modem controlled by the HH3 device, running SafetyPAD mobile. Contractor shall provide the two methods of wireless data transfers detailed above to create a diverse routing system.

The City shall be responsible for the City's wireless RD-LAP network and its message switch. The City, at its expense, must modify the message switch, upon receiving an incoming binary file, in order to receive files in a specified directory. The City must also ensure that the local Open Inc Server has access to this directory structure in order for the data transfer to function. The Open Inc Server will check this directory for files and, upon finding one, process it. Once processed, the file will be loaded into a local database that can be accessed by the PRC RMS System. The City shall be responsible for modifying and maintaining the PRC RMS System in order for the system to subsequently extract new records and incorporate them into the City's RMS database.

The diagram on the following page presents this configuration.

Contractor shall provide:

- One Windows 2000 Server capable of receiving PCR Data
- Modified ZClient Software capable of routing PCR Data to the above Database Server
- Modified Open Software capable of routing PCR Data to the above Database Server

The City must provide the following for the successful transmission of PCR data via the City's RD-LAP network:

- Maintain: (i.) the Motorola MW520 devices, (ii.) Custom Logic base ZClient32 product, (iii.) the city's RD-LAP network, (iv.) RNC3000, (v.) Mobile Data Message Switch, (vi.) network communication to the OPEN local EMS Report Repository via the HPD Communications Backbone and the HFD Network Backbone, and (vii.) PRC CAD and/or RMS ETL processing.

- A Functioning Motorola MW520, including Custom Logic's base Zclient32 software, with RD-LAP modem in each ambulance to receive a HH3 is a pre-requisite to Contractor's installing the Walkabout HH3 in the given vehicle.

- Specifications for the binary file transfer.

- Specifications for wireless message encryption in order to encrypt other traffic, when required.

- Binary file support by creating a file repository for the PCR Data.

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 45 of 71

Xerox 071

- Support and Maintenance of the Windows 2000 Server and Software associated with the local instance of Open Inc.'s SafetyPAD Base.

- Support and timely assistance to test and verify proper system operation prior to cutover.

- Technical Development support to create the means to reconcile delivery of patient reports and to verify that reports received via CDPD and via RD-LAP are consistent.

The City must, at a minimum, develop the PRC system to successfully implement the project by providing the following:
- CAD dispatch reconciliation
(ii) billing data extracts related to any ambulance transports that are manually data entered into the PRC CAD/RMS system.

## Hosted ACS Software

Contractor shall provide the City with its existing billing system, ABACOS, which shall be hosted at Contractor's Data Center in Tarrytown, NY. Contractor considers the billing software proprietary, the billing software shall remain the property of Contractor and shall not be; however, Contractor shall provide to the City a license to use ABACOS during the term of this Contract at no additional cost.. Contractor shall also provide the City with access to its Ad-Hoc/Data Warehouse Solution via the Oracle Discoverer tool set. Contractor also considers the Ad-Hoc/Data Warehouse Solution proprietary and thus the Ad-Hoc/Data Warehouse Solution and the billing software components shall not be transferred to the City under the Technology Refresh Transfer provision.

Contractor shall provide the Software components detailed above only if City transmits completed Patient Care Report Data to Contractor's Data Center via a Public Data Carrier.

## Maintenance

Contractor shall maintain the Technology outlined above at no additional cost to the City. Contractor shall maintain a spare inventory equal to 5% of the utilized HH3 units to facilitate an immediate "swap out" capability. The City requires a minimum 5% of utilized HH3's as reserve equipment on site at all times. (i.e.: Contractor shall maintain a 5% spare inventory on site exclusive of any units offsite for repairs). Further, Contractor shall locate the reserve equipment at HFD offices for HFD personnel to distribute as necessary on a 24/7 basis. City shall return faulty units to Contractor at a designated central depot where Contractor shall exchange the faulty units for functioning units. Contractor shall collect the faulty unit, repair the units and return the repaired units to the spare inventory, within 5 business days. City shall contact Contractor's local support person by telephone to report software problems occurring during normal office hours. If Contractor cannot find an immediate remedy

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 46 of 71

Xerox 072

Certified Document Number: 56748573 - Page 47 of 71

to rectify the problem, then City shall return the unit to the central depot in exchange for a functioning unit. Contractor shall collect the unit from the central depot and return the repaired unit to the depot in 2 business days.

## Equipment Operational Disclaimer

Contractor shall not be responsible for equipment that is damaged through City's negligence or misuse. City must bear all costs associated with such repairs, including shipping and handling, subject to the City's appropriated funds to pay such charges..

## Functional Software Description

The following document describes the functional software features, business rules, of Contractor's Mobile Data Collection EMS Solution. Contractor shall provide the City with the following mobile software components to complement Contractor's EMS Billing Services:

- An Enhanced Custom Logic Design MDT Application
- OPEN Incorporated's *SafetyPAD*® EMS Data Collection Application
- OPEN Incorporated's *iDelivery*® Application

### An Enhanced Custom Logic Design ZClient32 MDT Application

Contractor has teamed with Custom Logic Design, Inc. to provide the City with an enhanced MDT Application that can interface with OPEN's EMS software, running on the Hammerhead HH3. Contractor shall modify Custom Logic's existing Zclient32 application to create an UDP/IP interface to the OPEN's software as part of the City's EMS Billing and Hand-held Computer solution. Contractor shall implement an IP based communications interface in order to allow for communications between the Hammerhead unit and the communications workstation running the ZClient32 application. Contractor provided interface will support UDP based messaging. The interface between the ZClient32 application and Open's application will be bi-directional.

*ZClient32 to Open Inc.*— Contractor shall process each CAD Dispatched message received by the ZClient32 as normal. Contractor shall also place each dispatch message in an outbound OPEN message queue. Contractor shall ensure that the ZClient32 will also support a

Each Ambulance Will Be Equipped with 2 Mobile Computers Seamlessly Integrated Together using a Wireless 802.11b.



802.11b

Field Unit
Hammerhead (HH3)
with
Open Incorporated's
SafetyPAD Software

MDC Unit
Motorola's MW520
with Custom Logic
Design's ZClient
Software

Page 42

H:\MR\ACS-A.DOC

Xerox 073

special Contractor message type, which shall be passed to the OPEN application. Contractor shall ensure that the ZClient32 will then deliver these messages to the OPEN application. Contractor shall provide for the OPEN application to remove messages from the outbound message que, once it actually receives the message. Contractor shall also ensure that if the OPEN application does not ACK the message, ZClient32 will retry the message until delivered or until the ZClient32 application is shutdown.

**Open Inc to ZClient32**—Contractor shall provide the OPEN application which can pass a message to the ZClient32 that will be passed on to the message switch via the RD-Lap network. Contractor shall ensure that the application works in such a way that each message sent to the ZClient32 application will in turn be forwarded to the VRM modem and on to the message switch. Contractor shall ensure that Message ACK shall be implemented, if required, via the Contractor's interface to the message switch.

Contractor shall ensure that the enhanced Zclient32 version with the functions described above will provide the City with seamless connectivity with the computers equipped in the ambulances.

**OPEN Incorporated's SafetyPAD® EMS Data Collection Application**

*Contractor shall provide the City with the SafetyPAD®* software which is an electronic EMS patient care reporting and information management system comprised of two unique components, *SafetyPAD®* mobile (mobile) and *SafetyPAD®* base (base). Mobile and base are 32-bit Windows applications that each offers configurable graphical user interface. Both are compiled, component-based, and object-oriented programs. *SafetyPAD®* uses a MSSQL database.

## Mobile

*SafetyPAD®* mobile allows responders to collect, reference, and communicate call and patient information on mobile computers throughout the course of an EMS call at a patient's side in real-time. It operates under Windows 9x pen-based computers and shall be compatible with Windows 2000 professional software. Users are exposed to a configurable, graphical, pen centric user interface allowing them to enter and reference information.

## Base

*SafetyPAD®* base manages, analyzes, and distributes information evolving from each patient encounter. It gathers information from mobile through a number of connectivity options, has the capability to share data between the appropriate entities (CAD, billing, QA/QI, operations, etc.), and analyzes its content through web-based querying tools. Its database management architecture is predominantly data driven to offer unlimited analysis and customization capabilities through a web-based interface. Base operates on Windows NT or 2000 Server computer operating with IIS.

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 48 of 71

Xerox 074

Contractor shall provide the following EMS Solution which uses the process illustrated in the diagram below:

H:\MR\ACS-A.DOC

Certified Document Number: 56748573 - Page 49 of 71

Xerox 075

## Houston EMS Workflow



H:\MR\ACSSVCK.DOC

October 11, 2002

Xerox 076

**(b)** <u>Magnetic Card Reading Equipment:</u>

In addition to the technology implementation defined in the Contract, at the cost of the City, Contractor shall successfully install and integrate during Phase 1, the following equipment and software modification in every ambulance unit (subject to the total liability limit set out below) based on the following cost schedule:

| Description | Unit Price |
|---|---|
| Magnetic Card Reader Device | $150 (per unit) |
| Powered Hubs (12v to 5v) | $100 (per unit) |
| Software Modification | $30,000 (inclusive of all units) |
| Implementation costs | $22,500 (inclusive of all units) |

The City's total liability due to this single provision shall not exceed $250,000. Any changes, reductions or increases, in price from Contractor's suppliers will be passed on to the City. Upon successful implementation and acceptance by the City, Contractor shall invoice the City for all costs as defined herein per Section IV of the Contract. All payments to Contractor for this equipment will be made only from Net Collections.

Contractor shall maintain and support all equipment and software as required under the terms of this Contract at Contractor's actual cost, which shall not exceed $25,000 per year.

H:\MR\ACSSVCK.DOC

October 28, 2002

Xerox 077

**Houston EMS Project (3 Project Phase Approach)**
**OPEN Software and Hammerhead Equipment Installation**
**Definition Stage for Phase I**

| | |
|---|---|
| **Houston EMS Project (3 Project Phase Approach) shall be implemented beginning with the Notice to Proceed date. All dates will be adjusted accordingly, but the number of days to implement/install each listed item/phase shall remain the same.** | 250 days |
| *Phase I: OPEN Software and Hammerhead Equipment Installation* | 140 days |
| Definition Stage for Phase I | 20 days |
| Open Inc. Software Requirements | 5 days |
| Safety PAD Base | 5 days |
| Safety PAD Mobile | 5 days |
| Define Interim Data Input Procedures for Patient Care Reports | 2 days |
| Define CDPD Transport Approach for Completed Patient Care Reports | 5 days |
| Define Hammerhead Hardware Requirements | 2 days |
| Define Hardware Installation Requirements | 3 days |
| Landline Networking Interface Definition | 5 days |
| Network Interface with Houston ACS Office | 5 days |
| Network Interface with ACS Data Center | 5 days |
| Network Interface with City of Houston | 5 days |
| Define Testing Requirement | 5 days |
| Specific Performance Measures | 5 days |
| System Acceptance Testing | 5 days |
| Hardware Acceptance Testing | 5 days |
| Communication Interface Acceptance Testing | 5 days |
| Functional Acceptance Testing | 5 days |
| Final Acceptance Testing | 5 days |
| Live Operation Testing | 5 days |
| Define Training Requirement | 5 days |
| Application Development Stage for Phase I | 40 days |
| Safety PAD Base | 40 days |
| Safety PAD Mobile | 40 days |
| CDPD Transport of Completed Patient Care Reports | 40 days |
| Testing Stage for Phase I | 20 days |
| Specific Performance Measures | 5 days |
| System Acceptance Testing | 5 days |
| Hardware Acceptance Testing | 5 days |
| Communication Interface Acceptance Testing | 5 days |
| Functional Acceptance Testing | 5 days |
| Final Acceptance Testing | 5 days |
| Live Operation Testing | 5 days |
| Implementation Stage for Phase I | 60 days |
| Houston Pilot Project, install 6 units for pilot test | 30 days |
| Hardware Installation | 60 days |
| Training | 60 days |
| *Phase II: Wireless Interface to PRC CAD* | 85 day |
| City Completes PRC CAD Installation | 1 day |
| City Purchases and Installs MW520 Units | 1 day |
| City Completes Emergency Alerting System Contract with Custom Logic Design | 1 day |
| Definition Stage for Phase II | 15 days |
| Define Custom Logic Software Modifications | 15 days |

October 11, 2002

Certified Document Number: 56748573 - Page 52 of 71

Xerox 078

| | |
|---|---:|
| Define CAD Interface Requirements | 5 days |
| Status Messaging | 5 days |
| Message Structure | 5 days |
| Define Motorola Network Requirements (RD-LAP) | 5 days |
| Define Interface between MW520 and HH3 | 5 days |
| Define iDelivery Requirements | 5 days |
| Define Testing Requirement | 5 days |
| Specific Performance Measures | 5 days |
| System Acceptance Testing | 5 days |
| Hardware Acceptance Testing | 5 days |
| Communication Interface Acceptance Testing (RD-LAP) | 5 days |
| Functional Acceptance Testing | 5 days |
| Final Acceptance Testing | 5 days |
| Live Operation Testing | 5 days |
| Define Training Requirement | 5 days |
| Application Development Stage for Phase II | 40 days |
| CAD Interface | 40 days |
| Status Messaging | 40 days |
| Software Interface between MW520 and HH3 | 40 days |
| Testing Stage for Phase II | 20 days |
| Specific Performance Measures | 5 days |
| System Acceptance Testing | 5 days |
| Hardware Acceptance Testing | 5 days |
| Communication Interface Acceptance Testing | 5 days |
| Functional Acceptance Testing | 5 days |
| Final Acceptance Testing | 5 days |
| Live Operation Testing | 5 days |
| Implementation Stage for Phase II | 10 days |
| Hardware Installation | 0 days |
| Training | 10 days |
| *Phase III: System Interface to City RMS* | 25 days |
| City Completes RMS Installation | 0 days |
| Definition Stage for Phase III | 10 days |
| City RMS Data Requirement | 10 days |
| City Provides ACS with Required Data Format | 5 days |
| RMS/Local SafetyPAD Server Interface | 5 days |
| Define Testing Requirement | 5 days |
| Specific Performance Measures | 5 days |
| System Acceptance Testing | 5 days |
| Hardware Acceptance Testing | 5 days |
| Communication Interface Acceptance Testing | 5 days |
| Functional Acceptance Testing | 5 days |
| Final Acceptance Testing | 5 days |
| Live Operation Testing | 5 days |
| Define Training Requirement | 5 days |
| Application Development Stage for Phase III | 10 days |
| ACS Application Interface Support | 10 days |
| Testing Stage for Phase III | 5 days |
| Specific Performance Measures | 5 days |
| System Acceptance Testing | 5 days |
| Hardware Acceptance Testing | 5 days |
| Communication Interface Acceptance Testing | 5 days |
| Functional Acceptance Testing | 5 days |
| Final Acceptance Testing | 5 days |
| Live Operation Testing | 5 days |

Certified Document Number: 56748573 - Page 53 of 71

Xerox 079

Certified Document Number: 56748573 - Page 54 of 71

Implementation Stage for Phase III     5 days
Begin Operational Centralization Effort     0 days

Xerox 080

**Payment of Fees**

I.    General

Subject to all terms and conditions of this Contract, City agrees to pay Contractor for its performance under this Contract in accordance with this Exhibit "B" and Article IV, Section A and B of the Contract.

A.   The Contractor shall be paid a flat contingency fee of 14% based on gross revenue collections each month through the last month of the Cancellation Moratorium Period. Thereafter, at the completion of each City fiscal year, the Contractor's fee will be adjusted up or down (Annual Adjustment) based on the Net Collection Rate as defined below.

Net Collection Rate =    The dollar amount of Gross Revenue less Adjustments for Insufficient Checks and Refunds divided by the dollar amount of Gross Billings less the unallowable portion for Medicare and Medicaid accounts and Unbillable Accounts as defined in Exhibit A D.2

The Annual Adjustment for each fiscal year will be calculated using the following definitions:

Gross Revenue: Annual cash collections during the fiscal year regardless of the date of service on which the transport occurred and posted to customer's account in the receivable billing system.

B.   The Annual Adjustment will be calculated according to the following schedule:

| Net Collection Rate – Actual Rate Rounded Up or Down to The Nearest Percentage | Contractor Fee Percentage of Gross Revenue |
|---|---|
| Less than 40% | 14% |
| 41% | 14.50% |
| 42% | 15.00% |
| 43% | 15.50% |
| 44% | 16.00% |
| 45% | 16.50% |
| 46% | 17.00% |
| 47% | 17.50% |
| 48% | 18.00% |
| 49% | 18.50% |
| 50% | 19.00% |
| More than 50% | 20.00% |

For example, if the Net Collection Rate for a particular fiscal year were 42%, the flat contingency fee for that fiscal year would be fifteen percent. Since the Contractor has

Certified Document Number: 56748573 - Page 55 of 71

**Xerox 081**

already been paid a flat contingency fee of fourteen percent for all gross revenues, the Contractor would be paid an additional one percent on all collections within that fiscal year.

II.     Payment Holdback/Technology Implementation Incentive

20% percent of the Contractor's contingency fee will be withheld by the City during the Technology Implementation Phases.  The 20% holdback shall be paid to Contractor upon completion of each new phase of the implementation project in proportional amounts as each new phase is accepted by the City.

III.    Payment for Card Reading Equipment and Maintenance

Upon acceptance of all of the Card Reading Equipment set out in Exhibit "A" II (b) by the City, Contractor shall invoice the City for all costs of the Equipment as set out in Exhibit "A" and the City shall pay the invoice out of Net Collections in addition to any percentage fees owed for the month in which the invoice is received.

Contractor shall invoice the City on a semi-annual basis for Card Reader Equipment maintenance, which shall be payable only from Net Collections.

H:\MR\ACSSVCK.DOC                                                           October 28, 2002

Xerox 082

# EXHIBIT "C"

## PERFORMANCE REQUIREMENTS

Contractor shall meet the objectives set out in sub-section 1, of Exhibit "A" entitled, "Billing and Collections". Contractor's performance in meeting Contract objectives shall be measured as detailed in this Exhibit "C" and failure to meet such objectives shall be assessed as "Liquidated Damages" (subsection "E" of Article IV, Duties of the City") in the amounts detailed below:

Performance Requirements:

1. Contractor shall process and submit for payment all claims to Medicare, Medicaid, private healthcare insurers, or self-pay category within thirty (30) business days from receipt of transport data from City.

   Failure to File Claims – Liquidated Damages Assessed for such failures:
   If Contractor fails to file or submit a claim for payment due to lack of diligence, mistake or error, liquidated damages of twenty-five dollars ($25.00) shall be assessed against the Contractor for each such failure.

2. Contractor shall submit all reimbursement claims within the deadlines set by each third party payer (Medicare, Medicaid and private healthcare insurers).

   Failure to Meet Claims Filing Deadlines - Liquidated Damages Assessed for such failures:
   If Contractor fails to meet a third party payer's deadline for submission of claims, liquidated damages of two hundred dollars ($200.00) shall be assessed against the Contractor for each such failure.

   Contractor shall file claims within the deadlines detailed below for various third party payers:

   Medicare: October 1st of any given year to December 31 of the preceding year (15 months)
   Medicaid: Ninety-five (95) days from the date of service.
   Healthcare Insurers: one-hundred eighty (180) days from the date of service.

3. The Contractor shall submit all self-pay reimbursement claims within ninety (90) days of receipt of transport data from the City.

   Failure to File Self-Pay Claims – Liquidated Damages Assessed for such failures:
   In the event that the Contractor fails to submit a request for payment to the individual within the 90 day time period, a penalty of fifty dollars ($50.00) shall be assessed against the Contractor for each event.

Certified Document Number: 56748573 - Page 57 of 71

Xerox 083

**EXHIBIT D**

**BUY-OUT DETAIL PRICING MATRIX**

Certified Document Number: 56748573 - Page 58 of 71

October 11, 2002

Xerox 084

| Number of Wireless WANS | 0 |
|---|---|
| Months of Contract | 60 |
| Number of IH3 Units | 101 |
| Number of IPAQ Hand-Holds | 0 |

## Houston EMS Solution

| | Quantity | Unit Price | Ambulance Related | Hospital Related | Software/Hardware | Total | |
|---|---|---|---|---|---|---|---|
| **Hardware** | | | | | | | |
| **Server Hardware** | | | | | | | |
| Compaq ProLiant CL380 Intel Pentium 1GHz/133 Rack Model | 2 | $ 31,561.20 | | | $ 63,122.40 | 63,122.40 | Communications and Data Base Server |
| Compaq ProLiant CL380 Intel Pentium 1GHz/133 Rack Model | 1 | $ 31,561.20 | | | $ 31,561.20 | 31,561.20 | Houston local Saftey Pad server |
| HP 360/720GB dDLT 8000 SCSI Tower | 1 | $ 9,652.80 | | | $ 9,652.80 | 9,652.80 | Dedicated tape back up |
| **Workstations** | | | | | | | |
| E-1600 XL (Gateway) | 0 | $ 1,248.00 | | $ | $ | | 2 Per Hospital (EMS area and Nurses Station) |
| **Printers** | | | | | | | |
| HP 4110N | 50 | $ 1,858.80 | | $ 92,940.00 | $ | 92,940.00 | 2 Per Hospital (EMS area and Nurses Station) (Network and IR enabled) |
| **Nework Hardware** | | | | | | | |
| Catalyst 24 port 10/100 Switch Enterprise Edition | 2 | $ 1,508.40 | | 3,018.80 | $ | 3,015.80 | 1 Per Hospital |
| Cisco 2620 with 56kb DSU/CSU | 2 | $ 5,817.60 | | 11,635.20 | | $11,635.20 | 1 Per Hospital |
| US Robotics 56 KBPS Modem | 2 | $ 300.00 | | 600.00 | | $600.00 | 1 Per Hospital |
| **Hammer Head 3-Colorpen (Mfg Walkabout)** | | | | | | | |
| Computer | 101 | $ 4,972.80 | $502,252.80 | | | $502,252.80 | Ambulancas and spares |
| Display | 101 | $ 324.00 | $32,724.00 | | | $32,724.00 | Ambulances and spares |
| RAM | 101 | $ 409.20 | $41,329.20 | | | $41,329.20 | Ambulances and spares |
| Case | 101 | $ 75.60 | $7,635.60 | | | $7,635.60 | Ambulances and spares |
| Pen | 101 | $ 74.40 | $7,514.40 | | | $7,514.40 | Ambulances and spares |
| Power | 101 | $ 68.40 | $6,908.40 | | | $6,908.40 | Ambulances and spares |
| Docking (Desk Docking Station) | 3 | $ 438.00 | $1,314.00 | | | $1,314.00 | Ambulances and spares |
| Docking (Vehicle) | 101 | $ 579.60 | $58,539.60 | | | $58,539.60 | Ambulances and spares |
| Network Card | 101 | $ 286.80 | $28,966.80 | | | $28,966.80 | Ambulances and spares |
| PCMCIA-Door | 101 | $ 234.00 | $23,634.00 | | | $23,634.00 | Ambulances and spares |
| Power Misc. Parts | 101 | $ 290.40 | $29,330.40 | | | $29,330.40 | Ambulances and spares |
| Power Misc. Parts | 202 | $ 112.80 | $22,785.60 | | | $22,785.60 | Ambulances and spares |
| Power Misc. Parts | 101 | $ 528.00 | $53,328.00 | | | $53,328.00 | Ambulances and spares |
| 128MB Compact Flash w/PC-card type II adapter | 101 | $ 300.00 | $30,300.00 | | | $30,300.00 | Ambulances and spares |
| Sierra Wireless - Air Card 300 CDPD Modem | 101 | $ 598.80 | $60,478.80 | | | $60,478.80 | |
| L&E Mobile Installation | 101 | $ 1,344.00 | $135,744.00 | | | $135,744.00 | |
| **Compaq Palm Pilot Devices** | | | | | | | |
| Compaq iPAQ | 0 | $ 1,080.00 | $0.00 | 0.00 | | $0.00 | 44 First Responders |
| **Field Printers** | | | | | | | |
| Canon BJC-85 Printer | 101 | $ 360.00 | $36,360.00 | | | $35,360.00 | |
| 25 Foot USB cable | 101 | $ 24.00 | $2,424.00 | | | $2,424.00 | |

Number of Wireless WANs —————————— 0
Months of Contract —————————————— 60
Number of HH3 Units —————————————— 101
Number of IPAQ Hand-Helds ————————— 0

| Houston EMS Solution | Quantity | Unit Price | Ambulance Related | Hospital Related | Software/Hardware | Total | |
|---|---|---|---|---|---|---|---|
| IR Parallel | 0 | $132.00 | | | | $0.00 | |
| Vehicle Mounting Bracket | 101 | $240.00 | $24,240.00 | | | $24,240.00 | |
| LP patient cable | 101 | $72.00 | $7,272.00 | | | $7,272.00 | |
| **Digital Cameras** | | | | | | | |
| Camera | 0 | $480.00 | $0.00 | | | $0.00 | |
| Open Modules | 0 | $240.00 | $0.00 | | | $0.00 | |
| ***Third Party Software*** | | | | | | | |
| *Off-The-Shelf Software* | | | | | | | |
| Windows 2000 Server Edition | 1 | $529.20 | | | $529.20 | $529.20 | |
| ArcServe 2000 Workgroup Edition | 1 | $492.00 | | | $492.00 | $492.00 | |
| ArcServe 2000 Open File Agent | 1 | $558.00 | | | $558.00 | $558.00 | |
| **Custom Logic Design** | | | | | | | |
| Application Development | 1 | $29,160.00 | $29,160.00 | | | $29,160.00 | Integration of HH to MW520 |
| Application Development - RD LAP Network | 1 | $35,040.00 | $35,040.00 | | | $35,040.00 | Integration of HH to MW520 |
| Anticipated Consulting Fees | 30 | $1,440.00 | $43,200.00 | | | $43,200.00 | Integration of HH to MW520 |
| **OPEN Inc.** | | | | | | | |
| Saftey PAD Base & Wireless Manager | 1 | $869,920.80 | | | $869,920.80 | $869,920.80 | SEE BACK UP |
| | 1 | $74,388.00 | | | $74,388.00 | $74,388.00 | Hospital wireless local area network |
| ***Motorola AirMobile Installations*** | 0 | $13,911.15 | | | | | |
| **SUB-TOTAL HARDWARE & SOFTWARE** | | | $1,220,481.60 | $108,192.00 | $1,050,224.40 | $2,378,898.00 | |
| **SALES TAX 8.25%** | | | $100,689.73 | $8,925.84 | $86,843.51 | $196,259.09 | |
| **TOTAL HARDWARE & SOFTWARE** | | | $1,321,171.33 | $117,117.84 | $1,136,867.91 | $2,575,157.09 | |
| ***ACS Labor*** | | | | | | | |
| Project Manager (Man Months) | 6 | $36,000.00 | | | $216,000.00 | $216,000.00 | |
| Programmers (Man Months) | 12 | $21,600.00 | | $60,000.00 | $259,200.00 | $259,200.00 | |
| Programmers Data Transfer (Man Months) | 12 | $21,600.00 | $60,000.00 | $60,000.00 | $60,000.00 | $60,000.00 | |
| Data Warehouse Development | 4 | $36,000.00 | | | $144,000.00 | $144,000.00 | |
| Training | 6 | $14,400.00 | | | $86,400.00 | $86,400.00 | |
| Cabling ( 6 Cable Runs per Hospital) | 0 | $350.00 | | | | | |
| Engineering Design Support | 1 | $72,000.00 | | $72,000.00 | | $72,000.00 | |
| Pay by Web (Man Months) | 1 | $93,600.00 | | | $93,600.00 | $93,600.00 | |
| ***Misc. Travel and Related Expenses*** | 1 | $94,000.00 | | | $94,000.00 | $94,000.00 | |
| **TOTAL LABOR** | | | $60,000.00 | $192,000.00 | $694,000.00 | $1,025,200.00 | |
| **TOTAL PRODUCT COSTS** | | | $1,381,171.33 | $309,117.84 | $1,830,867.91 | $3,600,357.09 | |

Xerox 086

Number of Wireless WANS————————— 0
Months of Contract————————————— 60
Number of HH3 Units——————————— 101
Number of IPAQ Hand-Helds————————— 0

## Houston EMS Solution

| | Quantity | Unit Price | Ambulance Related | Hospital Related | Software/Hardware | Total |
|---|---|---|---|---|---|---|

H:\MRI\ACS_BODT.XLS|5-16 Version

EXHIBIT "E"

## EQUAL EMPLOYMENT OPPORTUNITY

1. The contractor, subcontractor, vendor, supplier, or lessee will not discriminate against any employee or applicant for employment because of race, religion, color, sex, national origin, or age. The contractor, subcontractor, vendor, supplier, or lessee will take affirmative action to ensure that applicants are employed and that employees are treated during employment without regard to their race, religion, color, sex, national origin, or age. Such action will include, but not be limited to, the following: employment; upgrading; demotion or transfer; recruitment advertising; layoff or termination; rates of pay or other forms of compensation and selection for training, including apprenticeship. The contractor, subcontractor, vendor, supplier or lessee agrees to post in conspicuous places available to employees, and applicants for employment, notices to be provided by the City setting forth the provisions of this Equal Employment Opportunity Clause.

2. The contractor, subcontractor, vendor, supplier, or lessee states that all qualified applicants will receive consideration for employment without regard to race, religion, color, sex, national origin or age.

