**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **THE CITY OF HOUSTON, TEXAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 4:13-cv-02532** |
| | § | |
| **XEROX STATE AND LOCAL** | § | |
| **SOLUTIONS, INC., a/k/a and f/k/a ACS** | § | |
| **STATE AND LOCAL SOLUTIONS,** | § | |
| **INC.,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**XEROX'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**</u>

Defendant, Xerox State and Local Solutions, Inc., files this Motion for Summary Judgment and Memorandum in Support.

BAKER & HOSTETLER LLP

Michael W. Mengis
State Bar No. 13941040
B. Scott McBride
State Bar No. 24002554
Bradley K. Jones
State Bar No. 24060041
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 751-1600
Facsimile: (713) 751-1717
Email: mmengis@bakerlaw.com;
smcbride@bakerlaw.com;
bkjones@bakerlaw.com

**ATTORNEYS FOR DEFENDANT,
XEROX STATE AND LOCAL
SOLUTIONS, INC.**

# TABLE OF CONTENTS

I.      NATURE AND STAGE OF THE PROCEEDINGS .........................................................1

II.     STATEMENT OF ISSUES BEFORE THE COURT ......................................................1

III.    SUMMARY OF THE ARGUMENT ..............................................................................1

IV.     STATEMENT OF FACTS ...............................................................................................2

  A. The Parties and Their Contract. .........................................................................2

  B. The City Was Hands-On and Laudatory of Xerox's Performance. ........................4

  C. In 2007, the City Extended the EMS Contract. ....................................................6

  D. Internal City Struggle Erupts Between ARA and Finance Over Contract
    Administration. .......................................................................................................8

  E. The City Issues a Request for Proposal and Engages a Neutral Third Party
    to Audit Xerox's Contract Compliance. ................................................................9

  F. The City Cancels the RFP and Uses Issues Raised in Previous Audits as
    Leverage in Negotiating a Second Contract Amendment....................................11

  G. The City's Finance Department Takes Over, Immediately Recommends to
    Terminate The Contract For Cause, and Replaces Xerox with Digitech..............12

  H. The City Files this Lawsuit, Ignores the Liquidated Damages Provision,
    and Seeks to Measure Xerox's Decade-Long Performance Against Its
    New Vendor. .........................................................................................................14

  I. The City's Retained Expert Witnesses ...............................................................15

V.      ARGUMENT & AUTHORITIES .................................................................................16

  A. Xerox is Entitled to Summary Judgment on the City's Breach of Contract
    and Breach of Warranty Claims...........................................................................16

    1. The Parties' Course of Dealings Demonstrates that Xerox Did Not
     Breach the EMS Contract. .......................................................................16

    2. The City's Breach of Contract Cause of Action is also Barred the
     by its Failure to Mitigate, Waiver, Estoppel, Accord and
     Satisfaction, and Laches...........................................................................21

    3. The Parties' Liquidated Damages Provision Precludes the City's
     Alleged Damages. ....................................................................................25

  B. Xerox is Entitled to Summary Judgment on the City's Fraud Claims..................29

  C. Xerox is Entitled to Summary Judgment on the City's Conversion Claim. ..........31

  D. Xerox is Entitled to Summary Judgment on The City's Breach of
    Fiduciary Duty and Constructive Fraud Claims. ..................................................32

  E. Xerox is Entitled to Summary Judgment on the City's Unjust Enrichment
    Claim.....................................................................................................................33

  F. Xerox is Entitled to Summary Judgment on the City's Declaratory
    Judgment Claim. ...................................................................................................33

VI.     CONCLUSION...............................................................................................................35

# **TABLE OF AUTHORITIES**

**Cases**

*Albemarle Corp. v. MEMC Elec. Materials, Inc.*,
 2010 WL 3239288 (S.D. Tex. Aug. 16, 2010) .......................................................... 17, 20

*Armstrong v. Am. Home Shield Corp.*,
 333 F.3d 566 (5th Cir. 2003) ....................................................................................... 30

*Associated Indem. Corp. v. CAT Contracting, Inc.*,
 964 S.W.2d 276 (Tex. 1998) ........................................................................................ 33

*Atain Specialty Ins. Co. v. Chang*,
 2012 WL 2194116 (S.D. Tex. June 14, 2012) ............................................................. 34

*Baylor Health Care System v. Employers Reinsurance Corp.*,
 492 F.3d 318 (5th Cir. 2007) ....................................................................................... 24

*Bohnsack v. Varco, LP*,
 668 F.3d 262 (5th Cir. 2012) ....................................................................................... 31

*Bonnema v. Builders Carpet & Design Ctr., Inc.*,
 2010 WL 923997 (Tex. App.—Dallas Mar. 16, 2010, no pet.) .................................... 33

*Brewer v. Myers*,
 545 S.W.2d 235 (Tex. Civ. App.—Tyler 1976, no writ) .............................................. 26

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
 98 F.3d 13 (2nd Cir. 1996) .......................................................................................... 32

*Buhler v. McIntire*,
 365 S.W.2d 237 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.) ................................ 26

*Cardinal Health Solutions, Inc. v. Valley Baptist Med. Ctr.*,
 2009 WL 150942 (S.D. Tex. Jan. 21, 2009) ................................................................ 31

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ...................................................................................................... 1

*City of Corpus Christi v. Nueces County Water Control & Improv. District No. 3*,
 540 S.W.2d 357 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.) ................... 22

*City of Dallas v. GTE Southwest, Inc.*,
 980 S.W.2d 928 (Tex. App.—Fort Worth 1998, pet. denied) ...................................... 21

*Dresser-Rand Co. v. Bolick*,
 2013 WL 3770950 (Tex. App.—Houston [14th Dist.] July 18, 2013), petition for review
 abated (Jan. 17, 2014) .................................................................................................. 30

*Enochs v. Brown*,
 872 S.W.2d 312 (Tex.App.—Austin 1994, no writ) ...................................................... 23

*Entergy Services, Inc. v. Union Pac. R. Co.*,
 35 F. Supp. 2d 746 (D. Neb. 1999) ............................................................................. 26

*Fid. & Deposit Co. of Maryland v. Stool*,
 607 S.W.2d 17 (Tex. Civ. App.—Tyler 1980, no writ) ................................................. 26

*Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*,
 960 S.W.2d 41 (Tex. 1998) .......................................................................................... 30

*Gideon v. Johns–Manville Sales Corp.*,
  761 F.2d 1129 (5th Cir. 1985) .................................................................... 25

*Great Am. Ins. Co. v. North Austin MUD*,
  908 S.W.2d 415 (Tex.1995)....................................................................... 25

*Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*,
  356 S.W.3d 54 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ..................... 26

*Houston Lighting & Power Co. v. City of Wharton*,
  101 S.W.3d 633 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)............. 22

*Marathon E.G. Holding Ltd. v. CMS Enterprises Co.*,
  597 F.3d 311 (5th Cir. 2010) ..................................................................... 34

*MBM Fin. Corp. v. Woodland Operating Co.*,
  292 S.W.3d 660 (Tex. 2009)...................................................................... 33

*McGinnis v. Union Pac. R. Co.*,
  2009 WL 2900277 (S.D. Tex. Sept. 8, 2009) ............................................... 35

*Meyer v. Cathey*,
  167 S.W.3d 327 (Tex. 2005)....................................................................... 32

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*,
  2010 WL 1463451 (S.D.Tex. Apr.12, 2010) .......................................... 17, 20

*Procom Servs., Inc. v. Deal*,
  2003 WL 298752 (N.D. Tex. Feb. 10, 2003)................................................. 32

*Republic Parking Sys. of Tex. v. Med. Towers, Ltd.*,
  2004 WL 2358315 (Tex. App.—Houston [14th Dist.] Oct. 21, 2004, pet. denied) ......... 32

*Stephanz v. Laird*,
  846 S.W.2d 895 (Tex. App.—Houston  [1st Dist.] 1988, no writ )................. 33

*Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*,
  817 S.W.2d 160 (Tex.App.—Houston [14th Dist.] 1991, no writ) ................. 23

*Tifford v. Tandem Energy Corp.*,
  562 F.3d 699 (5th Cir. 2012) ..................................................................... 31

*U.S. Quest Ltd. v. Kimmons*,
  228 F.3d 399 (5th Cir. 2000) ..................................................................... 30

*Womco, Inc. v. Navistar Int'l Corp.*,
  84 S.W.3d 272 (Tex. App.—Tyler 2002, no pet.) ......................................... 24

*Zieba v. Martin*,
  928 S.W.2d 782 (Tex. App.—Houston [14th Dist.] 1996, no writ) ................. 33

# I. NATURE AND STAGE OF THE PROCEEDINGS

1.      Plaintiff City of Houston, Texas (the "City") filed this lawsuit in state court on July 26, 2013, alleging Defendant Xerox State and Local Solutions, Inc., formerly ACS State and Local Solutions, Inc., ("Xerox"), the City's former Emergency Medical Services ("EMS") billing and collections vendor, performed its billing and collection services inadequately from 2002 through 2013,[1] and alleged a host of causes of action ranging from breach of contract and unjust enrichment to fraud and breach of fiduciary duty.  After removing this lawsuit to this Court, Xerox filed a counterclaim against the City for services Xerox rendered and for improper termination of the parties' contract.  Pursuant to this Court's order, the discovery cutoff was March 6, 2015 (although the parties agreed to take several depositions after March 6).  The dispositive motion and other motion deadline is April 17, 2015.  Docket call is set for August 28, 2015.