3. The contractor, subcontractor, vendor, supplier, or lessee will send to each labor union or representatives of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer advising the said labor union or worker's representative of the contractor's and subcontractor's commitments under Section 202 of Executive Order No. 11246, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4. The contractor, subcontractor, vendor, supplier, or lessee will comply with all provisions of Executive Order No. 11246 and the rules, regulations, and relevant orders of the Secretary of Labor or other Federal Agency responsible for enforcement of the equal employment opportunity and affirmative action provisions applicable and will likewise furnish all information and reports required by the Mayor and/or Contractor Compliance Officer(s) for purposes of investigation to ascertain and effect compliance with this program.

5. The contractor, subcontractor, vendor, supplier, or lessee will furnish all information and reports required by Executive Order No. 11246, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to all books, records, and accounts by the appropriate City and Federal Officials for purposes of investigations to ascertain compliance with such rules, regulations, and orders. Compliance reports filed at such times as directed shall contain information as to the employment practice policies, program, and work force statistics of the contractor, subcontractor, vendor, supplier, or lessee.

6. In the event of the contractor's, subcontractor's, vendor's, supplier's, or lessee's non-compliance with the non-discrimination clause of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part, and the contractor, subcontractor, vendor, supplier, or lessee may be declared ineligible for further City contracts in accordance with procedures provided in Executive Order No. 11246, and such other sanctions may be imposed and remedies invoked as provided in the said Executive Order, or by rule, regulation, or order of the Secretary of Labor, or as may otherwise be provided by law.

Certified Document Number: 56748573 - Page 62 of 71

Xerox 088

7.     The contractor shall include the provisions of paragraphs 1-8 of this Equal Employment Opportunity Clause in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontractor or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event the contractor becomes involved in, or is threatened with litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

8.     The contractor shall file and shall cause his or her subcontractors, if any, to file compliance reports with the City in the form and to the extent as may be prescribed by the Mayor. Compliance reports filed at such times as directed shall contain information as to the practices, policies, programs, and employment policies and employment statistics of the contractor and each subcontractor.

Certified Document Number: 56748573 - Page 63 of 71

**Xerox 089**

**DRUG POLICY COMPLIANCE AGREEMENT**

I, _____ as an owner or officer
of
      (Name)   (Print/Type)         (Title)

_____ (Construction Project Manager)
(Name of Company)

have authority to bind Construction Project Manager with respect to its bid, offer or performance of any and all contracts it may enter into with the City of Houston; and that by making this Agreement, I affirm that the Construction Project Manager is aware of and by the time the contract is awarded will be bound by and agree to designate appropriate safety impact positions for company employee positions, and to comply with the following requirements before the City issues a notice to proceed:

1.    Develop and implement a written Drug Free Workplace Policy and related drug testing procedures for the Construction Project Manager that meet the criteria and requirements established by the Mayor's Amended Policy on Drug Detection and Deterrence (Mayor's Drug Policy) and the Mayor's Drug Detection and Deterrence Procedures for Construction Project Managers (Executive Order No. 1-31).

2.    Obtain a facility to collect urine samples consistent with Health and Human Services (HHS) guidelines and a HHS certified drug testing laboratory to perform the drug tests.

3.    Monitor and keep records of drug tests given and the results; and upon request from the City of Houston, provide confirmation of such testing and results.

4.    Submit semi-annual Drug Policy Compliance Declarations.

I affirm on behalf of the Construction Project Manager that full compliance with the Mayor's Drug Policy and Executive Order No. 1-31 is a material condition of the contract with the City of Houston.

I further acknowledge that falsification, failure to comply with or failure to timely submit declarations and/or documentation in compliance with the Mayor's Drug Policy and/or Executive Order No. 1-31 will be considered a breach of the contract with the City and may result in non-award or termination of the contract by the City of Houston.

_____
Date

Construction Project Manager Name

_____

_____

H:\MR\ACSSVCK.DOC

October 11, 2002

Certified Document Number: 56748573 - Page 64 of 71

**Xerox 090**

**EXHIBIT "G"**

**DRUG POLICY COMPLIANCE DECLARATION**

I, _____ as an owner or officer of
     (Name)    (Print/Type)                          (Title)

_____ (Construction Project Manager)
     (Name of Company)

have personal knowledge and full authority to make the following declarations:

This reporting period covers the preceding 6 months from _____ to _____ , 20 ____ .

_____     A written Drug Free Workplace Policy has been implemented and employees notified.
Initials      The policy meets the criteria established by the Mayor's Amended Policy on Drug
              Detection and Deterrence (Mayor's Policy).

_____     Written drug testing procedures have been implemented in conformity with the
Initials      Mayor's Drug Detection and Deterrence Procedures for Construction Project
              Managers, Executive Order No. 1-31.  Employees have been notified of such
              procedures.

_____     Collection/testing has been conducted in compliance with federal Health and Human
Initials      Services (HHS) guidelines.

_____     Appropriate safety impact positions have been designated for employee positions
Initials      performing on the City of Houston contract.  The number of employees in safety
              impact positions during this reporting period is _____ .

_____     From _____ to_____ the following test has occurred
Initials          (Start date)              (End date)

| | Random | Reasonable Suspicion | Post Accident | Total |
|---|---|---|---|---|
| Number Employees Tested | | | | |
| Number Employees Positive | | | | |
| Percent Employees Positive | | | | |

_____     Any employee who tested positive was immediately removed from the City worksite
Initials      consistent with the Mayor's Policy and Executive Order No. 1-31.

_____     I affirm that falsification or failure to submit this declaration timely in accordance
Initials      with established guidelines will be considered a breach of contract.

Certified Document Number: 56748573 - Page 65 of 71

Xerox 001

I declare under penalty of perjury that the affirmations made herein and all information contained in this declaration are within my personal knowledge and are true and correct.

_____
(Date)

_____
(Typed or Printed Name)

_____
(Signature)

_____
(Title)

October 11, 2002

Xerox 092

**EXHIBIT "H"**

**CONSTRUCTION PROJECT MANAGER'S CERTIFICATION
OF NO SAFETY IMPACT POSITIONS
IN PERFORMANCE OF A CITY CONTRACT**

_____ _____
(Name)                                                    (Title)

as an owner or officer of _____ (Construction Project Manager)
                                    (Name of Company)

have authority to bind the Construction Project Manager with respect to its bid, and hereby certify that Construction Project Manager has no employee safety impact positions, as defined in '5.18 of Executive Order No. 1-31, that will be involved

in performing _____
                                        (Project)

Construction Project Manager agrees and covenants that it shall immediately notify the City of Houston Director of Personnel if any safety impact positions are established to provide services in performing this City Contract.


_____              _____
(Date)                                                   (Typed or Printed Name)

                                                         _____
                                                         (Sign

                                                         _____
                                                         (Title)

H:\MR\ACSSVCK.DOC

October 11, 2002

**Xerox 093**

**EXHIBIT "I" -**
**MWBE SUBCONTRACT TERMS**

Construction Project Manager shall insure that all subcontracts with MWBE subcontractors and suppliers are clearly labeled "**THIS CONTRACT IS SUBJECT TO BINDING ARBITRATION ACCORDING TO THE TEXAS GENERAL ARBITRATION ACT**" and contain the following terms:

1. _____ (MWBE subcontractor) shall not delegate or subcontract more than 50% of the work under this subcontract to any other subcontractor or supplier without the express written consent of the City of Houston's Affirmative Action Director ("the Director").

2. _____ (MWBE subcontractor) shall permit representatives of the City of Houston, at all reasonable times, to perform (1) audits of the books and records of the subcontractor, and (2) inspections of all places where work is to be undertaken in connection with this subcontract. Subcontractor shall keep such books and records available for inspection for at least 4 years after the end of its performance under this subcontract. Nothing in this provision shall change the time for bringing a cause of action nor the applicable statute of limitations.

3. Within 5 business days of execution of this subcontract, Construction Project Manager (prime Construction Project Manager) and Subcontractor shall designate in writing to the Director an agent for receiving any notice required or permitted to be given pursuant to Chapter 15 of the Houston City Code of Ordinances, along with the street and mailing address and phone number of such agent.

4. Any controversy between the parties involving the construction or application of any of the terms, covenants or conditions of this subcontract shall, on the written request of one party served upon the other or upon notice by Director served on both parties, be submitted to binding arbitration, under the Texas General Arbitration Act (Tex. Civ. Prac. & Rem. Code Ann., Ch. 171 -- "the Act"). Arbitration shall be conducted according to the following procedures:

a. Upon the decision of the Director or upon written notice to the Director from either party that a dispute has arisen, the Director shall notify all parties that they must resolve the dispute within thirty (30) days or the matter may be referred to arbitration.

b. If the dispute is not resolved within the time specified, any party or the Director may submit the matter to arbitration conducted by the American Arbitration Association under the rules of the American Arbitration Association, except as otherwise required by the City's contract with American Arbitration Association on file in the Office of the City's Affirmative Action Division.

c. Each party shall pay all fees required by the American Arbitration Association and sign a form releasing the American Arbitration Association and its arbitrators from liability for decisions reached in the arbitration.

d. If the American Arbitration Association no longer administers Affirmative Action arbitration for the City, the Director shall prescribe alternate procedures as necessary to provide arbitration by neutrals in accordance with the requirements of Chapter 15 of the Houston City Code of Ordinances.

e. All arbitrations shall be conducted in Houston, Texas unless the parties agree to another location in writing.

Certified Document Number: 56748573 - Page 68 of 71

Xerox 094

Exhibit "J"

Depreciation Schedule

H:\MR\ACSSVCK.DOC

Certified Document Number: 56748573 - Page 69 of 71

Xerox 095

Exhibit J - Depreciation and Buyout Schedule
Buyout provision becomes effective at beginning of Month 19

| Month of Contract | Beginning Month Cost | Less Depreciation | Month End Cost |
|---|---|---|---|
| 1 | $ 3,600,357.09 | $ (60,005.95) | $ 3,540,351.14 |
| 2 | $ 3,540,351.14 | $ (60,005.95) | $ 3,480,345.19 |
| 3 | $ 3,480,345.19 | $ (60,005.95) | $ 3,420,339.24 |
| 4 | $ 3,420,339.24 | $ (60,005.95) | $ 3,360,333.29 |
| 5 | $ 3,360,333.29 | $ (60,005.95) | $ 3,300,327.34 |
| 6 | $ 3,300,327.34 | $ (60,005.95) | $ 3,240,321.39 |
| 7 | $ 3,240,321.39 | $ (60,005.95) | $ 3,180,315.44 |
| 8 | $ 3,180,315.44 | $ (60,005.95) | $ 3,120,309.49 |
| 9 | $ 3,120,309.49 | $ (60,005.95) | $ 3,060,303.54 |
| 10 | $ 3,060,303.54 | $ (60,005.95) | $ 3,000,297.59 |
| 11 | $ 3,000,297.59 | $ (60,005.95) | $ 2,940,291.64 |
| 12 | $ 2,940,291.64 | $ (60,005.95) | $ 2,880,285.69 |
| 13 | $ 2,880,285.69 | $ (60,005.95) | $ 2,820,279.74 |
| 14 | $ 2,820,279.74 | $ (60,005.95) | $ 2,760,273.79 |
| 15 | $ 2,760,273.79 | $ (60,005.95) | $ 2,700,267.84 |
| 16 | $ 2,700,267.84 | $ (60,005.95) | $ 2,640,261.89 |
| 17 | $ 2,640,261.89 | $ (60,005.95) | $ 2,580,255.94 |
| 18 | $ 2,580,255.94 | $ (60,005.95) | $ 2,520,249.99 |
| 19 | $ 2,520,249.99 | $ (60,005.95) | $ 2,460,244.04 |
| 20 | $ 2,460,244.04 | $ (60,005.95) | $ 2,400,238.09 |
| 21 | $ 2,400,238.09 | $ (60,005.95) | $ 2,340,232.14 |
| 22 | $ 2,340,232.14 | $ (60,005.95) | $ 2,280,226.19 |
| 23 | $ 2,280,226.19 | $ (60,005.95) | $ 2,220,220.24 |
| 24 | $ 2,220,220.24 | $ (60,005.95) | $ 2,160,214.29 |
| 25 | $ 2,160,214.29 | $ (60,005.95) | $ 2,100,208.34 |
| 26 | $ 2,100,208.34 | $ (60,005.95) | $ 2,040,202.39 |
| 27 | $ 2,040,202.39 | $ (60,005.95) | $ 1,980,196.44 |
| 28 | $ 1,980,196.44 | $ (60,005.95) | $ 1,920,190.49 |
| 29 | $ 1,920,190.49 | $ (60,005.95) | $ 1,860,184.54 |
| 30 | $ 1,860,184.54 | $ (60,005.95) | $ 1,800,178.59 |
| 31 | $ 1,800,178.59 | $ (60,005.95) | $ 1,740,172.64 |
| 32 | $ 1,740,172.64 | $ (60,005.95) | $ 1,680,166.69 |
| 33 | $ 1,680,166.69 | $ (60,005.95) | $ 1,620,160.74 |
| 34 | $ 1,620,160.74 | $ (60,005.95) | $ 1,560,154.79 |
| 35 | $ 1,560,154.79 | $ (60,005.95) | $ 1,500,148.84 |
| 36 | $ 1,500,148.84 | $ (60,005.95) | $ 1,440,142.89 |
| 37 | $ 1,440,142.89 | $ (60,005.95) | $ 1,380,136.94 |
| 38 | $ 1,380,136.94 | $ (60,005.95) | $ 1,320,130.99 |
| 39 | $ 1,320,130.99 | $ (60,005.95) | $ 1,260,125.04 |
| 40 | $ 1,260,125.04 | $ (60,005.95) | $ 1,200,119.09 |
| 41 | $ 1,200,119.09 | $ (60,005.95) | $ 1,140,113.14 |
| 42 | $ 1,140,113.14 | $ (60,005.95) | $ 1,080,107.19 |
| 43 | $ 1,080,107.19 | $ (60,005.95) | $ 1,020,101.24 |
| 44 | $ 1,020,101.24 | $ (60,005.95) | $ 960,095.29 |
| 45 | $ 960,095.29 | $ (60,005.95) | $ 900,089.34 |
| 46 | $ 900,089.34 | $ (60,005.95) | $ 840,083.39 |
| 47 | $ 840,083.39 | $ (60,005.95) | $ 780,077.44 |
| 48 | $ 780,077.44 | $ (60,005.95) | $ 720,071.49 |

Xerox 096

| | | | | | |
|---|---|---|---|---|---|
| 49 | $ | 720,071.49 | $ | (60,005.95) | $ | 660,065.54 |
| 50 | $ | 660,065.54 | $ | (60,005.95) | $ | 600,059.59 |
| 51 | $ | 600,059.59 | $ | (60,005.95) | $ | 540,053.64 |
| 52 | $ | 540,053.64 | $ | (60,005.95) | $ | 480,047.69 |
| 53 | $ | 480,047.69 | $ | (60,005.95) | $ | 420,041.74 |
| 54 | $ | 420,041.74 | $ | (60,005.95) | $ | 360,035.79 |
| 55 | $ | 360,035.79 | $ | (60,005.95) | $ | 300,029.84 |
| 56 | $ | 300,029.84 | $ | (60,005.95) | $ | 240,023.89 |
| 57 | $ | 240,023.89 | $ | (60,005.95) | $ | 180,017.94 |
| 58 | $ | 180,017.94 | $ | (60,005.95) | $ | 120,011.99 |
| 59 | $ | 120,011.99 | $ | (60,005.95) | $ | 60,006.04 |
| 60 | $ | 60,006.04 | $ | (60,005.04) | $ | 1.00 |
| Month 60 and Thereafter | | | $ | 1.00 |

Xerox 007



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748573 Total Pages: 71

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

C 54484
07-1211

THE STATE OF TEXAS §
§
COUNTY OF HARRIS §

THIS FIRST AMENDMENT TO THE CONTRACT FOR EMS AMBULANCE COLLECTION SERVICES (the "First Amendment") is made on the countersignature date between the **CITY OF HOUSTON, TEXAS** ("City"), a municipal corporation and **ACS STATE AND LOCAL SOLUTIONS, INC.** ("Contractor"), a New York corporation doing business in Texas.

### BACKGROUND:

By Ordinance No. 02-0952, the City entered into a contract with Contractor, which was passed and adopted by City Council on October 23, 2002. Under the Contract (#54484)(the "Original Contract"), Contractor provides collection services for EMS ambulance services fees.

The City and Contractor desire to amend the Original Contract to extend the term of the contract and at Contractor's expense, to update the computers, printers and related equipment used by Contractor to collect ambulance fees for the City under this contract.

For and in consideration of the mutual promises, covenants, agreements, and benefits contained in this First Amendment, the City and Contractor agree as follows:

I.

Article II, Definitions, of the Original Contract is amended by adding the following definitions:

"Acceptance", "Accept" or "Accepted" means the City's acceptance of the equipment listed in Exhibit "A-1" and the related software ("the New Equipment") after the equipment has been delivered and installed by Contractor and the City has conducted tests to ascertain that the equipment works according to its Documentation when such equipment is used for EMS

L:\Contracts\02007\ACS\FIRST\FINAL.doc                                      October 19, 2007

Certified Document Number: 56748575 - Page 1 of 18

**ACS**

# EXHIBIT B



Xerox 099

ambulance fees collection services under this Agreement. The City has 10 days to conduct Acceptance tests after each of the three implementation phases.

"Documentation" means the manufacturer's manual provided by Contractor detailing the design, operations and instructions for using the Equipment to obtain the desired results from the computer system.

## II.

Section III, A, "Scope of Services" of the Original Contract is amended by adding a new paragraph to read as follows:

### A-1   Scope of Services - Technology Refresh

For and incidental to providing EMS fee collection services to the City, Contractor shall provide all labor, material, and supervision necessary to update the equipment used to provide EMS fee collection services under this Agreement by furnishing and installing the New Equipment and removing any existing equipment that it replaces, all at its own expense. In consultation with the Director and no later than 30 days from the Date of Countersignature (the "Start Date"), Contractor shall begin implementing the New Equipment change-out and shall complete the installation, testing and obtain the City's Acceptance of the New Equipment within 136 days from the Start Date, in accordance with the schedule set out in Exhibit "B-1," "Implementation Plan." Upon the City's Acceptance of the New Equipment, Contractor shall maintain it as set out in Exhibit "A" of the Original Agreement.

## III

Section V, H, "City's Buy-Out Option" is amended by adding the following paragraphs:

H-1   In the event the City terminates this Agreement before the end of the five-year Initial

Certified Document Number: 56748575 - Page 2 of 18

ACS

Xerox 100

Term of this First Amendment as set out in Section V, A, below, then as Termination Costs the City shall pay Contractor the then-current value of the New Equipment as set out below. In consideration for the City's payment of Termination Costs, Contractor shall transfer Title to the New Equipment and assign all related software licenses and software warranties to the City, to the extent permitted by any third party vendors. The City's Termination Costs for terminating this Agreement at the end of the last year of the Depreciation Schedule is $1.00.

For purposes of calculating Termination Costs, the initial cost of the New Equipment shall not exceed the costs specified in Exhibit "A-1." In the event the City terminates this Agreement before the end of the First Amendment Initial Term, then the City shall pay as Termination Costs the lesser of (1) the depreciated price for the New Equipment in accordance with the depreciation schedule attached as Exhibit "J-1" or (2) the five-year straight line depreciation value of the new Equipment, starting from the actual cost paid by Contractor.

IV.

Section I A 2 of the Original Contract is amended by adding the following:

Contractor may move the Technical Resources Groups offices to a location mutually agreed to by the parties.

V.

Section II of Exhibit "B" entitled "Payment of Fees" is amended by adding a paragraph to read as follows:

II(a)    Payment Holdback/Technology Implementation Initiative

3

Certified Document Number: 56748575 - Page 3 of 18

ACS

The City shall pay Contractor a flat contingency fee of 14% based on gross revenue collections each month through the last month of the contract. Thereafter, at the completion of each City fiscal year, Contractor's fee will be adjusted up or down (Annual Adjustment) based on the Net Collection Rate as defined in the schedule in Exhibit "B," (I)(B) of the Original Contract.

The City will withhold 20% of Contractor's fees during the Technology Implementation Phases. The City shall pay to Contractor the 20% holdback upon completion and Acceptance of each phase, in proportional amounts as set forth in the attached Technology Implementation Plan, which is appended hereto as Exhibit "B-1," which may be modified upon written mutual agreement. As each phase is completed and accepted, the holdback percentage shall proportionally decrease. For example, if there are three phases, upon completion and acceptance of Phase I, the City shall pay to Contractor one third of existing funds from the technology holdback and reduce the future technology holdback by one third. Acceptance of each phase must have the following approval and signature to be a valid acceptance: Finance and Administration Department Director or designee ("Director").

VI.

Section V, A, "Termination Date" of the Original Contract is deleted in its entirety and replaced with the following:

A.    Contract Term

This Agreement is effective on the Countersignature Date of this First Amendment and remains in effect for five years unless sooner terminated under this Agreement (the "First

4

Certified Document Number: 56748575 - Page 4 of 18

ACS

Xerox 102

Amendment Initial Term").

## VII.

Section V. C. "Renewals-Automatic" of the Original Contract is deleted in its entirety and replaced with the following:

C.    Renewals

If the Director, at his or her sole discretion, makes a written request to City Purchasing Agent to make a written request for renewal to Contractor at least 30 days before the expiration of the then-current term and if sufficient funds are allocated, then, upon expiration of the Initial Term, this Agreement is renewed for two successive one-year terms upon the same terms and conditions. Upon expiration of the Initial Term and in the event City exercises it option to renew this Agreement, Contractor shall have no obligation to replace or upgrade the hardware or software provided hereunder.

## VIII.

The following exhibits are attached and incorporated into this Agreement: Exhibit "A-1", "List And Price Of Change Out Equipment"; Exhibit "B-1," "Contractor's Implementation Plan For Replacing Existing Equipment With Equipment Listed in Exhibit A-1"; and Exhibit "J-1," "Depreciation Schedule For Equipment Listed in Exhibit "A-1."

## IX.

In the event of a conflict between the Original Contract and this First Amendment, this First Amendment shall prevail.

## X.

5

ACS

Xerox 103

All other terms and conditions of the Original Contract except as amended in this First Amendment shall continue in full force and effect.

6

Certified Document Number: 56748575 - Page 6 of 18

ACS

D.     Signatures

The Parties have executed this Agreement in multiple copies, each of which is an original.

**ACS STATE AND LOCAL SOLUTIONS, INC.   CITY OF HOUSTON, TEXAS**

Signed by:

By: _Naomi Mass_                          By: _Bill White_   _Saraya Scott_
Name: Naomi Marc                                 Mayor
Title: V P, State and Local Solutions, Inc
                    Date: 10-19-2007

ATTEST/SEAL (if a corporation)            ATTEST/SEAL:
WITNESS (if not a corporation)

By: _Paul R. Webber_                       _Anna Russell_
Name: Paul R. Webber IV                     City Secretary
Title: Asst. Secretary

APPROVED:

_Calvin D. Wells_                          _Jack Chang John_
City Purchasing Agent                      Director, Finance & Administration


APPROVED:                                  COUNTERSIGNED BY:

_Phil Boriskie_                            _Annise D. Parker_
Chief, Houston Fire Department             City Controller _William D. Appel_

APPROVED AS TO FORM:                       DATE COUNTERSIGNED:

_Maryse Ramanna_                                  11-2-07
Assistant City Attorney
L.D. No. 03 402.00.1 23 004

7

Certified Document Number: 56748575 - Page 7 of 18

ACS

## COMPUTERS

| Qty | Part Number | | | | Not to Exceed Unit Price | Not to Exceed Total Price |
|---|---|---|---|---|---|---|
| **HAMMERHEAD XTREME - CENTRINO** | | | | | | |
| 136 | X118-X01-XP-001 | Pen | SVGA-All-Vis In/Out Inclusive of Sierra Aircard 860 with 3G or Equivalent, 128 Mb or greater Compact Flash w/PC Card Type II Adapter, and Ruggedized case with handle. | 1GB | 8GB Solid State | $5,116.00 | $695,776.00 |
| **HAMMERHEAD & HAMMERHEAD XTREME SOLID STATE HARD DRIVE OPTIONS** | | | | | | |
| 136 | 0000-18485-0016 | 16GB Solid State Drive Upgrade for Hammerhead or Hammerhead Xtreme | | | $965.00 | $131,240.00 |
| **BATTERIES, POWER SUPPLIES & CHARGERS** | | | | | | |
| 136 | 0300-15663-0001 | Long lasting, memory-free Li-Ion battery pack for Hammerhead computers | | | $128.00 | $17,408.00 |
| 136 | 8900-16005-000 | Cigarette Lighter Power Cord | | | $80.00 | $10,880.00 |
| **DOCKING STATIONS** | | | | | | |
| 40 | 9800f-18001-0003 Replacement for 9800-16072-0000 & DESK2000AC | NEW Desktop Docking Station with 4 HUB USB, two serial ports, one parallel port, one PS/2 keyboard port and power. With **North American Power Cord** | | | $450.00 | $18,000.00 |
| 158 | 9800-17048-0000 | Vehicle Docking System (USB) | | | $650.00 | $102,700.00 |
| **HEAVY-DUTY PLASTIC DOORS** | | | | | | |
| 136 | 9800-17859-0000 | CDMA/GPRS Door. For use with Sierra Aircard 550, 555 & 750. Includes "lump style" heavy-duty polycarbonate PCMCIA door, o-ring & screws | | | $65.00 | $8,840.00 |
| **SPARE PENS** | | | | | | |
| 136 | 9800F15652-0000 | Spare Passive Pen Kit for Hammerhead PEN units with tether | | | $65.00 | $8,840.00 |

8

**ACS**

| EXTENDED WARRANTIES | | | | |
|---|---|---|---|---|
| 408 | 9990-00454-0002 | 2 years additional warranty coverage. Prepaid Service Contract at time of unit purchase | $ 515.00 | $210,120.00 |
| | | **SUB TOTAL** | | **$1,203,804.00** |

**EXHIBIT "A-1"**

## MOBILE PRINTERS

| Qty | Part Number | | Not to Exceed Unit Price | Not to Exceed Total Price |
|---|---|---|---|---|
| | | **GROUP A** | | |
| | | **HP Deskjet 460wbt Mobile Printer** | | |
| 136 | C8153A#A2L | Product - HP Deskjet 460wbt mobile printer in the box; HP Bluetooth printer card (C8249A), HP Lithium-ion battery, HP 94 black print cartridge, HP 95 tri-color print cartridge, Starter CD with printer drivers, User documentation, Compact power adapter Print speed, black - Up to 17 ppm; Print speed, color - Up to 16 ppm; Input capacity (std/max) - Up to 50 / Up to 50 Connectivity standard - 1 USB, 1 CompactFlash type card slot, 1 multimedia, 1 secure digital, Pictbridge, HP Bluetooth Printer Card, Paper-handling accessories - 50 sheet input tray; weight - including detahhable battery: 5 lb. | $ 301.00 | $ 40,936.00 |
| | | **HP USB Cable (a-b), 2 meter** | | |
| 136 | C6518A | For consumers who need a reliable, high-speed, bi-directional connection between their USB port printer and PC or Mac | $ 15.00 | $ 2,040.00 |
| | | The HP USB 2.0 Printer Cable is designed to deliver complex, graphic-rich documents to the printer with speed and accuracy | | |
| | | A-B, 2 meter universal serial bus cable | | |
| | | For interfacing USB peripherals to USB ports on PC's | | |
| | | **HP 94 Black Inkjet Print Cartridge (11 ml)** | | |
| 4,080 | C8765WN#140 | Get fast results and superior fade resistance while using less ink with HP's Vivera inks | $ 18.00 | $ 73,440.00 |
| | | Enjoy laser-quality results you get from the advanced technology and pigment-based Vivera inks. | | |
| | | **SUB TOTAL** | | **$116,416.00** |
| | | **GROUP B** | | |

9

Certified Document Number: 56748575 - Page 9 of 18

ACS

Xerox 107

| | | **HP LaserJet P2015 Printer** | | |
|---|---|---|---|---|
| 40 | CB366A#ABA | Product - HP LaserJet P2015 Printer In the box; HP LaserJet print cartridge, Getting Started Guide, CD (includes software and User's Guide), power cord Print speed, black - Up to 27 ppm; Recommended volume <b/> - 740 to 3,000 pages/month; two-sided printing - Manual (driver support provided); Input capacity (std/max) - Up to 250 / Up to 250 Connectivity, standard - Hi-Speed USB 2.0 compatible port; Paper trays (std/max) - 2 plus 50 sheet multipurpose input tray / 2; Paper handling accessories - 250 sheet input tray; Optional paper-handling accessories - Options not included: 250-sheet input tray. | $ 319.00 | $ 12,760.00 |
| 352 | H5473E | **HP 3-YEAR NEXT-BUSINESS-DAY ONSITE LASERJET 1160, 1320, P2015 HW SUPP** | $ 132.00 | $ 46,464.00 |
| 600 | Q7553X | HP 53X Toner Cartridge | $147.99 | $ 88,794.00 |
| 40 | C6518A | **HP USB cable (a-b), 2 meter** For consumers who need a reliable, high-speed, bi-directional connection between their USB port printer and PC or Mac | $ 15.00 | $ 600.00 |
| | | **The HP USB 2.0 Printer Cable is designed to deliver complex, graphic-rich documents to the printer with speed and accuracy** | | |
| | | **A to B, 2 meter universal serial bus cable** | | |
| | | **For interfacing USB peripherals to USB ports on PC's** | | |
| | | **SUB TOTAL** | | **$148,618.00** |

10

ACS

Xerox 108

EXHIBIT "A-1"

## MOBILE SOFTWARE

| Qty | Part Number | | Not to Exceed Unit Price | Not to Exceed Total Price |
|---|---|---|---|---|
| 136 | N/A | ACS EM Tablet Mobile Software Licenses | $ 1,750.00 | $238,000.00 |
| | | | | |
| 1 | N/A | ACS EM Tablet Base and Wireless Manager Software License | $74,464.33 | $ 74,464.33 |
| | | | | |
| | | | SUB TOTAL | $312,464.33 |

## VEHICLE INSTALLATIONS

| Qty | Part Number | | Not to Exceed Unit Price | Not to Exceed Total Price |
|---|---|---|---|---|
| 130 | N/A | Vehicle Installation, Wiring Services into City of Houston Fire Department Ambulance Fleet (24 Hour Installation during Out-Of-Service Maintenance and Repair Period) | $ 1,640.00 | $213,200.00 |
| | | | | |
| | | | SUB TOTAL | $213,200.00 |

11



# EXHIBIT "A-1"

## ACS IMPLEMENTATION LABOR AND TRAVEL

| Qty | Part Number | | | Not to Exceed Total Price |
|-----|-------------|---|---|---------------------------|
| 1 | N/A | ACS Labor and Travel for Implementation, Testing, and Training (136 Days). | $ 42,947.36 | $ 42,947.36 |
| | | | | |
| | | | SUB TOTAL | $ 42,947.36 |

## HARDWARE SHIPPING CHARGES

| Qty | Part Number | | | Not to Exceed Total Price |
|-----|-------------|---|---|---------------------------|
| 1 | N/A | Anticipated Shipping Charges for Mobile Equipment, Electronics, and Vehicle Docking Units. | $ 50,000.00 | $ 50,000.00 |
| | | | | |
| | | | SUB TOTAL | $ 50,000.00 |

Note: ACS will continue to support and maintain the 20 additional units that were purchased under the base term of the Original Contract under the terms of the Original Contract.