# II. STATEMENT OF ISSUES BEFORE THE COURT

2.      The issues to be decided in this Motion are whether there are any genuine issues of material fact regarding the City's claims against Xerox.  The standard for review is the familiar standard under Rule 56:  Xerox must establish that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  This motion is both a "traditional" and a "no evidence" motion for summary judgment as outlined below.

# III. SUMMARY OF THE ARGUMENT

3.      This is a breach of contract case, and the City's claims fail as a matter of law. First, the City's breach of contract and warranty claims fail because the parties' course of dealing

---

[1] The City presumably argues that since the statute of limitations does not apply to it, it can seek damages over a 12-year period even though it accepted the benefits of the contract with knowledge of the alleged deficiencies for many years and even amended and renewed the contract in 2007 and 2011.

spanning over the decade before the City filed this lawsuit establishes as a matter of law that Xerox did not breach the EMS Contract. Second, the City's claims for a decade's worth of damages are barred by the doctrines of mitigation, waiver, estoppel, accord and satisfaction, and laches, because the issues the City raises now relating to contract performance and technology were well known to the City and wholly resolved by the First and Second Contract Amendments, wherein Xerox made changes, took on additional responsibilities, and made substantial monetary concessions to resolve the City's concerns. The City now alleges that since 2002, Xerox's performance was so poor as to warrant termination of the EMS Contract, but the uncontroverted facts establish that the City willingly entered into the First and Second Contract Amendments, going so far as to extend the EMS Contract at the end of its natural term, rather than engaging another service provider. Finally, to the extent Xerox breached any of the contract terms, the EMS Contract and amendments had an unambiguous liquidated damages clause that is the exclusive measure of the City's damages.

4.     The City's extra-contractual causes of action for fraud, breach of warranty, conversion, breach of fiduciary duty, constructive fraud, and unjust enrichment are also without legal or factual merit, and Xerox is entitled to judgment as a matter of law.

## IV.     STATEMENT OF FACTS

### A.     <u>The Parties and Their Contract</u>.

5.     For 25 years, Xerox provided EMS billing services for the City. (Ex. 1, ¶ 3) (Declaration of Sue Elentrio). In 2002, the parties entered into an additional contract for EMS Ambulance Fee Collection Services. (Ex. 2) (the "EMS Contract").[2] The EMS Contract and its subsequent amendments contained term periods of five (5) years, which renewed automatically

---

[2] Even though Xerox had provided EMS billing for the City for years before, the parties entered into a new agreement in 2002. This (and the 2007 and 2011 amendments and extensions) are the relevant agreements for this matter.

unless expressly terminated. (Ex. 2, § V(A), (C)). The parties amended and extended the EMS Contract twice, first in 2007 (the "2007 Amendment") and again in 2011 (the "2011 Amendment") (collectively, the "Amendments").[3]

6.      Under the EMS Contract and its Amendments, Xerox transitioned the City's billing processes from paper-based to a wireless/computer-based technology, which was, at the time, a technological innovation, and unique among municipalities. (Ex. 1, ¶ 4); (Ex. 2 at Ex. A, § 11 "Technology"); (Ex. 3) (City Memoranda Discussing EMS billing background). In this endeavor, Xerox provided computer hardware, including handheld tablets and software for EMS personnel to capture patient demographics and document the medical care provided. (Ex. 1, ¶ 4); (Ex. 2 at Ex. A, § 11). Xerox used the information collected by EMS personnel to bill patients, their insurance carriers, Medicare, and/or Medicaid for the EMS treatment and hospital transportation. (Ex. 1, ¶ 4); (Ex. 2 at Ex. A, § I). Xerox's fee was a contingency fee based on the collections for each month. (Ex. 2 at Ex. B "Payment of Fees", § I(A)). Until the 2011 Amendment, Xerox was also entitled to a percentage bonus for its "Net Collection Rate" in excess of 40%. (Ex. 2 at Ex. B. § I(B)).[4] In other words, the parties agreed that a Net Collection Rate in excess of 40% was worthy of a bonus because such a rate was above and beyond the performance standards of the EMS Contract. (*Id.*).

7.      In addition to the "Net Collection Rate," in the year 2004, the City hired an outside consultant who determined that an average revenue of $200 per transport ("Revenue Per

---

[3] These so called amendments in 2007 and 2011 involved substantial changes in that they both involved new technology and contract term extensions. The 2011 revision contained a major re-write of the scope of services. In effect, both the 2007 and 2011 "amendments" where in fact new contracts.

[4] It is important to note here that the parties agreed in the contract that a net collection rate in excess of 40% was a performance worthy of a bonus and possibly a substantial one. Xerox could earn an extra 6% (increasing its fee from 14% to 20%) if the net collection rate was 50% or higher.

Transport") was also an appropriate metric to judge Xerox's performance and a metric Xerox consistently met:

> Additionally, ***ACS is consistently exceeding the performance target of $200 a transport*** that was established after an independent review and comparison to other Texas cities about a year ago.
>
> &#42;&#42;&#42;
>
> At that time, Houston collections per transport ranked at the bottom when compared to Austin, Dallas, Fort Worth, San Antonio and El Paso. The City now ranks near the top on this performance standard. As you may recall, revenue per transport was deemed to be the best performance measure for comparison to other cities and as a measure for what is realistically achievable.

(Ex. 4) (Director Johnson Letter to Mayor Bill White) (emphasis added). The City testified that its $200 Revenue Per Transport metric was a "mathematical compilation of what was mathematically achievable if certain things were being carried out properly . . . . a realistic goal was $200 a transport or more . . . . a real cash flow indicator of what your operation was doing." (Ex. 5, pp. 231:2-235:5) (Gray Dep.).

8.      In the EMS Contract, the parties also specifically bargained for remedies and damages available to the City in the event Xerox failed to perform. First, the EMS Contract provided for specific liquidated damages in the event Xerox failed to meet the billing and collection performance requirements set forth in the EMS Contract. (Ex. 2 at Ex. C). Next, the EMS Contract provided that the City could terminate for-convenience with 30-day's notice. (Ex. 2, § V(D) ("Termination for-Convenience"). Finally, the City had the right, after adequate notice and 30 days to cure, to terminate the EMS Contract for-cause with limited repercussions if Xerox **materially** failed to perform. (Ex. 2, § V(E)) ("Termination For Cause") (emphasis added).

### B.      The City Was Hands-On and Laudatory of Xerox's Performance.

9.      From 2002 to 2008, the City's Finance & Administration Department ("F&A") administered the EMS Contract, primarily by Gary Gray ("Gray") from 2002 to 2006 and then

by Alfred Moran ("Moran") from 2007 to 2008. (Ex. 5, pp. 29:6-12, 84:1-10, 289:19-25); (Ex. 6, pp. 12:1-13, 50:3-9). In 2008, F&A split into two (2) separate departments: Administrative and Regulatory Affairs ("ARA") and Finance. (Ex. 6, pp. 50:23-51:11, 62:10-14). After the split, ARA administered the EMS Contract; Moran continued as the contract administrator as Director of ARA until May 2012. *Id.*

10. Gray was "very involved" in Xerox's EMS billing process throughout his tenure as the Assistant Director of F&A (2002-2006). (Ex. 5 p. 297:15-20). For example, Gray (1) instituted a phone calling operation to contact unpaid self-pay accounts, (2) instituted regular meetings between the City and Xerox, (3) asked Xerox to purchase a state-of-the-art billing computer for the City, (4) requested that Xerox hire a manager to oversee the contract while residing in the City, (5) helped improve the hospital matching process[5], (6) created a monthly report for Xerox to generate for the City, and (7) worked with Xerox and the HFD to improve the quality and quantity of insurance information collected by EMS personnel for each transport. (Ex. 7) (Grey resume); (Ex. 8) (Email from Gray requesting new report); (Ex. 5, pp. 17:9-18, 35:10-37:21, 41:13-22, 43:10-44:4, 108:1-111:20); (Ex. 9, p. 1) (Gray memo regarding Xerox hiring a manager to reside in Houston).

11. In 2006, at the City's request, Jefferson Wells International audited Xerox's performance. (Ex. 11, p. 1); (Ex. 12) ("Jefferson Wells Audit"); (Ex. 5, pp. 189:14-190:1). The Jefferson Wells Audit took ten months to complete and constituted a complete cost recovery review of the City's EMS billings to commercial insurance companies for the years 1999-2004. (Ex. 11); (Ex. 12, p. 3). After receiving the Jefferson Wells Audit, Gray and others in the city

---

[5] "Hospital matching" was a process where Xerox would contact the hospital that received the patient to obtain patient information, such as name, social security number, insurance information, that was not captured by the EMS personnel at the time of transport and needed to properly bill the transport.

applauded Xerox's technology and performance of the contract and recommended extending the contract with Xerox in a formal evaluation of Xerox:

> Would you recommend contracting with this company in the future?
>
> Absolutely, yes. Why? Have there been problems? Yes, there have been some problems – but in every single case [**Xerox**] has worked through the problems and delivered, **often times, coming up with ingenious solutions to resolve some pretty tough problems**. And, revenue performance has improved year over year – you cannot argue with solid year over year revenue improvement. **We have also accomplished ALL of the goals I set forth initially** . . . .

(Ex. 13, p. 5) (emphasis added); *see also* (Ex. 18) (stating that "after discussing billing performance, which has been good, and the performance of the technology ACS provided, which the **Fire Department is very happy** with, the consensus was that it made sense to explore the possibility of renewing the ACS contract and . . . a technology refresh . . . .") (emphasis added).