12

Certified Document Number: 56748575 - Page 12 of 18

ACS

Xerox 110

## EXHIBIT "A-1"

| | |
|---|---|
| **COMPUTERS** Subtotal | $1,203,804.00 |
| **MOBILE PRINTERS** Subtotal | $ 116,416.00 |
| **HOSPITAL BASED PRINTERS** | $ 148,618.00 |
| **MOBILE SOFTWARE** Subtotal | $ 312,464.33 |
| **VEHICLE INSTALLATIONS** Subtotal | $ 213,200.00 |
| **ACS IMPLEMENTATION LABOR AND TRAVEL** Subtotal | $ 42,947.36 |
| **HARDWARE SHIPPING CHARGES** Subtotal | $ 50,000.00 |
| | |
| **NOT TO EXCEED TOTAL** | $2,087,449.69 |

Certified Document Number: 56748575 - Page 13 of 18



Xerox 111

Certified Document Number: 56748575 - Page 14 of 18

# EXHIBIT "B-1"

## TECHNOLOGY IMPLEMENTATION PLAN

## Exhibit B-1 Technology Implementation Plan

| ID | Task Name | Duration |
|---|---|---|
| 1 | Houston EMS Amendment Project (3 Phase Approach) | 136 days |
| 2 | Initial Project Logistics | 11 days |
| 3 | Contractual and Administrative Matters | 10 days |
| 4 | Obtain Internal ACS Approval to Capital Expenditure Request per receipt of fully Executed Contract | 10 days |
| 5 | Identify City Resource Team for ACS Interface and Task Approval | 5 days |
| 6 | Identify ACS Resource Team for On Site Implementation Tasks | 5 days |
| 7 | Initial Technology Orders | 1 day |
| 8 | Order Required EXTREME D4S Mobile Equipment (Exclusive of Docks) | 1 day |
| 9 | Order Required Mobile Printer Equipment | 1 day |
| 10 | Order Required Mount Printer Equipment | 1 day |
| 11 | Order Initial D4S Dock Hardware Quantity | 1 day |
| 12 | Phase I - Inventory MFD Apparatus. (Note: Phase I shall begin upon completion of the Initial Project Logistic Tasks. All dates will be adjusted accordingly, but the number of days to implement/execute each item shall remain the same.) | 50 days |
| 13 | Review of Fleet Inventory | 48 days |
| 14 | Determine MFD Apparatus requiring Dock Retrofit/Refurbish | 40 days |
| 15 | Determine MFD Apparatus requiring Dock Replacement | 40 days |
| 16 | Review Apparatus Wiring Status | 40 days |
| 17 | Review Voltage Armor Status for Possible Device Replacements | 40 days |
| 18 | Review MSU (Houston Airport Units) for unique installation requirements | 40 days |
| 19 | Document Findings for City Review | 2 days |
| 20 | Prepare Document for City | 2 days |
| 21 | Submit for City Review | 0 days |
| 22 | Order Remaining Quantity of Required D4S Vehicle Docks | 1 day |
| 23 | Schedule On-Site Installation Resources for Dock Installations and Vehicle Wiring | 5 days |
| 24 | Submit ACS Invoice to City for Release of Phase I Hold-Back Funds | 0 days |
| 25 | Obtain City Approval of Phase I / End Phase I | 10 days |
| 26 | Receipt of Hardware from Manufacture(s) | 48 days |
| 27 | Receipt of D4S XThemes Mobile Tablet Computers | 48 days |
| 28 | Receipt of Mobile Vehicle Printers | 40 days |
| 29 | Receipt of Vehicle Docking Equipment | 40 days |
| 30 | Phase II - Vehicle Installation (Note: Phase II shall begin upon completion of Phase I Tasks and receipt of hardware. All dates will be adjusted accordingly, but the number of days to implement/execute each Task shall remain the same.) | 48 days |
| 31 | Finalize Installation Schedule with MFD | 14 days |
| 32 | Review Installation Schedule with MFD | 11 days |
| 33 | Identify Rotation Schedule Plan of Service Schedule for covered MFD Apparatus | 3 days |
| 34 | Confirm Installation Services from Scheduling of On-Site Resources | 3 days |
| 35 | Execute MFD Apparatus Installation Services | 40 days |
| 36 | Complete MFD Apparatus Dock Retrofit/Refurbish | 40 days |
| 37 | Complete MFD Apparatus Dock Replacement | 40 days |
| 38 | Complete Apparatus Wiring | 40 days |
| 39 | Complete required Voltage Armor Remediation | 10 days |
| 40 | Install MSU (Houston Airport Units) | 4 days |
| 41 | Document Phase II Completion for City Review | 3 days |
| 42 | Prepare Documents for City | 3 days |
| 43 | Submit for City Review | 0 days |
| 44 | Submit ACS Invoice to City for Release of Phase II Hold Back Funds | 1 day |

Page 1
Date of Last Update: Tue 16/5/07

14

ACS

Xerox 112

Certified Document Number: 56748575 - Page 15 of 18

# Exhibit B-1 Technology Implementation Plan



| ID | Task Name | Duration |
|---|---|---|
| 45 | Obtain City Approval of Phase II / End Phase II | 10 days |
| 46 | Phase III - Deploy DRE Mobile Laptop Computers. (Note: Phase III shall begin upon completion of Phase II. All dates will be adjusted accordingly, but the number of days to implement all such items shall remain the same. | 25 days |
| 47 | Deploy DRE Xtreme Laptop Devices to H-D Crews | 13 days |
| 48 | Create Laptop Computer Roll-Out Schedule | 3 days |
| 49 | Schedule Crew Pick-Up of Laptop Devices | 10 days |
| 50 | Stock H-D Repair Depot with DRE Xtreme Laptop Devices | 1 day |
| 51 | Document Phase III Completion for City Review | 2 days |
| 52 | Prepare Document for City | 2 days |
| 53 | Submit for City Review | 0 days |
| 54 | Extend ACS Invoice to City for Release of Phase III Hold-Back Funds | 0 days |
| 65 | Obtain City Approval of Phase III / End Phase III | 10 days |

15

ACS

Xerox 113

## BUY-OUT DETAIL PRICING MATRIX FOR EQUIPMENT
## LISTED IN EXHIBIT "A-1"

| Month of Contract | Beginning Month Cost | Less Depreciation | Month End Cost |
|---|---|---|---|
| 1 | $ 2,087,449.69 | $ 34,790.83 | $ 2,052,658.86 |
| 2 | $ 2,052,658.86 | $ 34,790.83 | $ 2,017,868.03 |
| 3 | $ 2,017,868.03 | $ 34,790.83 | $ 1,983,077.21 |
| 4 | $ 1,983,077.21 | $ 34,790.83 | $ 1,948,286.38 |
| 5 | $ 1,948,286.38 | $ 34,790.83 | $ 1,913,495.55 |
| 6 | $ 1,913,495.55 | $ 34,790.83 | $ 1,878,704.72 |
| 7 | $ 1,878,704.72 | $ 34,790.83 | $ 1,843,913.89 |
| 8 | $ 1,843,913.89 | $ 34,790.83 | $ 1,809,123.06 |
| 9 | $ 1,809,123.06 | $ 34,790.83 | $ 1,774,332.24 |
| 10 | $ 1,774,332.24 | $ 34,790.83 | $ 1,739,541.41 |
| 11 | $ 1,739,541.41 | $ 34,790.83 | $ 1,704,750.58 |
| 12 | $ 1,704,750.58 | $ 34,790.83 | $ 1,669,959.75 |
| 13 | $ 1,669,959.75 | $ 34,790.83 | $ 1,635,168.92 |
| 14 | $ 1,635,168.92 | $ 34,790.83 | $ 1,600,378.10 |
| 15 | $ 1,600,378.10 | $ 34,790.83 | $ 1,565,587.27 |
| 16 | $ 1,565,587.27 | $ 34,790.83 | $ 1,530,796.44 |
| 17 | $ 1,530,796.44 | $ 34,790.83 | $ 1,496,005.61 |
| 18 | $ 1,496,005.61 | $ 34,790.83 | $ 1,461,214.78 |
| 19 | $ 1,461,214.78 | $ 34,790.83 | $ 1,426,423.95 |
| 20 | $ 1,426,423.95 | $ 34,790.83 | $ 1,391,633.13 |
| 21 | $ 1,391,633.13 | $ 34,790.83 | $ 1,356,842.30 |
| 22 | $ 1,356,842.30 | $ 34,790.83 | $ 1,322,051.47 |

16

ACS

Xerox 114

| 23 | $ | 1,322,051.47 | $ | 34,790.83 | $ | 1,287,260.64 |
|----|---|--------------|---|-----------|---|--------------|
| 24 | $ | 1,287,260.64 | $ | 34,790.83 | $ | 1,252,469.81 |
| 25 | $ | 1,252,469.81 | $ | 34,790.83 | $ | 1,217,678.99 |
| 26 | $ | 1,217,678.99 | $ | 34,790.83 | $ | 1,182,888.16 |
| 27 | $ | 1,182,888.16 | $ | 34,790.83 | $ | 1,148,097.33 |
| 28 | $ | 1,148,097.33 | $ | 34,790.83 | $ | 1,113,306.50 |
| 29 | $ | 1,113,306.50 | $ | 34,790.83 | $ | 1,078,515.67 |
| 30 | $ | 1,078,515.67 | $ | 34,790.83 | $ | 1,043,724.85 |
| 31 | $ | 1,043,724.85 | $ | 34,790.83 | $ | 1,008,934.02 |
| 32 | $ | 1,008,934.02 | $ | 34,790.83 | $ | 974,143.19 |
| 33 | $ | 974,143.19 | $ | 34,790.83 | $ | 939,352.36 |
| 34 | $ | 939,352.36 | $ | 34,790.83 | $ | 904,561.53 |
| 35 | $ | 904,561.53 | $ | 34,790.83 | $ | 869,770.70 |
| 36 | $ | 869,770.70 | $ | 34,790.83 | $ | 834,979.88 |
| 37 | $ | 834,979.88 | $ | 34,790.83 | $ | 800,189.05 |
| 38 | $ | 800,189.05 | $ | 34,790.83 | $ | 765,398.22 |
| 39 | $ | 765,398.22 | $ | 34,790.83 | $ | 730,607.39 |
| 40 | $ | 730,607.39 | $ | 34,790.83 | $ | 695,816.56 |
| 41 | $ | 695,816.56 | $ | 34,790.83 | $ | 661,025.74 |
| 42 | $ | 661,025.74 | $ | 34,790.83 | $ | 626,234.91 |
| 43 | $ | 626,234.91 | $ | 34,790.83 | $ | 591,444.08 |
| 44 | $ | 591,444.08 | $ | 34,790.83 | $ | 556,653.25 |
| 45 | $ | 556,653.25 | $ | 34,790.83 | $ | 521,862.42 |
| 46 | $ | 521,862.42 | $ | 34,790.83 | $ | 487,071.59 |
| 47 | $ | 487,071.59 | $ | 34,790.83 | $ | 452,280.77 |
| 48 | $ | 452,280.77 | $ | 34,790.83 | $ | 417,489.94 |
| 49 | $ | 417,489.94 | $ | 34,790.83 | $ | 382,699.11 |
| 50 | $ | 382,699.11 | $ | 34,790.83 | $ | 347,908.28 |

17

ACS

Xerox 115

| 51 | $ | 347,908.28 | $ | 34,790.83 | $ | 313,117.45 |
|----|----|------------|----|-----------|----|------------|
| 52 | $ | 313,117.45 | $ | 34,790.83 | $ | 278,326.63 |
| 53 | $ | 278,326.63 | $ | 34,790.83 | $ | 243,535.80 |
| 54 | $ | 243,535.80 | $ | 34,790.83 | $ | 208,744.97 |
| 55 | $ | 208,744.97 | $ | 34,790.83 | $ | 173,954.14 |
| 56 | $ | 173,954.14 | $ | 34,790.83 | $ | 139,163.31 |
| 57 | $ | 139,163.31 | $ | 34,790.83 | $ | 104,372.48 |
| 58 | $ | 104,372.48 | $ | 34,790.83 | $ | 69,581.66 |
| 59 | $ | 69,581.66 | $ | 34,790.83 | $ | 34,790.83 |
| 60 | $ | 34,790.83 | $ | 34,790.83 | $ | (0.00) |

Certified Document Number: 56748575 - Page 18 of 18



Xerox 116



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:          56748575 Total Pages:  18

*Chris Daniel*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# *00BREA

## City of Houston - Contracts

| | |
|---|---|
| **Contract #:** | C54484 |
| **Vendor Name:** | ACS State and Local Solutions |
| **Ordinance #:** | 11-0665 |

# * 2182 *

* 2182 *

Xerox 118



# CITY OF HOUSTON
City Secretary

C54484

**Interoffice**

Correspondence

To: Mr. Ronald C. Green
City Controller

*Dept: 6500 (ARA)*

*Fund: N/A*

From: Anna Russell
City Secretary

Date: August 9, 2011

Subject: Contract Amendment

Dear Mr. Green: *Term: Effec CS Date for 5 yrs.*

The following are sent to you for handling to completion:

2 Second Amendments to Contract

Between the City and <u>ACS State and Local Solutions, Inc.</u>

For EMS Ambulance Fee Collection Services

Authorized by Ordinance 2011-665

Passed on August 3, 2011

Executed by Mayor August 9, 2011

*RF 65068-11*

Yours Truly,

*Anna Russell*

Anna Russell
City Secretary

*CS 8/11/11*

AR/bg

cc: Chief Garrison
Mr. Moran

Certified Document Number: 56748578 - Page 2 of 63

2011 AUG 10 AM 8: 16

CONTROLLER'S

COPIES PICKED UP

BY _____
DEPT REPRESENTATIVE
8-11-11
DATE

**Xerox 119**

Certified Document Number: 56748578 - Page 3 of 63

## Controller's Office

To the Honorable Mayor and City Council of the City of Houston, Texas:

I hereby certify, with respect to the money required for the contract, agreement, obligation or expenditure contemplated by the ordinance set out below that:

( )    Funds have been encumbered out of funds previously appropriated for such purpose.

( )    Funds have been certified and designated to be appropriated by separate ordinance to be approved prior to the approval of the ordinance set out below.

( )    Funds will be available out of current or general revenue prior to the maturity of any such obligation.

( )    No pecuniary obligation is to be incurred as a result of approving the ordinance set out below.

( )    The money required for the expenditure or expenditures specified below is in the treasury, in the fund or funds specified below, and is not appropriated for any other purposes.

( )    A certificate with respect to the money required for the expenditure or expenditures specified below is attached hereto and incorporated herein by this reference.

( )    Other ~~Grant Funds Available~~  Revenue Contract - Amending Ordinance 02-0952

Date: _7-19, 20 11_              Ronald C. Green
                                    City Controller of the City of Houston, Texas

FUND REF: — 6500 —      AMOUNT:    —0—      ENCUMB. NO.: AF65068-11
                                                          C54484

City of Houston, Texas Ordinance No. _2011-665_

AN ORDINANCE APPROVING AND AUTHORIZING A SECOND AMENDMENT TO A CONTRACT (APPROVED BY ORDINANCE NO. 2002-0952) BETWEEN THE CITY OF HOUSTON AND ACS STATE AND LOCAL SOLUTIONS, INC. FOR EMS AMBULANCE FEE COLLECTION SERVICES; CONTAINING PROVISIONS RELATING TO THE SUBJECT; AND DECLARING AN EMERGENCY.

\* \* \* \*

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON, TEXAS:

Section 1. The City Council hereby approves and authorizes the contract, agreement or other undertaking described in the title of this ordinance, in substantially the form as shown in the document which is attached hereto and incorporated herein by this reference. The Mayor is hereby authorized to execute such document and all related documents on behalf of the City of Houston.

Xerox 120

The City Secretary is hereby authorized to attest to all such signatures and to affix the seal of the City to all such documents.

Section 2. The Mayor is hereby authorized to take all actions necessary to effectuate the City's intent and objectives in approving such agreement, agreements or other undertaking referenced in the title of this ordinance, in the event of changed circumstances.

Section 3. The City Attorney is hereby authorized to take all action necessary to enforce all legal obligations under said contract without further authorization from Council.

Section 4. There exists a public emergency requiring that this Ordinance be passed finally on the date of its introduction as requested in writing by the Mayor; therefore, this Ordinance shall be passed finally on such date and shall take effect immediately upon its passage and approval by the Mayor; however, in the event that the Mayor fails to sign this Ordinance within five days after its passage and adoption, it shall take effect in accordance with Article VI, Section 6, Houston City Charter.

PASSED AND ADOPTED this _3rd_ day of _August_, 20_11_.

APPROVED this _____ day of _____, 20_____.

_____
Mayor of the City of Houston, Texas

Pursuant to Article VI, Section 6, Houston City Charter, the effective date of the foregoing Ordinance is _____ AUG 0 9 2011

_____
City Secretary

(Prepared by Legal Dept. _____ )
(MPB/dg 7/14/11)            Assistant City Attorney
(Requested by Alfred J. Moran, Jr., Director, Administration and Regulatory Affairs Department)
(L.D. File No. 0371100045001)
G:\CONTRACT\DLG\MPB\ACS.2nd Amdmt.EMS Fee Collections.Doc

CAPTION PUBLISHED IN DAILY COURT REVIEW
DATE     AUG 0 9 2011

Certified Document Number: 56748578 - Page 4 of 63

Certified Document Number: 56748578 - Page 5 of 63

| AYE | NO | |
|-----|-----|-----|
| ✓ | | MAYOR PARKER |
| •••• | •••• | COUNCIL MEMBERS |
| ✓ | | STARDIG |
| ✓ | | JOHNSON |
| | ✓ | CLUTTERBUCK |
| ✓ | | ADAMS |
| ✓ | | SULLIVAN |
| ABSENT-CITY BUSINESS | | HOANG |
| ABSENT-ON PERSONAL BUSINESS | | PENNINGTON |
| ABSENT-OUT OF CITY CITY BUSINESS | | GONZALEZ |
| | | RODRIGUEZ |
| ✓ | | COSTELLO |
| ✓ | | LOVELL |
| ✓ | | NORIEGA |
| ✓ | | BRADFORD |
| | ✓ | JONES |
| CAPTION | ADOPTED | |

MAY 017 Rev. 12/09

Xerox 122

## REQUEST FOR COUNCIL ACTION

| | | | RCA# 8635 |
|---|---|---|---|
| **TO:** Mayor via City Secretary | | | |
| **Subject:** Ordinance Approving and Authorizing a Second amendment to a Contract between the City of Houston and ACS State and Local Solutions, Inc. for EMS Ambulance Fee Billing Services | Category # | Page 1 of 2 | Agenda Item 67 # |

| **FROM (Department or other point of origin):** | **Origination Date** | **Agenda Date** |
|---|---|---|
| Alfred J. Moran, Jr., Director Administration & Regulatory Affairs Department | July 14, 2011 | JUL 2 0 2011 |
| **DIRECTOR'S SIGNATURE** | **Council District(s) affected** All | AUG 03 2011 |
| **For additional information contact:** Frank Carmody      Phone: (713) 837-9521 Christopher Newport    Phone: (713) 837-9533 | **Date and Identification of prior authorizing Council Action:** Ord # 2002-0952; Passed October 23, 2002 Ord # 2007-1211; Passed October 30, 2007 | |

**RECOMMENDATION:** (Summary)
Approve an ordinance authorizing the second amendment to Contract No. C54484 between the City of Houston and ACS State and Local Solutions, Inc. to modify the scope of services and fees of the Contract, and to extend the term of the Contract to five years from the date of countersignature, with two one-year renewal options.

| | **Finance Budget** |
|---|---|
| Revenue Contract | |

**SPECIFIC EXPLANATION:**

The Director of the Administration & Regulatory Affairs Department (ARA) recommends City Council approve the second amendment to a contract between the City of Houston and ACS State and Local Solutions, Inc. to provide EMS fee billing services. The proposed second amendment to this contract will upgrade equipment utilized by Houston Fire Department (HFD) personnel in 276 vehicles (plus a 20% spare inventory), increase the City's ability to collect on outstanding accounts receivable, increase the M/WBE goal amount, and result in $3.6 Million annual savings. The proposed amendment will establish a contract term of five years from the date of City's countersignature of the contract, with two one-year renewal options.

Under this contract, the City earns gross revenue through the billing and collection of fees associated with Basic Life Support (BLS) and Advanced Life Support (ALS) emergency transports by HFD. ACS is compensated via a flat contingency fee which is a percentage of gross revenue collections per month. This contract generated $33.5M from 128,000 transports in FY11, approximately $2M above ARA's estimated revenues for FY11.

The proposed second amendment to the contract with ACS will reduce the contingency fee to 10.19% (plus the amortization of the additional 175 equipment sets) from the current effective fee of 20%. The negotiated fee reduction will result in $3.6 Million in annual savings or $18 M over the life of the contract. Furthermore, ACS has agreed to apply the lower fee amount to all gross revenue collected in July 2011.

The proposed amendment requires ACS to provide billing and collection software, hardware, installation, maintenance, support, data backup and system security, to include implementation and integration of a new electronic Patient Care Record (ePCR) software system. ACS will refresh existing computer equipment with new, state of the art hardware and software in 136 HFD vehicles, and will also install hardware and software in an additional 140 vehicles. The new system is significantly more user-friendly and efficient than the existing system, and is expected to increase the percentage of patient medical and billing information captured by HFD personnel. The second amendment to the contract with ACS modifies the contract to include a provision that in the event the City terminates the contract, ACS shall transfer title to the new equipment and assign all related software licenses and software warranties to the City. ACS will also be required to train HFD personnel on the new equipment and software as well as maintain a technical support team to assist whenever necessary over the term of the contract.

The second amendment to the contract enables the Director of ARA to recall uncollected accounts receivable more than 180 days overdue from ACS. This contract modification will facilitate the potential collection of a greater degree of outstanding EMS bills by alternate processing via a dedicated collections process to be established by the Legal and Finance Departments. Under the current contract, outstanding accounts are not returned to the City, which limits alternative collections options and potential additional revenue to be collected from such options.

In order to provide the City with full capability to assess vendor performance, ACS will be required to utilize fully auditable billing, collection and accounts receivable systems that secure patient information in accordance with governing accounting, debt collection

| **REQUIRED AUTHORIZATION** | | |
|---|---|---|
| Finance Department: | Other Authorization: | Other Authorization: |

Certified Document Number: 56748578 - Page 6 of 63

and privacy rules and statutes. ACS is further required to implement and maintain a data warehouse that ensures 100% transparency and oversight of billing operations. ACS shall provide to City staff user-friendly, continuous, open web-based access to the billing and collections data down to the individual claim, transaction, and clinical data elements. ARA personnel will have access to a contractually-mandated dynamic reporting toolkit with multi-dimensional analytical capabilities and powerful, web-based reporting options to enable rigorous oversight and auditing functions.

To ensure customer service issues are effectively and efficiently addressed, ACS shall be required to refer all complaints involving quality of care provided during transports to designated City personnel. ACS currently has a call center, staffed with English and Spanish speaking personnel, which is operated Monday through Friday from 8:30 am to 5:00 pm to address customer issues and provide information.

**M/WBE Subcontracting:**
The current contract is a goal-oriented contract with a 12% M/WBE participation level; ACS is currently achieving a participate level of 13.88%. The proposed second amendment will raise the M/WBE goal to 14% for the contract with ACS.

Xerox 124

Certified Document Number: 56748578 - Page 8 of 63

## Controller's Office

To the Honorable Mayor and City Council of the City of Houston, Texas:

I hereby certify, with respect to the money required for the contract, agreement, obligation or expenditure contemplated by the ordinance set out below that:

( ) Funds have been encumbered out of funds previously appropriated for such purpose.

( ) Funds have been certified and designated to be appropriated by separate ordinance to be approved prior to the approval of the ordinance set out below.

( ) Funds will be available out of current or general revenue prior to the maturity of any such obligation.

( ) No pecuniary obligation is to be incurred as a result of approving the ordinance set out below.

( ) The money required for the expenditure or expenditures specified below is in the treasury, in the fund or funds specified below, and is not appropriated for any other purposes.

( ) A certificate with respect to the money required for the expenditure or expenditures specified below is attached hereto and incorporated herein by this reference.

( ) Other ~~Grant Funds Available~~ Revenue Contract - Amending Ordinance 02-0952

Date: 7-19, 20 11          Ronald C. Green
                                           City Controller of the City of Houston, Texas

FUND REF: — 6500 —    AMOUNT: -0-    ENCUMB. NO.: BF65068-11    C54484

City of Houston, Texas Ordinance No. 2011-665

AN ORDINANCE APPROVING AND AUTHORIZING A SECOND AMENDMENT TO A CONTRACT (APPROVED BY ORDINANCE NO. 2002-0952) BETWEEN THE CITY OF HOUSTON AND ACS STATE AND LOCAL SOLUTIONS, INC. FOR EMS AMBULANCE FEE COLLECTION SERVICES; CONTAINING PROVISIONS RELATING TO THE SUBJECT; AND DECLARING AN EMERGENCY.

* * * *

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON, TEXAS:

Section 1. The City Council hereby approves and authorizes the contract, agreement or other undertaking described in the title of this ordinance, in substantially the form as shown in the document which is attached hereto and incorporated herein by this reference. The Mayor is hereby authorized to execute such document and all related documents on behalf of the City of Houston.

Xerox 125

The City Secretary is hereby authorized to attest to all such signatures and to affix the seal of the City to all such documents.

Section 2. The Mayor is hereby authorized to take all actions necessary to effectuate the City's intent and objectives in approving such agreement, agreements or other undertaking referenced in the title of this ordinance, in the event of changed circumstances.

Section 3. The City Attorney is hereby authorized to take all action necessary to enforce all legal obligations under said contract without further authorization from Council.

Section 4. There exists a public emergency requiring that this Ordinance be passed finally on the date of its introduction as requested in writing by the Mayor; therefore, this Ordinance shall be passed finally on such date and shall take effect immediately upon its passage and approval by the Mayor; however, in the event that the Mayor fails to sign this Ordinance within five days after its passage and adoption, it shall take effect in accordance with Article VI, Section 6, Houston City Charter.

PASSED AND ADOPTED this _3rd_ day of _August_, 20_11_.

APPROVED this _____ day of _____, 20_____.

_____
Mayor of the City of Houston, Texas

Pursuant to Article VI, Section 6, Houston City Charter, the effective date of the foregoing Ordinance is _____ AUG 0 9 2011

_____
City Secretary

(Prepared by Legal Dept. _____)
(MPB/dg 7/14/11)         Assistant City Attorney
(Requested by Alfred J. Moran, Jr., Director, Administration and Regulatory Affairs Department)
(L.D. File No. 0371100045001)
G:\CONTRACT\DLG\MPB\ACS.2nd Amdmt.EMS Fee Collections.Doc

CAPTION PUBLISHED IN DAILY COURT REVIEW
DATE:    AUG 0 9 2011

Certified Document Number: 56748578 - Page 9 of 63

Certified Document Number: 56748578 - Page 10 of 63

| AYE | NO | |
|-----|-----|-----|
| ✓ | | MAYOR PARKER |
| •••• | •••• | COUNCIL MEMBERS |
| ✓ | | STARDIG |
| ✓ | | JOHNSON |
| | ✓ | CLUTTERBUCK |
| ✓ | | ADAMS |
| ✓ | | SULLIVAN |
| ABSENT-CITY BUSINESS | | HOANG |
| ABSENT-ON PERSONAL BUSINESS | | PENNINGTON |
| ABSENT-OUT OF CITY CITY BUSINESS | | GONZALEZ |
| ✓ | | RODRIGUEZ |
| ✓ | | COSTELLO |
| ✓ | | LOVELL |
| ✓ | | NORIEGA |
| ✓ | | BRADFORD |
| | ✓ | JONES |
| CAPTION | ADOPTED | |

MAY 017 Rev. 12/08

**Xerox 127**

## SECOND AMENDMENT TO A CONTRACT FOR
## EMS AMBULANCE FEE COLLECTION SERVICES

**THE STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

THIS SECOND AMENDMENT TO A CONTRACT FOR EMS AMBULANCE FEE COLLECTION SERVICES (the "Second Amendment") is made on the date of countersignature ("Countersignature Date") between the CITY OF HOUSTON, TEXAS ("City"), a municipal corporation, and ACS STATE & LOCAL SOLUTIONS, INC. ("Contractor" or "ACS"), a New York corporation located at 8260 Willow Oaks Corporate Drive, Fairfax, VA 22031.