### C. In 2007, the City Extended the EMS Contract.

12.     In November 2007, after receiving the Jefferson Wells Audit and praise from Gray, the City entered into the 2007 Amendment to the EMS Contract, which was negotiated by Alfred Moran. (Ex. 2, pp. 69-97).[6] This 2007 Amendment extended the term of the EMS Contract for another five (5) years. Further, the 2007 Amendment provided for a $2,087,449.69 update to relevant computers and equipment, entirely **at Xerox's expense**. (Ex. 2, p. 69, 76-81).

13.     Then, in early 2008, the City's F&A Department split into two (2) departments: the ARA Department and the Finance Department. After the split, ARA administered the EMS Contract, and like his predecessor, Alfred Moran—the EMS Contract administrator from 2007 through 2012—openly praised Xerox:

> I am very happy to talk about our relationship—our strategic alliance relationship—with ACS [Xerox], which is a company that does our billing and

---

[6] The 2002 contract was nearing the end of its term and the City took this opportunity to renegotiate the agreement. The City extended the term in exchange for new hardware provided by Xerox. This extension and provision of new hardware was the subject of extensive negotiation between the parties.

our receivables collections for the EMS system. We transport approximately 144,000 people a year. And when I arrived from [the] private sector to take this position approximately 11 months ago, **I was asked to look into this contract because it was coming up for renewal**.

And as I got deeply into the relationship, **I became immediately aware that all the constituents of ACS, meaning Finance Administration Group and the EMS Department of the Houston Fire Department, were extremely happy with this relationship**. Every year ACS has been able to collect higher and higher number of receivables for us, and they have been extremely easy to deal with. So my first job was to negotiate the contract and to make sure that we had a win-win solution.

It was an eighteen-year relationship. **The fire department was thrilled with their work, and I have since become thrilled with the relationship**. Of all of the strategic alliance relationships that we have, I would say it is the easiest to deal with. They have just made it a non-problem for us. We are the fourth largest city in the United States. We have a very complex city—not unlike the three other large cities in the United States. And it's always great to have a strategic alliance relationship with a group that makes our jobs easy. So we've had an eighteen-year relationship. We've collected greater percentages of receivables every year. **We have the top equipment that we could possibly want—that are provided. And they respond minute by minute with anything we need. So we totally endorse the company**.

(Ex. 15) (Video of Alfred Moran was produced natively, and an electronic copy can be provided to the Court on request) (emphasis added).

14.     The evidence establishes that the City was, to this point, pleased—even "thrilled"—with Xerox's performance and technology; Xerox increased EMS revenue every year since 2002 and met or exceeded the parties' agreed upon performance standards. (*Id.*); (Ex. 16, p. 1) (Moran Sept. 6, 2007 Executive Summary stating the City "has had a very successful 20 year relationship with" Xerox. "The average revenue per transport is $212.52," collections have increased "15.21%," and Xerox's "collection rate (53.31%) remains above the national average of 39% . . . ."); (Ex. 13, p. 1) (Xerox's Past Performance is "good . . . there are no quality problems"); (Ex. 14, pp. 2-3) (Discussing bonuses paid from 2000 through 2009 and Xerox's Net Collection Rate from 2005 through 2009); (Ex. 17, p. 1) (Noting that Xerox's "current collection

rate of 46.56% is markedly above the national average of 39% for a city of comparable size and healthcare payer demographics").

D. **Internal City Struggle Erupts Between ARA and Finance Over Contract Administration.**

15.    Despite the fact that Xerox increased EMS revenue year over year and exceeded performance standards, the Finance Department (which, until 2012, did not administer the EMS Contract) openly criticized the ARA's administration of the EMS Contract, as well as other city contracts.  (Ex. 6, pp. 215:15-216:5, 217:18-218:1); (Ex. 40) (Moran explaining to Xerox that "[t]here is a chance I will lose responsibility for the contract, and it will move to Finance and Legal because 'Alfred has done a poor job of managing the ACS contract.'  We will see!").

16.    In mid-2008, the Finance Department withheld Xerox's fiscal year 2008 bonus in order to conduct an audit of Xerox's bonus calculation.  (Ex. 6, pp. 73:14-74:19); (Ex. 20) (City requesting Xerox to "sit down" with Finance to discuss the 2008 bonus); (Ex. 21) (stating that Finance "want[s] to do an audit," and once they are "satisfied with ACS's documents then we can move to the reconciliation or agreement on the bonus payment"); (Ex. 22) (Finance stating the "issue is not that we cannot reconcile with ACS numbers.  It is that we do not know ACS's policies, procedures and approvals for write-offs and unbilled items . . . . I want to be certain the bonus is properly earned."); (Ex. 23, pp. 36:21-42:6).  The City's own audit determined that Xerox was, in fact, entitled to its fiscal year 2008 bonus, and the City paid the bonus.  (*Id.*, p. 61:6-25); (Ex. 24) (Finance stating that they "have reviewed ACS bonus calculation for FY 2008 and I am recommending the bonus of $1,345,314 be processed for payment.").

17.    In the summer of 2009, the Finance Department again withheld half of Xerox's fiscal year 2009 Bonus, and Finance conducted an audit of Xerox's "compliance with the provisions of" the EMS Contract."   (Ex. 6, p. 139:10-18); (Ex. 54, p. 2) (in August 2009, the

City "[w]ithheld half of ACS' FY09 Bonus ($889,407) pending the outcome of the audit"); (Ex. 25) ("Seckel Audit"). Importantly, in the audits there was no recommendation or comment regarding termination of the EMS Contract; instead, only general recommendations were made concerning EMS billing processes. *See* (Ex. 25). As described further below, this 2009 performance bonus was ultimately paid upon a neutral auditor's finding.

      **E.**      **The City Issues a Request for Proposal and Engages a Neutral Third Party to Audit Xerox's Contract Compliance.**

18.      In August 2010, as the end of the term of the 2007 Amendment approached, the City decided to again withhold half of Xerox's fiscal year 2010 Bonus. (Ex. 26, p. 1) (Finance to "withhold the balance of their [Xerox's] 2009 bonus and the 2010 bonus payment because we feel they are not complying with the requirements to earn the bonus."); (Ex. 27, p. 188:11-21); (Ex. 28, p. 72:19-74:11). The total amount then being withheld by the City was well in excess of $1 million **and the fiscal year 2009 amount had been due for well over a year.**[7] (Ex. 27, pp. 73:2-10, 132:7-11); (Ex. 28, pp. 165:22-167:13).

19.      In August 2010, the City opted to consider using Xerox's competitors and issued a Notice of Request for Proposal ("RFP"), which sought proposals from both Xerox, as well as its competitors. (Ex. 29) (RFP and implementation schedule); (Ex. 30) (explaining the RFP history and discussing why extending the contract with Xerox was the best choice); (Ex. 54) (documenting negotiations with Xerox to remedy performance concerns with contract extension).

20.      While the RFP was pending, the City and Xerox agreed to have a neutral third party resolve the issues raised in the Seckel Audit and to further audit Xerox's contract compliance. (Ex. 31, p. 2) (City explaining that bonus payments were "held-back pending

---

[7] Even though the City owed Xerox well in excess of $1 million dollars, Xerox continued to perform under the contract without interruption.

results of an audit by Fitch"); (Ex. 32, p. 18) (explaining that the City paid 100% of the 2009 and 2010 bonus as a result of the Fitch Audit); (Ex. 28, pp. 77:11-78:18). The City selected Fitch & Associates ("Fitch") to perform the audit. (Ex. 33) (City personnel approving of the use of Fitch to audit Xerox); (Ex. 34) (City proposing Fitch conduct the audit); (Ex. 28, pp. 163:4-164:1). The scope of the audit was to determine Xerox's "compliance with the City of Houston contract and specifically the calculation of the annual performance bonus." (Ex. 35, p. 5, § 1 "Scope of Work"). **The parties agreed to abide by the finding of this independent review.** (Ex. 36) (documenting that "[p]er our agreement **to put an end to an 18 month old review** of our contract and the collections percentage as it relates to the Bonus, we are contracting with Fitch and Associates to help determine compliance with the contract for the bonus achievement.") (emphasis added); (Ex. 37, p. 2) ("In an effort to **move forward**, we are proposing the attached defined process which will allow us to **mutually resolve** the remaining questions."); (Ex. 6, pp. 200:1-201:13) (emphasis added).

21. Ultimately, in May, 2011, Fitch found Xerox was "substantially compliant with the [EMS] Contract and the calculation of the Annual Adjustment according to the current interpretation and understanding of the provisions of the [EMS] Contract." (Ex. 38, p. 1) ("Fitch Audit"). As a result of this finding, the City paid the entire unpaid bonus for fiscal year 2009 and 2010. (Ex. 39) (documenting representation that City is paying fiscal year 2009 and 2010 bonus); (Ex. 40, p. 1) (City stating that they were "glad that you [Xerox] were paid the entire amount on the bonus."); (Ex. 6, p. 203:20-204:8, 210:4-213:13). The Fitch Audit resolved the bonus calculation, which necessarily included Xerox's processes for the identification and pursuit of payors, and the parties moved on. (Ex. 36) (Agreement regarding Fitch Audit); (Ex. 6, pp. 200:1-201:13, 203:20-204:8, 210:4-213:13); (Ex. 40) ("Now we can focus on the future.").

**F.**     **The City Cancels the RFP and Uses Issues Raised in Previous Audits as Leverage in Negotiating a Second Contract Amendment.**

22.     The City withdrew the RFP in March 2011 and entered into the 2011 Amendment to the EMS Contract with Xerox in August 2011.   (Ex. 28, pp. 167:14-168:8);  (Ex. 41) (Memoranda discussing City's decision to amended the EMS Contract); (Ex. 42) (Response to Mayor Parker's "Questions Regarding Proposed EMS Billing Contract Amendment" stating "This RFP was cancelled on March 14, 2011"); (Ex. 2, pp. 98-150) ("2011 Amendment").