### BACKGROUND:

By Ordinance No. 02-0952, the City entered into Contract #54484 with Contractor, which was passed and adopted by City Council on October 23, 2002 and subsequently amended by a First Amendment on November 2, 2007 (the "First Amendment"), pursuant to which Contractor provides collection services for EMS ambulance services fees (as amended to date, the "Contract.").

The City and Contractor desire to further amend the Contract regarding the term, scope of services, fees, and other details.

For and in consideration of the mutual promises, covenants, agreements, and benefits contained in this Second Amendment, the City and Contractor agree as follows:

### I.

Section 1A, "Address" of the Contract is amended by deleting the addresses of the City and Contractor in their entirety and replacing them with the following:

City of Houston

Director of Administrative & Regulatory
Affairs Department
611 Walker
Houston, TX 77002

Contractor

ACS State & Local Solutions, Inc.
8260 Willow Oaks Corporate Drive
Fairfax, VA 22031

1

Certified Document Number: 56748578 - Page 11 of 63

## II.

Article II, <u>Definitions</u>, of the Contract is amended by adding the following definitions:

"'2011 Equipment' means the equipment and related software listed in Exhibit "A-2" of this Second Amendment and incorporated herein."

Article II, <u>Definitions</u>, of the Contract is amended by deleting the definition of "Director" in its entirety and replacing it with the following:

"'Director' means the Director of the Administration and Regulatory Affairs Department or such person as he shall designate."

## III.

Section V, A., "<u>Contract Term</u>" of the Contract is deleted in its entirety and replaced with the following:

"A.    <u>Contract Term</u>

"This Contract is effective from the Countersignature Date of this Second Amendment until the date that is five (5) years later, unless sooner terminated under this Contract. The five-year period beginning on the Countersignature Date is referred to as the 'Term.'"

## IV.

"Section V, C, "<u>Renewals-Automatic</u>" of the Contract is deleted in its entirety and replaced with the following:

"C.    <u>Renewals</u>

"If the Director, after consultation with the City Attorney, makes a written request to City Purchasing Agent to make a written request for renewal to Contractor at least 30 days before the expiration of the Term and if sufficient funds are allocated, then, upon expiration of the Term, this Contract is renewed annually for up to two successive one-year terms upon the same terms and conditions. Upon expiration of the Term or if the Director exercises his option to renew this Contract, Contractor shall have no obligation to replace or upgrade the hardware or software provided hereunder."

2

Certified Document Number: 56748578 - Page 12 of 63

Xerox 129

## V.

Section V. H. "City's Buy-Out Option" of the Contract is deleted in its entirety and replaced with the following:

"H.     City's Buy-Out Options

"(i) In the event the City terminates this Contract before November 1, 2012, then as termination costs the City shall pay Contractor the then-current value of the New Equipment (as defined in the First Amendment) as set out below. In consideration for the City's payment of these termination costs, Contractor shall transfer title to the New Equipment and assign all related software licenses and software warranties to the City, to the extent permitted by any third party vendors. The City's termination costs for terminating this Contract on or after November 1, 2012 are $1.00.

"For the purposes of calculating termination costs, the initial cost of the New Equipment shall not exceed the costs specified in Exhibit "A-1" of the First Amendment ("New Equipment Costs"). In the event that the City terminates this Contract before November 1, 2012, then the City shall pay as termination costs the lesser of: (1) the depreciated price for the New Equipment in accordance with the depreciation schedule attached to the First Amendment as Exhibit "J-1" which began on November 2, 2007; or (2) the five-year straight line depreciated price of the New Equipment, starting from the actual cost paid by Contractor.

"(ii) In addition to any termination costs which may be payable to Contractor under Section V. H. (i) above, in the event the City terminates this Contract before the end of the Term, then as termination costs the City shall pay Contractor the then-current value of the 2011 Equipment as set out below. In consideration for the City's payment of termination costs, Contractor shall transfer title to the 2011 Equipment and assign all related software licenses and software warranties to the City, to the extent permitted by any third party vendors. The City's termination costs for terminating this Contract as of the end of the Term are $1.00.

"For the purposes of calculating termination costs, the initial cost of the 2011 Equipment shall not exceed the costs specified in Exhibit "A-2," entitled "2011 Equipment Costs," of this Second Amendment. In the event that the City terminates this Contract before the end of the Term, then the City shall pay as termination costs the lesser of (1) the depreciated price for the 2011 Equipment in accordance with the depreciation schedule attached to this Second

3

Certified Document Number: 56748578 - Page 13 of 63

Xerox 130

Amendment as Exhibit "J-2," entitled "Buyout Detail Pricing for 2011 Equipment," beginning on the Countersignature Date of this Second Amendment; or (2) the five-year straight line depreciated price of the 2011 Equipment, starting from the actual cost paid by Contractor.

"(iii) This Contract includes provisions concerning the collection of delinquent accounts and the ability of the Director to recall accounts not yet collected. The Director's recall of any or all delinquent accounts shall not be considered an event of default or termination and no termination costs shall be payable absent the Director's termination of the remaining portions of this Contract."

## VI.

Section V.D, "Termination for Convenience" of the Contract is hereby amended by adding the following paragraph to the beginning of the Section:

"For purposes of this Section, 'Director' means both the Director of the Administration and Regulatory Affairs Department and the Director of the Finance Department, or such persons as they shall designate, acting in consultation with each other."

## VII.

Section III.L, "Compliance with Equal Employment Opportunity Ordinance" of the Contract is hereby amended as follows:

1.  The heading of the Section, "Compliance with Equal Employment Opportunity Ordinance" is deleted and replaced with "MWBE Compliance".

2.  The percent amount, "12%", in the first paragraph of the Section is deleted and replaced with "14%".

## VIII.

Before the Countersignature Date, Contractor and the City shall execute a HIPAA Business Associate Agreement in the form attached to this Second Amendment as Exhibit "K".

## IX.

Exhibit "A" of the Contract entitled "Scope of Services" is deleted in its entirety and replaced with Exhibit "A" to this Second Amendment, "Scope of Services".

4

Certified Document Number: 56748578 - Page 14 of 63

Xerox 131

### X.

Exhibit "B" of the Contract entitled "Payment of Fees" is deleted in its entirety and replaced with Exhibit "B" to this Second Amendment, "Payment of Fees".

### XI.

In the event of a conflict between the Contract, the First Amendment and this Second Amendment, this Second Amendment shall prevail.

### XII.

All other terms and conditions of the Contract except as amended by this Second Amendment shall continue in full force and effect.

Certified Document Number: 56748578 - Page 15 of 63

5

Xerox 132

The Parties have executed this Second Amendment in multiple copies, each of which is an original.

CONTRACTOR:
ACS STATE & LOCAL SOLUTIONS, INC.

Name: _LOUIS J. SCHIAVONE JR._
Title: _VICE PRESIDENT - PS/S_

ATTEST/SEAL

By:_____
Name:

APPROVED:
_____
Director, Administration & Regulatory
Affairs Department

APPROVED:
_____
Chief, Houston Fire Department

APPROVED AS TO FORM:
_____
Assistant City Attorney
L.D. No. _0377000145001_

CITY:
CITY OF HOUSTON, TEXAS
Signed by:

By:_____
Mayor

ATTEST/SEAL

_____
City Secretary

_____
Director, Finance Department

COUNTERSIGNED BY:

_____
City Controller

DATE COUNTERSIGNED:

_8-11-11_

6

Certified Document Number: 56748578 - Page 16 of 63

Xerox 133

Certified Document Number: 56748578 - Page 17 of 63

**EXHIBIT "A"**
**SCOPE OF SERVICES**

# EXHIBIT "A"

*SCOPE OF SERVICES*

# Table of Contents

I. GENERAL ....................................................................................................... 3

    A. Definitions ............................................................................................... 3

    B. Project Planning and Administration ........................................................ 4

    B. Basic Services ........................................................................................ 5

II. OPERATIONS ................................................................................................. 7

III. BILLING ........................................................................................................ 9

    A. General ................................................................................................... 9

    B. Billing Services ....................................................................................... 9

    C. Accounts ............................................................................................... 10

        1. Billable Accounts ............................................................................ 10

        2. Un-billable Accounts ...................................................................... 10

    D. Billing Requirements ............................................................................. 11

IV. COLLECTIONS .............................................................................................. 17

    A. General ................................................................................................. 13

    B. Payments and Deposits ........................................................................ 14

    C. Uncollectible Accounts ......................................................................... 15

    D. Adjustments .......................................................................................... 15

    E. Special Collections ............................................................................... 15

V. DATA ............................................................................................................. 17

    A. EMS Database ...................................................................................... 17

    B. Data Warehouse ................................................................................... 17

    C. ePCR Database Transition .................................................................... 18

    D. Reports ................................................................................................. 19

        1. General .......................................................................................... 19

        2. Standard Reports .......................................................................... 21

VI. Technical Requirements ................................................................................. 24

    A. Support ................................................................................................. 24

    B. Hardware .............................................................................................. 25

    C. Installation and Maintenance ................................................................ 27

    D. Training ................................................................................................. 27

Certified Document Number: 56748578 - Page 18 of 63

Xerox 135

E. ePCR Data Backup and System Security .................................................................. 28

    1. Data Center ........................................................................................................... 28

    2. Hardware .............................................................................................................. 29

    3. Data Integrity ....................................................................................................... 30

F. Billing and Collections Data Backup and System Security .......................................... 31

G. Software .................................................................................................................... 31

    1. User Administration and Customization of ePCR Software ..................................... 31

    2. ePCR Functions and Features ................................................................................ 32

    3. Field Software Functions and Features .................................................................. 33

Xerox 136

This Scope of Services consists of six sections:

I. General

II. Operations

III. Billing

IV. Collections

V. Data

VI. Technology

# I. GENERAL

## A. Definitions

For the purposes of this Scope of Services, the following terms have these meanings:

"Adjustments" means modifications made to account balances for over-payments, bad checks, or other changes to an account balance based on appropriate accounting treatment.

"CAD" means computer-aided dispatch.

"Collections Period" means a minimum of one hundred twenty (120) days from the date of Transport or, for accounts with payment plans, a minimum of sixty (60) days from the date of last account payment activity, as noted in the Contractor's billing system.

"EFT" means Electronic Funds Transfer.

"EMS Patient" means an emergency medical services patient or a person requiring ambulance transportation.

"ePCR" means electronic patient care report.

"Mission Critical" means the capability to enter, transmit, and receive ePCR data and to provide the necessary reports to hospitals.

"Nixies" means those Transports which reference the wrong name or are missing name and/or address information which can not be ascertained through means appropriate and standard to the industry.

"Sweeps" means seasonal, cyclical collection activities targeting all accounts from a mutually agreeable timeframe to be undertaken by Contractor annually at Contractor's sole expense, in addition to routine account information verification and correction activities, collection mailings and telephone contacts.

"Transport" means the conveyance of an EMS Patient by the City's Fire Department ambulance to a receiving hospital.

"Transport Fee" means the fees charged by the City to an EMS Patient or to a hospital for a Transport.

3

Certified Document Number: 56748578 - Page 20 of 63

Xerox 137

'Transport Date" means the date on which the Transport occurred.

"Un-billable Transports" means:

    i.    Transports which are expressly exempted in this Contract or otherwise specifically identified and agreed to in writing by the Director;

    ii.    Transports of EMS Patients who are adjudged by a court of competent jurisdiction to be bankrupt;

    iii.    Transports of EMS Patients who die and whose estate has been determined by a court of competent jurisdiction to have no assets;

    iv.    Transports billed to Medicare and/or Medicaid and:

        a)    for which further collection efforts are barred by Federal or other applicable law.

        b)    for which Medicare and/or Medicaid provisions require write-off of certain billed amounts; and

    v.    Nixies.

"Uncollectible Account" means an account or remaining balance on an account for which, based upon criteria set forth by the Finance Director of the City of Houston, further collections activities by Contractor may cease.

## B. Project Planning and Administration

The Contractor shall:

1. Be the single point of accountability for the services in this Scope of Services during the Term.

2. Provide a Client Services Manager who is the single point of contact for the project and provides oversight and coordination of all project functions, components, and interfaces.

The City shall:

    a.    Provide a primary point of contact with decision making authority.

    b.    Supply information and input as needed during the implementation and transition process.

    c.    Attend project status meetings with the Contractor.

    d.    Work with Contractor to establish or revise existing billing business rules, including noticing schedule and refund policies.

    e.    Approve all changes to noticing and letter formats.

    f.    Provide suitable training facilities to enable Contractor to fulfill its training obligations.

4

Certified Document Number: 56748578 - Page 21 of 63

g. Ensure that the City's trainers, after attending Contractor's train-the-trainer sessions, will provide instruction to the City's personnel on the new technology and all other information provided during the training, in accordance with Section VI.F.

## C. Basic Services

The Contractor shall provide the following services that are described in more detail in this Scope of Services:

1. Provide billing and collection software, hardware, installation, maintenance, support, training, data backup and system security as specified in Section VI, Technical Requirements.

   a. Manage the implementation of a new ePCR software system and integrate it into the Contractor's billing solution.

2. Utilize fully auditable billing, collection and accounts receivable systems that secure patient information in accordance with:

   i. Generally accepted accounting principles (GAAP) as they relate to health care billing and accounting practices;

   ii. Federal, state, and local statutes and regulations regarding protected health information, including the Health Insurance and Portability and Accountability Act of 1996 (HIPAA);

   iii. Protected Health Information (PHI) Patient data security requirements.

   iv. FDCPA (Fair Debt Collection Practices Act);

   v. FCRA (Fair Credit Reporting Act); and

   vi. FACTA (Fair and Accurate Credit Transactions Act).

3. Receive, from the City, and process electronic records of Transport Fees on a daily basis.

4. Maintain all EMS account information in a City-owned database that includes patient care reports, financial transactions, supporting medical documents, and patient correspondence.

5. Provide electronic and physical storage and data back-up/recovery procedures for all records pertaining to Contractor's obligations.

6. Provide designated City personnel with access to application systems and data, in all storage media, with reasonable prior notice and during regular business hours.

7. Provide, on a scheduled basis, standard reports on billing, collection and Contractor's performance and provide additional reports as mutually agreed to with the City.

8. Ensure that all data which is the property of the City is used by the Contractor only for purposes authorized under this Contract.

5

Certified Document Number: 56748578 - Page 22 of 63

Xerox 139

9. Establish and promote working relationships with area hospitals, insurance agencies, attorneys' and/or physicians' offices, etc. to obtain current and accurate billing information.

If Contractor and the City agree, Contractor will provide additional services to the City, but only if the Parties execute a written amendment to add to this Scope of Services any such services, fees, and other terms.

6

Certified Document Number: 56748578 - Page 23 of 63

# II. OPERATIONS

The Contractor shall:

1. Furnish systems, services, materials, equipment, office space and personnel necessary to deliver the services covered by this Scope of Services.

2. Establish an operational office in the Houston, Texas and:

   a. Locate the Client Service Manager at this site. Contractor shall also maintain a Technical Resources Group at its current office location, which may be changed by agreement of the City and Contractor.

   b. Provide a Disaster Recovery plan covering survivability, system redundancy and protected power.

   c. Enhance the local network with VoIP equipment.

   d. Staff the Call Center with English- and Spanish-speaking Customer Service Representatives (CSRs) at levels to be determined appropriate by Contractor.

   e. Operate a Call Center from Monday through Friday, from 8:30 a.m. to 5:00 p.m. local time (CT), excluding holidays recognized by the City.

   f. Provide a local telephone number, a toll-free fax number and a 24/7 answering service.

   g. Create secure email addresses for citizen inquiries and access to CSRs.

   h. Notify the City in writing of any change in the location of this facility.

   i. In addition to the Performance Requirements in Exhibit C of this Contract, meet the following.

   j. Answer calls in the Call Center within 15 seconds 90% of the time, measured on a calendar monthly basis.

   k. Respond within one business day to telephone messages received in the Call Center.

   l. Refer all complaints involving quality of care provided during Transports to the designated City employee.

3. Provide a mechanism to ensure that internal rules, regulations, and policies are revised to comply with applicable regulatory and legal changes. Ensure that agreements required for the processes related to billing and collection Transport Fees with payers, including Medicare, Medicaid are filed and maintained.

4. Provide assistance in the form of administrative support and document retrieval to the City in response to: (a) subpoenas served on the City for billing records; (b) requests to, or on behalf of the City for affidavits regarding billing records; and (c) requests to, by or on behalf of the City for direct or cross questions about billing records, such assistance to be provided in a timely manner

7

Certified Document Number: 56748578 - Page 24 of 63

consistent with the terms of the subpoena or reasonable request, recognizing the City may have time sensitive legal obligations associated with the subpoena or request. Should a court of competent jurisdiction fine or financially penalize the City due to Contractor's negligent failure to timely respond to a valid subpoena or request under this section, at Director's option, Contractor's compensation may be reduced up to the amount of the fine or financial penalty assessed against the City.

Any service level response times for Contractor to respond to subpoenas for billing records, affidavits regarding billing records, direct questions about billing records, and any other inquires to which Contractor is required to respond shall commence upon receipt by Contractor from the City of all documents necessary for Contractor to process the inquiry and provide a response to the inquiries. The need to respond to the subpoenas or requests referenced in this section is anticipated and the cost of same shall be borne by the Contractor except that Contractor may recoup its costs from requesting parties other than the City, as permitted by applicable law.

5. Maintain a program of education and training of Call Center CSR's and other staff in:

   a. System and technology functionality, operations and enhancements.

   b. Customer service principles and professionalism.

   c. Regulatory requirements and changes.

   d. Data security and privacy policies and procedures.

   e. Emergency procedures.

   f. Required information to keep patients informed of rights, payment options and collection procedures.

8

Certified Document Number: 56748578 - Page 25 of 63

# III. BILLING

## A. General

The Contractor shall:

1. Provide billing and collection services for Transport Fees.

2. Be responsible for the data collection and billing process, from the receipt of information regarding the Transport through the final collections and account closure.

3. Comply with state and federal regulations applicable to a third-party billing company.

4. Comply with procedural requirements of the third-party health care insurance carrier's institute.

## B. Billing Services

The Contractor shall:

1. Import ePCR data into the billing system and:

    a. Review the ePCR data for accuracy with respect to the ability of that data to generate a billable claim. Update the database with verified information or other changes from the ePCR data.

    b. Search Contractor's billing database for matching data fields in an effort to obtain accurate and complete insurance payer information.

2. Capture billable items or services from the ePCR data and utilize to bill patients for those services. Provide a real-time CAD reconciliation process and reporting system that compares dispatch calls to transport data to claim data received by Contractor in order to identify that services provided are entering the billing system.

    a. Allow Contractor and the City's Fire Department supervisors to view relevant summary data of un-reconciled calls for service.

    b. Reconcile by comparing CAD Dispatch data to RMS system data, and then compare to Contractor's billing process data.

    c. Reconcile billed and unbilled Transport Fees both on numeric counts and dollar value.

3. Verify patient billing information with the hospitals to which EMS Patients are transported. Use electronic hospital interfaces where practical to obtain patient demographic and/or insurance information using a data transfer process that complies with HIPAA regulations.

4. Submit account as necessary to a minimum of ~~three~~ two skip tracing services in order to locate and verify EMS Patient name and address.

9

Certified Document Number: 56748578 - Page 26 of 63

Xerox 143

5. Utilize an electronic insurance verification service where necessary. Utilize National Change of Address (NCOA)'s database upon initial data load to validate addresses and compare records against the NCOA's 18-month database.

6. Implement thorough collection procedures, including telephone calls, mail efforts, and skip tracing wherever necessary, in order to achieve a maximum recovery of all accounts.

7. Utilize other industry standard methods to obtain valid telephone and address information.

8. Ensure that data is consistent with HCPCS and ICD-9 Coding Procedures.

## C. Accounts

### 1. Billable Accounts

The Contractor shall:

    a. Calculate a Transport Fee for each Transport for reporting and billing purposes.

    b. Generate a detailed bill to the EMS Patient or originating hospital for each Transport unless such Transport is determined to be an un-billable account.

    c. Perform all billing services in accordance with the Performance Requirements in Exhibit C of this Contract.

    d. Bill the co-pay portion of approved insurance and Medicare claims, denials and rejections to the patient or to the patient's appropriate other insurance.

### 2. Un-billable Accounts

The Contractor shall:

    a. Calculate the net collection rate for reporting purposes by excluding:

        a. Un-billable accounts.

        b. City-approved write-offs, as defined below.

        c. All contractual write-offs (as defined below) for Medicare and Medicaid.

    b. Act reasonably and proactively to obtain missing or correct information through use of industry best practices, including, but not limited to searches of Contractor's existing database, National Change of Address review, electronic skip-tracing through a minimum of two services, other methods as specifically mentioned in this Contract and, to the extent feasible, manual skip tracing.

    c. Obtain the City's approval for all capitated agreements with insurance companies that offer discounted fast payment procedures.

    d. Treat no other Transports as Un-billable, except as otherwise approved by the City in writing.

10

Certified Document Number: 56748578 - Page 27 of 63

e. Consider any reference in this Contract to "write-offs" to mean accounts for Un-billable Transports to which any applicable exclusions have been applied.

## D. Billing Requirements

The Contractor shall:

1. Bill all transports in compliance with City rates and applicable laws.

   a. Meet all state and Federal mandated deadlines for claims submission and related compliance timeframes.

   b. Mail all initial bills within seven days of a billable EMS Patient Transport event.

   c. Assume responsibility for any late filing charges assessed because of the Contractor's failure to file in a timely manner.

2. Establish fully auditable billing, collection and accounts receivable systems and services compliant with standard industry practices.

   a. Track all data change details and system events.

   b. Maintain a complete audit trail, including data entry, record modifications, and billing events.

   c. Conduct periodic audits of actual claims to review all processing efforts and success rates in gathering insurance information through the use of hospital reports and/or third party eligibility validation services.

3. Provide electronic billing for Medicare, Medicaid and commercial Insurance claims or bill on CMS 1500s, if applicable.

   a. Use a clearinghouse to bill participating third-party health care insurance carriers electronically.

   b. Receive denials both electronically and via mail and resolve via appeal and/ resubmission of claims.

   c. Customize billing to meet the regulations of each provider.

   d. Automatically re-categorize claims appropriately after receiving and posting payment from primary payer.

   e. Process all refunds and overpayments.

   f. Contact the hospital to which the patient was transported and obtain insurance and/or updated billing information at two stages of the billing process.

      i. Within 10 business days after the Transport Date for all accounts without Medicare, Medicaid or private insurance billing information.

11

Certified Document Number: 56748578 - Page 28 of 63

ii.      Within 120 days after the Transport Date for all remaining unpaid accounts with a second request for updated insurance and/or billing information.

Certified Document Number: 56748578 - Page 29 of 63

12

Xerox 146

# IV. COLLECTIONS

## A. General

The Contractor shall:

1. Obtain Director's approval of any changes to the Performance Plan's Collection Service standards and content of collection notices and related materials in advance of implementation.

2. Coordinate with the Fire Department to ensure that field personnel use their best efforts to obtain the patient's signature and any information necessary to facilitate billing and collections as may be feasible under the circumstances of transport.

3. Create, produce, and mail timely and accurate EMS notices.

   a. Provide a clearly marked area for the patient to enter third-party billing and insurance information and a signature assigning benefits to the City.

   b. Mail at least five and at the Director's discretion, as many as nine recurring collection notices to each unpaid account unless the unpaid account has adequate billing information to bill Medicare, Medicaid or private insurer or until the account is paid in full. Unless the parties agree to a different schedule, collections notices to each unpaid accounts shall be mailed as follows:

      i. Within seven (7) business days of initial assignment/acquisition of valid address

      ii. Within twenty-one (21) business days of initial assignment/acquisition of valid address

      iii. Within forty-five (45) business days of initial assignment/acquisition of valid address

      iv. Within seventy-five (75) business days of initial assignment/acquisition of valid address

      v. Within one hundred (100) business days of initial assignment/acquisition of valid address

   c. Adjust noticing criteria (form, sequence, content, and timing) as required by the Director.

   d. Maintain complete documentation of all noticing activity undertaken and provide the Director with such documentation upon request.

4. Administer both the refund and attorney check processes.

5. Adhere strictly to state, federal and local laws pertaining to debt collection and privacy interests and other state, federal and local laws, regulations, legal requirements, business practices and codes of conduct as may be applicable, including, but not limited to policies and procedures provided to the Contractor by the City in writing.

13

Certified Document Number: 56748578 - Page 30 of 63

6. If the Director requests changes to an existing mail plan and provides 30 days written notice to the Contractor, implement the requested modifications as long as the total number of notices to unpaid accounts required under the direct mail plan in use has not yet exceeded nine.

   a. Use the City's Finance Department guidelines to determine accounts that will no longer be pursued for collection.

   b. If the Director instructs the Contractor to send more than nine regular notices, invoice City at cost for postage, printing envelopes, set-up fees and any associated programming/computer charges incurred in sending out the additional notices.

   c. For EMS Patients on payment plans with monthly payments of $50.00 or more, mail a notice to the patient outlining the agreed payment plan. Mail follow-up notices ten business days before the due date of an installment payment and, in the event of a missed payment, within twenty-four hours, mail written notice that the payment has not been made. Notices associated with payment plans shall be additional to the nine notices required elsewhere in this agreement and Contractor shall bear the cost of same.

7. Pursue Medicare, Medicaid, private insurers and third party billing companies aggressively by exhausting all appeals, re-billing accounts and initiating suits through the City's legal department.

8. Complaints, if any, received from the public must be maintained and detailed in a database and both the complaint and the resolution must be provided to the Director as part of the invoice process.

## B. Payments and Deposits

The Contractor shall:

1. Receive payments via checks, credit cards and electronically and reconcile to EOB's as necessary.

2. Deposit Medicare payments directly into the City's account via EFT Collect payments in the form of checks, credit card, on-line payment and EFT. All Medicare and Medicaid collections shall be received via EFT. All EFT payments shall be deposited into the City's established deposit bank account.

3. Any other insurance with the capacity for EFT payments shall be set up as such. All EFT payments shall be deposited into the City's established deposit bank account.

4. Retain the current remittance process and continue to receive payments at the same address. Remittance payments shall be delivered to the City's bank lockbox.

5. Process all lockbox payments the same day they are received.

6. Deliver daily to the City's banking facility any deposits not received via EFT or lockbox.

   a. Retain an armed, bonded carrier to deliver deposits to the bank.

   b. Require the carrier to maintain a minimum bonding capacity of $500,000 per daily pickup.

14

Certified Document Number: 56748578 - Page 31 of 63

Xerox 148

7. Allow EMS Patients to make credit card payments online using the Pay-By-Web system established in 2006.

    a. Allow the person to login using his or her account number and last name as it appears on the notice.

    b. Verify the last four digits of the Social Security Number for security purposes.

    c. Display account information, date of service, patient name and address, original charge, payments made and amount due.

    d. Provide an option of paying the total amount due or creating a payment plan.

8. Work with the City to develop a process of accepting cash payments should this become a future requirement.

## C. Uncollectible Accounts

The Contractor shall:

1. Utilize industry best practices and its best efforts to collect each account with the use of multiple invoices, follow up letters, and phone calls in combination with demographic and insurance eligibility searches.

2. Director may recall all or a portion of accounts if, ; Contractor has failed to perform its obligations hereunder within a reasonable time. Upon demand by the Director, and at no cost to the City, Contractor shall, within thirty days, forward all data pertaining to the recalled accounts to the City or its designated recipient.

## D. Adjustments

The Contractor shall:

1. Make Adjustments to Transport Fees for:

    a. Overpayments.

    b. Refunds of all or part of a Transport Fee or unidentified amount received which cannot be posted to an EMS Patient's account.

    c. Amounts paid by a check, posted to an EMS Patient's account and subsequently not honored (returned) by the bank.

    d. Contractor's posting errors.

## E. Special Collections

The Contractor shall:

15

Certified Document Number: 56748578 - Page 32 of 63

Xerox 149

1. Twice a year, initiate special follow-up notices to unpaid accounts that already received at least five mail notices or exceed one year in age from the transport date and run Sweeps for the purpose of collecting accounts targeted by date or other criteria acceptable to Director.

2. Accommodate additional Sweeps that the City, at its discretion, initiates at its own cost in any given fiscal year and include, at the City's option, any account, regardless of age.

3. If at the request of Director Contractor performs an additional sweep, Contractor may:

   a. Invoice the City for reasonable costs, exclusive of overhead, directly related to the additional sweep including postage, printing, envelopes, set-up charges and associated programming/computer costs for creating the mailing lists.

   b. Reduce the Contractor's contingency fee to five percent (5%).

16

Certified Document Number: 56748578 - Page 33 of 63

Xerox 150

# V. DATA

## A. EMS Database

The Contractor shall:

1. Provide a database that directly receives all patient care and billing data via CDPD transmission and provides a perpetual record of all Transports by account number.

    a. Generate an account number that consists of the Transport Date.

    b. Provide a daily sequential transport number to be used to track billing and collection information on each Transport.