23.     The City entered into the 2011 Amendment to the EMS Contract after thoroughly evaluating its options, which included Xerox and three (3) of Xerox's competitors, and determining that Xerox was the best decision.  (Ex. 41) (detailing decision to amended Xerox contract versus a competitor); (Ex. 43) (Mayor Parker's Xerox contract "Talking Points" outlining the concessions the City obtained from Xerox in exchange for extending the contract); (Ex. 44) (ARA presentation to Purchasing Committee outlining the justification for canceling RFP and contracting with Xerox); (Ex. 45) (discussing the selection of Xerox over other RFP bidders and that the City's complaints against Xerox will be resolved with implementation of the contract amendment).   Further, this decision was made after the City had audited Xerox's performance twice (Jefferson Wells and Seckel) and was in the process of a third audit of Xerox's performance (Fitch & Associates).

24.     The 2011 Amendment resolved the City's complaints regarding Xerox's contract performance—all of which were raised through the audits—by eliminating the Net Collection Rate bonus, lowering Xerox's contingency fee from 14% to 11.96%, and requiring Xerox to provide a substantial technology upgrade to the City, which included more than $2 million in hardware upgrades and a complete software upgrade using the City's desired software, Image Trend, and a re-write of Xerox's billing, collections, and data requirements.  (Ex. 41, p. 2)

(Xerox "will save the City $3M per year vs. the current [Xerox] contract."); (Ex. 43) (Mayor Parker "Talking Points" that new contract saves the City $3.6M per year, required hardware and software refresh, required return of accounts receivable for City to send to collections, and required ACS to "maintain auditable and web-accessible records system," as well as required them to produce "ad-hoc reports requested by ARA"); (Ex. 44) (ARA presentation to Purchasing Committee outlining the justification for canceling RFP and contracting with Xerox); (Ex. 32) (Executive summary of new contract advantages); (Ex. 2, pp. 128-140, 143, 107-127). Indeed, the City understood that the 2011 Amendment was a resolution its major complaints of Xerox's performance:

> The root cause of the major complaints against ACS will be addressed with the replacement of their outdated ePCR [electronic patient care record] system with one favored by HFD (Image Trend). With this, the first, and certainly most serious complaint, will be completely eliminated. The second concern will also be addressed using Image Trend's software system, which has a robust data warehouse that can be used to generate the reports necessary to resolve the transparency problem.

(Ex. 45, p. 1) (Moran memorandum to the Mayor and City Council, the issues raised in the audits would be resolved by the Second Amendment to the EMS Contract). With the 2011 Amendment in place, Xerox, the City, and Image Trend, began implementing the technology upgrades.

**G.      The City's Finance Department Takes Over, Immediately Recommends to Terminate The Contract For Cause, and Replaces Xerox with Digitech.**

25.      In May 2012, despite receiving increased revenue every year, and despite having just entered into the 2011 Amendment, the City's Finance department took over administration of the EMS Contract and immediately recommended terminating the contract with Xerox.[8] (Ex. 46, p. 79:6-13); (Ex. 6, pp. 215:15-216:5). In fact, Finance recommended terminating the EMS

---

[8] It is important to remember that Mr. Moran and ARA had just recommended that the contract with Xerox be renewed in August 2011. Nine months after this recommendation and only three weeks into its tenure as contract administrator, Finance is moving to terminate the agreement.

Contract within three (3) weeks of becoming the contract administrator and actively sought to find issues that would support termination.  (Ex. 46, pp. 79:6-13; 145:11-21); *see also* (Ex. 47) (discussing that a Medicaid investigation "does help our case"); (Ex. 48) (City discussing contract termination timeline).

26.     In May 2013, the City sent Xerox a letter declaring "Notice of Default and Intent to Terminate the Contract for Cause," which lists alleged "independent grounds" for default. (Ex. 49).[9]  Therein, the City alleged that Xerox had not "[c]omplied with its express warranties as to performance," had not "[t]imely performed its obligations," and had not "[p]roperly calculated its fees under the Contract."  (Ex. 49) (Notice of Intent to Terminate).  The City then claimed Xerox had to cure these "independent grounds" within 31 days or the City would terminate the EMS Contract for cause.  (Ex. 49).

27.     Xerox sent a letter to the City requesting a description of the default in order to allow Xerox an opportunity to cure, because the City's purported Notice of Default" letter— which raised vague complaints of timeliness and failure to perform—did not provide a meaningful description of the alleged "material defaults," thus, making it impossible for Xerox to cure them.  (Ex. 50) (Xerox response to Notice of Intent to Terminate).  The City, however, refused and, instead, moved to terminate the EMS Contract "for cause," effective July 25, 2013. (Ex. 51) (Termination Notice).

---

[9] There were two ways for the City to terminate the contract: "for cause" and "for convenience."  (Ex. 2, § V(D), (E)).  Termination "for cause" required notice of the alleged breach and an opportunity to cure.  (Ex. 2, § V(E))  The City could also terminate the EMS Contract "for convenience," but Xerox would still be entitled to fees for a 90-day period after the termination on billable accounts that Xerox had noticed or billed before the termination date.  (Ex. 2, § V(D)).  That is, after a termination for convenience, Xerox would be able to re-work and collect fees on all outstanding accounts for 90 days.  (Ex. 2, § V(D)).

**H.** **The City Files this Lawsuit, Ignores the Liquidated Damages Provision, and Seeks to Measure Xerox's Decade-Long Performance Against Its New Vendor.**

28.     The day after the effective date of the termination of the EMS Contract, the City filed this lawsuit in state court, and Xerox removed to this Court on August 29, 2013.  (Rec. Doc. 1 & 1-2).  In essence, the City now seeks to ignore the parties' decades-long course of dealings and cooperation, two (2) renegotiations of the contract, the agreement regarding the Fitch audit, and years of praising Xerox's performance in order to rehash matters resolved by the parties via the Amendments.  At all times, the City was keenly aware of Xerox's billing and collection data, as well as its own concerns and complaints, having raised them throughout the audit periods, and had agreed to resolve them in the Amendments.  In fact, the City was sufficiently satisfied that the parties had resolved all issues, as it chose to select Xerox over its competitors in the 2010 RFP, which led to the 2011 Amendment.

29.     Next, the City ignores the liquidated damages provision of the EMS Contract and the parties' agreed upon Performance Requirements, inappropriately deciding instead to arbitrarily measure Xerox' performance from 2003 through 2013 against its new EMS vendor, Digitech.  *See* (Ex. 52, ¶¶ 190-97) (Report of Peter Lawrence stating that a "comparison to Digitech shows that Digitech is outperforming Xerox in the two most important metrics: revenue per transport and percentage of paid transports."); (Ex. 53, ¶¶ 83-94) (Report of Donald Lochabay discussing "Xerox's performance challenges can be highlighted by contrasting its billing and collection processes with those of the City's current EMS vendor, Digitech.").  Instead of applying the bargained for liquidated damages to Xerox performance, the City seeks to recover nearly $40 million in damages by claiming Xerox was in breach of the EMS Contract

for over a decade by not collecting as much as Digitech allegedly and hypothetically could have collected.

## I.     **The City's Retained Expert Witnesses.**

30.     The City's claims rest entirely on the City's purported expert witness, Peter Lawrence ("Lawrence"), who concludes that Xerox breached the EMS Contract's requirement that Xerox "conform to the **professional** standards prevailing in Harris County, Texas, with respect to the scope, quality, due diligence, and care of [the] services and products." (Ex 52 at ¶ 27).  Lawrence further concludes that Xerox breached specific contract provisions allegedly:

- By failing to develop a "**close business relationship** with all area hospitals to which patients are transported to by the Houston Fire Department;"

- By failing to "furnish all services, materials, equipment, office space, and personnel **necessary** to complete the services described" in the EMS Contract;"

- By failing to "pursue Medicare, Medicaid, private insurers, and third party billing companies **aggressively** by exhausting all appeals, re-billing accounts and initiating suits through the City's legal department;" and

- By failing to submit claims in a **timely** manner. (*Id.* at ¶ 28) (emphasis added).

31.     The City retained Donald E. Lochabay, Jr. ("Lochabay") to quantify the City's alleged damages associated with these alleged breaches.  (Ex. 53).  Lochabay's reports identify a total of three categories of purported damages: (1) identification and pursuit of payors, (2) level of service under billing, and (3) Aetna and Blue Cross Blue Shield disallowances.  *Id.*

32.     The vast majority (91%)[10] of the alleged damages calculated by Lochabay relate to his damage category of "identification and pursuit of payors."  *Id.*  To calculate these alleged

---

[10] The other 9% of Mr. Locabay's damages model alleges: (1) Xerox's automated approach to determining the transport service level allegedly caused it to under-bill and under-collect Medicaid and Medicare claims by $2.7 million; and (2) Xerox allegedly accepted lower than expected amounts for claims submitted to Aetna and BlueCross BlueShield of Texas and should have collected an additional $.7 million from Aetna and $.8 million from BlueCross BlueShield.

damages, Lochabay compares Xerox's and Digitech's "paid transport rate." The paid transport rate is a metric created entirely by Lochabay; it was never a benchmark that the City used to judge Xerox's performance, as the City instead used the $200 average collections per transport metric and a 40% net collection rate performance bonus to measure Xerox's performance. To arrive at the novel paid transport rate for Digitech, Lochabay divided the number of claims the City transmitted to Digitech from September 1, 2013 through August 31, 2014 that received any payment (even partial payments) by the total number of claims. Lochabay then coins Digitech's paid transport rate as the rate Xerox "should have been" achieving for the years 2003 through 2013. Lochabay next calculates how much EMS billings revenue the City would have received during the years 2003 through 2013 if Xerox had achieved the same paid transport rate as Digitech. In other words, the City takes the unreasonable—indeed, the historically technologically impossible—position that because *one* vendor in 2014 ostensibly outperformed Xerox under a single standard that the City never applied as a measure of performance, Xerox necessarily breached the EMS Contract's requirements of professional performance.