## B. Data Warehouse

The Contractor shall:

1. Implement and maintain a Data Warehouse that ensures 100 percent transparency and oversight of billing operations and support that includes:

    a. Decades of historical, detailed medical, billing, and collections data.

    b. EMS accounts including patient care reports, financial transactions, supporting medical documents, and patient correspondence.

    c. Augment the current solution by including records of all services performed and all financial transactions covered under this contract.

2. Provide, to City-designated staff:

    a. User-friendly, continuous, open web-based access to the billing and collections data down to the individual claim, transaction, and clinical data elements.

    b. Replicated database.

    c. Multitude of reporting options to users that support the ability to drill down into the layers of account details including a reporting toolkit.

    d. Training and support to designated City personnel who monitor the systems and reports, as detailed in Section VI.

3. Allow analysis to be performed against the Data Warehouse with the City's in-house tools of choice.

4. Provide set of multifaceted data warehouses comprised of nuanced reporting requirements.

17

Certified Document Number: 56748578 - Page 34 of 63

Xerox 151

       a.   Provide multiple updates to the data warehouse per day in order to reflect near real-time information.

       b.   Provide a replicated database of raw information – both clinical and financial – for the City's internal analytics to deliver complete data transparency.

5.   Store all clinical and financial data, regardless of source, into a consolidated data warehouse.

       a.   Create a complete consolidated data store of all financial and clinical data for reporting.

       b.   Pass data from the data store to the City's data warehouse containing all clinical and financial records.

       c.   Provide online access to the data store for internal analysis and reporting.

## C. ePCR Database Transition

The Contractor shall:

1.   Develop a Transition Plan in cooperation with the City for the conversion from the current vendor's ePCR to the new ePCR provided by Contractor or its vendor.

2.   Support a phased deployment of the new ePCR solution.

       a.   Provide uninterrupted ePCR and billing and collections processing during the transition.

       b.   Be able to provide the data from the current solution and the data acquired from the new ePCR solution in a manner that reduces the need for conversion of any data

3.   As the financial data is initiated by the ePCR field systems, redirect and store data from both the EMTablet legacy systems and the new ePCR system during the transition period.

4.   Pass EMTablet data to the data warehouse once the new solution begins billing processing to ensure financial data from 100 percent of the billable Transports are tied to the originating clinical data.

5.   Replicate all EMS Patient and Transport data to the City's in-house database for use of their in-house reporting software to access and query the data.

6.   Enhance Contractor's vendor's production ready pre-programmed and ad-hoc reporting to allow queries against the consolidated clinical and financial data.

7.   Retain the historical records from the existing database.

8.   Upon the City's request, provide legacy EMTablet ePCR data.

Certified Document Number: 56748578 - Page 35 of 63

Xerox 152

## D. Reports

### 1. General

Within ninety (90) days of the Countersignature Date, Contractor will provide the City's designated technical monitors and auditors with both the tools and training required to access all City reports, including Ad-Hoc reports, on a 24/7 bases. Additionally, Contractor shall:

a. Provide City's designated personnel with access to:

    i. All data collected in a relational database.

    ii. Standard billing reports.

    iii. Ad-hoc reports reporting.

    iv. A web-based reporting tool to generate ad-hoc reports, at anytime, without the need to code or structure database queries and modify these reports as needed.

    v. A dynamic reporting toolkit with multi-dimensional analytical capabilities and powerful, web-based reporting options:

        a) Ad-Hoc Queries — Allow the consolidated data warehouse to be queried by selecting any of the data fields it contains, filterable by user preference including changeable time period parameters.

        b) Pre-Programmed Reports — Provide pre-programmed reports that are routinely generated or scheduled to run on a regular basis—sometimes referred to as 'canned,' 'standard,' or 'batch' reports

        c) Data Mining — Support a robust data-mining solution with an advanced reporting option that includes data analytics that provide the ability to not only drill into City clinical and financial data and add additional context through interfaces; e.g., to U.S. Census data.

b. Deliver training and Help Desk support for all reporting tools.

c. Provide the City's designated technical monitors and auditors with both the tools and training required to access all City reports on a 24 by 7 basis.

d. Ensure that all common data listed in reports balances from one report to another.

e. Review the format of existing reports with the City. If new formats are required, create the new reports to meet the City's needs. Determine desired frequencies and method of access/transmission for all required reports.

f. Make detailed reports of individual accounts or transactions available upon request to audit the Contractor's accounting, business practices and operational compliance or any write-offs specifically approved by the City.

g. Meet the reporting needs required for internal management controls as well as external measurement requirements and performance assessments.

h. Provide the ability to generate long-term analysis reports in order to assess historical trends pertaining to current City objectives.

19

Certified Document Number: 56748578 - Page 36 of 63

i. Provide training facilities as required for ongoing use in conjunction with this contract

    i. Provide ePCR/Clinical Training "Train-the-Trainer" instruction at a mutually agreeable location.

    ii. Fund travel and accommodations for five EMS personnel if training site is remote to the City. After the Contractor has trained the Fire Department's trainers, it is the responsibility of the City to provide instruction on the new ePCR technology, in sessions from four (4) to eight (8) hours, led by instructors who have attended train-the-trainer classes at the City's facilities.

    iii. Make available appropriate personnel for ePCR training or consultation for up to one week within 30 days after the completion of the "Train-the-Trainer" process.

    iv. Coordinate with the City to establish times and locations for the initial training of City personnel to access the online administration tool for purposes of monitoring and reporting access and performing administrative and data management functions for replicated datasets

    v. Review and revise training plans as necessary to incorporate the City's specific requirements and provide additional training as required.

j. Provide access to Contractor's or its vendor's tools for reporting and viewing data and:

    i. Enforce user security to restrict reporting and viewing information to authorized data.

    ii. Establish permission groups that provide selected users rights to the following report functions:

        a) Define Data Set

        b) Choose Field Properties

        c) Define Selection Criteria

        d) Set Report Layout Options

        e) Define Display Options

        f) Save and Schedule Reports

        g) Set Permissions

    iii. Provide Texas DSHS state reporting and modify to meet changed requirements.

    iv. Allow Administrators to configure the auto-generation of printed reports.

    v. Provide standard reports, including QA/QI, statistical analysis, employee performance and key performance indicators.

    vi. Provide vendor support for reporting tools.

20

Certified Document Number: 56748578 - Page 37 of 63

Certified Document Number: 56748578 - Page 38 of 63

k. Make Contractor's Systems programmers and administrators available to support the City's reporting efforts.

l. Work with the City to determine the right mix of data analysis and reporting mechanisms to increase the City's revenue potential and meet the City's objectives, including such services as:

    i. Develop data fields.

    ii. Construct questionnaires.

    iii. Perform data analysis.

    iv. Develop data mining techniques.

    v. Gather data from any relevant data base to which access is both legal and appropriate.

    vi. Apply sophisticated statistical analysis in support of the research.

    vii. Sponsor the City's Medical Director or his/her designee to either attend, pay for or host a symposium related to expanding the body of knowledge related to Paramedicine during the term of this contract.

m. Provide Rapid reporting via data cubing and expedited searching capabilities in the Report Writer and data mining tool along with the advanced Visual Informatics reporting module.

n. Satisfy requests from the ARA Director for additional reports or modifications to such reports from time to time and provide such additional reports and/or modified reports to Director in the form, method and time frame requested.

    i. Work with the City's staff to enhance existing reports or develop new reports that meet current and future needs.

    ii. If a report cannot be mutually agreed upon, the City may request from the Contractor a cost and time estimate quotation to produce the requested report.

    iii. Such cost quotation shall not exceed $125 per hour.

    iv. If the City authorizes the Contractor to produce the requested report at the quoted price, then the Contractor shall produce the report and, upon completion of the report, bill the City in the normal monthly billing process.

## 2. Standard Reports

The Contractor shall make the following standard Billing and Collections reports available in the form and time frame prescribed by the Contractor or upon the City's reasonable request.

a. **Report of Transports Received and Billed** — a monthly report that compares transport data received by the Contractor from the City with transports billed by the Contractor to provide reconciliation between the two; identifies the Transport Date, the City's incident number,

21

number of Transports billed, net amount billed, and amount of "no fee" Transport authorized by the City; provides EMS Patient Transport level detail.

b. **Report of Collections** — A monthly report used to verify and reconcile the bank deposit activity with collection posting activity; identifies the total daily bank deposit amount, amount posted to accounts from both current deposits and previously unidentified payments, amounts posted as overpayments, unidentified payments, refund of unidentified payments and the outstanding balance of unidentified payments; provides detailed data at EMS Patient Transport level.

c. **Commission Invoice Report** — A monthly report that details and verifies the accuracy of the payments made by the City to the Contractor; supports the calculation of variable rate fee and includes the total amount billed by Transport month, prior month cumulative collections by Transport month, current month collections by Transport month, cumulative fees payable by Transport month, cumulative fees paid by Transport month and net fees due by Transport month.

d. **Contractor Performance Analysis Report** — A monthly report that summarizes the results of the collection effort in order to measure Contractor performance; contains all activity for each Transport month with collections aged by billing month.

e. **Transport reports** — Lists total number of Transports reported by the City; total number of Transports billed by Contractor; amount billed by Contractor; adjustments to amount billed including Transports reported as "no fee" by the City, Uncollectible Account amounts by category (Medicare/Medicaid, Private Insurance, Self Pay, third party, etc.) and the resulting net amount collected.

f. **Collection reports** — include the number of accounts collected by collection method (i.e., Medicare, Medicaid, private insurance, third party and self-payment), total amount collected by collection method, amount of overpayments, adjustments including refunds, returned checks and posting errors and the resulting net amount collected.

g. **Effective Collection Rate** — include the Effective Collection Rate to date for each Transport month.

h. **Report of Outstanding Accounts Receivables** — A monthly report that details outstanding accounts receivable balances on totals by all EMS Patient Transport accounts and age of each invoice.

i. **Medicare Medicaid Activity Report** — a monthly report that monitors all related activity, including the number of assigned claims submitted and the associated reduction in receivables due to the difference between the Medicare/Medicaid profile and the current EMS Transport rate, the total amount of payments received, the number and percent of rejected claims, the number and percent of rejected claims subsequently recovered and the amount of unpaid balances collected from sources other than Medicare/Medicaid.

j. **Outstanding Un-billable (Nixie) Accounts Report** — details outstanding transports currently un-billable because of missing or incorrect information that precludes billings.

22

Certified Document Number: 56748578 - Page 39 of 63

k.  **Other Statistical Reports** — Other reports reasonably requested by the City from time to time.

l.  **Management Reports** — System-generated reports that help management to identify any anomalies within the data, both before and after the Transport is transmitted to billing, to support City oversight to ensure 100 percent accountability.

Certified Document Number: 56748578 - Page 40 of 63

23

# VI. Technical Requirements

## A. Support

The Contractor shall:

Provide a specialized ePCR Clinical Help Desk with second level technical support coverage for Clinical/ePCR & Reporting incident reporting available 24/7 at support@imagetrend.com or such other address provided by Contractor, as well as Monday through Friday from 8:30 am to 5:00 pm CST at: Phone: (952) 469-1589 and Toll Free: (888) 469-7789.

1. Provide Technical Support for the City's trainers during their normal working hours for ePCR and for other City personnel using the Reporting system during their normal business hours.

2. Provide a Local Technical Support office, no more than a mile from EMS Headquarters, staffed with two FTE during business hours Monday through Friday from 8:30 am to 5:00 pm CST via Cell Phone with After-Hours pager.

3. Provide on-site local technical support of the City's Business Office to address questions relating to Billing and Collections from Monday through Friday from 8:30 am to 5:00 pm CST at (713) 651-0353.

4. Provide onsite Support and Maintenance for field crews, 40 hours per week and on-call outside of normal business hours for 24 x 7 coverage.

5. Respond to Core Software change requests within two business days of receipt.

6. When there is a change to policy, procedure, statutes or regulations that affects Contractor's Billing and Collections systems functionality, make the required modifications to the existing billing platform or configuration.

7. Work with the City to revise, enhance, and update the systems as necessary to support process improvement programs.

Provide second level help desk and technical support (technical diagnosis and fixes of technology issues involving software and hardware) to the onsite technicians as needed to allow them to support field personnel.

Acknowledge receipt of a malfunction report from the City within four business hours.

    a. If all useful work is prevented from being accomplished and major functions from cannot be performed, take immediate corrective action.

    b. If a mission critical malfunction is reported, the contractor will respond within four (4) business hours and replace or repair will occur within twenty-four (24) hours.

24

Certified Document Number: 56748578 - Page 41 of 63

c.  If a non-mission critical issue is involved, take reasonable corrective action to remedy the problem within two (2) business days.

d.  If only non-essential functions are disabled, resulting in degraded operations, undertake reasonable corrective action to remedy the problem within five (5) business days.

e.  Malfunction report pertains to technology, software, hardware and connectivity.

8.  Provide 500 hours for Core ePCR Software changes as part of this contract. Time spent on the interface will not be charged to the 500 hours.

9.  For changes beyond the 500 hours, charge a standard development rate of $110/hour; subject to market variations.

10. Provide End-to-end data flow with the a new CAD IP-Based Message switch and interfaces between the Contractor's Billing and Collection systems, Contractor's vendor's systems, Hospitals, and other third parties to ensure a seamless flow of billable data in order to maximize collections in the shortest time.

11. Provide ongoing ePCR support, including product performance and general maintenance.

12. Provide ePCR system administrators with the ability to support field maintenance for the system as the first level of contact with the option to refer inquiries directly to the specialized ePCR Help Desk through the Contractor's Change Management Process.

13. Escalate problems to the Contractor's onsite Project Manager who is responsible for addressing operational and technical matters from point of contact to resolution.

14. Refer unresolved issues to the Contractor's Senior Management for resolution.

15. Make the Contractor's Support Team available during the City's training.

16. Provide Contractor's vendor's self-service online support center, including FAQs, incident logging capabilities, incident review, and education materials for ePCR products and Reporting.

## B. Hardware

The Contractor shall:

1.  Refresh the City's field technology and include supplies and warranties.

2.  Provide the next generation ruggedized tablets when available to meet the City's implementation schedule.

Based on equipment recommendations for use with Contractor's vendor's ePCR product, provide ruggedized tablets with their newest release, the X10gx, with a processor speed of 1.5 GHz.

25

Certified Document Number: 56748578 - Page 42 of 63

Xerox 159

3. Replace the following equipment according to the timeframe specified in the table below:

| Description | Quantity | Hardware | Deployment Schedule |
|---|---|---|---|
| Ruggedized Tablet PC, 1.5 GHz Processor, 4 GB RAM, 32 GB SSD, Windows 7 | 341 | DRS Armor next generation | In accordance with the City's deployment schedule. Please see section below for further discussion. |
| Long lasting, memory-free Li-ion battery pack for Tablet Computers | 516 | DRS Twin hot-swappable lithium ion battery pack | Per Tablet replacement schedule. |
| Cigarette Lighter Power Cord | 316 | DRS Cigarette Lighter Power Cord per Tablet provided | Per Tablet replacement schedule. |
| Desktop Docking Stations for 4 HUB USB, two serial ports, one parallel port, one PS/2 keyboard port and power | 50 | DRS tablet Desk Dock | Incremental will be acquired to bring the total deployed to 50 units upon Contract Award with replacement as needed during the contract period for up to 50 docks. Conduct a thorough review of the docking station in each apparatus and repair as needed. |
| Vehicle Docking System (USB) | 308 | DRS tablet Vehicle Dock | As needed within the vehicles with a complete fleet replacement as per the requirement of the tech refresh. |
| CDMA/GPRS Door. For use with Wireless card | 0 | Not applicable | The planned DRS tablet uses an embedded air card / chip whereby the door is no longer needed for protecting the air card. |
| Gobi 2000 mobile broadband and integrated GPS, 802.11 A/B/G/N and Bluetooth[2] | 341 | DRS Armor Internal Wireless Communication (air card) | Per Tablet replacement schedule. |
| Spare Passive Pen Kit for Tablets with Tether | 401 | DRS Armor pen input device | Per Tablet replacement schedule. |
| DRS Tablet three year limited warranty, parts and labor, with ARMORcareAR (advanced replacement service) | 341 | Base warranty for DRS Armor with Service Agreement | Per Tablet replacement schedule. |
| DRS Tablet Extended Warranty | 341 | Extended Warranty for DRS Armor Tablet (Years 4 and 5 warranty coverage) | Per Tablet replacement schedule. |
| HP DeskJet mobile printer (H470wbt) with Bluetooth printer card | 166 | Portable printer for Ambulance units | At the start of the Term. |
| HP USB Cable, 2 Meter | 166 | USB printer cables for portable printers | At the start of the Term. |
| HP Black Inkjet Printer Cartridge for mobile printer | 4080 | Black toner cartridge for portable printers. | Provide 350 inkjet cartridges at the start of the Term and will maintain an inventory of 170 cartridges during the Term. |

[1]Equipment and supplies provided as needed during the Term up to the quantities listed.

26

Certified Document Number: 56748578 - Page 43 of 63

## C. Installation and Maintenance

The Contractor shall:

> Inspect all apparatus equipment, docking stations, driver's license scanners, printers and repair or replace as needed. Install the Armor XG10gx within the City's EMS transport vehicles and access power from the vehicles for charging while docked.

1. Assume responsibility for the costs of the following components of the Billing and Collections solution:

   a. Initial capital outlay for the hardware and software.

   b. Modems or broadband cards and the ongoing cellular service costs during the life of the contract.

   c. Hardware maintenance and software license fees.

   d. Installation and maintenance of all laptop docking hardware provided within the EMS units.

   e. Installation and maintenance of all hardware supporting the system and located within the local area hospitals.

   f. Installation and maintenance of all printing hardware within the EMS units.

   g. Include vehicle docks and related equipment to allow the complete field hardware refresh.

   h. Balance of the buyout of the existing software and hardware.

   i. Replacement of all field units upon replacement of the existing ePCR solution with the new ePCR solution, pending approval from the Fire Department on the recommended advanced timing and processor speed variances.

2. In accordance with the City's implementation schedule, provide the City with a 10 percent spare factor on the new tablets provided to be on hand at all times.

3. The Contractor shall provide a process and system of reporting all trouble tickets for work required for system malfunctions.

4. Provide a new City Buy Out Amortization schedule for the hardware refresh until the end of the Term.

## D. Training

The Contractor shall:

27

    ii. Provide ePCR/Clinical Training "Train-the-Trainer" instruction at Contractor's vendor's facilities or in Houston.

    iii. Fund travel and accommodations for three to five EMS personnel to be trained at Contractor's vendor's facilities or for Contractor's vendor's trainers to conduct classes the City's facilities for up to one week.

    iv. Provide Field Training for the EMS ePCR system from four to eight hours using the City's instructors who have attended a train-the-trainer sessions.

    v. Review and revise training plans as necessary to incorporate the City's specific requirements and provide additional training as required.

    vi. Make the Contractor's vendor's team available for a reasonable amount of consultation.

    vii. Deliver professional training on Billing Platform, Reports, and Oversight and ensure that the subject matter presented is directly relevant to the tasks that City personnel are expected to perform within their daily interactions with the solution.

    viii. Provide basic one-day training required for City employees to access the reporting and monitoring functions including:

        i. Security process

        ii. System Navigation and Menus

        iii. Claim Lookup and Auditing

        iv. Creating Ad-Hoc Reports including Sharing and Distribution

        v. Drill Down Reporting Capabilities

        vi. Accessing and Running Pre-programmed/Standard Reports

        vii. Accessing Financial Scorecard and Operational Processing Scorecards

        viii. Using Advanced Data Mining Tools

    ix. Provide periodic live online (Webinar) or onsite training and refresher classes, as requested, for both ePCR and Reporting system during normal business hours for new personnel and as review for existing personnel.

## E. ePCR Data Backup and System Security

## 1. Data Center

The Contractor shall:

    1. Provide premium hosting facilities at Contractor's vendor's data center and incorporate comprehensive infrastructure, application security and technical support.

    2. House both the clinical ePCR system and data.

28

Certified Document Number: 56748578 - Page 45 of 63

Xerox 162

3. Provide backup and contingency planning services covering ePCR data and all related financial information.

4. Supply the following hosting facility features:

    i. Redundant, high-speed Internet connections over fiber optics.

    ii. Power protection via an in-line 80kVa UPS with a 150 KW backup diesel generator

    iii. Temperature controlled environment

    iv. Waterless Fire Protection and Clean agent fire suppression

    v. Secured site access

    vi. Steel Vault Doors

    vii. 21" concrete walls and ceiling

## 2. Hardware

The Contractor shall:

1. Configure Contractor's vendor's hosting server hardware to prevent data loss due to hardware failure to ensure a quick recovery from any hardware related problems:

2. Install Independent Application and Database Servers.

    a. Microsoft SQL Server 2005

    b. Microsoft Windows Advanced Server 2003

3. Provide Redundant Power Supplies.

4. Locate Off-Site Idle Emergency Backup Servers.

5. Use Sonicwall VPN Firewall.

6. Supply Redundant Disk Configurations.

7. Perform Weekly, Monthly, or quarterly backups with periodic CD-ROM Backups (on request).

8. To provide vaulting and escrow of all source code utilized as part of the ePCR solution. This means preservation of the source code in an escrow account where Contactor designee is named beneficiary in case the supplier cannot continue business operations.

9. Allocate 500 MB of Disk Space per month and provide additional space in 100 MB increments.

10. Support 1 GB Traffic or Bandwidth per month with additional bandwidth available in 1GB increments.

29

Certified Document Number: 56748578 - Page 46 of 63

## 3. Data Integrity

The ePCR provider shall:

    1. Back up Contractor's vendor's hosted applications daily to allow for complete recovery of data.

        a. **Code/Data Backups:**

            i. Execute all backup routines after peak hours to minimize the effect on users.

            ii. Store backups on hard disks.

            iii. Take a backup copy offsite on a monthly basis.

            iv. Execute data synchronization across a secure network connection to Contractor's vendor for both application code and database files on as near a real time basis as practical.

        b. **Restore Procedure:**

            i. Store daily backup files as uncompressed to facilitate quick recovery of one or more files as needed.

            ii. Un-Compress and reattach database files for restoration.

            iii. Backup the restoration copy before modifying it.

            iv. If restoring a complete backup of application code over a corrupted install, make a copy of the bad files to maintain any new user-added files since the backup was created.

## F. Billing and Collections Data Backup and System Security

The Contractor shall:

    1. Maintain the multiple levels of security already in place to protect the City's patient information.

    2. Enforce policies prohibiting the discussion of patient information in open areas.

    3. Restrict access to sensitive software programs to unauthorized personnel.

    4. Use a commercial shredder to destroy all documents that contain patient data.

    5. Maintain Secure Servers and FTP Sites.

    6. Encrypt all electronic data during any transmissions that the Contractor controls made on behalf of the City to required databases, hospitals, and/or third party payers in compliance with the HIPAA privacy act requirements.

    7. Implement processes to prevent system loss and protect and recover client data from cyber attack, a network failure, a long term power outage, a fire, a flood and/or a natural disaster.

30

Certified Document Number: 56748578 - Page 47 of 63

8. In the unlikely event that a disaster occurs, provide for alternate processing facilities for Contractor's EMS billing and collection solution.

9. Provide a system that ensures a complete and uninterrupted flow of service via back-up systems and a data recovery system.

10. Provide an comprehensive disaster recovery Plan that incorporates an effective backup and recovery program and also includes:

    a. The physical security of the Contractor's data center

    b. Reliable and serviceable hardware

    c. Proven operating policies and procedures

    d. Software and data base backups

    e. Rapid response, rapid recovery and data integrity in case of failure

    f. Periodic testing at Contractor's alternative processing facilities to ensure readiness

## G. Software

## 1. User Administration and Customization of ePCR Software

The Contractor shall provide an ePCR system that allows Fire Department Administrators to:

1. Query and print ePCRs from Database within minutes of record being transmitted from field device.

2. Access Administrative functions via the Web.

3. Configure the online forms; i.e., Data entry screens from any internet connection at any time to meet the City's data collection needs.

4. Create Service Defined Questions to capture any additional information not included in the NEMSIS dataset, administer these questions centrally via the ePCR administrative function to the ePCR system and report results.

5. Set up and modify each template, tab, label, and form from a central web-based location.

6. Update organization-specific list of values (pick lists).

7. Update field devices via wireless connection quickly, routinely, without persistent problems using the centrally administered ePCR administrative function that pushes changes to the ePCR system units upon connection.

8. Establish an audit trail to require entry for reasons for subsequent changes/addendum made to the record by the original crew.

9. Add system edit checks to compel users to comply with the City's requirements and protocols which are provided to Contractor in writing.

31

Certified Document Number: 56748578 - Page 48 of 63

10. Use Active Protocols feature to establish national and service protocols for display on action checklists and allowing easy access to specific power tools (i.e., vitals, IV, etc.) needed for each assigned protocol.

11. Use the EMS ePCR administrative function to centrally manage service information, defined files, data elements, Service Defined Questions, Active Protocols, and run form templates.

12. Lock or unlock runs from editing by time, security level, and user. Be able to track changes in the audit log.

13. Configure the validation score for required field data elements (validation score as opposed to not being able to close a PCR without filling in required fields) and allow each field to have established its own value towards the Validity Score. On the system screens, display in red the labels of those fields in which errors are detected in them.

14. On the ePCR system screens, display in red the labels of those fields that have errors detected in them.

15. Provide service-definable run form templates.

16. Edit the Signature Panel and related legal verbiage.

17. Provide user based security to allow the administrator to set permission levels for each user, including entry and closing capabilities.

## 2. ePCR Functions and Features

The ePCR system must provide the following features and functionality:

1. Allow area hospitals' authorized personnel to log in, view, and print only the ePCRs of transports to their facility via the Hospital Dashboard accessed from any browser.

2. Be compliant with the most current NEMSIS Gold Standard and subsequent upgrades that occur over the life of the contract.

3. Identify whether an ePCR was started manually or via Dispatch "Shell Record".

4. When a run is added, provide the option to import the CAD data into the ePCR.

5. Restrict the ability to enter data and close a record to the originating user and Administrators.

6. Provide a sufficient number of administrative roles to accommodate all levels of system access and security.

7. Meet or exceed State and Federal data privacy requirements and the HIPAA guidelines.

8. Be NFIRS compliant.

9. Collect the NHTSA 2.2.1 dataset and support future revisions.

10. Provide drill down technology for rapid lookups of data such as destinations, locations, meds, and procedures.

32

Certified Document Number: 56748578 - Page 49 of 63

Certified Document Number: 56748578 - Page 50 of 63

11. Provide the Standard Medicare questionnaire for billing information including insurance, authorization, waiver of liability, record of belongings, HIPAA consent, and emergency contact information as well questions to determine medical need such as Unconscious/Shock, Transported To/For, Hospital Admit, Type of Transport.

12. Allow billing information to be captured through a series of text prompts, radio buttons, and checkboxes.

13. Allow EMS Patient (or user) to sign the Authorization for Billing, Waiver of Liability, Emergency Admission, and HIPAA Consent using a Tablet PC.

14. Display percentage for the current run to the user at the top of the Incident window.

15. Provide QA/QI review and secure messaging with intra-application and external email capabilities.

16. Allow EMS personnel and Medical Directors to track, review, and comment upon all incidents within their service.

17. Incorporate historical patient demographic information to allow a user to search on an EMS Patient's name, social security number or address as collected during past encounters and view existing information.

18. Use the ePCR administrative function dashboard to provide a user-configurable view of runs for the person's service as well as monitoring widgets for financial information for billable transports.

19. Use the ePCR administrative function to automatically notify the appropriate employee when follow-up action by emergency personnel is required based on notes recorded by the medical director or other service administrators. Track correspondences and allow replies in the same fashion as email.

## 3. Field Software Functions and Features

The Contractor shall provide field personnel with the ePCR system component that provides the following features and functions:

1. Login security with a SQL database that is encrypted.

2. Secure data and transmissions using with 128-bit security.

3. Secured website using HTTPS protocol.

4. Interface with the EKG device to import data recorded during patient monitoring, store in the Vitals/Treatments section of the EMS ePCR system and include this data on the PCR.

5. Display all six-second EKG wave forms during the transport and the historical vitals record once loaded into the ePCR

33

6.  Ability to run applications outside of the ePCR product using the Quick Links tab to access the Care Withholding Form, Controlled Drug List, Forms, and the Unit Daily Checklist.

7.  Display documentation for EMS Protocols and support electronic creation of documents and their subsequent distribution, storage, and updating in formats including print, PDF, Web, and CD-ROM.

8.  Provide Remote Disconnected Client Field Application using internet connectivity to post data and receive downloads to assist City's emergency responders in generating complete, real-time electronic patient care reports in the field.

9.  Synchronize data with the ePCR administrative function over a wireless network or via phone service carrier lines.

10. Print a PCR for the receiving hospital at the time of patient delivery.

11. Print patient forms as defined by the City and agreed to by the Contractor.

12. Be compatible with Windows 7.

13. Retain a Dispatch queue for all runs.

14. Provide an End-of-shift report/CAD Reconciliation Report using CAD data to ensure there is an ePCR attached to all pertinent calls and includes the validity score of the ePCR.

15. Encrypt data transmitted from the field to the host server using a 128-bit encryption SSL Server Security Certificate.

16. Provide specialty tools, including pen-based entry, handwriting recognitions, graphical interactive patient assessment, and online data verification to enable rapid entry of data by field personnel for Medications; Therapies; and Vitals; Broselow/Luten Scale; Graphic assessment for Medical; Injury and Burn; Glasgow/Coma; Cardiac Arrest.