## V. ARGUMENT & AUTHORITIES

### A. Xerox is Entitled to Summary Judgment on the City's Breach of Contract and Breach of Warranty Claims.

#### 1. The Parties' Course of Dealings Demonstrates that Xerox Did Not Breach the EMS Contract.

33. The City's breach of contract and warranty claims fail because the parties' course of dealing spanning over the decade before the City filed this lawsuit establishes as a matter of law that Xerox did not breach the EMS Contract. The Court should not ignore this course of dealing in construing the critical ambiguous phrases in the EMS Contract; such as "professional standards prevailing in Harris County," "close business relationship," "necessary to complete the

services described," pursue payors "aggressively," and "timely manner."[11]  In other words, the

parties' conduct during their decade long relationship—and not Peter Lawrence's myopic view

of Digitech's 2013-2014 performance—defines how "professional," "close," "aggressive," and

"timely" Xerox needed to be, and defines what services were "necessary."  Using this proper

construction, the Court may find as a matter of law that Xerox did not breach the EMS Contract.

34.     This Court recently held under Texas law, a course of dealing is a "sequence of

previous conduct between the parties to an agreement which is fairly to be regarded as

establishing a common basis of understanding for interpreting their expressions and other

conduct."  *One Beacon Ins. Co. v. Crowley Marine Servs., Inc*., 2010 WL 1463451, at *13

(S.D.Tex. Apr.12, 2010) (Miller, J.) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 223).  In

fact, Texas courts have applied this Court's decision in *One Beacon* in holding that the parties'

course of dealing will define ambiguous contract terms and set the level of acceptable contractual

performance.  *See, e.g.*, *Albemarle Corp. v. MEMC Elec. Materials, Inc*., 4:08-cv-3236, 2010

WL 3239288, at *1 (S.D. Tex. Aug. 16, 2010) (Ellison, J.).

35.     In *Albemarle*, a company called Albermale manufactured, marketed, and sold

polysilicon at its plant in Pasadena, Texas.  *Id.* at 1.  In 1995, Albermale entered into an Asset

Purchase Agreement with its biggest customer, MEMC, to purchase the plant.  The purchase

agreement included a Seller Technology License Agreement ("STLA") which provided that

Albermarle would receive royalty payments from MEMC for certain quantities of polysilicon

over a fifteen-year period.  *Id.*  The heart of the dispute concerned the definition of "Polysilicon"

---

[11] Unlike the other contractual provisions quoted by Lawrence, he is not actually quoting the EMS Contract with respect to his opinion that Xerox breached the EMS Contract by allegedly "failing to submit claims in a timely manner." Instead, Lawrence merely cites Exhibit C to the EMS Contract (the liquidated damages exhibit) to support this opinion. To be clear, Xerox is not contending that Exhibit C is ambiguous.

in the STLA, which provided in relevant part that the Polysilicon for which royalty payments were owed must meet "the **specifications** required for the preparation of semiconductor silicon" and "shall not include polysilicon which is **unsuitable** for the manufacture of semiconductor grade silicon wafers." *Id.* (emphasis added). The words "specifications" and "unsuitable" were not defined in the agreement. *Id.* After the sale of the plant, MEMC never made a single royalty payment based on its contention that the Polysilicon produced from the plant—the same Polysilicon it bought in large quantities from Albermarle prior to the sale—did not meet "specifications" and was "unsuitable."

36. Relying on this Court's decision in *One Beacon*, the court held that MEMC breached the STLA by not paying the royalties and the parties' course of dealing set the standard for what met "specifications" and was "suitable." *Id.* at *3. The court held that that it could not "ignore the history between the two parties" and find that the polysilicon the plant that was manufacturing and selling before the sale could somehow be considered "unsuitable" under the parties' agreement. *Id.* The Court held that "[a]adopting MEMC's interpretation of the contract would be unreasonable and oppressive," and the court could not believe that the "threshold to suitability was intended by the parties to be so high that the pre-transfer polysilicon would not even be suitable under the STLA." *Id.* In other words, the court found that the level of performance that passed muster before the sale (and before the lawsuit) was the appropriate yardstick to measure whether post sale performance met "specifications" and was "suitable." *Id.* The same analysis should apply here in this case.

37. When construing words in the EMS Contract such as "professional," "aggressive," "timely," and "necessary," the Court must ignore the conclusions of Peter Lawrence because they are completely at odds with the parties' acceptable (and even

congratulated) level of performance for over a decade. The following facts show that Xerox's performance from 2003 through 2013 was sufficiently professional, aggressive, and timely, and that Xerox devoted the necessary resources to do—at a minimum—a contractually sufficient job:

- In 2002 through 2007, Xerox's net collection rate was consistently well over the 39% national average. (Ex. 16, p. 2); *see also* (Ex. 17).

- On July 8, 2005, the director of F&A wrote to the mayor that "[Xerox] is consistently exceeding the performance target of $200 a transport that was established after an independent review and comparison to other Texas cities about a year ago. . . . As you may recall, revenue per transport was deemed to be the best performance measure for comparison to other cities and as a measure for what is realistically achievable. (Ex. 4).

- In 2006, the City's assistant director of F&A completed a "Past Performance Evaluation" and gave Xerox a 4 out of 5 rating (meaning "Good") and wrote "revenue performance has improved year over year – you cannot argue with solid year over year revenue improvement. We have also accomplished ALL of the goals I set forth initially." (Ex. 13, pp. 1, 5).

- On September 6, 2007, after submitting Xerox's collection practices to an audit, F&A recommended the City renew its contract with Xerox (which the City did) because:

  o "Houston has had a very successful 18 year relationship with [Xerox]"

  o "[W]e could find no companies with the size or sophistication required by the City of Houston's 'state of the art,' technologically complex EMS System."

  o "[T]he Houston Fire Department was very positive on the performance of [Xerox]."

  o "In [the City's] partnership with [Xerox], EMS Transport Collections have risen from $20,538,543 in FY 2002 to $28,921,464.56 in FY 2007."

  o "[Xerox's] current collection rate of 46.56 is markedly above the national average of 39% for a city of comparable size and healthcare payer demographics."

  o "[Xerox] has worked with the City in partnership to provide an outstanding technological solution that has consistently provided incremental increases in revenue to the City year after year." (Ex. 16).

- After the City extended the EMS Contract in 2007, the then director of ARA openly praised Xerox. (Ex. 15).

- After subjecting Xerox to the Seckel Audit in 2008, the City determined that Xerox was entitled to a performance bonus for its 2008 collections. (Ex. 24).

- In 2009, the City noted that Xerox's "current collection rate (54.31%) remains above the national average of 39% for a city of comparable size and healthcare payer demographics." (Ex. 17, p. 1).

- After agreeing to subject Xerox's 2009 and 2010 performance to yet another audit by a third party (who found that Xerox was in substantial compliance with the EMS Contract), the City paid Xerox's performance bonuses for its 2009 and 2010 collections. (Ex. 31); (Ex. 32); (Ex. 36); (Ex. 38); (Ex. 40).

- The City paid Xerox a net collection rate performance bonus each year from 2005 through 2010. (Ex. 1 at ¶ 9).

- In 2011, after issuing a request for proposal and considering the bids of several competitors, the City decided to renew the EMS Contract yet again with the Xerox. (Ex. 41).

- Despite the fact the EMS Contract requires, "[i]f a default occurs, **the injured party shall** deliver a written notice to the defaulting party describing the default and the proposed termination date," (Ex. 2, § V(E), emphasis added) the City never once notified Xerox that it was in default of the EMS Contract until 2013, and when it did provide notice, the notice was insufficiently vague. (Ex. 49); (Ex. 50).[12]

38.    As a matter of law, the foregoing facts—and not the words of an expert retained during litigation to support phantom damages—set the standard for what performance was sufficiently "professional," "aggressive," "close," "timely," and "necessary." *One Beacon*, 2010 WL 1463451, at *13; *Albemarle*, 2010 WL 3239288, at *3. The Court may simply construe these words to mean that the parties contracted for a level of service that the City found more than satisfactory during the time period it now claims Xerox's performance was unsatisfactory. And the City's failure to—even once from 2002 until 2013—provide a formal notice of default, completely belies the City's claims that Xerox was in breach during this same time period. In the words of the *Albermarle* Court, "[t]he Court cannot believe that the threshold to suitability was intended by the parties to be so high that" the level for which the City praised Xerox, paid Xerox bonuses, and renewed its contract with Xerox "would not even be suitable under the"

---

[12] The City's failure to be adequately specific in its notice of default supports Xerox's position that Xerox's performance was in fact consistent with the parties' expectations under the EMS Contract.

EMS Contract. *Albemarle*, 2010 WL 3239288, at *3. As such, Xerox is entitled to summary judgment on the breach element of the City's breach of contract and breach of warranty claims.