17. Support for MapPoint integration for incident and GPS mapping.

18. Provide a capability for quick, electronic note taking using the mouse or pen-based entry.

19. Attach photos, scanned documents and any other file formats to the ePCR.

20. Integrate with the City's Altaris CAD system, via the ePCR system's DataPort allows for data exchange with software packages via XML standard, using an IP-based Message Switch to translate CAD status updates and pass them to the ePCR administrative function Dispatch Bridge module.

21. Navigate to any data field (entry or drop-down) within two clicks via data entry short cuts.

22. Document all key events during the call, including: Arrive on scene, EnRoute to Hospital, Arrive at Hospital, Return to Service. The timestamps from the MDTs are transmitted to the City's CAD. The CAD updates are subsequently transmitted to the ePCR provider and to the ePCR application in the field as outlined in #20.

34

Certified Document Number: 56748578 - Page 51 of 63

23. Using the wireless CAD interface, provide real-time automated dispatch call status date and time stamps to the appropriate ePCR system fields.

24. Using the Custom Logic Design Message switch, exchange CAD call data with the legacy vehicle Mobile Data Terminals (MDTs) and transmit to ePCR administrative function through to the ePCR system wirelessly.

25. Integrate Contractor's vendor's Mapping and Reporting System (MARS) and Strategic Triggered Alert Reporting (STAR) with Microsoft Bing Maps.

26. Enter data in any order.

Capture Patient Information from government-issued Identification Cards, including all state Driver's Licenses that are compliant with the current standards issued by the American Association of Motor Vehicle Administrators (AAMVA), via a 10 card swipe reader, and use it to populate the appropriate fields in the EMS mobile data collection software.

27. Relocate the Drivers' License scanners from the MDTs to the DRS Mounts to facilitate data collection to the new ePCR tablets and ePCR system application.

28. Calculate GCS, including age parameters, automatically based on patient examination.

29. Convert values entered (weight in either pounds or kilograms, and temperature in either degrees Fahrenheit or Celsius) to record both values in the corresponding format.

30. Display all activities of a given run chronologically using the Activities Tab in ePCR system.

31. Filter activity details by meds, procedures, and vitals using the Report Writer.

32. Support auto generation and editing of multiple, service definable narratives in paragraph format and allow the text to be manually edited.

33. Use the Tablet PC to capture multiple electronic signatures of Patient, Parent/Guardian, Peace Officer, Witness, Technician, Hospital/Receiving Agent, and the Medical Control/Physician for Authorization for Billing, Waiver of Liability, Emergency Admission, and HIPAA Consent panels.

34. Provide a Perpetual Time Code Display that allows events to be quickly time-stamped through the selection of the clock icon when in the appropriate field.

35. Populate Time and date fields by tapping a "clock" button when in the appropriate field.

36. Provide a quick display of the City's selected data points to eliminate need to open each and every data entry field.

37. Display the Validity Score based on the service-definable data element score, and identify missing fields by selecting a tab or the validity score. Allow the user to look up, display, and navigate to any missing required data elements.

38. Supply tracking and reporting of multiple patients for a single incident with minimum redundant data entry.

35

Certified Document Number: 56748578 - Page 52 of 63

39. Implement secure multi-tiered access to ensure and respect data privacy up to HIPAA standards via a multi-tiered security module incorporated into the ePCR application meets HIPAA guidelines.

40. Use of the reporting and auditing functions of the application's procedures to allow for complete safeguarding and immediate notifications of any attempted breaches. The auditing feature provides audit trail of updates. Audit trails can be reported on by authorized users.

41. Provide data access only through assigned permissions and ensures that only those intended see their data and can access it for reporting.

42. Contractor shall provide functionality in the ePCR which will produce a .pdf or similar format document prior to the application of a signature that closes a given call in the field. This shall allow the EMT/Paramedic that ability to view the document to which he or she is assigning his or her signature.

36

Certified Document Number: 56748578 - Page 53 of 63

## EXHIBIT "B"
## PAYMENT OF FEES

Subject to all terms and conditions of this Contract, City agrees to pay Contractor for its performance under this Contract in accordance with this Exhibit "B" and Article IV, Sections A and B of the Contract.

Definitions:

"Electronic Interface" means that Contractor's billing software has an electronic interface with the financial billing data held by the hospital receiving a Transport.

"Gross Revenue Collections" means the total amount of cash collections received by Contractor during a calendar month which are posted to the bank account designated by the City, regardless of the date of service on which a Transport occurred.

"Transport" means the conveyance of an EMS Patient by the City's Fire Department ambulance to a receiving hospital.

## 1. Fees

The Contractor shall be paid a flat contingency fee of **11.96%** based upon Gross Revenue Collections each month during the Term.

For example, if Contractor's Gross Revenue Collections for a month were $300,000, Contractor's fee for that month would be $30,570.

## 2. Additional Fees

After each year of the Contract, Contractor shall provide an annual report of the average percentage of Contractor's Transports which maintained an Electronic Interface for the prior year. If the annual average is **90%** (ninety percent) or greater, then, at discretion of the Director, the City may pay Contractor an additional one time fee per year of **0.25%** (1/4 of 1 %) of the Gross Revenue Collections received during the prior contract year. Contractor will invoice the City for this amount as a lump sum which will be payable in accordance with the payment terms of this Contract.

Contractor's annual reports to the City shall be deemed sufficient for verifying Contractor's performance with respect to the maintenance of Electronic Interfaces.

Certified Document Number: 56748578 - Page 54 of 63

For example, if Contractor's Gross Revenue Collections for one year were $35,000,000, and an annual average of 92% of Contractor's Transports maintained an Electronic Interface, then Contractor's additional fee for that year, if paid, would be $87,500.

## 3. Medicaid Claims

Notwithstanding any other provision of this Contract, Contractor shall not receive any compensation from the City for preparing or submitting Medicaid claims arising from Transports so long as ACS State Healthcare, LLC remains the Medicaid Claims Processor for the State of Texas. In the event that ACS State Healthcare, LLC no longer processes Medicaid claims for the State of Texas, Contractor shall notify City in writing of the date on which ACS State Healthcare, LLC no longer provides Medicaid claims processing for the State of Texas, and Contractor may immediately after such date include revenue received from Medicaid claims for determining the amount of Gross Revenue Collections.

Xerox 172

**EXHIBIT "A-2"**
**2011 EQUIPMENT COSTS**

| Description | Qty | Note | Unit Costs | Extended |
|---|---|---|---|---|
| Ruggedized Tablet PC, 1.5 Ghz Processor, 4 Gb RAM, 32 Gb SSD, Windows 7 | 341 | DRS Tablet | $ 3,470.94 | $ 1,183,590.54 |
| Long Lasting, memory-free Li-Ion battery pack for Tablet computers | 516 | DRS X10 Batteries | $ 120.60 | $ 62,229.60 |
| Cigarette Lighter Power Cord | 316 | DRS X10 Cigarette Lighter Power Cord | $ 95.00 | $ 30,020.00 |
| Desktop Docking Stations for 4 HUB USB, two serial ports, one parallel port, one PS/2 keyboard port and power | 50 | DRS X10 Desk Dock | $ 500.00 | $ 25,000.00 |
| Vehicle Docking System (USB) | 308 | DRS X10 Vehicle Dock | $ 700.00 | $ 215,600.00 |
| Spare Passive Pen Kit for Tablets with Tether | 401 | DRS Pens | $ 40.00 | $ 16,040.00 |
| 2 years additional warranty coverage | 341 | DRS X10 Years 4 and 5 warranty coverage | $ 600.00 | $ 204,600.00 |
| HP Deskjet mobile printer with Bluetooth printer card | 166 | | $ 250.00 | $ 41,500.00 |
| HP USB Cable, 2 Meter | 166 | | $ 13.25 | $ 2,199.50 |
| HP Black Inkjet Printer Cartridge | 4080 | | $ 21.00 | $ 85,680.00 |
| HP LaserJet Printer | 50 | | $ 335.00 | $ 16,750.00 |
| HP 3-Year Next Business Day Extended Warranty | 50 | | $ 85.00 | $ 4,250.00 |
| HP Toner Cartridge | 600 | | $ 79.20 | $ 47,520.00 |
| HP USB Cable, 2 Meger | 50 | | $ 13.25 | $ 662.50 |
| Dell PowerEdge T710 Server (Fully Equipped) | 1 | | $ 28,353.00 | $ 28,353.00 |

Certified Document Number: 56748578 - Page 56 of 63

| Houston EMS Amortization Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month 1 | $ | 2,513,371 | Month 21 | $ | 1,875,580 | Month 41 | $ 837,790 |
| Month 2 | $ | 2,471,481 | Month 22 | $ | 1,633,691 | Month 42 | $ 795,901 |
| Month 3 | $ | 2,429,592 | Month 23 | $ | 1,591,801 | Month 43 | $ 754,011 |
| Month 4 | $ | 2,387,702 | Month 24 | $ | 1,549,912 | Month 44 | $ 712,122 |
| Month 5 | $ | 2,345,813 | Month 25 | $ | 1,508,022 | Month 45 | $ 670,232 |
| Month 6 | $ | 2,303,923 | Month 26 | $ | 1,466,133 | Month 46 | $ 628,343 |
| Month 7 | $ | 2,262,034 | Month 27 | $ | 1,424,243 | Month 47 | $ 586,453 |
| Month 8 | $ | 2,220,144 | Month 28 | $ | 1,382,354 | Month 48 | $ 544,564 |
| Month 9 | $ | 2,178,254 | Month 29 | $ | 1,340,464 | Month 49 | $ 502,674 |
| Month 10 | $ | 2,136,365 | Month 30 | $ | 1,298,575 | Month 50 | $ 460,785 |
| Month 11 | $ | 2,094,475 | Month 31 | $ | 1,256,685 | Month 51 | $ 418,895 |
| Month 12 | $ | 2,052,586 | Month 32 | $ | 1,214,796 | Month 52 | $ 377,006 |
| Month 13 | $ | 2,010,696 | Month 33 | $ | 1,172,906 | Month 53 | $ 335,116 |
| Month 14 | $ | 1,968,807 | Month 34 | $ | 1,131,017 | Month 54 | $ 293,227 |
| Month 15 | $ | 1,926,917 | Month 35 | $ | 1,089,127 | Month 55 | $ 251,337 |
| Month 16 | $ | 1,885,028 | Month 36 | $ | 1,047,238 | Month 56 | $ 209,448 |
| Month 17 | $ | 1,843,138 | Month 37 | $ | 1,005,348 | Month 57 | $ 167,558 |
| Month 18 | $ | 1,801,249 | Month 38 | $ | 963,459 | Month 58 | $ 125,669 |
| Month 19 | $ | 1,759,359 | Month 39 | $ | 921,569 | Month 59 | $ 83,779 |
| Month 20 | $ | 1,717,470 | Month 40 | $ | 879,680 | Month 60 | $ 41,890 |

Xerox 174

# EXHIBIT "K"
# HIPAA BUSINESS ASSOCIATE AGREEMENT

This **HIPAA BUSINESS ASSOCIATE AGREEMENT** (the "BAA") is made and entered into by and between ___A C S ,  I N C.___ ("Business Associate" or "Contractor") and the **CITY OF HOUSTON, TEXAS**, a home rule city of the State of Texas ("Covered Entity" or the "City"). This BAA supersedes and replaces any existing Business Associate Agreement between Covered Entity and Business Associate.

The purpose of this BAA is to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 (codified at 45 C.F.R. Parts 160 and 164), as amended ("HIPAA"); privacy and security regulations promulgated by the United States Department of Health and Human Services ("DHHS"); Title XIII, Subtitle D of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, as amended ("HITECH Act"); and TEX. HEALTH & SAFETY CODE ANN. §§ 81.046, as amended, 181.001 *et seq.*, as amended, 241.151 *et seq.*, as amended, and 611.001 *et seq.*, as amended (collectively referred to herein as the "Privacy and Security Requirements").

A. Definitions.

    1. "Confidential Information" is information that has been deemed or designated confidential by law (*i.e.*, constitutional, statutory, regulatory, or by judicial decision).

    2. "Protected Health Information" ("PHI") is defined in 45 C.F.R. § 164.501 and is limited to information created or received by Contractor (*each party*) from or on behalf of the City (*the other party*).

    3. "Electronic Protected Health Information" ("EPHI") shall mean individually identifiable health information *that is transmitted by or maintained in electronic media.*

    4. "Security Incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification, or destruction of Confidential Information, including, but not limited to, PHI and EPHI, or interference with the systems operations in an information system, including, but not limited to, information systems containing EPHI. This definition includes, but is not limited to, lost or stolen transportable media devices (*e.g.*, flash drives, CDs, PDAs, cell phones, and cameras), desktop and laptop computers, photographs, and paper files containing Confidential Information, including, but not limited to, PHI and EPHI.

B. General.

    1. Contractor agrees to hold all PHI and EPHI confidential except to the extent that disclosure is required by Federal or State law, including the Texas Public Information Act, TEX. GOV'T CODE ANN. §§ 552.001 *et seq.*, as amended.

    2. Contractor agrees to be bound by and comply with all applicable Federal and State of Texas licensing authorities' laws, rules, and regulations regarding records and governmental records, including the Privacy and Security Requirements. Compliance with this paragraph is at Contractor's own expense.

    3. Contractor agrees to cooperate with state and federal agencies and to make appropriate personnel available for interviews, consultation, grand jury proceedings, pre-trial conferences, hearings, trials, and any other process, including investigations, required as a result of Contractor's services to the City. Compliance with this paragraph is at Contractor's own expense.

    4. The terms used in this BAA shall have the same meaning as those terms in the Privacy and Security Requirements.

Certified Document Number: 56748578 - Page 58 of 63

C.  Representation. Contractor represents that it is familiar with and is in compliance with the Privacy and Security Requirements, which include Federal and State of Texas requirements governing information relating to _____(list applicable health subjects).

D.  Business Associate. Contractor is a "Business Associate" of the City as that term is defined under the Privacy and Security Requirements. Contractor specifically agrees to abide by all requirements of the Privacy Rule and Security Rule made applicable to Business Associate under HITECH as if Business Associate were a covered entity under HIPAA.

   1.  *Nondisclosure of PHI and EPHI.* Contractor agrees not to use or disclose PHI and EPHI received from or on behalf of the City or created, compiled, or used by Contractor pursuant to this Agreement other than as permitted or required by this BAA, or as otherwise required by law.

   2.  *Limitation on Further Use or Disclosure.* Contractor agrees not to further use or disclose PHI or EPHI received from or on behalf of the City or created, compiled, or used by Contractor pursuant to this BAA in a manner that would be prohibited by the Privacy and Security Requirements if disclosure was made by the City, or if either Contractor or the City is otherwise prohibited from making such disclosure by any present or future State or Federal law, regulation, or rule.

   3.  *Safeguarding PHI.* Contractor agrees to use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this BAA or as required by State or Federal law, regulation, or rule.

   4.  *Safeguarding EPHI.* Contractor agrees to implement and use administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of EPHI that it creates, receives, maintains, or transmits on behalf of the City. These safeguards shall include the following:

      a)  Encryption of EPHI that Contractor stores and transmits;

      b)  Implementation of strong access controls, including physical locks, firewalls, and strong passwords;

      c)  Use of updated antivirus software;

      d)  Adoption of contingency planning policies and procedures, including data backup and disaster recovery plans; and

      e)  Conduct of periodic security training.

   5.  *Reporting Security Incidents.* Contractor agrees to report to the City any Security Incident **immediately** upon becoming aware of such. Contractor further agrees to provide the City with the following information regarding the Security Incident as soon as possible, but no more than five (5) business days after becoming aware of the Security Incident: (1) a brief description of what happened, including the dates the Security Incident occurred and was discovered; (2) a reproduction of the PHI or EPHI involved in the Security Incident; and (3) a description of whether and how the PHI or EPHI involved in the Security Incident was rendered unusable, unreadable, or indecipherable to unauthorized individuals either by encryption or otherwise destroying the PHI or EPHI prior to disposal. If Contractor determines that it is infeasible to reproduce the PHI or EPHI involved in the Security Incident, the Contractor agrees to notify the City in writing of the conditions that make reproduction infeasible and any information the Contractor has regarding the PHI or EPHI involved.

      Contractor agrees to cooperate in a timely fashion with the City regarding all Security Incidents reported to the City.

Xerox 176

The City will review all Security Incidents reported by Contractor.

Contractor will take the following steps in response, to the extent necessary or required by law, including, but not limited to, (1) notifying the individual(s) whose PHI or EPHI was involved in the Security Incident, either in writing, via telephone, through the media, or by posting a notice on the City's website, or through a combination of those methods, of the Security Incident; and (2) providing the individual(s) whose PHI or EPHI was involved in the Security Incident with credit monitoring services for a period of time to be determined by the City, at no cost to the individuals.

The City, to the extent necessary or required by law, will provide notice of the Security Incident, as required by law, to the Secretary of the United States Department of Health and Human Services ("HHS").

Contractor agrees to reimburse the City for all expenses incurred as a result of Contractor's Security Incidents, including, but not limited to, expenses related to the activities described above. Contractor agrees that the City will select the Contractors and negotiate the contracts related to said expenses.

6. *EPHI and Subcontractors.* Contractor shall require any agent to whom it provides PHI or EPHI, including a subcontractor, to agree to implement reasonable and appropriate safeguards to protect such PHI or EPHI. Further, Contractor agrees to give the City at least sixty (60) days advance notice of its intent to provide PHI or EPHI to an agent located outside of the United States.

7. *Subcontractors and Agents.* Contractor shall require any subcontractor or agent to whom Contractor provides PHI or EPHI received from or on behalf of the City or created, compiled, or used by Contractor pursuant to this BAA, to agree to the same restrictions and conditions that apply to Contractor with respect to such PHI and EPHI.

8. *Reciprocal Disclosures.* The Parties agree that the Parties may reciprocally disclose and use PHI or EPHI for initial and continuing eligibility and compliance determinations related to the provision of benefits, for auditing and legal compliance purposes, and for compliance with laws, regulations, and rules related to the provision of medical or drug benefits to persons who may be eligible for such benefits under the Medicare Prescription Drug Benefit Program, Part D, or other federal or State of Texas programs. The City agrees:

a) to be bound by these provisions with regard to PHI or EPHI received from Contractor;

b) to take disciplinary action against any employee whose willful act violates these provisions and results in an unlawful disclosure of PHI or EPHI.

9. *Mitigation.* Contractor agrees to mitigate, to the extent practicable, any harmful effect that is known to Contractor of a use or disclosure of PHI or EPHI by Contractor, or by a subcontractor or agent of Contractor, resulting from a violation of this BAA, including violations of the Privacy and Security Requirements stated herein. Contractor also agrees to inform the City in advance of its actual mitigation and of the details of its mitigation plan, unless doing so would cause additional harm.

10. *Notice – Access by Individual.* Contractor agrees to notify the City in writing within three (3) business days of any request by an individual for access to the individual's PHI or EPHI and, upon receipt of such request, direct the individual to contact the City to obtain access to the individual's PHI. Upon request by the City, Contractor agrees to make available PHI and EPHI to the City or, as directed by the City, to an individual in accordance with 45 C.F.R. § 164.524.

11. *Notice – Request for Amendment.* Contractor agrees to notify the City in writing within three (3) business days of any request by an individual for an amendment to the individual's PHI or EPHI and, upon receipt of such request from the individual, direct the individual to the City to request an

Certified Document Number: 56748578 - Page 60 of 63

amendment of the individual's PHI or EPHI. Contractor agrees to make available upon request PHI and EPHI for amendment and to incorporate any amendments to PHI and EPHI agreed to or directed by the City in accordance with 45 C.F.R. § 164.526.

12. *Notice -- Request for Accounting.* Upon receipt of any request from an individual for an accounting of disclosures made of the individual's PHI or EPHI, Contractor agrees to notify the City in writing within three (3) business days of any such request, and upon receipt of such request from the individual, direct the individual to the City for an accounting of the disclosures of the individual's PHI or EPHI. Contractor agrees to make available upon request the information required to provide an accounting of disclosures in accordance with 45 C.F.R. § 164.528. Pursuant to 45 C.F.R. § 164.528(a), an individual has a right to receive an accounting of certain disclosures of PHI or EPHI in the six (6) years prior to the date on which the accounting is requested.

13. *HHS Inspection.* Upon written request, Contractor agrees to make available to HHS or its designee, Contractor's internal practices, books, and records relating to the use and disclosure of PHI and EPHI received from, or created or received on behalf of, the City in a time or manner designated by HHS for purposes of HHS determining the City's compliance with the Privacy and Security Requirements.

14. *City Inspection.* Upon written request, Contractor agrees to make available to the City and its duly authorized representatives during normal business hours Contractor's internal practices, books, records and documents relating to the use and disclosure of confidential information, including, but not limited to, PHI and EPHI received from, or created or received on behalf of, the City in a time and manner designated by the City for the purposes of the City determining compliance with the Privacy and Security Requirements. Contractor agrees to allow such access until the expiration of four (4) years after the services are furnished under the contract or subcontract or until the completion of any audit or audit period, whichever is later. Contractor agrees to allow similar access to books, records, and documents related to contracts between Contractor and organizations related to or subcontracted by Contractor to whom Contractor provides confidential information, including, but not limited to, PHI and EPHI received from, or created or received on behalf of, the City.

15. *PHI or EPHI Amendment.* Contractor agrees to incorporate any amendments, corrections, or additions to the PHI or EPHI received from or created, compiled, or used by the City pursuant to this BAA when notified by the City that the PHI or EPHI is inaccurate or incomplete, or that other documents are to be added as required or allowed by the Privacy and Security Requirements.

16. *Documentation of Disclosures.* Contractor agrees to document disclosure of PHI or EPHI and information related to such disclosures as is necessary for the City to respond to a request by an individual for an accounting of disclosures of PHI or EPHI in accordance with 45 C.F.R. § 164.528, as amended.

17. *Termination Procedures.* Upon termination of this BAA for any reason, Contractor agrees to deliver all PHI or EPHI received from the City or created, compiled, or used by Contractor pursuant to this BAA within thirty (30) days from the date of termination, or, if specially requested to do so by the City in writing, to destroy all PHI or EPHI within the time frame determined by the City, which will be no less than thirty (30) days from the date of the notice of termination. This provision applies when Contractor maintains PHI or EPHI from the City in any form. If Contractor determines that transferring or destroying the PHI or EPHI is infeasible, Contractor agrees:

a) to notify the City of the conditions that make transfer or destruction infeasible;

b) to extend the protections of this BAA to such PHI or EPHI; and

Xerox 178

       c)    to limit any further uses and disclosures of such PHI or EPHI to those purposes that make the return, or transfer to the City, or destruction infeasible.

18.    *Notice-Termination.* Upon written notice to Contractor, the City may terminate any portion of the Agreement under which Contractor maintains, compiles, or has access to PHI or EPHI. Additionally, upon written notice to Contractor, the City may terminate the entire Agreement if the City determines, at its sole discretion, that Contractor has repeatedly violated a Privacy or Security Requirement.

E.    Survival of Privacy Provisions.  Contractor's obligations with regard to PHI and EPHI shall survive termination of this BAA and the Agreement.

F.    Amendment Related to Privacy and Security Requirements.  The Parties agree to take such action as is necessary to amend this BAA if the City, in its reasonable discretion, determines that amendment is necessary for the City to comply with the Privacy and Security Requirements or any other law or regulation affecting the use or disclosure of PHI or EPHI. Any ambiguity in this BAA shall be resolved to permit the City to comply with the Privacy and Security Requirements.

G.    **Indemnification.**  **Contractor agrees to indemnify and hold harmless the City and its officers, employees, and agents (individually and collectively "Indemnitees") against any and all losses, liabilities, judgments, penalties, awards, and costs (including costs of investigations, legal fees, and expenses) arising out of or related to:**

    1.    **a breach of this BAA relating to the Privacy and Security Requirements by Contractor; or**

    2.    **any negligent or wrongful acts or omissions of Contractor or its employees, directors, officers, subcontractors, or agents, relating to the Privacy and Security Requirements, including failure to perform their obligations under the Privacy and Security Requirements.**

H.    Electronic Mail Addresses.  Contractor affirmatively consents to the disclosure of its e-mail addresses that are provided to the City, including any agency or department of the City. This consent is intended to comply with the requirements of the Texas Public Information Act, TEX. GOV'T CODE ANN. § 552.137 *et seq.*, as amended, and shall survive termination of this BAA. This consent shall apply to e-mail addresses provided by Contractor and agents acting on behalf of Contractor and shall apply to any e-mail address provided in any form for any reason whether related to this BAA or otherwise.

I.    Except as otherwise limited in this BAA, Contractor may use or disclose Protected Health Information it creates or receives from or on behalf of the City to provide the services to or on behalf of the City set out in the Agreement to which this BAA is attached.

J.    This BAA survives the termination of the Agreement and expires when all of the PHI provided by the City to Contractor is returned to the City.

The Parties have executed this BAA in multiple copies, each of which is an original.

WITNESS:                  (BUSINESS ASSOCIATE)

ACS STATE AND LOCAL SOLUTIONS, INC.

By:_____    By:_____

Name:_____    Name: LOUIS J. SCHIAVONE JR.

Title:_____    Title: VICE PRESIDENT

                                  Tax Identification No._____

ATTEST/SEAL:

City Secretary

APPROVED:

Director,
Department of Administration and Regulatory
Affairs

APPROVED AS TO FORM:

Assistant City Attorney
L.D. File No. 0371000045001

**(COVERED ENTITY)**
**CITY OF HOUSTON, TEXAS**
Signed by:

Mayor

COUNTERSIGNED BY:

City Controller

DATE COUNTERSIGNED:

8 - 17 - 11

Certified Document Number: 56748578 - Page 63 of 63



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748578 Total Pages:  63

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

**Xerox 181**



# CITY OF HOUSTON————————
Legal Department

**Annise D. Parker**

Mayor

David M. Feldman
City Attorney
Legal Department
P.O. Box 368
Houston, Texas 77001-0368
City Hall Annex
900 Bagby, 4th Floor

T. 832.393.6491
F. 832.393.6259
www.houstontx.gov

May 30, 2013

**_Via Overnight Delivery_**
ACS State and Local Solutions, Inc.
n/k/a Xerox State and Local Solutions, Inc.
8260 Willow Oaks Corporate Drive
Fairfax, VA 22031

      Re:    Contract for EMS Ambulance Fee Collection Services, as Amended (the
               "Contract"

Dear Sir or Madam:

As the City Attorney of the City of Houston (the "City"), I write to you on behalf of the
Director, as defined in the above-referenced Contract.

### Notice of Default and Intent to Terminate the Contract for Cause

As defined and required by the Contract, the City hereby gives ACS State and Local
Solutions, Inc., n/k/a Xerox State and Local Solutions, Inc., (the "Contractor") notice of
the Contractor's default under the Contract and affords Contractor the opportunity to cure
the acts and omissions upon which this notice is based within 31 days of the date of this
correspondence. If Contractor does not cure its defaults within that applicable cure
period, the City will terminate the Contract for Cause. The following material defaults by
Contractor are independent grounds for Termination for Cause as defined and prescribed
in the Contract. The Contractor has not:

    1.  Complied with its express warranties as to performance.

Council Members: Helena Brown  Jerry Davis  Ellen R. Cohen  Wanda Adams  Dave Martin  Al Hoang  Oliver Pennington  Edward Gonzalez
James G. Rodriguez  Mike Laster  Larry V. Green  Stephen C. Costello  Andrew C. Burks, Jr.  Melissa Noriega  C.O. "Brad" Bradford  Jack Christie
Controller: Ronald C. Green

# EXHIBIT D



**Xerox 182**

2. Dedicated adequate systems and services, and properly qualified personnel, necessary to deliver the services covered by the Agreement.

3. Maintained a program of education and training as required by the Contract.

4. Ensured that submissions for reimbursement were accurate and compliant with applicable standards.

5. Complied with all applicable state and federal laws, regulations, legal requirements, business practices and codes of conduct applicable to the activities under the Contract, a third-party billing company and otherwise.

6. Timely performed its obligations.

7. Properly calculated its fees under the Contract.

8. Provided the reports required by the Contract.

9. Provided the data platform and access required by the Contract, including, but not limited to:
   a. the Data Warehouse;
   b. the user-friendly, continuous, open web-based access to the billing and collections data down to the individual claim, transaction, and clinical data elements;
   c. the replicated database; or the multitude of reporting options to users that support the ability to drill down into the layers of account details, including a report toolkit;
   d. the replicated database of raw information – both clinical and financial – for the City's internal analytics to deliver complete data transparency;
   e. online access to the data store for internal analysis and reporting;
   f. rapid reporting via data cubing and expedited searching capabilities in the Report Writer and data mining tool along with advanced Visual Informatics reporting module;
   g. ad-hoc reporting capability; and
   h. a web-based reporting tool to generate ad-hoc reports at any time, without the need to code or structure database queries.

10. Provided a mechanism to ensure that internal rules, regulations and policies are revised to comply with applicable regulatory and legal changes.

Because of the Contractor's defaults, the City has procured, and will continue to procure, articles or services from other sources. It intends to hold the Contractor responsible for

Xerox 183

the costs of such articles and services and for any excess re-procurement cost occasioned thereby.