> 2. **The City's Breach of Contract Cause of Action is also Barred the by its Failure to Mitigate, Waiver, Estoppel, Accord and Satisfaction, and Laches.**

39. As described above, 91% of the City's alleged damages rest on its allegation that, from 2003 through 2013, Xerox was unable to collect payment on a sufficiently high percentage of transports. Yet during this entire time period, the City knew precisely the percent of transports transmitted to Xerox that received payment. (Ex. 1, ¶¶ 5-9) (Declaration of Sue Elentrio). Because the City had this knowledge each and every year, yet never notified Xerox that its "paid transport" or collection rates were too low, and continued to pay Xerox pursuant to the EMS Contract, even paying Xerox's yearly performance bonuses during most of this period, Xerox's affirmative defenses are established as a matter of law.

40. Texas law does not permit one party to a contract, such as the City, to stand by idly and accept—congratulate, even—another party's level of contractual performance for a decade, such as Xerox's performance from 2003 through 2013, and then sue for breach of contract by claiming, as the City does here, that the achieved level of contractual performance was not good enough. Instead, well-established defenses such as waiver, estoppel, laches, and failure to mitigate bar such claims. For example, in *City of Dallas v. GTE Southwest, Inc.*, 980 S.W.2d 928 (Tex. App.—Fort Worth 1998, pet. denied), for the six (6) years before the suit was filed, the city of Dallas accepted, without protest, a telephone company's franchise payments knowing that those payments were based only on the company's revenues from local telephone service, but not long distance. *Id.* at 931. In response to the lawsuit, the telephone company argued that the City had waived any right to dispute the fee calculation. The appellate court

agreed and held that waiver had been established as a matter of law because the city knew how the fee was being calculated, but paid the fee without protest. *Id.* at 937. Likewise, in *Houston Lighting & Power Co. v. City of Wharton*, 101 S.W.3d 633, 639 (Tex. App.—Houston [1st Dist.] 2003, pet. denied), the appellate court found a city's 30-year delay in filing a breach of contract claim seeking to recoup unpaid franchise fees from a utility provider supported the defense of laches, and barred the city's claim.

41.     Another example of the applicability of equitable defenses to a suit by a municipality is *City of Corpus Christi v. Nueces County Water Control & Improvement District No. 3*, 540 S.W.2d 357, 377-78 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.). The district had been diverting water for more than forty (40) years and had enlarged and rebuilt its water distribution system to utilize the diverted water. Applying laches as a total bar to plaintiff's claims, the court reasoned that it was "obviously unjust and unfair for the City to stand idly by, . . . and then 40 years later" assert claims that included payment for the water diverted. *Id.* at 378.

42.     Similar to the facts in *City of Dallas*, *Houston Lighting & Power*, and *City of Corpus Christi*, the facts here show that in each of the ten years the City now claims Xerox breached the EMS Contract by underperforming, the City knew what Xerox's paid transport rates and collection rates were, yet failed to protest about these rates or bring suit. (Ex. 1, ¶¶ 5-9). Moreover, despite knowledge of these rates, in each year from 2003 through 2013, the City continued to accept the benefits of Xerox's performance, continued to pay Xerox pursuant to the EMS Contract's terms, and even paid Xerox an "above and beyond" performance bonus almost every year. These undisputed facts support Xerox's affirmative defenses of failure to mitigate, waiver, estoppel, accord and satisfaction, and laches, and the City should not be allowed now to

bring claims that entirely contradict a decade of its conduct.

43.     Further, not only did the City know Xerox's specific collection rates that it now claims were insufficient, through Gray and Moran's involvement, the Jefferson Wells Audit, the Seckel Audit, and the Fitch Audit, the City had intimate knowledge of Xerox's billing and collection procedures and systems that achieved these rates.  By choosing not to object after receiving an inside look at Xerox's procedures and by having never claimed that Xerox's collection rates were inadequate, the City has waived any claim may have had that Xerox's performance under the EMS Contract was unsatisfactory.  *City of Dallas v. GTE Southwest, Inc.*, 980 S.W.2d at 937.

44.     Further, the City's consistent conduct of praising Xerox, its conduct of not lodging objections to the bottom line, paying Xerox its fees and performance bonuses, and its renewal of the contract on two (2) separate occasions operate to estop[13] the City from now claiming that Xerox's performance over the past decade was not sufficiently professional, aggressive, timely, or otherwise not compliance with the EMS Contract.  Further, Xerox changed its position in reliance on the City's conduct as the City agreed to extend the EMS Contract on the condition that Xerox make updates to relevant computers and equipment costing $2,087,449.69, which Xerox agreed to do.  (Ex. 2, p. 69, 76-81).  These facts establish estoppel as a matter of law because the City's actions—actions it took consistently for over a decade—are simply inconsistent with the position it takes now that Xerox's performance was so grossly inadequate as to support almost $40 million in damages.

---

[13] Under the principle of quasi-estoppel, a party is precluded from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken.  *Enochs v. Brown*, 872 S.W.2d 312, 317 (Tex.App.—Austin 1994, no writ)  The doctrine applies where it would be unconscionable to allow a party to maintain a position inconsistent with one in which it acquiesced, or of which it accepted a benefit.  *Id*.  Quasi-estoppel is in essence a term applied to certain legal bars such as ratification, election, acquiescence, waiver, or acceptance of benefits. *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex.App.—Houston [14th Dist.] 1991, no writ).

45.    Further, as a matter of law, the City cannot attempt to litigate issues that were resolved by the parties' prior agreements.  For example, after the 2007 Amendment, the City continued to audit Xerox's collection and billing processes.  In mid-2008, after auditing Xerox's performance, the City determined that Xerox was, in fact, entitled to the bonus because its collections surpassed the 40% mark set in the EMS Contract.  (Ex. 24).  The City again withheld Xerox's 2009 and 2010 bonuses subject to an audit, and the parties agreed to abide by the findings of an independent auditor.  (Ex. 26); (Ex. 36).  The auditor, Fitch & Associates, agreed that Xerox was entitled to the bonuses, and the City paid them.  (Ex. 38).

46.    The City's conduct in agreeing to submit the issues of Xerox's contractual performance to a third party auditor and then paying Xerox pursuant to that agreement supports Xerox's defenses of waiver and estoppel, and also constituted an accord and satisfaction with respect to Xerox's prior contractual performance.  If the auditors believed that Xerox's performance in 2009 and 2010 was so poor that it constituted a breach of the EMS Contract, then the City certainly could have claimed an offset and argued that it did not owe Xerox any bonus.  Yet the auditors did not make this finding and the City's agreement to submit the issue to an auditor, and its agreement to pay the recommended performance bonus, as well as Xerox's satisfaction of that agreement, constitutes an accord and satisfaction.[14]

47.    Finally, the City's agreement to once again renew and amend the EMS Contract in 2011 supports, as a matter of law, Xerox's contractual defenses.  By 2011, the City had *eight years of data* it could have used to terminate the Contract and sue for breach, or at a bare

---

[14] A valid accord and satisfaction exists when there an "unmistakable communication" establishing that performance according to the terms of a new agreement will satisfy the underlying obligation created by the original contract. *Baylor Health Care System v. Employers Reinsurance Corp.*, 492 F.3d 318, 321 (5th Cir. 2007).  Yet the new agreement need not explicitly state that it is intended to supersede the original contract.  *Womco, Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 280 (Tex. App.—Tyler 2002, no pet.).  Rather, courts may look to the circumstances surrounding the execution of the new agreement to determine if there has been an agreement to discharge the original obligation.  *Id.*

minimum, put Xerox on notice that its paid transport rates, collection rates, and procedures were poor enough to constitute a default of the EMS Contract. (Ex. 1, ¶¶ 5-9). Yet, the City never notified Xerox that its performance constituted a default; rather, it induced Xerox to agree to provide billing and collection services for an additional two (2) years via an extension to the EMS Contract. By remaining silent and never notifying Xerox of a default, even a potential one, the City received an agreement from Xerox to make amendments to the EMS Contract that saved the City millions of dollars. (Ex. 2, pp. 107-127, 128-140, 143); (Ex. 43). The City's acceptance of these benefits, and its renewal of the EMS Contract further supports the defenses of accord and satisfaction, estoppel and failure to mitigate.[15] The City could have easily mitigated against further alleged losses due to Xerox's supposed poor collection rates by terminating the contract, or by selecting one of Xerox's competitors in the RFP. Instead, accepting for the moment that the City truly has complaints regarding Xerox's performance, it opted to remain entirely silent for two (2) years, and now inappropriately adds those years to the damage calculation.

### 3. The Parties' Liquidated Damages Provision Precludes the City's Alleged Damages.

48. Xerox did not breach the EMS Contract. However, even if it had, the City's damages are expressly limited by the specific liquidated damages provision in the EMS Contract. As such, the City cannot recover damages through a theory the parties did not bargain for: that is, by comparing Xerox's performance from 2003 through 2013 to Digitech's recent year-long performance. As stated above, the City's damages are based on what Mr. Lochabay says Xerox's contract performance "should have been." Notwithstanding the inappropriateness of comparing current technology to what existed in 2003, without making corresponding

---

[15] The doctrine of mitigation requires the City to exercise reasonable care in minimizing its damages. *Great Am. Ins. Co. v. North Austin MUD*, 908 S.W.2d 415, 426 (Tex.1995). An injured person cannot recover damages that do not result proximately from the breach of duty and thus damages that might be avoided or mitigated are not recoverable. *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1139 (5th Cir. 1985).

adjustments to the City's expectations, this damages model is contrary to the parties' liquidated damages agreement and their decades-long course of dealings.