## Indemnity

The Contract provides that Contractor shall indemnify the City and hold it harmless for all claims, causes of action, liabilities, fines and expenses for damage or loss to property sustained with or incidental to performance under the Contract. Contractor's representative affirmed this obligation to the City's representatives on May 21, 2013. As you know, the City has incurred and will continue to incur substantial expenses in connection with the Contractor's performance, and lack thereof, under the Contract. It is the City's intention to continue to hold Contractor responsible for such expenses and for all of the other elements covered by the Contractor's indemnity obligations. Please note that the Contractor's obligations extend beyond the termination of the Contract.

## Notice of Offset

The City intends to offset all amounts it has incurred, or will incur, that are Contractor's responsibility under the Contract, at law, or otherwise against any amounts that the Contractor may claim it is owed. Moreover, the City disputes the invoices that the Contractor has previously submitted to the City and intends to conduct a full accounting and reconciliation of the basis for the invoices, the amounts previously paid and amounts that Contractor might claim to be owing.

## Request for Information

The Contract obligates the Contractor to provide certain information to the City, which now demands that the Contractor furnish the following, within 7 days of the date hereof:

1. A copy of the Contractor's Professional Liability Policy, Declarations and Certificates designating the City as an Additional Insured, from the inception of the Contract to the present. Also, please provide a letter confirming that the Certificates accurately reflect the insurance coverage maintained.
2. A copy of the Transport master database file, as described in the Contract, along with the means to access the data it contains.

3. Copies of the contents of the fully auditable billing, collections and accounts receivable systems that the Contractor is required to maintain and to provide, along with the provision of full access to them, as set forth in the Contract.
4. All records of inquiries and complaints, as described in the Contract.

5. All of the reports that the Contractor is obligated to provide either as a matter of course or upon the Director's request, as set forth in the Contract. The reports should be monthly for each month the Contract has been in effect, along with annual reports for each contract year.

6. Copies of all "Change Logs" relating to claims submitted on behalf of the City.

7. A complete reconciliation of all present or past credit balances owed to any third party.

8. Copies of all of the claims audits conducted by Contractor.

## Demand for Inspections and Audits

The City hereby invokes its right to perform one or more inspections of all places where work is conducted under the Contract and to audit the Contractor's books and records. Please provide me with the name and the contact information of the Contractor's representative with whom the City should communicate in connection with the inspections and audits within 7 days of the date hereof.

The Contract requires the Contractor to provide all documents and records necessary to assist the City Attorney in determining the Contractor's compliance with this Agreement. The City Attorney intends to engage in the steps necessary to make such a determination. Please provide me with the name and the contact information of the Contractor's representative with whom the City should communicate in connection with the City Attorney's assessment, within 7 days of the date hereof.

In the interim, the Contractor is reminded of the City's previous request that it preserve all information relating to the Contract and the activities related to it.

## Confidentiality

The City reminds the Contractor of its continuing confidentiality obligations under the Contract and applicable laws and regulations.

## No Waiver or Estoppel

Nothing in this correspondence is intended to be, or should be construed to be, a waiver, election, estoppel or any other diminution or alteration of the City's rights. The City reserves all of its rights under the Contract and otherwise, including, but not limited to,

Xerox 185

the right to extend the 30-day termination date set forth above. The matters addressed in this correspondence are not exclusive, but are cumulative of all rights and remedies the City may have now or in the future.

If you have any questions, please contact me.

Very truly yours,

David M. Feldman
City Attorney

cc:    Robert D. Zuckswert – *Via email*
       Vice President of Operations
       Xerox State and Local Solutions, Inc.



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748588 Total Pages:  5

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**



**Clay B. Scheitzach**
*Vice President and Senior*
*Corporate Litigation Counsel*

Xerox Business Services, LLC
2828 North Haskell Avenue
Building 1, Floor 9
Dallas, TX 75204

Clay.Scheitzach@xerox.com
tel 214.584.5259
fax 214.887.7997

June 6, 2013

***VIA UPS OVERNIGHT DELIVERY***
***1Z7159021392641563***

City of Houston Legal Department
David Feldman
900 Bagby, 3rd Floor
Houston, TX 77002

**Re: *Letter from the City of Houston dated May 30, 2013***

Dear Mr. Feldman,

ACS State and Local Solutions, Inc. ("ACS") is in receipt of your letter dated May 30, 2013 and written on behalf of the City of Houston (the "City") regarding the City's contract with ACS to provide EMS ambulance fee collection services (the "Contract"). Please consider this ACS's response.

Your letter states that it is notice to ACS that it is in default and lists ten "independent grounds" the City believes it has to terminate the Contract for cause (as defined by the Contract, Article V, Section E). The letter provides a termination date of thirty-one (31) days from the date of the letter.

As you note in the letter, the Contract explicitly provides ACS a thirty (30) day cure period once it is properly notified of default. Curing the default renders the proposed termination ineffective. (Article V, Section E) Written notice under the Contract, however, requires the City to ***describe*** the default. Article V, Section E. Without a description of the purported default, ACS is without notice, and the City does not have the right to terminate the Contract for cause. Article V, Section E.

The letter does not comply with the requirements set forth in the Contract for a notice to cure and is specifically deficient in at least the following ways: (1) it does not provide ***any*** information regarding ACS's purported default; (2) it does not state the specific conduct that the City contends constitutes a default; and (3) it does not reference the Contract provision that the City believes ACS breached. The letter is vague and ambiguous at best. Without a description of the purported default, ACS is without notice to cure. ACS addresses the deficiencies of each purported default in turn:

1.  *Complied with its express warranties as to performance.* This does not specify which express warranties the City contends ACS has breached and it does not reference where in the Contract ACS has made express warranties. Indeed, ACS has not made any express warranties under the Contract.

2.  *Dedicated adequate systems and services, and properly qualified personnel, necessary to deliver the services covered by the Agreement.* This does not specify what systems, services, and personnel the City believes are inadequate or how ACS failed to comply with the terms of the Contract. It also does not describe the services that the City contends were not adequately completed.

Page 1





3. *Maintained a program of education and training as required by the Contract.* This assertion does not specify what type of education and training were required by the Contract but not provided, and to whom that education and training should have been provided.

4. *Ensured that submissions for reimbursement were accurate and compliant with the applicable standards.* This does not provide any description of any submissions for reimbursement that the City contends were noncompliant.

5. *Complied with all applicable state and federal laws, regulations, legal requirements, business practices and codes of conduct applicable to the activities under the Contract, a third-party billing company and otherwise.* This neither identifies any state or federal laws, regulations, legal requirements, or business practices or codes of conduct the City believes ACS has not complied, nor does the City provide any facts supporting the purported non-compliance. This does not provide adequate information or guidance to ACS that would allow it to cure such default.

6. *Timely performed its obligations.* This does not provide ACS with any description of what obligations the City believes ACS did not timely perform.

7. *Properly calculated its fees under the Contract.* This does not refer to any instance or way in which ACS has not properly calculated its fees. This is not a description of default, as required by the Contract.

8. *Provided the reports required by the Contract.* This fails to describe or specify which reports the City contends ACS failed to provide.

9. *Provided the data platform and access required by the Contract.* This does not describe how the data platform provided was insufficient pursuant to the terms of the Contract, what access the City requested, or what access was lacking.

10. *Provided a mechanism to ensure that internal rules, regulations and policies are revised to comply with applicable regulatory and legal changes.* This does not provide ACS a description of how the mechanism was insufficient to ensure the internal rules, regulations, and policies were properly revised.

These items do not "describe the default" of ACS. The assertions are vague, ambiguous, conclusory, and do not state with any description of how ACS has failed to satisfy its contractual obligations. The Contract does not give the City a right to terminate the Contract prior to providing notice to ACS, ***describing the default*** and providing thirty (30) days for ACS to cure any purported default. Because the letter does not describe the default the City asserts ACS has done, it does not constitute notice under the Contract to give ACS to an opportunity to cure.

### Notice to the City to Cure

To the extent the City withholds payment and/or ceases billing based on these assertions, the City is in default. Article IV, Sections A and B of the Contract require the City to pay for the services rendered by the ACS. Specifically, Exhibit B of the Contract (Second Amended) provides that the City will pay ACS a flat contingency fee of **11.96%** based on the Gross Revenue Collections (as defined in the Contract) each month


Page 2


Xerox 189


Certified Document Number: 56748589 - Page 2 of 3



during the term of the Contract. To the extent that the City fails to timely pay ACS for its services, the City is in default. This letter serves as notice to the City to cure such default within thirty (30) days of receipt. Further, this letter puts the City on notice that the directive to cease billing could result in certain claims being denied by payers for failure to timely submit for payment, and the City would be responsible under the contract and/or at equity for any damages to the City or ACS as a result.

In addition, the Contract does not entitle the City to offset amounts owed to ACS. To the extent that the City offsets any monies the City received for services ACS rendered under the Contract, the City is in default, and this letter services as notice to the City to cure such default within thirty (30) days.

Finally, the City cannot terminate the Contract for Cause without providing proper notice to ACS. The City is in breach of the Contract if it proceeds. ACS remains willing to work to cure any defaults the City believes may have occurred, but ACS cannot, and is not required to, do so without proper notice and a description of the purported default. While ACS does not believe the Default Notice is either accurate or legally sufficient, ACS remains committed to working with City personnel to improve its relationship with and services provided to the City in order to amicably resolve any issues that exist between the parties.

ACS reserves all of its rights, remedies, and defenses under the contract or in law.

If you have any questions, please contact me.

Sincerely,

Clay B. Scheitzach



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748589 Total Pages: 3

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

Xerox 191



# CITY OF HOUSTON
Legal Department

**Annise D. Parker**
Mayor

David M. Feldman
City Attorney
Legal Department
P.O. Box 368,
Houston, Texas 77001-0368
City Hall Annex
900 Bagby, 4th Floor

T. 832.393.6491
F. 832.393.6259
www.houstontx.gov

June 28, 2013

***Via Overnight Delivery***
ACS State and Local Solutions, Inc.
n/k/a Xerox State and Local Solutions, Inc.
8260 Willow Oaks Corporate Drive
Fairfax, VA 22031

Re: Contract for EMS Ambulance Fee Collection Services, as Amended (the "Contract")

Dear Sir or Madam:

As the City Attorney of the City of Houston (the "City"), I again write to you on behalf of the Director, as defined in the above-referenced Contract.

By correspondence dated May 30, 2013 the City notified ACS State and Local Solutions, Inc., n/k/a Xerox State and Local Solution, Inc., (the "Contractor") of Contractor's default and the City's intent to terminate the Contract for cause. At that time, and in the same correspondence, Contractor was notified that it was being afforded a 31 day period in which to cure its default. Under the Contract, the City as injured party may extend the proposed termination date to a later date. This letter supplements the City's letter of May 30, 2013 and serves to notify you that the City is extending the proposed termination date to July 22, 2013 after which the city will terminate the contract for cause if the Contractor does not cure its defaults within the applicable cure period, as extended.

Very truly yours,

David M. Feldman
City Attorney

cc: Robert D. Zuckswert – via email
Vice President of Operations
Xerox State and Local Solutions, Inc.

# EXHIBIT F

Council Members: Helena Brown   Jerry Davis   Ellen R. Cohen   Wanda Adams   Dave Martin   Al Hoang   Oliver Pennington   Edward Gonzalez
James G. Rodriguez   Mike Laster   Larry V. Green   Stephen C. Costello   Andrew C. Burks, Jr.   Melissa Noriega   C.O. "Brad" Bradford   Jack Christie
Controller: Ronald C. Green

Certified Document Number: 56748590 - Page 1 of 1



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:         56748590 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

**Xerox 193**



# CITY OF HOUSTON
Legal Department

**Annise D. Parker**
Mayor

David M. Feldman
City Attorney
Legal Department
P.O. Box 368,
Houston, Texas 77001-0368
City Hall Annex
900 Bagby, 4th Floor

T. 832.393.6491
F. 832.393.6259
www.houstontx.gov

July 18, 2013

ACS State and Local Solutions, Inc.
n/k/a Xerox State and Local Solutions, Inc.
8260 Willow Oaks Corporate Drive
Fairfax, VA 11031

Re: Contract for EMS Ambulance Fee Collection Services, as Amended (the "Contract")

Dear Sir or Madam:

On May 30, 2013, I corresponded with you on behalf of the Director, as defined in the above-referenced Contract. On page 3 of the letter you were reminded that your contract with the City obligates you to provide certain information to the City and demand was made for the following to be furnished within 7 days of the date of the letter:

1. A copy of the Contractor's Professional Liability Policy, Declarations and Certificates designating the City as an Additional Insured, from the inception of the Contract to the present. Also, please provide a letter confirming that the Certificates accurately reflect the insurance coverage maintained.
2. A copy of the Transport master database file, as described in the Contract, along with the means to access the data it contains.
3. Copies of the contents of the fully auditable billing, collections and accounts receivable systems that the Contractor is required to maintain and to provide, along with the provision of full access to them, as set forth in the Contract.
4. All records of inquiries and complaints, as described in the Contract.
5. All of the reports that the Contractor is obligated to provide either as a matter of course or upon the Director's request, as set forth in the Contract. The reports should be monthly for each month the Contract has been in effect, along with annual reports for each contract year.
6. Copies of all "Change Logs" relating to claims submitted on behalf of the City.
7. A complete reconciliation of all present or past credit balances owned to any third party.
8. Copies of all of the claims audits conducted by Contractor.

**EXHIBIT G**

Council Members: Helena Brown   Jerry Davis   Ellen R. Cohen   Wanda Adams   Dave Martin   Al Hoang   Oliver Pennington   Edward Gonzalez
James G. Rodriguez   Mike Laster   Larry V. Green   Stephen C. Costello   Andrew C. Burks, Jr.   Melissa Noriega   C.O. "Brad" Bradford   Jack Christie
Controller: Ronald C. Green

Certified Document Number: 56748591 - Page 1 of 2

The items identified above were not received by June 6, 2013. The City reiterates its demand for the above itemized documents and information. Please arrange for the requested items to be delivered to the Legal Department and my attention by or before Wednesday, July 24, 2013.

Very truly yours,

David M. Feldman
City Attorney

Cc:    Robert D. Zuckswert – Via email
       Vice President of Operations
       Xerox State and Local Solutions, Inc.

Xerox 195



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748591 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# EXHIBIT H



# CITY OF HOUSTON

Legal Department

**Annise D. Parker**

Mayor

David M. Feldman
City Attorney
Legal Department
P.O. Box 368
Houston, Texas 77001-0368
City Hall Annex
900 Bagby, 4th Floor
Houston, Texas 77002

T. 832.393.6491
F. 832.393.6259
www.houstontx.gov

July 25, 2013

**VIA OVERNIGHT DELIVERY**

ACS State and Local Solutions, Inc.
n/k/a Xerox State and Local Solutions, Inc.
8260 Willow Oaks Corporate Drive
Fairfax, VA 22031

Re:    Contract for EMS Ambulance Fee Collection Services, as Amended (the "Contract")

Dear Sir or Madam:

Acting on behalf of the Director, as defined in the above-referenced Contract, and in my capacity as the City Attorney for the City of Houston, I wrote to ACS State and Local Solution, Inc. now Xerox State and Local Solutions, Inc. ("Contractor") on May 30, 2013, providing notice of Contractor's default and informing you of the City's intent to terminate the referenced Contract for cause.    At that time, Contractor's material defaults were enumerated and Contractor was informed of a 31 day opportunity to cure its defaults. Contractor was further informed that, absent cure of its' defaults within the applicable time frame, the Contract would be terminated for cause.    Subsequently, Contractor was provided with an extension of the initial 31 day cure period.  Contractor has failed to cure one or more of its material defaults within the applicable cure period, as extended.

Again acting on behalf of the Director, and as City Attorney, I now write to effect termination of the Contract as of close of business, Thursday, July 25, 2013. The City will no longer perform under the Contract.  You are reminded of your continuing obligations to the City and of the fact that you are in possession of legally protected government documents and information all of which should be promptly transferred to the City's

# EXHIBIT H

Council Members:  Helena Brown   Jerry Davis   Ellen R. Cohen   Wanda Adams   Dave Martin   Al Hoang   Oliver Pennington   Edward Gonzalez
James G. Rodriguez   Mike Laster   Larry V. Green   Stephen C. Costello   Andrew C. Burks, Jr.   Melissa Noriega   C.O. "Brad" Bradford   Jack Christie
Controller: Ronald C. Green

possession. We trust that you will act to help ensure a smooth transition and to that end I suggest we meet as soon as possible to discuss logistics after which First Assistant City Attorney, Lynette Fons will be your point of contact for purposes of the transition.

Very truly yours,

David M. Feldman
City Attorney

DMF:LKF:asw
G:\DFeldman\Xerox Termination.wpd

Cc:    Robert D. Zuckswert – Via email
       Vice President of Operations
       Xerox State and Local Solutions, Inc.

Xerox 199



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56748592 Total Pages:  3

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

RECEIPT NUMBER  469221       70.00
TRACKING NUMBER  72930297       CTM

CAUSE NUMBER  201343841

PLAINTIFF:  CITY OF HOUSTON TEXAS
    vs.
DEFENDANT:  XEROX STATE AND LOCAL SOLUTIONS INC (A/K/A AND F/X

In The  189th
Judicial District Court of
Harris County, Texas

**F I L E D**
Chris Daniel
District Clerk

JUL 29 2013

Time:
3:22 PM

By
Harris County, Texas
Deputy

## CITATION CORPORATE

THE STATE OF TEXAS
County of Harris

TO: XEROX STATE AND LOCAL SOLUTIONS INC (A/K/A AND F/K/A ACS STATE AND
LOCAL SOLUTIONS INC) (FOREIGN FOR-PROFIT CORPORATION) BY SERVING ITS
REGISTERED AGENT OR AN OFFICER OF THE CORPORATION CORPORATION SERVICE COMPANY

211 E 7TH ST SUITE 620  AUSTIN TX 787013218

Attached is a copy of  PLAINTIFF'S ORIGINAL PETITION

This instrument was filed on the  26th  day of  July  , 20  13  , in the
above cited cause number and court. The instrument attached describes the claim against you.

    **YOU HAVE BEEN SUED**; you may employ an attorney. If you or your attorney do not file a written answer with the
District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were
served this citation and petition, a default judgment may be taken against you.

TO OFFICER SERVING:

    **This Citation** was issued under my hand and seal of said Court, at Houston, Texas, this  29th  day of
July  , 20  13 .

Issued at request of:
FELDMAN, DAVID M.
900 BAGBY, 4TH FLOOR
HOUSTON, TX 77057
Tel: (832) 393-6412
Bar Number:  6886700

*Chris Daniel*
**CHRIS DANIEL, District Clerk**
Harris County, Texas
**201 Caroline, Houston, Texas 77002**
**P.O. Box 4651, Houston, Texas 77210**

Generated by: CUERO, NELSON   7MM/7MM/9626718

---

### OFFICER/AUTHORIZED PERSON RETURN

I received this citation on the _____ day of _____, 20____, at _____ o'clock ____.M., endorsed

the date of delivery thereon, and executed it at _____, _____,
                                              (street address)                 (city)

in _____ County, Texas on the _____ day of _____, 20____, at _____ o'clock ____.M.,

by delivering to _____, by delivering to its
             (the defendant corporation named in citation)

_____, in person, whose name is _____,
(registered agent, president, or vice-president)

a true copy of this citation, with a copy of the _____ Petition attached,
                           (description of petition, e.g., "Plaintiffs Original"

and with accompanying copies of _____.
                        (additional documents, if any, delivered with the petition)

I certify that the facts stated in this return are true by my signature below on the _____ day of _____, 20____.

FEE: $ _____       By: _____
                              (signature of officer)

            Printed Name: _____

            As Deputy for: _____
Affiant Other Than Officer                (printed name & title of sheriff or constable)

On this day, _____, known to me to be the person whose signature
appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was
executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this _____ day of _____, 20 ___.

                             _____
                             Notary Public

N.INT.CITC.P

Xerox 201



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56806866 Total Pages: 1

*Chris Daniel*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# FILED
**Chris Daniel**
**District Clerk**

JUL 31 2013

Time: _____
Harris County, Texas

13-43841

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

**CHRIS DANIEL**
HARRIS COUNTY DISTRICT CLERK
P.O. BOX 4651
HOUSTON, TEXAS 77210-4651

189th
court

| | |
|---|---|
| Postage $ | 12.35 |
| Certified Fee | 3.10 |
| Return Receipt Fee (Endorsement Required) | 2.55 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees ¢ | 18.00 |

Xerox State and Local Solutions Inc f/k/a
ACS State and Local Solutions Inc by and or its
registered agent or officer
Corporation Service Company
211 E. 7th St., Suite 620
Austin, Texas 78701-3218

Xerox 203



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 27, 2013

Certified Document Number:        56827715 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

**Xerox 204**

Filed13 August 7 P1:19
Chris Daniel - District Clerk
Harris County
ED101J017639734
By: Fatima Y. Rodriguez

CAUSE NO. 2013-43841

| | | |
|---|---|---|
| **THE CITY OF HOUSTON, TEXAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **XEROX STATE AND LOCAL** | § | |
| **SOLUTIONS, INC., a/k/a and f/k/a** | § | |
| **ACS STATE AND LOCAL** | § | |
| **SOLUTIONS, INC.** | § | |
| | § | |
| **Defendant.** | § | **189th JUDICIAL DISTRICT** |

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION FOR TEMPORARTY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff the City of Houston, Texas (the "City") files this First Amended Original Petition and Application for Temporary Restraining Order and Temporary Injunction, and in support hereof, would respectfully show the Court as follows:

**SUMMARY OF THIS CASE**

1.     As part of its services to citizens, the City's Fire Department provides Emergency Medical Services, ambulance services and related items and services (collectively, "EMS Services") to people who need them. The City contracted with and paid millions of dollars to Xerox, which holds itself out as an expert in such processes, to handle billing and collections for EMS Services provided by the City. Xerox has not done the things it was obligated to do, made many misrepresentations, wrongfully withheld information the City owns and engaged in misconduct that goes to the very core of the services it was engaged to perform. The City seeks

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

                                                                                        **PAGE 1**

Certified Document Number: 56873927 - Page 1 of 35

Xerox 205

remedies for Xerox's many wrongful acts, concealments and failures to act that have caused, and will continue to cause, substantial harm to the City. The City also now seeks injunctive relief from threatened and imminent harm as Xerox has, since the Original Petition was filed, (1) prevented access to patient care records and other data; and (2) informed the City that it intends to deprive it of access to all data, equipment, software and software licenses, and warranties for these items, all of which are critical to the City's EMS Services and EMS Billing Process, and in doing so will disrupt emergency patient care, make difficult state-mandated record keeping, and disrupt billing.

## PARTIES

2.      The City of Houston is a Texas home rule municipal corporation, established by and functioning under its City Charter with its place of business in Houston, Harris County, Texas.

3.      Xerox State and Local Solutions, Inc., also and formerly known as ACS State and Local Solutions, Inc. ("Xerox") is a foreign, for-profit corporation incorporated in the State of New York and doing business in Harris County, Texas, and with an office in Dallas, Texas, and it can be served with process by delivering the Citation and a copy of this Petition to its Registered Agent or an officer of the corporation. The Registered Agent information for Xerox is as follows:

> **Corporation Service Company**
> **211 E. 7th St., Suite 620**
> **Austin, TX 78701-3218**

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

PAGE 2

Certified Document Number: 56873927 - Page 2 of 35

Xerox 206

4.     This Court has jurisdiction over Xerox because this action arose from, or is connected with, Xerox's purposeful acts committed in Texas and Xerox is amenable to service of process by a Texas court, and this Court in particular.  In addition, Xerox agreed the Contract is subject to the laws of Texas, and that venue for any litigation relating to the Contract is Harris County, Texas.  Xerox maintains an office in Texas.

5.     This Court has jurisdiction over the claims in this matter because the amount in controversy is within the jurisdictional limits of the Court.

6.     Venue is proper in Harris County, Texas, because it is the county in which all or a substantial part of the events or omissions giving rise to the claims in this matter occurred.  TEX. CIV. PRAC. & REM. CODE §15.002(1).

## DISCOVERY LEVEL

7.     Plaintiff intends to conduct discovery under Level 3 of Rule 190 of the Texas Rules of Civil Procedure.

## FACTUAL BACKGROUND

8.     The City provides EMS Services through the Houston Fire Department ("HFD") for residents and visitors in its jurisdiction who are in need.  Private and governmental health insurance programs, other third parties, and the people who receive such services are billed for them.  The data collection, documentation, coding, billing, and collection process ("EMS Billing Processes") and standards for EMS Services are complex and require specialized expertise.

9.     Xerox holds itself out as having the expertise necessary to perform EMS Billing Processes properly, in compliance with applicable law and standards, accurately and professionally.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 3 of 35

**Xerox 207**

10.     The City contracted with Xerox[1] to perform EMS Billing Processes on its behalf. The initial contract, called the Contract for EMS Ambulance Fee Collection Services, was entered into effective on or about October 31, 2002, and is attached to this Petition as Exhibit A. It was amended by the First Amendment to the Contract for EMS Ambulance Collection Services effective on or about November 2, 2007, which is attached to this Petition as Exhibit B. The agreement was amended again by the Second Amendment to a Contract for EMS Ambulance Fee Collection Services effective on or about August 11, 2011, which is attached to this Petition as Exhibit C. In this Petition, the City refers to the initial contract and the amendments collectively as the "Contract."

11.     Xerox publicly and widely represents that it has vast expertise in EMS Billing Processes. For example, Xerox has stated that "[i]n 2011, we processed 500,000 emergency transports and accurately applied and accounted for more that [sic] $80 million in EMS payments." Xerox has stated that emergency medical services personnel should focus on helping people in need, not filing paperwork, so it provides (a) Tools to help workers compile data; (b) Software to handle billing and collections; and, importantly for the issues here, (c) "Detailed knowledge of constantly changing Medicare and Medicaid requirements, regulations and reimbursement rules. By making administration simple, EMS billing services free EMS professionals to focus on what they do best: saving lives." These are misrepresentations that deceive customers like the City to develop an unwarranted sense of security about Xerox's EMS

---

[1] The contracts at issue were between the City and ACS State and Local Solutions, Inc. The name of that entity was changed to Xerox State and Local Solutions Inc. after a corporate transaction; in the City's dealings with it, the entity has used both names and now uses the latter, so the City refers to the entity accordingly in this Petition.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

PAGE 4

Certified Document Number: 56873927 - Page 4 of 35

Xerox 208

Billing Processes. They also confirm that Xerox claims to know the challenges that cities face, why they need competent outside help with such processes and what can happen when the contractor proves to be incompetent or worse.

12. Xerox also touts the quality and extent of its services to its customers, and has publicly trumpeted its healthcare expertise, representing, for example:

> By applying our deep healthcare expertise and heritage of innovation expertise across virtually every member of the healthcare ecosystem–providers and payers, employers and government agencies, we help you focus on what matters–the real business of improving people's lives through better, more accessible and more affordable healthcare–which leads to better health and wellness. That's what we mean by the freedom to care.

Xerox has also declared: "Better care, better bottom line. We improve accuracy in billing third-party payers, including Medicaid and Medicare, and decrease the amount of unpaid debt from ambulance transport fees." Xerox has fallen woefully short of its represented "expertise" in providing the City with EMS Billing Processes that are at issue in this lawsuit.

13. The City reasonably reposed trust and confidence in Xerox, especially because Xerox represented to it on many occasions that it had expertise in EMS Billing Processes. The City also appointed Xerox as its agent to perform EMS Billing Processes and to represent its interests with health insurance programs, government agencies, auditors and people who received EMS Services. Xerox exploited and took advantage of the City's trust and comparative lack of knowledge and experience about EMS Billing Processes. When the City questioned the accuracy, correctness, or propriety of Xerox's EMS Billing Processes, Xerox repeatedly made representations to the City to the effect that it knew what it was doing and the City did not, and that Xerox was doing everything properly. Xerox also made numerous representations that it would engage in remedial measures and provide information that the City needed, and thereafter failed and refused to do so. Xerox also concealed or obfuscated information such that the City

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 5 of 35

Xerox 209

could not determine the extent Xerox to which was engaging in unsound EMS Billing Processes. In fact, to this day, most of the evidence of Xerox's wrongdoing is in Xerox's sole possession, even though it is contained in information that legally and contractually belongs to the City and is information that the City has asked for repeatedly.

14.     The Contract generally provides that Xerox was to receive a fee for its services that would be calculated as a percentage of the amounts collected for the City's EMS Services. Xerox also was to receive fees for processing claims for EMS Services that might not be collectable and Xerox had the opportunity to obtain performance bonuses as well. Xerox generated the information on which its fees were to be based. The City asserts that Xerox calculated its fees incorrectly, resulting in overpayments by the City. Moreover, it appears that Xerox submitted claims for payment of EMS Services in a manner that may have caused the City to be overpaid, which means that Xerox's fees based on a percentage of collections were overstated. The City is entitled to a refund of fees paid to Xerox in both these and other circumstances, and also because the services Xerox did provide were inadequate and deficient.