49.     Liquidated damages provisions are routinely enforced to limit damages and prevent the recovery of alleged actual damages in excess of the liquidated amount. *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 67 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Parties may also contractually agree to the measure of damages in the event of a breach."); *Brewer v. Myers*, 545 S.W.2d 235, 237 (Tex. Civ. App.—Tyler 1976, no writ) ("Since the damages were estimated by the parties in advance and were liquidated by agreement, the courts will enforce the provision as written and will not apply a different measure of damages so as to allow the aggrieved party to sue for actual damages.");[16] *Fid. & Deposit Co. of Maryland v. Stool*, 607 S.W.2d 17, 24 (Tex. Civ. App.—Tyler 1980, no writ) (limiting damages in faulty construction case to cost to repair, as opposed to difference in values, based on contractual provision and stating "appellants cannot complain that the trial court improperly applied the measure of damages for which they agreed in a duly executed contract"); *Buhler v. McIntire*, 365 S.W.2d 237, 239–40 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.) ("Public policy may forbid the enforcement of penalties against a defendant; but it does not forbid the enforcement of a limitation in his favor").

50.     Xerox's "Performance Requirements" and the parties' agreed-upon damages for failure to meet these Performance Requirements are outlined in Exhibit C to the EMS Contract:

> Contractor [Xerox] shall meet the objectives set out in subsection 1, of Exhibit 'A' entitled '<u>Billing and Collections</u>'. Contractor's performance in meeting Contract objectives **shall** be measured as detailed in this Exhibit 'C' and failure to meet such objectives **shall** be assessed as 'Liquidated Damages' (subsection 'E' of Article IV, Duties of the City' [sic]) in the amount detailed below:

---

[16] In *Entergy Services, Inc. v. Union Pac. R. Co*., 35 F. Supp. 2d 746, 755 (D. Neb. 1999), the federal court for the District of Nebraska cited the Texas case *Brewer v. Meyers* in holding that "the liquidated damages provision prevents Entergy from arguing that it has the option of electing either the liquidated amount or the actual damages."

Performance Requirements:

1. Contractor shall process and submit for payment all claims to Medicare, Medicaid, private healthcare insurers, or self-pay category within thirty (30) business days from receipt of transport data from City.

\*\*\*

2. Contractor shall submit all reimbursement claims within the deadlines set by each third party payer (Medicare, Medicaid and private healthcare insurers).

\*\*\*

3. The Contractor shall submit all self-pay reimbursement claims within ninety (90) days of receipt of transport data from the City.

(Ex. 2 at Ex. C) (emphasis added). The City's damages for each failure to meet the Performance Requirements are $25, $200, and $50, respectively. (*Id*.). For example, if the City has evidence that Xerox completely failed to submit any—or all—Medicaid claims, the City can recover no more than $225 per transport, $25 for failing to meet the 30-day deadline for all claims, and $200 for failing to meet the deadline to file Medicaid claims. (*Id*.).

51. The parties' course of conduct further demonstrates that liquidated damages were the agreed-upon damages for contract performance. (Ex. 4) (City explaining in 2005 that Xerox "had paid specified contractual liquidated damages as a result of their poor contract performance earlier in the fiscal year.");[17] *see also* (Ex. 13, p. 3) (The City's Past Performance Evaluation of Xerox explaining that the EMS Contract provides for "specific liquidated damages for failing to file claims in a **timely or proper manner**") (emphasis added); (Ex. 10) (Xerox invoice deducting liquidated damages). Also, the damages amount is not an arbitrary number; rather, the parties' $200 liquidated damages agreement is consistent with the $200 Revenue Per Transport metric established by the City. (Ex. 5, pp. 234:13-235:5); (Ex. 19, p. 1) ("the best measure of performance was not the collection rate but, rather, [$200] revenue per transport, which

---

[17] It is noteworthy that in this lawsuit the City is seeking to recover actual damages coving the same time period and—mathematically under the Lochaby report—the very same claims for which Xerox **already paid** liquidated damages. As explained above, Texas law clearly does not allow such double dipping.

represents the average [for] collected revenue per patient transport.").

52.     In addition to the plain language of the EMS Contract and the parties' course of dealings, which are inconsistent with the City's current demand for damages, the City's current damages model is inappropriate because a comparison of Xerox's and Digitech's liquidated damages provisions shows that the City made the application of liquidated damages in its contract with Digitech *permissive*—rather than *mandatory* as in the EMS Contract (note the difference between "may assess" in the Digitech agreement and "shall be assessed" in the Xerox EMS Contract):

**Digitech Agreement:**

Nothing in this Section F [Liquidated Damages] shall limit or abrogate the City's right to seek actual damages or any other remedy to which it may be entitled.

***

     Contractor [Digitech] shall provide all labor, material, and supervision necessary to perform the services described in Article IV(A) and Exhibit 'A' entitled, 'Scope of Services.'   Contractor shall satisfy the Performance Requirements described below.   The City shall use those Performance Requirements to measure Contractor's performance.   **In addition to any other remedies available to the City by law or under this Agreement, the Director may assess** the amounts detailed below as 'Liquidated Damages' (pursuant to subsection 'F' of Article V, Duties of the City) as specified below. Further, Contractor agrees to reimburse the City for certain performance failures as set forth below.

(Ex. 55, pp. 55, 96-97) (emphasis added).[18]

**Xerox Agreement:**

Contractor [Xerox] shall meet the objectives set out in subsection 1, of Exhibit 'A' entitled '<u>Billing and Collections</u>'.   Contractor's performance in meeting Contract objectives **shall be measured** as detailed in this Exhibit 'C' and failure to meet such objectives **shall be assessed** as 'Liquidated Damages' (subsection 'E' of Article IV, Duties of the City' [sic]) in the amount detailed below.

(Ex. 2, p. 53) (emphasis added).

---

[18] The Digitech contract also added a list of performance requirements to the liquidated damages provision that were not in the Xerox EMS Contract.  (*Id.*, pp. 96-97).

53. The EMS Contract's liquidated damages provision should be enforced as written, agreed, and practiced. The City cannot ignore the mandatory liquidated damages clause and recover more than would be allowed by the liquidated damages provisions by showing that a subsequent vendor may have been able to recover more revenue than Xerox, and Xerox thus did not perform "in accordance with prevailing industry practices." Such an interpretation would render the liquidated damages provision meaningless. The City's only other remedy for Xerox's alleged failure to perform pursuant to the agreed-upon Performance Requirements is to terminate the contract for-convenience or, in the proper circumstance, for cause. In other words, the Court should rule as a matter of law that monetary damages are limited to the parties' contractually preclusive liquidated damages provisions. (Ex. 2 at Ex. C).

54. In sum, as argued above, the City's entire breach of contract case should be dismissed because Xerox met the parties' agreed upon performance standards. At the very least, the City should be prohibited from claiming damages prior to the August 2011 effect date of the Second Amendment which contractually addressed and resolved many of the issues now claimed by the City. And because the City has not pleaded a right to liquidated damages or produced any evidence regarding the proper measure of liquidated damages (such as which untimely claims were Xerox's fault), the entire breach of contract claim should be dismissed.

### B.  Xerox is Entitled to Summary Judgment on the City's Fraud Claims.

55. The City's fraud based claims are (1) barred entirely by the Contract's "Entire Agreement" clause and (2) not supported by evidence.[19] First, the City's fraud claims are barred

---

[19] The City identified the allegations supporting its fraud based claim as follows: The City alleged it accepted the 2002 EMS Contract "based on Xerox's misrepresentations about the quality of services, the depths of its resources, and the strength of its commitment to do its job right." (Ex. 57, pp. 11-12). The City further alleges that the City entered into the 2007 Amendment "based on Xerox's representations that it would take significant steps to improve its billing and collections processes, including, at a minimum, addressing the findings" in the Jefferson Wells Audit. (*Id*). Lastly, the City alleges that on October 1, 2010 "Xerox misrepresented to the City its EMS expertise and data

by the Contract's "entire agreement" clause, which provides:

> Entire Agreement: This Agreement merges the prior negotiations and understandings of the Parties and embodies the entire agreement of the Parties. No other agreements, assurances, conditions, covenants (express or implied), or other terms of any kind, exist between the Parties regarding the Agreement.

(Ex. 2, § VII(D)).

56.    Texas courts have held that similar clauses negate the element of reliance necessary for a fraud based claim, particularly if the alleged extra-contractual representations differ from the express contractual terms.[20]   Here, for example, the City could not have justifiably relied on Xerox's alleged misrepresentation that it would address all of the Jefferson Wells audit findings, when the Contract contains a specific and detailed "Scope of Services" (Ex. 2, at Exhibit "A") that does not include that representation.  The "entire agreement" clause in the Contract—a contract between the fourth largest city in the United States and a Fortune 100 company—sufficiently disclaims any reliance the City may have had on pre-contractual representations.

57.    Second, the City has no evidence of material elements to its fraud based claims. With regard to fraud, the City has no evidence that Xerox (1) made a material representation; (2) that was either known to be false when made or was made without knowledge of its truth; (3) that was intended to be acted upon; (4) that was relied upon; and (5) that caused injury.  *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998).