15.     Xerox has materially breached the Contract in several independent ways. For example, it has not:

    a.  Complied with its express warranties as to performance under the Contract.

    b.  Dedicated adequate systems and services, and properly qualified personnel, necessary to deliver the services covered by the Contract.

    c.  Maintained a program of education and training as required by the Contract.

    d.  Ensured that submissions for reimbursement were accurate and compliant with applicable standards.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

                                                **PAGE 6**

Certified Document Number: 56873927 - Page 6 of 35

**Xerox 210**

e. Complied with all applicable state and federal laws, regulations, legal requirements, business practices and codes of conduct applicable to the activities under the Contract, a third-party billing company and otherwise.

f. Timely performed its obligations.

g. Properly calculated its fees under the Contract.

h. Provided the reports required by the Contract.

i. Provided the data platform and access and "100 percent transparency" required by the Contract, including, but not limited to:

    i. the Data Warehouse;

    ii. the user-friendly, continuous, open web-based access to the billing and collections data down to the individual claim, transaction, and clinical data elements;

    iii. the replicated database; or the multitude of reporting options to users that support the ability to drill down into the layers of account details, including a report toolkit;

    iv. the replicated database of raw information – both clinical and financial – for the City's internal analytics to deliver complete data transparency;

    v. online access to the data store for internal analysis and reporting;

    vi. rapid reporting via data cubing and expedited searching capabilities in software;

    vii. ad-hoc reporting capability; and

    viii. a web-based reporting tool to generate ad-hoc reports at any time, without the need to code or structure database queries.

j. Provided a mechanism to ensure that internal rules, regulations and policies are revised to comply with applicable regulatory and legal changes.

16. In addition, Xerox has, since the Original Petition was filed, further breached the Contract by preventing access to electronic patient care records (ePCRs) through Xerox's

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

PAGE 7

**Xerox 211**

EMTablet system, and, according to its correspondence of July 30, 2013, intends to deprive the City of all data, equipment, software and software licenses, and warranties unless the City makes an immediate payment – by August 1, 2013 -- for these items, an act unjustified by the language of the Contract and the parties' continuing obligations under the Contract. Exhibit I. Xerox's actions are a further breach of the Contract and actionable under other causes of action plead herein. Xerox's threat is based on a complete misstatement of the Contract terms.

17.     The Contract requires the City to purchase two categories of equipment: the "New Equipment" and "2011 Equipment." The City promptly tendered payment for the "New Equipment" upon termination of the Contract and Xerox is therefore obligated to transfer all titles and assign all related software licenses and software warranties to the City, to the extent permitted by any third party vendors. Xerox has absolutely no right to do anything with the New Equipment other than fulfill this obligation.

18.     With regard to the "2011 Equipment," the City has the option to pay the *lesser* of the amount provided in an amortization schedule (Exhibit J-2 to the Contract), or a five-year straight line depreciation, "starting from the actual cost paid by the Contractor." To that end, immediately after terminating the Contract and filing this lawsuit, the City requested critical information from Xerox about the equipment, software licenses, and warranties, including but not limited to information about Xerox's actual cost, in order to determine which of these options would result in a lesser price and thereby provide the best use of the City's resources. Exhibit J. Rather than providing the requested information, Xerox has threatened to disrupt patient care and the entire operation of the City's EMS operations. Significantly, there is no deadline in the Contract for purchasing the 2011 Equipment. Therefore, a reasonable time is implied. Insisting on immediate payment by August 1, 2013, under a buyout method Xerox has unilaterally chosen,

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 8 of 35

Xerox 212

is not reasonable.

19.     The Contract provides that Xerox shall indemnify the City and hold it harmless for all claims, causes of action, liabilities, fines and expenses for damage or loss to property sustained with or incidental to performance under the Contract.  Xerox's representative affirmed this obligation to the City's representatives on May 21, 2013.  The City has incurred and will continue to incur substantial expenses in connection with Xerox's performance, and lack thereof, under the Contract.  It has notified Xerox of its intention to continue to hold Xerox responsible for such expenses and for all of the other elements covered by Xerox's indemnity obligations, which extend beyond the termination of the Contract.

20.     The City has been compelled to engage outside counsel and consultants, and to devote tremendous internal resources, to its efforts to see that Xerox performed its services properly, that its fees were correct and that its EMS Billing Processes were accurate and compliant with applicable standards.  The City has also had to acquire substitute services due to Xerox's failures and refusals to perform its obligations under the Contract.  Xerox is legally and contractually obligated to reimburse and to indemnify the City for the costs of doing so, and the City seeks to enforce that obligation in this lawsuit.

21.     The City suspended payments to Xerox because of Xerox's prior material breaches of the Contract and because it was deprived of the benefit that could have been reasonably anticipated from full performance.  Moreover, Xerox did not comply with the City's demand to provide the basis for all of the fees that it had billed to, and collected from, the City.  Based on the limited information that Xerox has provided, it appears that Xerox has been grossly overpaid.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 9 of 35

Xerox 213

22.     The City has endeavored to review Xerox's work, as is its right under the Contract, and Xerox discouraged the City from doing so, suggested that any such review should be extremely limited, and provided only limited data for the City to review.

23.     The City has disputed the fee invoices that Xerox has submitted to it and has placed Xerox on notice that it intends to conduct a full accounting and reconciliation of the basis for the invoices, the amounts paid to Xerox and amounts that Xerox might claim to be owing. Xerox has not provided the information necessary for the City to perform this accounting.

24.     In light of Xerox's multiple material breaches and the other wrongful acts and omissions described in this Petition, the City instructed Xerox to suspend the submission and resubmission of all claims for payment of EMS Services provided by the City. On information and belief, Xerox complied with the City's requests.

25.     The City provided notice of default to Xerox in the May 30, 2013 correspondence that is attached to this Petition as Exhibit D, in which it described a number of obligations Xerox had previously or was then failing to perform. Also in that correspondence, the City requested information that Xerox is required to provide to the City under the Contract, including the following:

    a. A copy of Xerox's Professional Liability Policy, Declarations and Certificates designating the City as an Additional Insured, from the inception of the Contract to the present, along with a letter confirming that the Certificates accurately reflect the insurance coverage maintained.

    b. A copy of the Transport master database file, as described in the Contract, along with the means to access the data it contains.

PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

c.  Copies of the contents of the fully auditable billing, collections and accounts receivable systems that Xerox was required to maintain and to provide, along with the provision of full access to them, as set forth in the Contract.

d.  All records of inquiries and complaints, as described in the Contract.

e.  All of the reports that Xerox was obligated to provide either as a matter of course or upon the City's request, as set forth in the Contract.  The reports were requested to be monthly for each month the Contract had been in effect, along with annual reports for each contract year.

f.  Copies of all "Change Logs" relating to claims submitted on behalf of the City.

g.  A complete reconciliation of all present or past credit balances owed to any third party.

h.  Copies of all of the claims audits conducted by Xerox.

26.    Xerox flatly rejected the City's notice, ignored the City's request for the City's own information and data and Xerox demanded continued payment under the Contract for Xerox's insufficient services, as illustrated in the June 6, 2013 correspondence attached to this Petition as Exhibit E.  Xerox disingenuously contended that the City's correspondence was vague and ambiguous, even though it was well aware of the many deficiencies, material defaults, inaccuracies, misrepresentations and concealments in which it had engaged.  In fact, because Xerox is purportedly the world's largest "expert" in EMS Billing Processes and because it has all of the detailed information about its lack of performance under the Contract (which it has withheld from the City, in spite of demands that it be produced), Xerox is in the position to understand the depth and breadth of its misconduct.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

PAGE 11

Certified Document Number: 56873927 - Page 11 of 35

27.     The City provided additional notice and time for Xerox to perform its delinquent obligations.  Based on assurances from Xerox, the City extended the time for Xerox to cure its default in the June 28, 2013 correspondence that is attached to this Petition as Exhibit F.  The City reiterated its demand for information and data that Xerox is required to provide under the Contract in the July 18, 2013 correspondence that is attached to this Petition as Exhibit G.  Xerox did not cure its many defaults or provide information and data as required by the City's notice of default, subsequent correspondence and the Contract.

28.     Xerox failed to cure its defaults and perform its obligations, and the City gave Xerox notice of termination of the Contract in the July 25, 2013 correspondence that is attached to this Petition as Exhibit H.

## RECITATIONS APPLICABLE TO ALL COUNTS

29.     In the interest of brevity, the City hereby incorporates the foregoing paragraphs into each of the following Counts by reference, as if they were fully set forth in each Count.

30.     The Attachments to this Petition are incorporated into this Petition by reference for all purposes, as if they were fully set forth.

31.     All conditions precedent for which the City might have any burden have occurred or have been waived or excused, or Xerox is estopped to rely on their non-occurrence.

32.     The City does not make any elections of remedies, but rather reserves its right to do so at the appropriate point.

33.     The City seeks to recover all lawful pre-judgment and post-judgment interest to which it is entitled and as applicable to sums awarded to it in this action.

PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

Xerox 216

34.	References to acts and omissions of Xerox are intended to include the acts and omissions of its employees, authorized representatives, persons with apparent authority to act for it, or its agents.

35.	In the unlikely event the City is found to owe any amount to Xerox, the City claims a right of offset against any such amount for the amounts awarded to the City in this action.

36.	The City is a proper party to bring these claims and causes of action against Xerox.

**COUNT I**
**BREACH OF CONTRACT**

37.	The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

38.	The Contract was valid and enforceable.

39.	The City performed its duties and obligations under the Contract, or was excused from performing one or more of them due to Xerox's prior material breach or otherwise.

40.	Xerox materially breached the Contract in one or more of the following independent manners:

　　a.	By neglecting or refusing to perform its obligations; and

　　b.	By repudiating the performance of its obligations.

41.	Xerox was given notice of its breaches, notice of the City's intent to terminate the Contract, an opportunity to cure and an extension of the cure period. Nonetheless, Xerox failed and refused to cure its breaches.

Certified Document Number: 56873927 - Page 13 of 35

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

PAGE 13

Xerox 217

42. The City has suffered, and will continue to suffer, damages that are compensable under the Contract and law as a result of Xerox's breaches. They include, but are not limited to, the following:

    a. The cost of replacement services;

    b. Fees and penalties based on Xerox's breaches of the Contract;

    c. Costs and attorneys' fees; and

    d. Other actual and economic damages and costs.

43. The City seeks to recover for all injuries that were natural, probable and foreseeable consequences of Xerox's breaches.

## COUNT II
## FRAUD

44. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

45. Xerox made false material written and oral representations to the City about EMS data collection, documentation, coding and billing, and its abilities and expertise in performing EMS Billing Processes.

46. Xerox and its personnel knew or should have known that the representations were false or they were reckless with respect to their knowledge of the truth and were made as a positive assertion.

47. Xerox made these material representations about various EMS data collection, documentation, coding, and billing issues, including Xerox's experience and performance of EMS Billing Services with the intent that the City rely on those representations.

48. The City relied on the misrepresentations of Xerox to its detriment.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

        **PAGE 14**

Certified Document Number: 56873927 - Page 14 of 35

49. The City suffered actual damages as a result of its reasonable reliance on the foregoing misrepresentations and it seeks to recover all actual damages and equitable remedies to which it is entitled from Xerox, including actual and exemplary damages in an amount to be determined by the trier of fact.

**COUNT III**
**FRAUD BY NONDISCLOSURE OR CONCEALMENT**

50. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

51. Xerox deliberately concealed from or failed to disclose to the City certain material facts about EMS Billing Processes and Xerox's experience and expertise, which facts Xerox had a duty to disclose.

52. Xerox knew that the City was bereft of those facts and the City did not have an equal opportunity to discover the facts through reasonable diligence, which the City exercised.

53. Xerox concealed or failed to disclose those facts with the intent that the City take some action or refrain from acting.

54. The City relied on Xerox's nondisclosure to the City's detriment.

55. The City suffered actual damages as a result of Xerox's actions and it seeks to recover all actual damages and equitable remedies to which it is entitled from Xerox, including actual and exemplary damages in an amount to be determined by the trier of fact.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**

56. Xerox provided information about EMS Billing Processes and its capabilities and expertise to the City in the course of its business, in which Xerox has a pecuniary interest.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

**PAGE 15**

Certified Document Number: 56873927 - Page 15 of 35

**Xerox 219**

57.     The information Xerox supplied was false.

58.     Xerox and its agents did not exercise reasonable care or competence in obtaining or communicating the information.

59.     The City justifiably relied on the information provided by Xerox.

60.     The City suffered damages that were proximately caused by its reliance on the false information. The City seeks to recover actual and exemplary damages to which it is entitled in connection with Xerox's negligent misrepresentations.

## COUNT V
## BREACH OF WARRANTY

61.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

62.     In the Contract and in written and oral communications, Xerox made representations and warranties to the City regarding (a) its qualifications and capabilities to render the services it was required to perform under the Contract; (b) the quality of such services; and (c) various other matters involving the EMS Billing Processes. Those representations and warranties were part of the basis of the bargain between the City and Xerox, and the City reasonably relied on them to its detriment.

63.     Xerox breached its representations, warranties and covenants.

64.     The City has suffered, and will continue to suffer, damages as a result of Xerox's breaches of warranty. The City seeks to recover all damages to which it is entitled in connection with Xerox's breaches of warranty, including actual and other damages provided by contract.

Certified Document Number: 56873927 - Page 16 of 35

Xerox 220

## COUNT VI
## BREACH OF FIDUCIARY DUTY

65.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

66.     Xerox owed a fiduciary duty to the City by reason of trust and confidence the City reasonably reposed in Xerox, the agency of Xerox to act on behalf of the City in important and complex financial matters, and Xerox's representations that it had superior expertise and competence in these matters.

67.     Xerox had a duty to act in the City's best interests and with complete candor and fairness.

68.     Xerox breached this duty.

69.     Xerox's breach proximately caused injury to the City and benefit to Xerox.  The City seeks to recover all actual and exemplary damages and equitable relief to which it is entitled in connection with Xerox's breach of fiduciary duty.

## COUNT VII
## CONSTRUCTIVE FRAUD

70.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

71.     Xerox owed a fiduciary duty to the City.  Accordingly, Xerox's misrepresentations and concealment of information amounted to constructive fraud, which does not require the City to demonstrate that Xerox possessed any intent to defraud.

72.     As described above, Xerox willfully breached the fiduciary duties owed to the City by failing to perform its duties and obligations to the City and by disregarding the express terms of the Contract.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Xerox 221

73. Xerox's breach has resulted in injury to the City. The City seeks to recover all actual and exemplary damages and equitable relief to which it is entitled in connection with Xerox's constructive fraud.

## COUNT VIII
## CONSTRUCTIVE TRUST

74. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

75. Xerox owed a fiduciary duty to the City.

76. Xerox and its agents and affiliates wrongfully and fraudulently hold funds, which, in equity and good conscience, belong to the City.

77. Xerox has been and continues to be unjustly enriched by its possession of money and other property belonging to the City.

78. Xerox's acts were willful.

79. The City has been injured by being deprived of its money and property by Xerox.

80. The City has no adequate remedy at law to compensate it for the damage caused by Xerox's actions. Accordingly, the City seeks the imposition of a constructive trust over the money and property in Xerox's possession that was misappropriated, as well as all proceeds of such money and property.

## COUNT IX
## ACCOUNTING

81. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

Certified Document Number: 56873927 - Page 18 of 35

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Xerox 222

82.    As set forth more fully above, Xerox breached the fiduciary duty it owed to the City. Xerox also breached the Contract and misappropriated property and funds from the City. As a result of those unlawful actions, Xerox owes the City damages.

83.    The amount of damages Xerox owes the City is disputed and can be determined by an accounting.

84.    The City requests an accounting and request that the Court order Xerox to produce the documents and information that will allow the City to determine the amount of its damages, including but not limited to:

    a.  An accounting of all money received by the City under the Contract;

    b.  Any audits or assessments of profitability under the Contract; and

    c.  Any additional information the City may so request by amendment or otherwise.

85.    Due to the urgent need for the information and the nature of the entities to which the information relates, the City requests an order expediting Xerox's provision of such information.

## COUNT X
## MONEY HAD AND RECEIVED

86.    The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

87.    The City transferred funds into Xerox's possession to which Xerox was not entitled.

88.    Xerox wrongfully continues to hold funds that belong to the City in equity and good conscience and by which Xerox has been and is unjustly enriched.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 19 of 35

Xerox 223

89.     As a result of Xerox's actions, the City has suffered injury.

90.     The City seeks equitable and legal remedies in connection with Xerox's wrongful conduct, including actual and exemplary damages and injunctive relief.

## COUNT XI
## CONVERSION

91.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

92.     The City owns or otherwise has the right of immediate possession of the specific funds being wrongfully held by Xerox and the confidential business and health records, data and information it refuses to provide the City.

93.     Xerox wrongfully, willfully, and without authorization assumed dominion and control over property belonging to the City to the exclusion of and inconsistent with the rights of the City.

94.     The City demanded the return of the City's property held by Xerox.

95.     Xerox has failed to return the property and continues to wrongfully exercise dominion and control over the City's property.

96.     As a result of Xerox's actions, the City has suffered injury. The City seeks actual and exemplary damages and appropriate equitable relief in connection with Xerox's wrongful conduct.

## COUNT XII
## NEGLIGENCE AND GROSS NEGLIGENCE

97.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 20 of 35

Xerox 224

98. Xerox had a duty to perform its activities with reasonable care. Xerox also owed duties to the City by reason of the special relationship between the parties.

99. As demonstrated above, Xerox failed to satisfy its duties. In fact, Xerox's failures involved an extreme degree of risk, considering the probability and magnitude of the potential harm to the City and others, and Xerox had actual subjective awareness of the risk involved but nevertheless proceeded in conscious indifference of the rights and welfare of the City and others.

100. The City has been damaged by Xerox's failure to exercise reasonable care in its dealings with the City, particularly where Xerox has held itself out as an expert in EMS Billing Processes.

101. The City seeks all appropriate remedies in connection with Xerox's negligence and gross negligence, including actual and exemplary damages.

## COUNT XIII
## UNJUST ENRICHMENT

102. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

103. Xerox obtained funds from the City by fraud and by taking undue advantage.

104. The City seeks equitable return of all amounts by which Xerox was unjustly enriched and any and all other relief to which it may be entitled.

## COUNT XIV
## REQUEST FOR DECLARATORY RELIEF

105. The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

106. In the Contract, Xerox agreed to perform a variety of EMS claims and billing services.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

**PAGE 21**

Xerox 225

107. There is an actual controversy regarding whether and to what extent Xerox is required to indemnify and hold the City harmless for a number of items including, but not limited to, the following:

    a. The cost of replacement services;

    b. Fees and penalties based on Xerox's breaches of the Contract;

    c. Costs and attorneys' fees; and

    d. Other damages and costs.

108. The City requests that the Court declare that Xerox is required to indemnify and hold the City harmless for all damages, costs, penalties and other expenses arising out of Xerox's failure to perform its obligations under the Contract, including, but not limited to, the damages and costs listed above.

## COUNT XV

## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUCTION

109. The City incorporates the foregoing paragraphs by reference as if set forth fully herein.

110. There is a substantial likelihood that the City will prevail on the merits of its claims, which are described above. As detailed below, Xerox has created a situation of immediate, imminent, and irreparable harm to the City and those in need of urgent medical care, and for which the City has no adequate remedy at law. In the alternative, Xerox's actions will cause irreparable injury to personal property, irrespective of any remedy at law. TEX. CIV. PRAC. & REM. CODE § 65.011(5). Xerox must be enjoined from these actions.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

**PAGE 22**

Certified Document Number: 56873927 - Page 22 of 35

**Xerox 226**

**Electronic data**

111.  Pursuant to the Contract, the City is the owner of all data provided to Xerox and all databases. Xerox maintains all EMS account information in a City-owned database that includes patient care reports, financial transactions, supporting medical documents and patient correspondence. Exhibit C. This electronic information is an important part of the City's ability to bill third party payors, appeal denials, and collect transport fees.

112.  The City has asked for a copy of this EMTablet data from Xerox on numerous occasions prior to the initiation of this lawsuit, to no avail. *See Verification of Chris Souders, M.D. and Affidavit of Victor Gonzalez.* Xerox has denied the City access to this data. On or about July 29, 2013, the EMTablet website provided by Xerox to HFD for viewing its incident reports created with EMTablet was no longer working. HFD cannot at this time view EMTablet ePCR records.

113.  Additionally, the City is harmed by the denial of access to this EMTablet data because this is the website from which it accesses records to respond to Texas Public Information Act requests, subpoenas, and other requests. Other requests for these records come from the Medical Examiner's Office, the Houston Police Department, hospitals, attorneys, the District Attorney's Office, insurers, and the Office of Inspector General, to name a few. HFD's public information official / custodian of records is responsible for processing these requests and subpoenas.

114.  Under Texas Government Code section 552.353, a public information officer can be subject to criminal penalties for failure to provide access to public information, including a fine of not more than $1000 and/or confinement in county jail for not more than six months. Pursuant to Texas Government Code sections 552.353, 552.321, and 552.3215, the City may also

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 23 of 35

Xerox 227

be subject to a suit for writ of mandamus or an action for injunctive relief, if the City does not provide a requestor access to information subject to the Texas Public Information Act. The Texas Medical Privacy Act (Ch. 181 of the Texas Health & Safety Code) also guarantees patients access to their electronic health records. A violation of that chapter can potentially carry a penalty of $5000 for each violation that occurs in a year for violations committed negligently (Texas Health & Safety Code § 181.201).

### Equipment, software, licenses, and warranties

115.    The City also has the right to retain all equipment and software. The Contract contains "Buy-Out Options" for two groups of equipment, described as "New Equipment" and "2011 Equipment." The "Buy-Out Option" is triggered by the termination of the Contract which occurred on July 25, 2013. As the Contract was terminated after November 1, 2012, the City's termination costs associated with "New Equipment" are $1.00. On July 30, 2013, the City tendered to Xerox the $1.00 required termination cost for the "New Equipment." Exhibit I. In consideration for this payment, the Contract states "Contractor shall transfer title to the New Equipment and assign all related software licenses and software warranties to the City, to the extent permitted by any third party vendors." The City's letter of July 30, 2013 demands that the Contractor comply with that obligation. With regard to the second category, the "2011 Equipment," the Contract states that termination costs in the event of a termination before the end of the Term are to be "the lesser of (1) the depreciated price for the 2011 Equipment in accordance with the depreciation schedule attached . . . as Exhibit 'J-2,' entitled 'Buyout Detail Pricing for 2011 Equipment,'. . . or (2) the five-year straight line depreciated price of the 2011 Equipment, starting from the actual cost paid by Contractor." The City's July 30, 2013 letter explains that the City stands ready to meet its Buy Out obligations for the "2011 Equipment."

Certified Document Number: 56873927 - Page 24 of 35

Xerox 228

Exhibit J. In order to determine which option (amortization schedule in J-2 or straight-line method) would be "lesser," thereby better utilizing the public fisc and City resources, the City asked Xerox to provide critical information about the equipment, licenses and warranties to be purchased, including the actual cost paid by Xerox for the equipment. Exhibit J.

116. Xerox has demanded that the City pay for the 2011 Equipment under the amortization schedule in Exhibit J-2 by August 1, 2013, failing which Xerox will immediately cease and desist all current systems and operations, retrieve all equipment, and revoke all software licensing used in conjunction with the systems and equipment. Exhibit J. These actions will cause immediate, imminent, and irreparable harm. EMS providers are required, under the Texas Administrative Code, to provide hard copies of patient care records to the hospital to which the patient is transported. The City must have 100 percent ability to access all the data, and retain and use the New Equipment and the 2011 Equipment. The City notified Xerox that Xerox's July 30, 2013 letter did not conform to the Contract, and asked it to reconsider. Exhibit K. Even so, the City has delivered a check to Xerox's counsel based on the five-year straight-line depreciation method, using the costs set out in Exhibit A-2, with the caveat that the City will expect reimbursement if this payment is inflated due to failure of Xerox to pay for and provide equipment, or if it is discovered later that the method based on Exhibit J-2 was actually the lesser cost. Exhibit M. As of the filing of this amended petition, Xerox has not stood down on those threats. In addition, the City paid in June of 2011 for a perpetual software license for the EMTablet Software. As a result, the City is asking this Court to restrain Xerox from taking the actions threatened in its July 30, 2013 correspondence. In addition, the City asks that the Court restrain Xerox from disconnecting or suspending any cellular data service or wireless connectivity provided by Xerox under the Contract.

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 25 of 35

Xerox 229

117.    Without this equipment and access to the data, our provision of EMS services will be severely impacted.  These services are provided often to critically ill patients.  Xerox's action and threatened actions will foreclose certain established means of communicating with hospitals about patient information and care, and timely and efficient transmission of time sensitive reports to medical professionals which results in harm to the city.  For example, the Houston Fire Department transports over 400 individuals per day, and all the vehicles that provide emergency patient care are equipped with laptops furnished by Xerox under the Contract.  The City has used an electronic system to record patient information for over a decade.  Additionally, under the Contract, Xerox supplies printers which are located at approximately 46 hospitals in and around the Houston area.  These printers are used by the City emergency responders in order to print a copy of the ePCR for the hospital.  If the laptops and printers are removed or rendered useless, then the City and its citizens will suffer irreparable harm because the City's ability to properly and electronically record the patient care information and/or provide important and necessary information to the hospitals will be severely impacted.  Plaintiff has no adequate remedy at law because damages are incalculable.

118.    Finally, the City negotiated the right to purchase these items and is meeting its obligation.  The actions imminently threatened by Xerox create an urgent situation.

**Paper records and correspondence**

119.    The City also has a right to all of the paper records and correspondence which Xerox has stored at Xerox offices, Iron Mountain, and other locations, as well as all correspondence, and inquiries of any kind in the possession of Xerox.  Exhibit C. The City has previously asked for this information to be preserved and delivered to the City by Xerox.  Exhibit D; *Affidavit of Victor Gonzalez*.  This request has been ignored.

<u>**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**</u>
<u>**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**</u>

PAGE 26

Certified Document Number: 56873927 - Page 26 of 35

**Xerox 230**

120.     The City will be irreparably harmed by the failure to preserve these records because the City has no information whether Xerox kept electronic copies of these records, and has not been provided this electronic copy if it exists. These records cannot be replicated. These records include: (1) crucial information about refunds the City may owe to either the patient, Medicare, Medicaid or third party payors; (2) any correspondence addressed to the City from many different organizations which pertain to the City's EMS Services and Billing Process or from payors; (3) copies of billing records or invoices prior to a time when electronic archiving was prevalent, or where paper copies were made; (4) any explanation of benefits (EOB) forms from payors; and (5) any claims prepared and not sent.

121.     The City asks the Court to order Xerox to (1) preserve – and refrain from destroying or allowing to be destroyed -- all paper records in Xerox's possession or under its control relating to the Contract, the City's EMS Services, and the EMS Billing Process; (2) immediately allow physical transfer of all of these records to the City. Exhibit L. The City also asks this Court to restrain Xerox from destroying any evidence relevant to the Contract.

122.     As a direct and proximate result of Xerox's wrongful conduct as alleged in this petition, the City has suffered and will continue to suffer imminent injury that will be irreparable and for which no adequate remedy at law exists without the protections of a temporary restraining order and injunctive relief.

123.     The equities in this matter weigh heavily in the favor of the City. Further, the injury being suffered due to Xerox's conduct heavily outweighs whatever hardship Xerox could allege or prove from being restrained and the granting of injunctive relief.

124.     Xerox would not be harmed by issuance of an injunction, because, as stated, the data, databases, and documents are owned by the City, not Xerox, and the hardware and

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 - Page 27 of 35

Xerox 231

equipment in question is being purchased pursuant to the City's obligation to do so in the Contract.

125.  The City is not required to provide a bond. Houston's Charter, Art. IX, sec. 8. "City Not Required to Give Bond" provides that no bond is required. *See also* TEX. CIV. PRAC. & REM. CODE § 6.002 (providing no security or costs may be required of an incorporated city in an action, suit, or proceeding). In addition, justice and equity warrant the waving of a bond. The City however, is ready, willing and able to post a bond if necessary.

126.  Based on the foregoing, the City requests a Temporary Restraining Order and Temporary Injunction against Xerox, and its agents, servants, employees, independent contractors, attorneys, representatives, and those persons in active concert or in participation with them who receive actual notice of the by personal service or otherwise, from further engaging in certain proscribed activities as set forth below:

1) terminating or prohibiting access to equipment installed in EMS vehicles and hospitals that facilitate the creation of Patient Care Records pursuant to State Law;

2) repossessing or retrieving any equipment listed as "New Equipment" or "2011 Equipment" in the Contract;

3) revoking any software licenses utilized by Xerox or the City in connection with the services rendered under the Contract;

4) ceasing and desisting all current systems and operations used in providing EMS services or EMS Billing Processes;

5) failing to provide the City with a full and complete copy of the EMTablet database provided by Xerox in usable form, and terminating the City's ability to access documents on the EMTablet website;

6) denying the City access to and possession of any and all data and documents related to the EMS Services or the EMS Billing Process;

7) destroying or allowing to be destroyed any records in Xerox's possession or control relating to the Contract, the City's EMS Services, or the City's EMS Billing Process; and

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Certified Document Number: 56873927 – Page 28 of 35

Xerox 232

8) disconnecting or suspending any cellular data service or wireless connectivity provided by Xerox under the Contract; and

9) destroying or allowing to be destroyed any evidence relating to the lawsuit, the Contract, the City's EMS Services, or the City's EMS Billing Process.

## COUNT XIV
## ATTORNEYS' FEES AND COSTS

127.     The City incorporates the foregoing Paragraphs by reference as if set forth fully herein.

128.     The City's claims are founded upon a written agreement and pursuant to Section 38.001 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE; the City is entitled to recover its costs and reasonable and necessary attorneys' fees from Xerox.

129.     Furthermore, the City has requested relief pursuant to the Texas Declaratory Judgments Act. Pursuant to Section 37.009 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE, the City is entitled to recover its costs and reasonable and necessary attorneys' fees from Xerox.

130.     All conditions precedent to the City's recovery of its costs and attorneys' fees have occurred, or will occur prior to entry of judgment in this suit.

## JURY DEMAND

131.     The City requests a jury trial in this action.

Xerox 233