---

management capabilities in its response the City's August 5, 2010 request for proposals for EMS Service Providers." (*Id.*)

[20] *Dresser-Rand Co. v. Bolick,* 2013 WL 3770950, at *8 (Tex. App.—Houston [14th Dist.] July 18, 2013), petition for review abated (Jan. 17, 2014) (holding that an claims of fraud precluded by similarly worded merger clause); *U.S. Quest Ltd. v. Kimmons,* 228 F.3d 399, 403 (5th Cir. 2000) ("When experienced executives represented by counsel voluntarily sign a contract whose terms they know, they should not be allowed to claim fraud in any earlier oral statement inconsistent with a specific contract provision." *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003) ("[A] fraud claim can be negated where a merger clause evinces a party's clear and unequivocal expression of intent to disclaim reliance on specific representations.").

58. Similarly, with regarding to its fraud by non-disclosure claim, the City has no evidence (with respect to each of the EMS Contract and the 2007 and 2011 amendments) that Xerox (1) concealed or failed to disclose a material fact within the knowledge of Xerox; (2) knowing that the City was ignorant of the fact and did not have an equal opportunity to discover the truth; (3) with intent to take some action by concealing or failing to disclose the fact; and (4) thus injuring the City as a result of acting without the knowledge of the undisclosed fact. *Cardinal Health Solutions, Inc. v. Valley Baptist Med. Ctr.,* 2009 WL 150942, at *13 (S.D. Tex. Jan. 21, 2009) (Hanen, J.).

59. Further, with regard to its fraudulent inducement claim (with respect to each of the EMS Contract and the 2007 and 2011 Amendments), the City has no evidence that: (1) Xerox made a misrepresentation; (2) that Xerox knew was false and intended to induce the City to enter into the contract through that misrepresentation; (3) that the City actually relied on the misrepresentation in entering into the contract; and (4) that the City's reliance led the City to suffer an injury through entering into the contract. *Id.* at *3. Furthermore, the City has no evidence that would not have entered into the contract in the absence of the alleged misrepresentation. *Bohnsack v. Varco, LP*, 668 F.3d 262, 277 (5th Cir. 2012).

## C. Xerox is Entitled to Summary Judgment on the City's Conversion Claim.

60. Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, which causes the owner damages. *Tifford v. Tandem Energy Corp.*, 562 F.3d 699, 705 (5th Cir. 2012). The City has no evidence that Xerox has not returned any of the City's property, and the City has no evidence of damages related to its conversion claim.

**D.** **Xerox is Entitled to Summary Judgment on The City's Breach of Fiduciary Duty and Constructive Fraud Claims.**

61.     The City's breach of fiduciary duty claim[21] fails as a matter of law for the simple reason that Xerox and the City never had a fiduciary relationship.  Under Texas law, "arms-length transactions entered into for the parties' mutual benefit . . . do not establish a basis for a fiduciary relationship."  *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005). Further, the mere fact that one party collects, accounts for, or holds revenue for the benefit of another party is insufficient to prove the existence of a fiduciary relationship.  *Republic Parking Sys. of Tex. v. Med. Towers, Ltd.*, 2004 WL 2358315, *7 (Tex. App.—Houston [14th Dist.] Oct. 21, 2004, pet. denied); *see also Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2nd Cir. 1996) (refusing to find a fiduciary duty relationship in a collections contact scenario) (citing New York cases, which are in line with Fifth Circuit law).

62.     The City's breach of fiduciary duty fails as a matter of law because the EMS Contract provides that Xerox was "an independent contractor and shall perform the services provided for in this Agreement in that capacity.  The City has no control or supervisory powers over the manner or method of Contractor's performance under this Agreement."   (Ex. 2, § VII(A). This language precludes a finding of agency sufficient to support a fiduciary relationship.  *Procom Servs., Inc. v. Deal*, 2003 WL 298752, *5 (N.D. Tex. Feb. 10, 2003).

63.     Also, the City's breach of fiduciary duty claim based on an alleged informal fiduciary relationship fails.  To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement

---

[21] The City claims Xerox owed a fiduciary duty because the City allegedly appointed Xerox as its "agent" to act on its behalf in billing and collecting a significant revenue stream, and because the City placed "special trust and confidence" in Xerox to act for its benefit in providing EMS billing and collection services.  (Rec. Doc 21 at ¶¶ 65-69).  The City also allegedly placed "special trust and confidence" in Xerox to ensure that the actions Xerox took on its behalf complied with all applicable rules, regulations and policies, regulations, and laws for EMS billing and collection services.  *Id.*

made the basis of the suit. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998). The summary judgment evidence shows that Xerox acted as an independent contractor and there was no "special relationship of trust and confidence" that existed apart from the EMS Contract. Accordingly, Xerox is entitled to summary judgment on the City's breach of fiduciary duty claim and constructive fraud claim.[22]

**E.  Xerox is Entitled to Summary Judgment on the City's Unjust Enrichment Claim.**

64.  Xerox is entitled to summary judgment on the City's unjust enrichment claim because both the City and Xerox agree that a binding express contract governs this dispute and the City has not pleaded for rescission. It is long-standing and well-established law that "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, such as unjust enrichment." *Bonnema v. Builders Carpet & Design Ctr., Inc.*, 2010 WL 923997, at *4 (Tex. App.—Dallas Mar. 16, 2010, no pet.).

**F.  Xerox is Entitled to Summary Judgment on the City's Declaratory Judgment Claim.**

65.  The City's cause of action seeking declaratory relief should be dismissed because it is redundant of its other claims. Although declaratory relief may be proper in a particular case, a party's use of Chapter 37 as a "vehicle to obtain otherwise impermissible attorney's fees" is improper. *MBM Fin. Corp. v. Woodland Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). A declaratory judgment claim must thus do "more than merely duplicate the issues litigated" by the contract claims. *Id*. at 670. Specifically, the City seeks a declaration that (1) Xerox breached the

---

[22] Further, in Texas, the breach of a fiduciary or confidential relationship is virtually the same tort as constructive fraud. *See Stephanz v. Laird*, 846 S.W.2d 895, 903 (Tex. App.—Houston [1st Dist.] 1988, no writ ). Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary relationship. *See Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ). Because Xerox entitled to summary judgment on the City's breach of fiduciary duty claim, it is entitled to summary judgment on the City's constructive fraud claim as well.

Contract, and (2) Xerox is required to indemnify the City for all harm sustained to date and in the future by Houston. (Rec. Doc. 21, ¶ 81). This claim for declaratory relief should be dismissed because it is duplicative of the City's breach of contract claim.

66. Furthermore, the City's declaratory judgment action seeking a declaration that Xerox is obligated to indemnify the City for "recoupment proceedings" brought by Medicare and Medicaid fails as a matter of law. First, these "recoupment proceedings" fall outside the scope of the relevant indemnity provision in the EMS Contract. These proceedings simply demand that the City "repay [to Medicare and Medicaid] money received for claims billed by Xerox." (Ex. 56 at p. 11). Yet the indemnity provision in the EMS Contract is limited to claims "for injury, death, damage, or loss to persons or property." (Ex. 2 at § III(E), page 8). Construing the indemnity provision strictly, as the Court should do under Texas law, the Court should rule that the recoupment proceedings do not involve "injury, death, damage, or loss to persons or property." *Marathon E.G. Holding Ltd. v. CMS Enterprises Co.*, 597 F.3d 311, 317 (5th Cir. 2010) ("indemnity agreements are strictly construed in favor of the indemnitor, and the indemnity must be clearly expressed.")

67. Second, the declaratory judgment action regarding indemnity should be dismissed because it is not ripe. The indemnity claims relate to pending matters for which the City's liability, if any, has not yet been determined. (Ex. 56 at damage disclosure). Thus, the City's request for declaratory relief related to these pending and undetermined claims is premature at this stage and the request for declaratory relief should be dismissed. "[T]he duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the" indemnity agreement. *Atain Specialty Ins. Co. v. Chang*, 2012 WL 2194116, at *6 (S.D. Tex. June 14, 2012) (Miller, J.). "As a result, indemnification is

usually not justiciable until the consummation of the underlying suit." *Id.; see also McGinnis v. Union Pac. R. Co.*, 2009 WL 2900277, at *3 (S.D. Tex. Sept. 8, 2009) (Ellison, J.) ("Insofar as Metro's legal liability to UP has not yet been established, any claim for indemnity it may have under either the Wrap-Up Policy or the Umbrella Policy is not yet ripe for adjudication and, therefore, must be dismissed")

## VI.    CONCLUSION

For the foregoing reasons, the City's claims are without merit and Xerox respectfully requests summary judgment on all claims.

Dated: April 17, 2015                    Respectfully submitted,

                                         BAKER & HOSTETLER LLP

                                         By: /s/ Michael W. Mengis
                                             Michael W. Mengis
                                             State Bar No. 13941040
                                             B. Scott McBride
                                             State Bar No. 24002554
                                             Bradley K. Jones
                                             State Bar No. 24060041
                                             811 Main Street, Suite 1100
                                             Houston, Texas 77002
                                             Telephone: (713) 751-1600
                                             Facsimile: (713) 751-1717
                                             Email: mmengis@bakerlaw.com;
                                             smcbride@bakerlaw.com;
                                             bkjones@bakerlaw.com

                                         **ATTORNEYS FOR DEFENDANT,**
                                         **XEROX STATE AND LOCAL**
                                         **SOLUTIONS, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above document has been served on all counsel of record via hand-delivery on this 17th day of April, 2014.

        Geoffrey L Harrison
        Matt Behncke
        Alex Kaplan
        Susman Godfrey LLP
        1000 Louisiana, Suite 5100
        Houston, Texas 77002
        Telephone: 713-653-7807
        Facsimile: 713-654-6666
        Email: gharrison@susmangodfrey.com;
               mbehncke@susmangodfrey.com;
               akaplan@susmangodfrey.com

                                         /s/ Michael W. Mengis
                                         Michael W. Mengis