IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| City of Houston, | § | |
| *Plaintiff,* | § | |
| v. | § | |
| Xerox State and Local Solutions, Inc., | § | Case No. 4:13-cv-02532 |
| a/k/a and f/k/a ACS State and Local | § | Jury Demanded |
| Solutions, Inc. | § | |
| *Defendant.* | § | |

## The City's Response in Opposition to Xerox's Motion for Summary Judgment

# Table of Contents

Nature and Stage of the Proceeding.................................................................1

Issues and Standard of Review .......................................................................1

Summary of the Argument..............................................................................1

Facts .............................................................................................................2

Argument and Authorities..............................................................................4

I.     Xerox Breached the Contract.................................................................4

     A.     Xerox's Course of Performance Argument Fails as A Matter of Law ...................4

     B.     Substantial Evidence Shows Xerox Breached the Contract ...................................6

     C.     Third-party Audits Confirmed That Xerox Systemically Breached the Contract................................................................9

II.     Industry Custom and Professional Standards Evidence Establishes Xerox's Breach ................................................................11

III.     Course of Performance Evidence Establishes Xerox's Breach .........................13

     A.     The City Disputed Xerox's Contract Compliance .................................................13

     B.     Xerox's "Net Collection Rate" Argument Is Incorrect and Misleading ...............16

     C.     Xerox's "Bonus" Argument Is Incorrect and Misleading.....................................16

     D.     Xerox's "$200 Per Transport" Argument Undermines Xerox's Position ................................................................18

IV.     Xerox's Affirmative Defenses Are Legally and Factually Deficient ................................19

     A.     Xerox's Accord and Satisfaction Defense Fails ....................................................19

     B.     Xerox's Equitable Defenses Are Legally Barred and Fail.....................................21

     C.     Xerox's Legally Barred Affirmative Defenses Also Fail on the Merits................24

V.     Xerox Is Not Entitled to Summary Judgment Regarding Liquidated Damages................27

     A.     The Liquidated Damages Provision Is Limited In Scope and Does Not Apply................................................................27

3688201v1/013883

B.    Xerox's Counter-Textual Construction of Liquidated Damages Is Unreasonable ................................................................................... 30

C.    The Contract's Remedies Are *Not* Exclusive ........................................ 30

VI.    Xerox Is Not Entitled To Summary Judgment on The City's Fraud Claim ...................... 32

A.    The Contract Does Not Disclaim Reliance on Xerox's Representations .............. 32

B.    The Evidence Supports the City's Fraud Claim ...................................... 33

VII.    Summary Judgment Is Not Proper on the City's Declaratory Judgment Claims ............. 34

Conclusion .................................................................................................................... 35

Cases

*Albemarle Corp. v. MEMC,*
685 F.Supp.2d 652 (S.D.Tex. 2010) ................................................................ 5

*Albermarle Corp v. MEMC,*
2010 WL 3239288 (S.D.Tex. Aug. 16, 2010) ................................................. 5

*Alpha/Omega Ins. Servs, v. Prudential Ins. Co.,*
2000 WL 122473 (5th Cir. 2000) ................................................................. 11

*APS Capital Corp. v. Mesa Air Grp., Inc.,*
580 F.3d 265 (5th Cir. 2009) ........................................................................ 5

*Aquaplex v. Ranch La Valenica, Inc.,*
297 S.W.3d 768 (Tex. 2009).......................................................................... 34

*Baylor Health Care System v. Employers Reinsurance,*
492 F.3d 318 (5th Cir. 2007) ........................................................... 19, 20, 21

*Bifano v. Young,*
665 S.W.2d 536 (Tex. App. – Corpus Christi 1983, writ ref'd n.r.e.) ............. 31

*Canal Ins. v. Hopkins,*
238 S.W.3d 549 (Tex. App. – Tyler, 2007, pet. denied)................................. 35

*Childer v. Pumping Sys., Inc.,*
968 F.2d 565 (5th Cir. 1992) ......................................................................... 5

*City of Dallas v. GTE Southwest, Inc.,*
980 S.W.2d 928 (Tex. App. – Fort Worth 1998, pet. denied) ........................ 26

*City of Houston v. Petroleum Traders Corp.,*
261 S.W.3d 350 (Tex. App. – Houston [14th Dist.] 2008, no pet.)............................ 22, 23

*City of San Antonio v. Butler,*
131 S.W.3d 170 (Tex. App – San Antonio 2004, pet. denied) ........................ 23

*City of White Settlement v. Super Wash, Inc.,*
198 S.W.3d 770 (Tex. 2006)............................................................................ 22

*Corpus Christi v. Nueces County Water Control,*
540 S.W.2d 357 (Tex. App. – Corpus Christi 1976, writ ref'd n.r.e.) ............. 24

*Creative Waste Mgmt., Inc. v. Capital Envtl. Servs. Inc.,*
495 F.Supp.2d 353 (S.D.N.Y. 2007)................................................................ 30

*Dresser-Rand Company v. Bolick*,
No. 14-21-00192 (Tex. App. – Houston [14 Dist.] July 18, 2013, pet. abated) .............. 33

*Dynegy Midstream Servs., L.P. v. Apache Corp.*,
294 S.W.3d 164 (Tex. 2009) ......................................................................... 11

*Ethio Express Shuttle Serv., Inc. v. City of Houston*,
164 S.W.3d 751 (Tex. App – Houston [14th Dist.] 2005, no pet.) ................................. 23

*Forest Oil v. McAllen*,
268 S.W.3d 51 (Tex. 2008) ........................................................................... 32

*FPL Energy LLC v. TXU Portfolio Mgmt. Co., L.P*,
426 S.W.3d 59 (Tex. 2014) ........................................................................... 29

*Frasier v. Schauweker*,
915 S.W.2d 601 (Tex. App. – Houston [14 Dist.] 1996, no pet.) .................................... 31

*Great Am Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*,
908 S.W.2d 415 (Tex. 1995) ........................................................................... 27

*HL&P Co. v. Wharton*,
101 S.W.3d 633 (Houston [1st Dist.] 2003, pet. denied) .................................................. 24

*Hutchens v. Prasifka*,
450 S.W.2d 829 (Tex. 1970) ..................................................................... 22, 23

*In re Enron Corp. Secs. Derivative & ERISA Litig.*,
279 F.R.D. 395 (S.D.Tex. 2011) ......................................................................... 6

*Italian Cowboy Partners Ltd. v. Prudential Ins. Co. of Am.*,
341 S.W.3d 323 (Tex. 2011) ..................................................................... 32, 33

*Jernigan v. Langley*,
111 S.W.3d 153 (Tex. 2003) ........................................................................... 25

*Leeco Gas & Oil Co. v. Nueces County*,
736 S.W.2d 629 (Tex. 1987) ........................................................................... 22

*Mariner Energy v. Devon Energy Prod.*,
690 F.Supp.2d 558 (S.D.Tex. 2010) ...................................................................... 1

*MBM Financial v. Woodland Operating*,
292 S.W.3d 660 (Tex. 2009) ..................................................................... 34, 35

*Miller v. Gray*,
149 S.W.2d 582 (Tex. 1941) ........................................................................... 11

3688201v1/013883

*One Beacon Ins. v. Crowley Marine Svs.,*
 2010 WL 1463451 (S.D.Tex. Apr. 12, 2010) .............................................................. 5, 6

*Orthoflex v. ThermoTex, Inc.,*
 983 F.Supp.2d 866 (N.D.Tex. 2013) .......................................................................... 5

*Schlumberger Technology Corp. v. Swanson,*
 959 S.W.2d 171 (Tex. 1997) ...................................................................................... 32

*SLT Dealer Group, Ltd. v. AmeriCredit Fin. Servs., Inc.,*
 336 S.W.3d 822 (Tex. App. – Houston [1st Dist.] 2011, no pet.) .............................. 30

*Texas Dep't of Transp. v. A.P.I. Pipe & Supply,*
 397 S.W.3d 162 (Tex. 2013) ...................................................................................... 22

*Truong v. City of Houston,*
 99 S.W.3d 204 (Tex. App. – Houston [1st Dist.] 2002, no pet.) ........................... 21, 23

*Tyree Org. Ltd. v. Cashin Assocs.,*
 2007 WL 171906 (N.Y. Sup. Jan. 22, 2007) .............................................................. 6

*Willis v. Donnelly,*
 199 S.W. 262 (Tex. 2006) ........................................................................................... 28

*Womco Inc. v. Navistar Int'l,*
 84 S.W. 3d 272 (Tex. App. – Tyler 2002, no pet.) ..................................................... 20

*Yucca Supply Co. v. Continental Operating Co.,*
 2003 WL 297557 (Tex. App. – Houston [14th Dist.] 2003, no pet.) .......................... 11

<u>Statutes</u>

Tex. Pen. Code § 31.01 .................................................................................................. 35

Tex. Tax Code § 1.04 ..................................................................................................... 35

Tex. Tax Code § 33.21 ................................................................................................... 35

Texas Civil Practice & Remedies Code § 101.0215 ...................................................... 22

Texas Civil Practice and Remedies Code § 38.001 ....................................................... 35

<u>Rules</u>

FRCP 56 ........................................................................................................................... 1

Other Authorities

12 Williston on Contracts § 34:7 ............................................................. 11

Restatement (Second) of Contracts § 350.................................................. 27

3688201v1/013883

Table of Exhibits

X-1        Contract for EMS Ambulance Fee Collection Services

X-2        10/12/2006 Email re ACS Draft Audit Response

X-3        08/10/2006 EMS Selection Committee (Draft) Minutes of First Meeting

X-4        12/01/2006 Email re ACS Contract

X-5        12/29/2006 Email re Draft Agreement with comments

X-6        06/18/2010 Memorandum re ARA-ACS History

X-7        06/13/2011 Memorandum re EMS Billing – Decision to Amend the ACS Contract

X-8        11/18/2010 EMS RFP A Question and Answer Presentation (SEALED)

X-9        12/06/2011 Email re ACS FY11 Bonus

X-10       Alfred Moran Deposition Excerpts (01/23/2015)

X-11       Jay Campbell Deposition Excerpts (04/16/2015)

X-12       09/21/2012 City of Houston Xeror Review – Billing Audit & Process Review

X-13       AR Aging – First Year w/attachment

X-14       Janet Ferlita Deposition Excerpts (03/06/2015)

X-15       David Feldman Deposition Excerpts (03/27/2015)

X-16       05/30/2013 Letter re Contract for EMS Ambulance Fee Collection Services

X-17       07/31/2013 Request for Council Auction

X-18       Linda Miller Deposition Excerpts (04/14/2015)

X-19       Expert Report of Peter Lawrence (12/12/2014)

X-20       12/11/2008 Linda Miller Performance Improvement Review (SEALED)

X-21       12/15/2006 Email re Houston Temp

X-22       11/13/2006 Email re Houston Denials

X-23       05/03/2007 Email re Medicaid Denials

X-24       07/24/2007 Email re Need Volumes

X-25       04/21/2008 Email re Sweep & Addresses

X-26       06/16/2011 Email re Overall Opinion on the Houston Operation

X-27       12/21/2009 Email re Wire Transfer Request

X-28       01/08/2010 Email re ACS Government Solutions

X-29       01/13/2010 Email re Phonoscope

X-30       01/19/2010 Email re EMS Invoice Payment Status

| X-31 | Ed Kerkow Deposition Excerpts (01/13/2015) |
| X-32 | Chris Carlson Deposition Excerpts (02/19/2015) |
| X-33 | 02/02/2011 Email re Houston Project Manager |
| X-34 | 06/12/2013 Email re Houston EMS SBC Critical Question |
| X-35 | 10/12/2010 Email re Hospital Matching Summary |
| X-36 | Kevin Albanese Deposition Excerpts (01/15/2015) |
| X-37 | Sue Elentrio Deposition Excerpts (10/01/2014) |
| X-38 | 07/31/2006 Jefferson Wells Report |
| X-39 | 05/11/2011 Fitch and Associates Audit |
| X-40 | 07/11/2012 Email re Visit with the Remediation Team |
| X-41 | 05/31/2013 Navigant audit |
| X-42 | Expert Report of Donald Lochabay (12/12/2014) |
| X-43 | Supplemental Expert Report of Donald Lochabay (03/20/2015) |
| X-44 | 10/07/2004 Email re Contract RFP |
| X-45 | 01/13/2005 Email re VPAR |
| X-46 | 02/16/2004 email re Data Warehouse EMS Tracking |
| X-47 | 09/14/2004 Email re September 2004 |
| X-48 | 05/02/2005 Email re April Numbers |
| X-49 | 05/21/2010 EMS Ambulance Fee Collection Services Executive Summary |
| X-50 | 07/24/2012 Email re EMS Issues Log |
| X-51 | 03/17/2008 Letter from Xerox to City |
| X-52 | Frank Carmody Deposition Excerpts (02/13/2015) |
| X-53 | 05/20/2010 Carlson Consulting Group Study |
| X-54 | Rich Keller Deposition Excerpts (03/03/15) |
| X-55 | 06/13/2012 Email re Collection Vendors |
| X-56 | 09/15/2009 Email re City of Houston ACS questions |
| X-57 | Bernard Ford Deposition Excerpts (04/01/2015) |
| X-58 | Gary Gray Deposition Excerpts (12/09/2014) |
| X-59 | 07/02/2008 Email re Revenue Analysis Report |
| X-60 | Declaration of Kelly Dowe |
| X-61 | 03/01/2004 Email re EMS Memo – ALS-1 Designation for Billing Purposes |

X-62          Paul Nelson Deposition Excerpts (02/03/2015)

X-63          Declaration of Victor Gonzalez

X-64          06/14/2012 Email re EMS & ARC presentation

X-65          08/11/2010 Email re VPAR vs. MRAR

X-66          01/21/2011 Email re Selection of ACS as EMS Billing Vendor

X-67          Victor Gonzalez Deposition Excerpts (02/26/2015)

X-68          03/01/2011 Email re Review of Houston SOW

X-69          05/10/2013 Email re EMS reporting update

X-70          05/30/2013 EMS Common Platform presentation

X-71          04/14/2015 Letter re Final Notice of Overpayment Determination

X-72          12/11/2014 Letter re Medicare Part B

X-73          Lou Schiavone Deposition Excerpts (04/28/2015)

X-74          08/30/2010 Memorandum re EMS ePCR and Billing RFP update

X-75          03/06/2015 Xerox's Supplement and Amended Rule 26(a)(1) Disclosures

3688201v1/013883

<u>Nature and Stage of the Proceeding</u>

The parties completed fact and expert discovery, and neither party filed a *Daubert* motion. The City has been working to resolve its challenges to Xerox's 57-page log of 1,872 withheld documents. This case will be trial ready at the August 28, 2015 docket call per Dkt. 29.

<u>Issues and Standard of Review</u>

The issue is whether Xerox is entitled to summary judgment against the City's breach of contract and warranty, fraud, and declaratory judgment claims.  Xerox has the burden of proving there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* FRCP 56(a).  In *Mariner Energy v. Devon Energy Prod.*, 690 F.Supp.2d 558, 569 (S.D.Tex. 2010) (Rosenthal, J.), the court explained that "In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party" and, for affirmative defenses, there is an even "heavier burden" to "establish beyond peradventure *all* of the essential elements of the…defense to warrant judgment in his favor." *Id.*

<u>Summary of the Argument</u>

Xerox's own witnesses admitted that Xerox breached the parties' contract, and admitted its breaches cost the City millions of dollars. Multiple pre-lawsuit consultants reviewed Xerox's contract performance and found Xerox failed to comply. The City's experts in this lawsuit identified multiple specific contract breaches by Xerox that cost the City millions of dollars. Despite this and other powerful evidence of breach, Xerox bases its motion on the demonstrably false notion that the City did not object to Xerox's breaches and poor collections performance. The City objected, repeatedly, and Xerox failed to cure its breaches.

The limited-in-scope liquidated damages clause does not insulate Xerox from liability because it applies only to EMS claims that Xerox failed *timely* to file – not the basis for the City's damages – and the contract gives the City cumulative, not exclusive, remedies. Xerox

1

cannot avoid liability with equitable defenses that, as a matter of law, do not apply to the City's claims and that, as a matter of fact, cannot be resolved on disputed facts at summary judgement.

Facts

The City of Houston's Fire Department provides ambulance transportation and emergency medical services. In 2002, the City and ACS State and Local Solutions, entered into a "Contract for EMS Ambulance Fee Collection Services" that required Xerox to bill and collect for such transports in accordance with detailed performance requirements to maximize collections for the City. X-1. Xerox State and Local Solutions, Inc. ("Xerox") acquired ACS in 2010 and made big promises to the City that Xerox would improve and reform ACS.

In contract ¶III.H, Xerox warranted that its "performance shall conform to the professional standards prevailing in Harris County, Texas with respect to the scope, quality, due diligence, and care of the services and products Contractor provides under this Agreement." X-1 at 12. The contract also required Xerox to "Furnish all services, materials, equipment, office space and personnel necessary to complete the services," "Maintain a client service manager in Houston with appropriate staffing levels," "Establish fully auditable billing, collection, and accounts receivable systems…accessible to the city or its designated agents at all times," "Contact the hospital the patient was transported to for obtaining insurance and/or updated billing information at two stages of the billing process," "develop a close business relationship with all area hospitals to which patients are transported," "Pursue Medicare, Medicaid, private insurers and third party billing companies *aggressively* by exhausting all appeals, re-billing accounts and initiating suits," and the contract also had six pages of detailed reporting requirements. X-1 at X.A.I.A.1-2, 5, 10; *id.* at 30-35 and X.A.II.E.3.F.

2007 contract amendment. In July 2006, consultant Jefferson Wells identified material deficiencies in Xerox's private insurance collections. X-38. In August 2006, the City voted *not* to

renew Xerox, opting instead to pursue other vendors. X-3. In October and December 2006, Xerox *concurred* with many of the deficiency findings, promised to cure, persuaded the City to extend the contract, X-2 at 4 and X-4, the parties began drafting, X-5, and amended the contract in November 2007 to extend its term and update the computers used under the contract.

2011 contract amendment. In April 2010, the City told Xerox it "was still failing to perform." X-6 at 2. In August 2010, the City issued a "Request For Proposal" to replace Xerox/ACS. X-7. Xerox committed to cure its "failings" in part by using "ImageTrend" software to allow the City to track Xerox's performance. X-8 at 8-10. Xerox had just acquired ACS and began selling itself as the new "Xerox-driven ACS." X-9 at 2, X-10 at 163:6-14; 167:10-17. Xerox hired a new and experienced EMS VP. X-10 at 224:18-24. In reliance on Xerox's representations, the City withdrew the RFP and, in 2011, again amended the contract with Xerox. X-1 at 99. The amendment changed Xerox's compensation structure and added seven pages of specific reporting requirements, including Xerox's duty within 90 days to "provide the City's designated technical monitor and auditors with both the tools and training required to access all City reports, including Ad-Hoc reports, on a 24/7 bases." X-1 at 124, X-A.V.D.1.

Termination for cause. In late 2011, consultants from Alvarez & Marsal ("A&M") conducted the first full-scale, in-depth review of Xerox's services, identified serious problems with Xerox's contract performance, and reviewed Xerox's billing and collections processes. X-11 at 27:16-28:8. In September 2012, A&M issued a 59-page report and identified many material contract breaches by Xerox. X-12; X-11 at 255:25-256:24. The City sent Xerox a detailed spreadsheet listing 24 areas of noncompliance with specific contract terms. X-50; X-14 at 77:1-11. Xerox did not cure. X-15 at 200:18-201:8. On May 30, 2013, the City sent Xerox notice of default. X-16. On July 25, 2013, the City terminated the contract, and filed suit the next day.

3

<u>Argument and Authorities</u>

This Court should deny Xerox's motion as to the City's breach of contract/warranty and fraud claims. The City withdraws its conversion, fiduciary duty, unjust enrichment, and constructive fraud claims.

I.      <u>Xerox Breached the Contract</u>

Xerox affirmatively contends the key provisions of the contract are ambiguous and yet seeks summary judgment by improperly relying on hotly disputed course of performance evidence while ignoring its own witnesses' admissions of breach, ignoring independent consultants' findings of contract noncompliance, and side-stepping industry custom and practice evidence that confirms Xerox's breach and certainly creates a genuine issue of material fact.

In March 2012, Xerox hired Janet Ferlita as its Director of System Development for EMS "to try to help Xerox solve some of its contractual noncompliance and customer dissatisfaction issues." X-14 at 5:3-9, 8:3-10. After reviewing Xerox's history of noncompliance, Ferlita "initiate[d] internal at Xerox ethics complaints in connection with Xerox's performance or nonperformance…." *Id.* at 16:14-19. Ferlita testified "***Xerox admitted to the City of Houston, yes, we have breached the contract***," and as "a result of the many breaches of contract by Xerox, Xerox was not collecting as much money as it should have for the City of Houston" and "revenue did decline." *Id.* at 97:18-98:4 (all emphasis in this response is added).

> Q      Sure. If Xerox had fulfilled rather than breached its contractual obligations, it could have gotten more money for the City of Houston?
>
> A      Yes.

X-14 at 98:12-15 (objection omitted); *see also* 201:21-202:5. Ferlita calculated a "***$40 million number...as a potential Xerox liability to Houston for contract breaches***." *Id.* at 40:5-11.

A.      <u>Xerox's Course of Performance Argument Fails as A Matter of Law</u>

Xerox incorrectly says at page 16 of its motion that "the parties' course of dealing… establishes as a matter of law that Xerox did not breach the EMS Contract." At summary judgment, this Court examines *all* the evidence of Xerox's breach, and does not look solely to Xerox's sharply-contested evidence to determine the meaning of allegedly ambiguous terms. In *Orthoflex v. ThermoTex, Inc.*, 983 F.Supp.2d 866, 876-77 (N.D.Tex. 2013), the court denied defendants' motion for summary judgment based on the parties' course of performance treating a "minimum per month" contract term as an "average per month," explaining (at 877):

> even if the court concludes that there is a course of performance that casts doubt on ThermoTek's interpretation, such evidence merely raises a genuine issue of material fact that requires resolution by the trier of fact; it does not entitle defendants to summary judgment. *See, e.g. Childer v. Pumping Sys., Inc.*, 968 F.2d 565, 569 (5th Cir. 1992); *see also APS Capital Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272 (5th Cir. 2009) (holding that district court erred when it resolved case at summary judgment where contract was ambiguous on its face.).

Xerox cited only two cases for its course of performance argument, and they are *not summary judgment cases.* Case 1 of 2 is *Albermarle Corp v. MEMC*, 2010 WL 3239288 at *3 (S.D.Tex. Aug. 16, 2010) (Ellison, J.), in which the court interpreted the term "specifications" in a polysilicon license agreement. Xerox omitted to mention that the court earlier had *denied* summary judgment based on defendant's course of performance argument. *Albemarle Corp. v. MEMC,* 685 F.Supp.2d 652, 662 (S.D.Tex. 2010). It was only *after* a full evidentiary bench trial that the court, as fact-finder, interpreted "specifications" in accordance with the parties' multi-year pre-license agreement practice. *Id.* Case 2 of 2 is *One Beacon Ins. v. Crowley Marine Svs.*, 2010 WL 1463451 at *1 (S.D.Tex. Apr. 12, 2010) (Miller, J.), in which "At the parties' request, the Court conducted a trial of this matter by written submission." After considering all of the evidence, this Court determined that the parties ratified certain repair service order terms because, in eight prior jobs, the injured party "specifically reserved in writing the right to object

to the RSO containing the notice of Terms and Conditions, but never objected." *Id.* at *13. Unlike *One Beacon,* the City did *not* "accept without objection" Xerox's contract interpretation (and Xerox has not said *what* provision it purportedly interpreted in *what* way). The City repeatedly objected to Xerox's poor contract performance.[1]

> B.      Substantial Evidence Shows Xerox Breached the Contract

Xerox considered its contract with the City a "***cash cow***." X-18 at 148:23-149:16. Yet, Xerox ran its Houston operation on a shoestring and failed to devote necessary (and contractually required, *see* X-1 ¶A.I.A.1) resources to bill and process the approximately 140,000 claims per year, and failed to perform in accordance prevailing industry standards. *See* X-14 at 150:4-152:6; X-19 ¶¶109-112. Xerox's own employees admitted that Xerox's failures cost the City "millions and millions of dollars." X-14 at 40:5-20; 130:1-6.

In an internal document Xerox withheld until just weeks ago, Xerox's former Houston project manager Linda Miller wrote in 2008 that Xerox provided her with "*in many cases no training on any of the systems, policies and procedures, etc., of the company and frequently…I find out we have no written standards and virtually no policy and procedures, if you or anyone in upper management even responds to my questions. When there is a response it does seem that many of these items are 'Made up' as it is needed.*" X-20. Miller received only one day of training before taking over as Xerox's Houston project manager, and that was not adequate for her to do her job. *See* X-18 at 10:13-22; 12:2-12; 18:3-22; 30:7-13. Xerox gave Miller a copy of the contract, but did not discuss it with her, did not explain her duties, and provided unhelpful outdated policies and procedures. *Id.* at 12:2-22, 16:13-18.

---

[1] In *In re Enron Corp. Secs. Derivative & ERISA Litig.*, 279 F.R.D. 395, 404 (S.D.Tex. 2011) (Harmon, J.), the court cited with approval *Tyree Org. Ltd. v. Cashin Assocs.*, 2007 WL 171906 at *8 (N.Y. Sup. Jan. 22, 2007), in which the court explained that "Because of the nature of a professional services contract, the Court concludes that the parties' *course of dealing is not an aid* for determining their intent." The City/Xerox contract is a professional services contract. *See* X-1 (¶III.H); X-17.

Miller soon realized that Xerox was *months behind* on key claims correspondence, "they were just storing them in an office," and "it was five months before someone was getting to it." X-21; X-18 at 60:1-19. In November 2006, Xerox experienced claims denials "due to the decrease in staff." X-22. In May 2007, Xerox's Houston office was "dramatically behind." X-23. In July 2007, Xerox had 22,374 pieces of unprocessed correspondence and unprocessed Medicaid denials. ***Xerox's EMS Director Sue Elentrio called this backlog "Crazy. Insane. Ludicious.***" X-24 (sic). In April 2008, Xerox met with outside vendors to discuss "Nixie issues" on bills returned because of bad addresses, process "breakdown," and Xerox's persistent problem keeping up with the Nixie volume. X-25. In June 2011, Xerox was "way behind" on Nixies and had a 12,000 claim backlog with only one staff member on the task. X-26. Xerox *never disclosed* its back-log or told the City these issues negatively were affecting revenue. X-18 at 62:5-24.

Xerox also failed to pay vendors necessary to Xerox's contract performance:

- In December 2009, Xerox had "$1,271,811.07 worth of claims sitting in envelopes here in Houston waiting for postage" due to Xerox's failure to pay its mailing vendor; Xerox was concerned about the "negative REV variance this will create." X-27.

- Xerox's Ferlita admitted that "over the course of ten or twelve years, Xerox's delay and delay in its billings costs millions and millions and millions of dollars in lost revenue to the City of Houston." X-14 at 130:1-6.

- In January 2010, Xerox's internet service provider shut off internet service because Xerox didn't pay its bills. Xerox's VP observed internally that Xerox's failure to pay vendors "will impact Houston's revenue." X-28; X-29.

- Xerox's vendor nonpayments caused "service interruptions from multiple vendors including our print houses, network providers, installers, and hardware manufacturers." X-30.[2]

Xerox's former director <u>Janet Ferlita</u> testified that Xerox's performance "was pretty

---

[2] Xerox also refused to update its 1980s' "green-screen" outdated and ineffective billing database or digitize its record keeping forcing its clerks to "spend a disproportionate amount of time chasing paper around the office." X-18 at 33:1-23; 45:6-21; 47:1-48:3; X-32 at 38:15-42:18. Xerox's former VP Ed Kerkow testified that "Employees were challenged to… to get the work done, comply with contractual obligations" due to "thin staffing," "forced furloughs," and "pay cuts." X-31 at 230:21-231:3.

3688201v1/013883

disturbing," "terrible," and "horrible." X-14 at 104:22-105:17, 123:18-124:18. Ferlita testified that "the frankly entire Houston operation that Xerox put in place," did "*not* have top talent," was *not* "in conformance with professional standards," and the "**Houston account was neglected by Xerox**." X-14 at 107:19-108:9. Ferlita quantified the economic impact of some of Xerox's breaches as **costing the City about $40 million.** X-14 at 40:5-11. In response, Xerox management's told Ferlita to "stop running the reports" and "stop investigating the issue," which Ferlita considered "***very unethical***." X-14 at 28:20-29:8; 33:9-16; 40:5-42:18.

In 2011, Xerox hired <u>Debra Fuller</u> to lead Xerox's Houston operation and asked for her "honest opinion of what was going on in the Houston office in the overall performance of what was going on at a very granular level." X-33; X-32 at 136:11-137:17, 143:22-144:20. Xerox's Fuller wrote an internal memo, criticized Xerox, and identified multiple operational and processing deficiencies. X-26. Fuller noted that "although there are policies in place, they are seldom followed," "The staff are not well trained," "Correspondence falls behind frequently," Xerox had poor operational controls resulting in "delays," and "***As a result, revenue is being lost***." *Id.*; *see also* X-32 at 148:12-150. ***Xerox terminated Fuller shortly after her memo***, *see* X-32 at 145:1-14, and did not disclose to the City the serious issues Fuller identified, even though the parties actively were negotiating the 2011 amendment at the time. *Id.* at 149:1-150:6. Xerox's former VP <u>Chris Carlson</u> resigned in frustration over Xerox's lack of resources devoted to EMS billing and collection. *See* X-32 at 228:22-229:15.

Xerox's witnesses identified specific contract obligations Xerox breached, such as obligations under contract Exhibit A.I.B.5 (X-1) to "develop a close business relationship *with <u>all</u> area hospitals to which patients are transported*," and to "contact the hospital the patient was transported to for obtaining insurance and/or updated billing information *at two stages of the*

*billing process*," within 10 days for all accounts without insurance information, and within 120 days for all accounts still unpaid. Xerox breached by contacting only *some* hospitals and breached by *not following up* for updated insurance information. ***Xerox's Ferlita testified that "from 2002 through early 2012, Xerox had not matched with 100% of the Houston hospitals."*** X-14 at 34:17-35:6; *see also* X-34; X-35.

Xerox also breached its obligation to collect updated insurance/billing information from hospitals. Xerox's hospital matching program was automated, and Xerox's Director of IT <u>Kevin Albanese</u> testified that ***Xerox did not have a "process to capture from the hospitals any changes they made in their records for a particular patient" and did not follow up on unpaid accounts after 120 days as the contract required***. X-36 at 195:14-196:5. Following up with hospitals was a critical contract obligation and standard industry practice. X-19 ¶¶67. Xerox's <u>Sue Elentrio</u> also admitted that Xerox failed to follow up to "get additional or updated information from hospitals." X-37 at 101:2-9. Xerox's Ferlita quantified Xerox's hospital matching breach as "around eight, ten million…If not more." X-14 at 38:5-21.

C.  <u>Third-party Audits Confirmed That Xerox Systemically Breached the Contract</u>

In 2006, <u>Jefferson Wells</u> reviewed "reduced or 'under' payment of accounts billed to commercial insurers. During the review, the underlying premise of insurance under payments was confirmed." X-38 at 2. Jefferson Wells identified several key issues of Xerox's contractual noncompliance –failure to follow up with nonresponsive insurance companies for doing so, failure to develop required policies and procedures, acceptance of insufficient amounts from commercial insurers, etc. – and *Xerox/ACS concurred* in the findings, committed to cure its noncompliance, but failed to do so. X-2 at 3-4.

In May 2011, <u>Fitch and Associates</u> audited Xerox's calculation of its annual adjustment payment and found Xerox improperly declared certain accounts "unbillable" which inflated its

9

"net collection rate" and led to improperly high payments from the City. X-39 at 2-3. Fitch reviewed 130 accounts that Xerox declared "unbillable" and found that 22 were not "unbillable" under the contract. X-39 at 2. Fitch found that Xerox was not permitted to declare "unbillable" two larger categories of accounts (Medicaid denials and certain Nixies) without the City's agreement, and indicated concern that the contract did not support many of Xerox's "unbillable" declarations, which improperly increased the City's payments to Xerox. X-39 at 2-3, 4-9.

In September 2012, A&M completed the first comprehensive review of Xerox's contract performance across the entire EMS cycle from initial claims submission through billing and collections. X-50. A&M made the "Key Finding" that "***Contractual terms and conditions have not been met***," *id.* at 12, identified two-dozen specific breaches by Xerox "across the entire EMS revenue cycle," *id.* at 7, 21-23, and concluded that ***Xerox's breaches were costing the City millions of dollars each year***, *id.* at 26. A&M found:

- Xerox had "ineffective follow-up processes," resulting in a "steep decline" in collection percentages beyond the first 90 days from ambulance transport, found "virtually no collection activity occurring beyond first series of bills," and no established procedures for collections on old accounts. (*Id.* at 4, 7, 8)

- "Significant number of claims were submitted with the wrong service level," and many rejected claims were resubmitted with incorrect service codes, resulting in claim denials and underpayments. (*Id.* at 5)

- "Hospital matching process does not effectively match with transport data," "Xerox's relationships with the hospitals were dormant and needed to be refreshed," and "Not all Houston hospitals/systems receiving patients had interfaces established." (*Id.* at 7, 26)

- "Insurance eligibility process is ineffective," "Significant amount of accounts outstanding with insurance companies," and "No workflow to establish account follow up." (*Id.* at 7). "Lack of standard processes and follow up leads to significant delay in payment and missed collection opportunities." (*Id.* at 19)

- Widespread coding errors in initial claim submissions, resulting in a first-pass yield for billing the top ten private insurers of 53%, and 27% for all other insurers, despite "Industry averages for first pass yields through clearing houses is 98-99%." (*Id.* at 4).

To flesh out A&M's finding that Xerox improperly "upcoded" denied Medicare and

10

Medicaid claims, Xerox and the City retained consulting firm <u>Navigant</u> to audit 25 such claims. X-41. Xerox's Ferlita testified that Xerox's Elentrio "admitted that she knew for years and years and years that this hard coding was in place within Xerox's code for the improper upcoding," and that struck Ferlita as "wildly unethical." X-14 at 75:6-10, 76:9-11. In 2013, Navigant found that Xerox improperly had upcoded 21 out of 25 such claims (84%). X-41. From 2012 to 2014, Medicare and Medicaid processing agents audited claims billed by Xerox, determined there were substantial errors, and sought to recover over $20 million from the City. X-19 ¶146.

II.    <u>Industry Custom and Professional Standards Evidence Establishes Xerox's Breach</u>

Xerox asserts that certain key contract performance provisions are ambiguous, and points exclusively (and incorrectly) to alleged course of performance evidence to try to limit the scope of its obligations. Xerox ignores evidence of prevailing industry standards and its failure to satisfy them. Under Texas law, evidence of industry practice is admissible both to determine *whether* a contract is ambiguous and, if so, *to explain the meaning of an ambiguous contract.*[3] Industry custom and practice evidence is extremely relevant here because contract § III.H. (titled "Warranties") provides that "Contractor's performance shall conform to the professional standards prevailing in Harris County, Texas with respect to the scope, quality, due diligence, and care of the services and products Contractor provides under this Agreement." X-1.

The City designated two industry experts who provided detailed reports on Xerox's many failures to conform to prevailing professional standards and contract breaches. Nationally

---

[3] *See Miller v. Gray*, 149 S.W.2d 582, 583 (Tex. 1941); *accord Dynegy Midstream Servs., L.P. v. Apache Corp.*, 294 S.W.3d 164, 170 & n.23 (Tex. 2009) (citing *Miller*); *see also Alpha/Omega Ins. Servs, v. Prudential Ins. Co.*, 2000 WL 122473 at *2 (5th Cir. 2000) (unpublished) (applying Texas law) ("parties may introduce additional facts of custom and practice in the industry to guide interpretation of the [ambiguous] provision"); *Yucca Supply Co. v. Continental Operating Co.*, 2003 WL 297557 at *3 (Tex. App. – Houston [14th Dist.] 2003, no pet.) ("Testimony regarding custom and usage in an industry is admissible when a contract's terms are ambiguous."); 12 Williston on Contracts § 34:7 ("If the court determines that a contractual provision is ambiguous, it is appropriate to refer to extrinsic evidence, including industry custom and practice, to determine the parties' intent.")

recognized EMS billing and collections expert <u>Peter Lawrence</u> addressed Xerox's nonconforming performance, misunderstanding of basic EMS billing practices, noncompliant coding per Medicare and Medicaid regulations, flaws in Xerox's automated systems that led to underbilling, allowance of certain insurers to pay reduced claims amounts, and more. Lawrence's report is attached as X-19, and these matters are discussed ¶¶104-105, 109-146.[4] Lawrence's opinions about Xerox noncompliance with prevailing industry standards are based on his extensive experience as well as Xerox's poor comparison to the City's new vendor, Digitech.

A&M's <u>Don Lochabay</u> worked with Lawrence, reviewed Xerox's billing database, identified examples of Xerox's failure to comply with the contract, and calculated damages caused by Xerox's breaches. Lochabay's reports are attached as X-42, X-43, and Lochabay identified **91,039 specific claims** for which Xerox received **no payment**, and as to which Xerox's coding shows **no follow up**. X-42 ¶¶106-23. Xerox routinely accepted less than full payment from private insurance companies, and Xerox's automated approach to determining which level of service to bill (ALS 1, ALS 2, or BLS) caused Xerox to *underbill* and *undercollect* Medicare and Medicaid. *Id.* ¶¶ 124-130. Xerox's flawed automated approach caused it incorrectly to bill otherwise higher-paying ALS clams as if they were lower-paying BLS claims. *Id.* ¶¶ 131-143. Xerox knew its ALS/BLS ratio was out of line with industry standards and knew it was leaving millions on the table. X-19 ¶138 .

Lochabay determined that Digitech's paid transport rate was 59.7%, which was materially higher than Xerox's as low as 48% average paid transport rate from 2003 to 2013. X-42 ¶¶97-103. After Xerox's expert testified that the proper metric to evaluate Xerox's performance is the "net collection rate," Lochabay determined that Digitech's properly

---

[4] Xerox's billing practices led Medicare and Medicaid to initiate proceedings against the City to recoup more than $20 million. The City appealed, retained counsel, and has reduced current liability to $8,300,00.00.  X-72.

calculated rate also was materially higher than Xerox's rate. *See* X-43 ¶15. Depending on the metric, Xerox breached the contract and cost the City at least $33,511,278 and as much as $45,963,197 (X-42 ¶103; X-43 ¶15) by failing aggressively to pursue collections (as required in X-1 at X-A ¶A.I.10.), failing to identify as many payors as it should and could have for the ambulance transports the City provided (as required in ¶III.H), and other failings.

III.    Course of Performance Evidence Establishes Xerox's Breach

Xerox says on page 19 that course of performance "show[s] that Xerox's performance from 2003 through 2013 was sufficiently professional, aggressive, and timely, and that Xerox devoted the necessary resources to do—at a minimum—a contractually sufficient job." Not so. Xerox's argument is wrong as a matter of fact and law, and cannot overcome the City's powerful summary judgment evidence that actually (and inferentially) establishes Xerox's breach.

A.    The City Disputed Xerox's Contract Compliance

The City did not accept Xerox's low-baseline level of performance as sufficient. The City repeatedly expressed concern about Xerox's poor performance. By October 2004, Xerox's performance had deteriorated to the point that the City threatened to "issue an RFP after 30 days from today if billing to forms of insurance, (Medicare, Medicaid, Private Insurance) does not make significant improvement from where we are today….we need to also see significant improvement in the revenue as a result of the billing." X-44 at 3. The City told Xerox's whole senior management team it was not satisfied. X-45 ("I'm sorry to cc: the whole company – but I want your senior management aware of and on top of putting the solutions in place to correct this."); *see also* X-46 ("My fear of course is that we have a ton of unpaid billed insurance accounts and we are simply not collecting it…In any event, at a minimum, where insurance is shown as owing money, we need the insurance companies to tell us whether they denied or rejected it, or paid it to the customer."); X-47 ("this is not good – in fact – it is devastating…The

13

trend is not looking good - ACS has set itself up to have a disastrous first quarter of our new fiscal year. It is IMPERATIVE that this trend be reversed as soon as possible.").

In May 2005, the City told Xerox "Private insurance collection percentage still has not improved to where it should be….I'm convinced ACS is not doing something it should be doing here…." X-48. In July 2006, Jefferson Wells noted material deficiencies in Xerox's collections. X-2. In October 2006, Xerox *concurred* with findings that "Commercial insurers paid less than the expected amount based on EMS Charges," *concurred* that Xerox did not re-bill or follow up after "Zero (No) Payments by Commercial Insurance Companies," *concurred* that a "substantial amount of the commercial insurance carrier claims were denied for payment," and *concurred* that the "City cannot verify that all EMS billable transports are actually billed by ACS." X-2 at 3-5.

In May 2010, the City "determined that ***ACS is not in compliance with its agreement with the COH***….Furthermore, ACS appears to lack any internal control environment which would mitigate errors and ensure accuracy." X-49 at 2. In June 2010, the City's Alfred Moran sent a summary of the City's objections to Xerox's deficiencies since the 2007 amendment, and noted that ***Xerox/ACS "were, and still are, failing," and "did not have the technology to cure either the EMS operational problems or the myriad of problems resulting from what appeared to be poor, even sloppy, business practices***." X-6. Moran noted that in 2009 and 2010, the City had communicated many objections to Xerox, including that "Progress has been both minimal and slow," that the City *"informed ACS' senior level executives it was still failing in both functional areas*, and that we did not think it possible for them to compete using their current technology," and that the City "met again with ACS' senior-level executives and informed them that the City planned to publish an RFP" to replace Xerox/ACS. X-6 at 2-3.

14

In August 2010, the City issued a "Request For Proposal" to replace Xerox/ACS with a new vendor. During the RFP process, Xerox promised to address the City's concerns. Xerox had just acquired ACS and began selling itself to the City as the new "Xerox-driven ACS." *See* X-9, X-10 at 163:6-14; 167:10-17. Xerox hired Chris Carlson as its new VP for EMS, and Carlson told the City he would clean up his predecessor's messes. X-10 at 224:18-24. Xerox assured the City that it would address its "failings" by using software called "ImageTrend." X-8 at 8-10. In reliance on Xerox's representations, the City withdrew the RFP and, in 2011, further amended its contract with Xerox. To that end, § V.D.1 of Exhibit A to the 2011 Amendment obligates contractor Xerox as follows: "Within ninety (90) days of the Countersignature Date, Contractor will provide the City's designated technical monitor and auditors with both the tools and training required to access all City reports, including Ad-Hoc reports, on a 24/7 bases."

Concerned with Xerox's post-amendment performance, the City retained A&M to conduct a comprehensive audit of Xerox's billing and collections process, including a claim-by-claim review of more than 350 claims that Xerox had billed. In September 2012, A&M issued its 59-page report identifying many material breaches by Xerox. X-12. The City also sent Xerox a ***detailed spreadsheet*** listing 24 areas where Xerox had failed to comply with the parties' contract and listing the specific provisions Xerox had breached. X-50. ***Xerox's Ferlita, Shutt, Zuckswert, Sauceda, and Elentrio all "acknowledged that Xerox indeed had failed to comply with many of its obligations under the contract."*** X-14 at 201:14-202:5. Xerox's Ferlita testified:

Q       And so do you have a basis based on your own time and experience at Xerox, a solid basis, to say, ***yes, Xerox breached its contract with the City of Houston in multiple, multiple ways that cost the City of Houston millions and millions and millions of dollars***?

A       I would say ***yes***, and that was one of the reasons why I resigned.

X-14 at 214:9-16 (objection omitted). Houston's former City Attorney David Feldman testified

that, in 2012 and 2013, he repeatedly contacted Xerox about the City's objections, "was pulling my hair out trying to get their attention," and "went to extraordinary lengths to get their attention, and what I got was too little too late." X-15 at 169:3-10.

### B. Xerox's "Net Collection Rate" Argument Is Incorrect and Misleading

Xerox says at page 19 that its "net collection rate was consistently well over the 39% national average." Wrong. Xerox misled the City by comparing its "*net*" collection rate to statistics Xerox provided showing a national average "*gross*" collection rate of 39%.[5] *See* X-51, X-52 at 114:25-115:11. Xerox's VP Carlson admitted the national average "net collection rate," which he defined as "collection of potential," was **54%, not 39%**. X-53. Carlson testified he preferred other metrics over net collection rate because net collection rate – which is the amount collected divided by the total amount billed *minus accounts deemed unbillable* – is **subject to manipulation**. X-32 at 99:6-101:19. That is exactly what happened here, as the Fitch audit found Xerox improperly declared accounts unbillable. X-54 at 155:5-17.

Instead of a mathematically manipulable percentage, the contract sets forth standards, procedures, and steps Xerox was obligated to implement. Xerox ignored data the City received from A&M showing that national average *gross collections* ranged from 28% to 62%, while *net collections* ranged from 32% to 99%. X-55. Xerox's inflated net collection rate when compared apples-to-apples falls well *below* what another vendor (Digitech) accomplished in this same Harris County market. X-43 ¶¶15. The contract does not say – and the City never agreed – that Xerox's performance would be acceptable as long as Xerox met a purported (and unsupported) "national average collected" or matched Xerox-provided estimates from other cities.

### C. Xerox's "Bonus" Argument Is Incorrect and Misleading

---

[5] Xerox portrays this as the City's number, but omits that *Xerox* was the source – and never provided data to support it. *See* X-51; X-10 at 28:20-29:2 (rate was "what I was being told by the vendor, meaning ACS"; did not "verify that 39 percent or some other number was indeed the national average collected").

Xerox says at page 3 (and elsewhere) that "*In other words,* the parties agreed that a Net Collection Rate in excess of 40% was worthy of a bonus because such a rate was above and beyond the performance standards of the EMS Contract." Xerox uses its own "other words" because the contract does *not* say that, and the City did *not* agree to that. What Xerox calls a "bonus," the contract calls an "annual adjustment" to the guaranteed "flat contingency fee of fourteen percent." X-1 at X-B at I.B.

Before the 2011 amendment, the contract provided Xerox a fee for collecting low-hanging fruit (e.g., payments after automated bills were submitted to Medicare, Medicaid, and private insurers) and for more difficult accounts through more robust collection efforts. *Id.* The contract does *not* say an adjustment/bonus means Xerox complied with its expressly articulated contract obligations and with prevailing industry standards. To the contrary, the contract imposed specific obligations and its language and structure obligated Xerox to maximize collections for the City. Xerox/ACS's Houston project manager Miller testified (X-18 at 245:17-25):

> Q      Based on your experience at ACS, was ACS focused on the low-hanging fruit under the contract with the City of Houston?
>
> A      Absolutely.
>
> Q      Did ACS do the hard work – were there policies and procedures in place before you got to ACS to do the hard work of collecting on things that were not low-hanging fruit?
>
> A      Not that I remember.

Xerox's Sue Elentrio admitted that getting paid an annual adjustment "bonus" years after it signed the contract in 2002 had *nothing* to do with Xerox's performance, but rather resulted from the fact that the City's net collection rate increased every year because public and private insurance companies increased the amount they reimbursed for each ambulance transport every year while the City had not had a fee increase in seven years: "***Did anyone explain to Doug*** –

*that as long as the City of Houston keeps the same rates – the bonus will keep increasing. Does he realize that COH has not had a fee increase since 2002 (that is 7 years).*" X-56.

Xerox's net collection rate argument also undermines Xerox's motion and shows that Xerox did not perform in accordance with prevailing industry standards. By comparison, Digitech in its very first year of collections in Houston (and thus without the substantial experiential benefit Xerox had) had a materially higher net collections rate (when calculated on an apples-to-apples basis) than Xerox did from 2002-2013. X-43 ¶¶15. Xerox's own expert, Bernard Ford of Navigant, opined that net collection rate is the appropriate metric to assess Xerox's performance, X-57 at 71:18-24, and, using that metric, Xerox undercollected for the City by $45,963,197 compared to Digitech's level of performance. X-43 ¶21.

D.    Xerox's "$200 Per Transport" Argument Undermines Xerox's Position

Without citation, Xerox says at 15 that the City "used the $200 average collections per transport metric…to measure Xerox's performance." This is wrong and actually demonstrates Xerox's deficient performance. The $200 target came up 11 years ago *in 2004* to set a "realistic goal" for Xerox whose performance was even worse than that. *See* X-58 at 234:9-18. Even so, Xerox neglected to mention in its motion that Xerox *failed to meet even that modest target for years.* Lochabay explains in Exhibit 8 to his initial report (X-42 at Ex. 8):

- In FY 2004, Xerox earned an average of $168.36 on 143,686 transports. Xerox's failure to get even $200 per transport cost the City $4,546,225, and Xerox's failure to comply with contractual and industry standards cost the City even more.

- In FY 2005, Xerox's revenue per transport was $175.68 on 147,139 transports. Xerox's failure cost the City $3,578,420.

- In FY 2006, Xerox's revenue per transport was $187.18 on 150,356 transports. Xerox's failure cost the City $1,927,564.

- In FY 2007, Xerox earned an average of $188.53 on 148,383 transports. Xerox's failure cost the City $1,701,953.

- In FY 2008, Xerox finally squeaked past the $200 per transport – Xerox finally earned revenue per transport of $200.39.

By the time the Xerox finally in FY 2008 squeaked past the *four-years-old* $200 per transport goal by a scant *39 cents*, the goal was so stale that Xerox's Elentrio admitted internally that the revenue increase had nothing to do with Xerox's performance: "***Just between us ducks….Revenue increase due to [Medi]caid increase***. Higher collection rate due to reinstating program that automatically writes-off caid accounts with denial." X-59.

IV.    Xerox's Affirmative Defenses Are Legally and Factually Deficient

In Part V.A.2 of its motion, Xerox presents a grab-bag of defenses it hopes might stick. They do not. Xerox's defenses are legally untenable and, in violation of the standard of review, are based on self-serving characterizations of sharply-contested facts.

A.    Xerox's Accord and Satisfaction Defense Fails

At ¶¶45-47 of its motion, Xerox discusses an alleged (albeit nonexistent) "accord and satisfaction" based on the 2011 contract amendment and, in footnote 14, cites exactly two cases on this point. Both cases undermine Xerox's argument because those courts ***reversed grants of summary judgment*** on accord and satisfaction defenses due to contested fact issues. In *Baylor Health Care System v. Employers Reinsurance*, 492 F.3d 318 (5th Cir. 2007), the Fifth Circuit found that defendant's evidence did not satisfy "the ***stringent language*** of accord-and-satisfaction cases," held there were genuine issues of material fact for trial, and explained:

- "There must be ***an unmistakable communication*** establishing that performance according to the terms of the new agreement will satisfy the underlying obligation created by the original contract." *Id.* at 321 (internal marks omitted).

- "Such communication must be plain, definite, certain, clear, full, explicit, ***not susceptible of any other interpretation****,* and accompanied by acts and declarations that [the parties are] sure to understand." *Id.* (brackets in original).

- Although the "new agreement need not explicitly state that it is intended to supersede the original contract," if "the parties' intent is resting in implication, however, the circumstantial

evidence must **irresistibly point to the conclusion** that, in reaching a new agreement, the parties assented to a complete discharge of the original obligation." *Id.*

In Xerox's only other case, *Womco Inc. v. Navistar Int'l*, 84 S.W. 3d 272, 281 (Tex. App. – Tyler 2002, no pet.), the court also **reversed summary judgment** and explained that "even assuming that these circumstances are indicative of an accord and satisfaction, taking the evidence favorable to appellants as true, we conclude that there is a material issue of fact as to whether the letter agreement dated September 12, 1995 was an accord and satisfaction." The City/Xerox 2011 amendment does not come close. It does *not* contain a release**,** does *not* prohibit the City from seeking damages for pre-amendment breaches, and is *silent* with respect to claims or disputes. *See Baylor Health Care*, 492 F.3d at 322 (no accord where the agreement made "no reference to the policy or any policy-related dispute, and is completely silent regarding the effect of the agreement on the parties' existing obligations under the policy").

Xerox did not identify any documents surrounding the 2011 amendment that can plausibly – let alone conclusively – be read as "unmistakable communication" "not susceptible to any other interpretation" that the City considered the 2011 amendment a satisfaction and waiver of any claims for Xerox's breaches to date. To the contrary, the City's Director of Finance Kelly Dowe signed the 2011 amendment and testified the City never intended to release claims against Xerox in the 2011 amendment, and Xerox never even *suggested* the amendment would relieve it from such liability. *See* X-60 ¶¶4-5. As in *Womco*, 84 S.W.3d at 281, that evidence alone defeats Xerox's argument:

> Appellants point out that in Marquess's affidavit, which was part of Appellants' summary judgment evidence, Marquess expressly denies that he, on behalf of Womco, ever agreed to release any claim he had against Price or anyone else for the problems with Womco's trucks. Thus, even assuming that these circumstances are indicative of an accord and satisfaction, taking the evidence favorable to appellants as true, we conclude that there is a material issue of fact as to whether the letter agreement dated September 12, 1995 was an accord and satisfaction.

20

Xerox's accord and satisfaction defense also fails because there was no "satisfaction." There is substantial evidence that Xerox breached the contract, including terms in the 2011 Amendment, by (among other things) failing to deliver the key ad-hoc data reporting capabilities that were critical to the City's decision to amend the contract. *See* VI, *infra.* Xerox's continuing breaches (and its new and old failures to perform) defeat its defense because, as the Fifth Circuit explained, "'satisfaction' is the actual performance of the new agreement." *Baylor Health Care System*, 492 F.3d at 321. The 2011 amendment actually reaffirmed Xerox's obligation to perform per prevailing industry standards and to aggressively pursue collections.

Xerox also misleads when it says at ¶46 that there was an accord and satisfaction due to the City's agreement to abide by Fitch's review of what Xerox incorrectly calls "the issues of Xerox's contractual performance." Fitch's review did *not* concern whether Xerox performed in accordance with the contract and prevailing standards, met its hospital matching and reporting obligations, collected as much as it should have, etc. The Fitch consultant who conducted the review testified that Fitch *only* examined the calculation of Xerox's annual adjustment (and the City's damages are *not* based on annual adjustment payments to Xerox):

> Q      And you're also not expressing any opinion as to whether Xerox complied with the contract generally as it related to its collections and billing obligations; correct?
>
> A      ***My only opinion was specifically focused on the calculation of the annual performance bonus***.

X-54 at 100:19-101:12; *see also* X-73 at 58:8-21.

B.      Xerox's Equitable Defenses Are Legally Barred and Fail

Xerox asserts various equitable defenses, such as laches and estoppel, that are legally untenable because equitable defenses generally do not apply to municipalities performing governmental (as opposed to proprietary) functions. *See Truong v. City of Houston*, 99 S.W.3d

204, 211 (Tex. App. – Houston [1st Dist.] 2002, no pet.) ("Affirmative defenses based in equity have been consistently held not to apply when the activity complained of is a governmental function."); *see also Leeco Gas & Oil Co. v. Nueces County*, 736 S.W.2d 629, 630 (Tex. 1987) ("When a governmental unit is exercising governmental powers it is not subject to estoppel."); *Hutchens v. Prasifka*, 450 S.W.2d 829, 835 (Tex. 1970) ("general rule has been in this state that when a unit of government is exercising its governmental powers it is not subject to estoppel").

The City's provision of emergency medical services is a governmental function. Governmental functions are defined in Texas Civil Practice & Remedies Code § 101.0215(a) as functions "enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public...." In *City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 355 (Tex. App. – Houston [14th Dist.] 2008, no pet.), the court explained that § 101.0215 "was written to provide guidance in determining which functions are governmental and which are proprietary." Section 101.0215 lists 36 non-exclusive activities that are "governmental functions," and subpart 18 is "***operation of emergency ambulance service***."[6] Xerox cannot assert equitable defenses against the City.

Xerox cannot avoid this result by saying the matters in dispute here are only *related to* (and not themselves) the performance of a governmental function. "Courts have repeatedly recognized that governmental functions encompass activities that are *closely related to or necessary for* performance of the governmental activities designated by the statute." *Petroleum Traders Corp.*, 261 S.W.3d at 356. The *Petroleum Traders* court found the City of Houston's

---

[6] These legislative definitions are "binding only in the context of the Tort Claims Act," but the Texas Supreme Court "previously found that 'the statute is helpful' in our interpretation of whether an activity is a 'governmental function.'" *Texas Dep't of Transp. v. A.P.I. Pipe & Supply*, 397 S.W.3d 162, 171 n.39 (Tex. 2013) (citing *City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 776-77 (Tex. 2006)). The *A.P.I.* Court at 397 S.W.d 3d at 171 & n.39, applied the statutory definition and held that estoppel did not apply against TXDOT, because "applying estoppel here would impair that governmental function."

fuel purchases were a governmental function because they were "essential" to the statutory governmental functions identified in § 101.0215 (*i.e.* police and fire protection, garbage collection, operation of ambulance service, vehicle equipment maintenance), and "[w]ithout fuel, the City would be unable to perform governmental tasks required for the public good." *Id.*

The matters at issue in this case include the hardware/software for Houston Fire Department personnel to record patient information, generate patient care records for transports, track transports and medical services provided in a billing database, and bill and collect from public and private payors for medical services to finance the provision of such services – all of which are "closely related to or necessary for performance of the governmental activities designated by the statute," namely the "operation of emergency ambulance service."[7]

Xerox cannot squeeze this case into the narrow exception that a municipality "may be estopped in those cases where justice requires its application, and there is no interference with the exercise of its governmental functions," as such defenses should be "*applied with caution and only in exceptional cases* where the circumstances clearly demand its application to *prevent manifest injustice*." *Prasifka*, 450 S.W.2d at 836. Courts "will look at the totality of the circumstances" and apply the exception "only where justice, honesty, and fair dealing require it," taking into account the conduct of all parties, including bad faith or unclean hands. *See Truong*, 99 S.W.3d at 212 (internal marks omitted) (refusing to apply equitable affirmative defenses where city attempted to enforce deed restrictions within five years of the purchase of the property). Even if an inquiry into the "totality of the circumstances" were properly resolved on a truncated (and disputed) summary judgment record, Xerox has not demonstrated this is one of

---

[7] *See also Ethio Express Shuttle Serv., Inc. v. City of Houston*, 164 S.W.3d 751, 753 (Tex. App – Houston [14th Dist.] 2005, no pet.) (operation of a shuttle service to airports related to governmental function of regulating airports, traffic, and transportation); *City of San Antonio v. Butler*, 131 S.W.3d 170, 177-78 (Tex. App – San Antonio 2004, pet. denied) (alcohol sales related to governmental function of operating "civic, convention centers, or coliseums").

3688201v1/013883

the few "exceptional cases where the circumstances clearly demand" application of equitable defenses. As discussed below, the two cases that Xerox cites plainly are distinguishable.

C.    Xerox's Legally Barred Affirmative Defenses Also Fail on the Merits

Xerox has not conclusively established the elements for its legally barred equitable defenses of laches, estoppel, or waiver. The facts here are materially different from the cases Xerox cited. In *HL&P Co. v. Wharton,* 101 S.W.3d 633, 639 (Houston [1st Dist.] 2003, pet. denied), the court reviewed a full trial record and held that laches barred the municipal plaintiffs' claims because it had accepted franchise payments "***without question***" and "***did not raise any objection to the payments, nor did they question the payments for well over 30 years***." In *Corpus Christi v. Nueces County Water Control*, 540 S.W.2d 357, 377 (Tex. App. – Corpus Christi 1976, writ ref'd n.r.e.), the court held, also on a full trial record, that laches barred the city's claim because it "stood by ***for over 40 years*** while the Robstown District has continuously diverted water," and it was "obviously unjust and unfair for the City ***to stand idly by, watching the Robstown District become dependent*** upon the validity of C.F. 70, ***and then 40 years later*** claim that such a right was lost due to the alleged abandonment by the District prior to 1923."

Xerox's cited cases involved delays of 30 and 40 years despite full knowledge of the challenged conduct and, thus, are *nothing* like this case. The City did *not* "stand idly by" and, instead, consistently raised issues with Xerox's performance, tried to help Xerox's improve, and took increasingly-escalating measures before terminating Xerox.

- When the City discovered in 2004 that Xerox was underbilling Medicare and Medicaid by not billing for ALS, the City instructed Xerox to do so and provided written documentation supporting the practice. *See* X-61. Xerox followed the City's instructions for a time, but then inexplicably stopped that practice and never informed the City. X-36 at 273:21-278:1.

- When the City suspected that Xerox was not collecting what it should from private insurance, the City retained Jefferson Wells to conduct a review of insurance claims. Xerox concurred in the findings, committed to correct its practices, but failed to do so. X-2 at 3-4.

24

- The City finance department conducted an audit of Xerox's performance in 2010 and concluded "that ACS is not in compliance with its agreement with the City of Houston due to its inability to provide reliable data and supporting documentation for the City of Houston financial reporting purposes." X-49. The City then amended the contract to require Xerox to use third-party reporting software and give the City the ability to generate its own reports using that software within 90 days. X-1 at 124.

- Even after the 2011 amendment, the City continued to assess Xerox's performance and, in 2012, A&M conducted an in-depth review of Xerox's collections performance and determined that Xerox was in breach. X-12.

- After A&M's audit, the City sent Xerox spreadsheets identifying the specific contractual provisions that Xerox breached. X-50. The City and Xerox formed a remediation team to address these issues. X-40. Xerox rebuffed the City Attorney's repeated attempts to get Xerox's attention. X-15 at 169.3-10.

Xerox also failed to establish its waiver defense. In *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003), the Court explained that waiver requires an "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right," is "largely a matter of intent," and "ordinarily is a question of fact," except when the "facts and circumstances are undisputed." Xerox did not provide *any* evidence that the City *intentionally* relinquished a known right, and the facts here *are* disputed. Indeed, Xerox's main "evidence" on its equitable defenses (*see, e.g.*, ¶¶39-42) is a short declaration from *Xerox's own* Sue Elentrio, and her declaration (and Xerox's reliance on it) is factually inaccurate in key respects.

Citing Elentrio's inaccurate declaration, Xerox wrongly says at ¶¶39 that "the City knew precisely the percent of transports transmitted to Xerox that received payment" from 2003 to 2013. Wrong. The data warehouse that Xerox provided to the City before 2012 was incomplete, unreliable, and had significant gaps and missing data that Xerox never updated. X-62 at 160:21-161:11. The City did not get a reliable database until 2012. X-63 ¶4. Even then, it took the City's consultants at A&M *three months* of repeated requests to Xerox and the threat of mayoral action to finally get the data necessary to build the database (that Xerox was obligated to supply under the Contract). *See* X-64 at 2; X-11 at 213:6-214:7.

25

Xerox also cites Elentrio's declaration to claim inaccurately that the City could have calculated Xerox's paid transport rate using certain other reports. Wrong. Those other reports do *not* even provide the total number of transports for which Xerox received some payment. *See* X-63 ¶5. Those reports also do *not* say how many claims Xerox incorrectly coded in its database, failed to follow-up on, and failed to aggressively pursue. X-65.

Xerox also incorrectly says at ¶43 that the City had "intimate knowledge of Xerox's billing and collection procedures and systems" from prior audits. The 2006 Jefferson Wells audit was an early, limited review of private insurance claims, which only accounted for 25% of EMS revenue. *See* X-65 at 2, X-38. The 2011 Fitch audit was limited to verification of Xerox's fee and did not involve a full review of Xerox's contract compliance. X-54 at 100:19-101:1. The 2010 Seckel audit *confirms the City's lack of "intimate knowledge"* noting that Xerox did not provide required reporting and data information. X-49 at 2-3.[8] The City's Alfred Moran managed the Xerox relationship for several years and testified the City did not know the extent of Xerox's breaches until *after* A&M's September 2012 analysis (X-10 at 79:21-80:7):

> a chronology of issues that we had with ACS, and until we had a major audit done by a major firm, it was hard to tell what was really going on. So the answer is Mr. Carmody did a fabulous job, but what we really needed was audits, which we asked for and received, but when Alvarez and Marsal finally got involved, then it was a different thing.

Xerox did not (and cannot) show as a matter of law that the City knew the full extent of Xerox's contractually-deficient billing and collections before September 2012, sat on its rights, or failed to mitigate its damages. There are genuine issues of material fact on Xerox's affirmative

---

[8] Xerox's reliance on *City of Dallas v. GTE Southwest, Inc.*, 980 S.W.2d 928, 937 (Tex. App. – Fort Worth 1998, pet. denied), is misplaced because that defendant provided specific written notice that it was *not* paying franchise fees on long-distance revenues, *and the jury found* that, for 10 years, the plaintiff "knew or reasonably should have known" it was not receiving such fees and, for six years, "continued to accept the franchise fees from GTESW knowing that the fees were not based on any long distance revenues." Relying on these jury findings, the court found waiver post-trial.

3688201v1/013883

defines, and Xerox is not entitled to summary judgment.[9]

## V.     Xerox Is Not Entitled to Summary Judgment Regarding Liquidated Damages

Xerox incorrectly says at ¶¶48-54 that the City's exclusive remedy for *any and all* of Xerox's breaches is to seek liquidated damages. Xerox is wrong legally and factually.

### A.     The Liquidated Damages Provision Is Limited In Scope and Does Not Apply

Xerox's motion on liquidated damages is contrary to the plain text of the liquidated damages provision in § IV.D of the contract – a section Xerox does not mention in its motion. Section IV.D unambiguously provides that liquidated damages apply *only* to claims Xerox failed to file or failed timely to file – and untimely claims are *not* the basis for the City's damages. Xerox is trying to *re-write* and *expand* the provision to *create* an exclusive remedy for *any breach* by Xerox, including its failures to follow-up and collect timely submitted claims. Section IV.D is titled "Liquidated Damages" and provides:

> Time is of the essence of this Agreement. *If Contractor fails to file claims, or fails to file claims within the deadlines set by third party payers*, the City will suffer harm, although the actual damages from that harm are difficult to estimate. Therefore, *if Contractor fails to file claims or does not meet the deadlines, Contractor shall pay to the City the amounts stipulated in Exhibit "C" as liquidated damages*. The amounts listed for each event of delay or failure to file as detailed in Exhibit "C"….

---

[9] Xerox argues in two sentences on page 25 that the City failed to mitigate against "*further* alleged losses" because the City did not hire Digitech sooner. Xerox's argument turns the doctrine of mitigation upside down and is wrong as a matter of law: The duty to mitigate applies only "[o]nce a party has reason to know that performance by the other party will not be forthcoming." Restatement (Second) of Contracts § 350; *see also Great Am Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995) (mitigation doctrine "prevents a party from recovering damages *resulting from a breach*").  The City was not required to *presuppose* that Xerox would breach *in the future*, particularly given Xerox's promises to reform and improve to induce the City to sign the 2011 amendment. The City did not have genuine visibility into Xerox's across-the-board contract-breaching conduct until A&M's late 2012 report. Mitigation does not require a party to terminate a contract and undergo a major, resource-intensive change on hundreds of ambulance vehicles and dozens of fire stations (X-74); mitigation requires only reasonable efforts to minimize damages "at a trifling expense or with reasonable exertions." *Great Am Ins. Co.*, 908 S.W.2d at 426. Unrelated to mitigation, Xerox also says the 2011 amendment provided for $2 million in upgrades to various computer equipment, but the parties so agreed in the 2011 amendment, which *Xerox breached*. In any case, that cost was amortized over the life of the contract, and the City paid the contractually-required buy-out fee when it terminated in July 2013. *See* X-1 at 143-44; X-75 at 9.

The triggering event is "if Contractor fails to file claims or does not meet the deadlines."

Section IV.D refers to Exhibit C of the contract for the "amounts listed for each event of delay or failure to file," and lists three "Performance Requirements" that obligate Xerox to timely file claims and specify liquidated amounts if Xerox does not do so. Paragraph 1 imposes liquidated damages "If Contractor fails to file or submit a claim...."; ¶2 imposes them if "If Contractor fails to meet a third party payer's deadline for submission of claims...."; and ¶3 imposes them "In the event that Contractor fails to submit a request for payment to the individual within the 90 day time period...." *Under both Exhibit C and § IV.D, the contract's liquidated damages provisions apply only to claims that Xerox failed to file or failed timely to file.*

In *Willis v. Donnelly*, 199 S.W. 262, 275 (Tex. 2006), a jury instruction on damages was erroneous because it was based on a contract that "unambiguously applies to only two situations," and could not be expanded to other situations. Xerox cannot expand the liquidated damages provisions beyond their limited scope. The provisions do not apply to the *tens of thousands* of claims for which Xerox's failure to collect has *nothing to do* with untimeliness. Xerox failed to collect any money on *tens of thousands* of claims because, among other deficiencies, it failed to identify the right payors, failed to provide requested information, failed to exhaust appeals, and failed aggressively to pursue collections on timely submitted claims.

The City's damages arise from three main areas: (1) Xerox's failure to collect the full amount owed to the City from private insurance companies (*see* X-42 ¶¶133-143); (2) Xerox's use of an automated system that systematically under-billed Medicare and Medicaid with respect to the proper level of EMS service (*id.* ¶¶124-32); and (3) Xerox's failure to collect on claims because of its lackluster identification and pursuit of payors (*id.* ¶¶95-123). The first two categories are not subject to the liquidated damages provisions because those are not claims that

were denied because they were not timely filed. Rather, these are claims for which Xerox actually collected payments, but Xerox should have collected more: Xerox used a flawed algorithm that billed Medicare and Medicaid the wrong amount for the level of EMS service, and Xerox routinely accepted less than the actual amount owed to the City from private insurance companies. *See id.* ¶¶124-43; X-19 ¶¶131-145, 171-183.

The third category also falls outside of the liquidated damages provisions. The City's expert identified *86,562* claims for which Xerox received no payment, but could have collected with additional follow-up and pursuit as required. Xerox did not code *any* of these claims in its database as unpaid due to untimely submission.

- Xerox did not collect anything on *21,993 claims* that were originally billed to public or private insurance, but were denied and which Xerox's database "denial code" says "Rebill with Run Report." Xerox's coding proves it did not follow up, and did not rebill these claims with the additional information requested. *See* X-42 ¶¶108-110.

-  Xerox submitted *42,343 claims* to private insurance, but never received any response or payment on those claims. Xerox coded these claims in its database as "Insurance Company Did not Respond," and rather than exhaust efforts with the insurance company Xerox would simply bill the patient instead. *Id.* ¶¶117-118.

- Xerox submitted *10,563 claims* to Medicaid that were denied because the "Claim Needs Manual Review," but Xerox's coding shows it never resubmitted the claims. *Id.* ¶120.

- Xerox did not collect on another *16,140 claims* that were denied and which Xerox *incorrectly* coded in its database as denied because the "Claim Filing Limit Expired." *Id.* ¶¶111-115. The City's expert determined that *11,663* of those claims (over 70%) *were timely filed* per the timelines for liquidated damages in Exhibit C. For those 11,663 claims, Xerox failed properly to code them and determine the proper basis for their denial, and failed to follow up and collect any payment. *Id.* ¶¶ 115.

The issue on these 86,562 claims was Xerox's failure to follow up and pursue payments per specific contract requirements and prevailing industry standards, *not untimeliness* of submission. *See* X-42 ¶¶105-122; *see also FPL Energy LLC v. TXU Portfolio Mgmt. Co., L.P*, 426 S.W.3d 59, 69 (Tex. 2014) ("The plain language of the liquidated damages provisions…and the separate provisions of the Indian Mesa contract all support a limited interpretation of a REC.

We hold that the liquidated damages provisions apply only to REC deficiencies."); *Creative Waste Mgmt., Inc. v. Capital Envtl. Servs. Inc.*, 495 F.Supp.2d 353, 359 (S.D.N.Y. 2007) ("award of liquidated damages will not preclude the recovery of actual damages when the former does not subsume the latter.").[10]

B.     Xerox's Counter-Textual Construction of Liquidated Damages Is Unreasonable

Xerox's theory that the City's exclusive remedy for *any* breach is to seek liquidated damages is contrary to express contract provisions and is unreasonable. Under Xerox's theory, Xerox timely could submit thousands of claims using its automated system, but then close shop, never follow up on any of the claims, and never collect a single dollar for months or years on end – yet the City would have no remedy because the claims were timely submitted. Xerox's absurd interpretation renders meaningless the core contract provisions governing Xerox's performance, including the warranty to perform per prevailing industry standards, the duty aggressively to pursue all accounts, rebills, appeals, and contacting hospitals for updated patient billing information. Xerox's construction should be rejected. *See SLT Dealer Group, Ltd. v. AmeriCredit Fin. Servs., Inc.*, 336 S.W.3d 822, 830 (Tex. App. – Houston [1st Dist.] 2011, no pet.) ("We reject this interpretation as it plainly violates the intent of the parties and would lead to an absurd result, in clear violation of the rules of contract construction.") (internal marks omitted).

C.     The Contract's Remedies Are *Not* Exclusive

Even if the liquidated damages provision in § IV.D applied – it does not – Xerox's argument still would fail. Section IV.D does *not* say liquidated damages are the City's sole or

---

[10] Xerox seeks dismissal ¶ 54 based on its incorrect notion that the City has not "produced any evidence regarding the proper measure of liquidated damages." Looking only at the small subset of claims coded as "Claim Filing Limit Expired," there are 4,507 claims that were not timely filed under the deadlines for liquidated damages, resulting in over $900,000 in liquidated damages. *See* X-42 ¶¶ 113-116.

exclusive remedy for *any* breach, let alone for *all* breaches. Contract § VII.Q is titled "Remedies Cumulative" and provides "Unless otherwise specified elsewhere in this Agreement, the rights and remedies contained in this Agreement are ***not exclusive, but are cumulative of all rights and remedies which exist now or in the future***." Under § VII.Q, the City is entitled to choose between liquidated and actual damages because neither clause says liquidated damages are exclusive remedies. *See, e.g.*, *Frasier v. Schauweker*, 915 S.W.2d 601, 605 (Tex. App. – Houston [14 Dist.] 1996, no pet.) ("Contrary to Schauweker's position, this language did not limit the Frasiers' remedy to liquidated damages, but allowed them to choose from any remedies available, including actual or liquidated damages."); *Bifano v. Young*, 665 S.W.2d 536, 539 (Tex. App. – Corpus Christi 1983, writ ref'd n.r.e.) ("A construction that renders the specific remedy exclusive should not be made unless the intent of the parties that it be exclusive is *clearly* indicated or declared.").[11]

Xerox ignored the contract's "Cumulative Remedies" provision, but may try to say in reply that Exhibit C's introductory paragraph somehow satisfies the "Unless otherwise specified elsewhere in this Agreement" exception to § VII.Q's "Cumulative Remedies." It does not. That paragraph does not expand the triggering events for liquidated damages and, to the contrary, says "Contractor's performance in meeting Contract objectives shall be measured *as detailed in this Exhibit 'C'* and failure to meet such objectives shall be assessed as 'Liquidated Damages'...*in the amounts detailed below*." What is "detailed in this Exhibit C" and "detailed below" are the three performance requirements discussed *infra* that expressly are limited to the timely/untimely submission of claims. Xerox's argument also would conflict with the express language of

---

[11] Xerox says ¶ 52 that the City's *contract with Digitech* is different because it has language providing that the City may assess liquidated damages "[i]n addition to any other remedies available to the City by law or under this Agreement." The City's *contract with Xerox* contains § VII.Q's "Cumulative Remedies" provision, which gives the City the same right to seek all remedies.

contract § IV.D, which provides that the triggering mechanism for liquidated damages is the failure to file or timely file claims – it does not say liquidated damages apply to any other breach, and does *not* say liquidated damages are the City's sole or exclusive remedy. To that end, contract § I.D. (titled "Controlling Parts") provides that "If a conflict among the sections and exhibits arises, ***the sections control over the exhibits***." Thus, § IV.D controls over Exhibit C if there is a conflict and, at worst, Xerox's suggestion of ambiguity precludes summary judgment.

VI.     Xerox Is Not Entitled To Summary Judgment on The City's Fraud Claim

Xerox says in § V.B of its motion that the City's fraud claim is barred by the merger clause, and says there is no evidence of fraud. Xerox is wrong on both counts.

A.     The Contract Does Not Disclaim Reliance on Xerox's Representations

The contract's "Entire Agreement" provision does not preclude a fraud claim based on Xerox's false promises during the 2010-2011 RFP process and negotiation of the 2011 amendment. In *Italian Cowboy Partners Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011), the Court held that standard merger clauses do *not* bar fraudulent inducement claims because "a plain reading of the contract language at issue indicates that the parties' intent was merely to include the substance of a standard merger clause, which does not disclaim reliance," and "even if the parties had intended to disclaim reliance, the contract provisions do not do so by clear and unequivocal language." The *Italian Cowboy* court, 341 S.W.3d at 334, explained that fraudulent inducement claims are precluded *only* when an agreement (as in *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), and *Forest Oil v. McAllen*, 268 S.W.3d 51 (Tex. 2008)) "clearly expresses the parties' intent to waive fraudulent inducement claims," or "expressed clear and unequivocal intent to disclaim reliance." The City/Xerox merger clause does neither. It is a generic integration clause that does not disclaim reliance, and does not waive fraudulent inducement claims. *See* X-1 at § V.II.D. The similar clause in *Italian Cowboy*,

32

341 S.W.3d at 329, did *not* disclaim reliance, and did not bar a fraud claim.

Xerox's reliance on the unpublished decision in *Dresser-Rand Company v. Bolick*, No. 14-21-00192 at *9 (Tex. App. – Houston [14 Dist.] July 18, 2013, pet. abated), is misplaced because the waiver language in that case was "broader and more explicit than the 'generic merger language' quoted in *Italian Cowboy*." The merger clauses here and in *Italian Cowboy* only disclaimed the existence of representations and promises outside of the agreement, and affirmed the agreement is the entire agreement. *See id.* at 335 ("There is a significant difference between a party disclaiming its *reliance* on certain representations, and therefore potentially relinquishing the right to pursue any claim for which reliance is an element, and disclaiming the *fact* that no other representations were made."). The City did not unequivocally disclaim reliance through a generic merger clause that does not even mention reliance or fraudulent inducement.

B.     The Evidence Supports the City's Fraud Claim

Xerox made repeated promises to induce the City to cancel the 2010 RFP and continue with Xerox. Xerox promised to deliver a complete data warehouse that would allow the City to generate its own financial reports of Xerox's performance using reporting software from a company called "ImageTrend." *See, e.g.*, X-8 at 8-10. The 2011 amendment required Xerox to "implement and maintain a data warehouse that ensures 100 percent transparency and oversight of billing operations," provide the City with "user-friendly continuous, open web-based access to the billing and collections data down to the individual claim, transactions, and clinical data elements," and "allow the consolidated data warehouse to be queried by selecting any of the data fields it contains, filterable by user preference including changeable time period parameters." X-1 at 124, X-A.V. Xerox promised to deliver the ad-hoc data reporting within 90 days of the 2011 amendment. *Id.* These promises were material, the City relied on them in deciding to amend the contract, and Xerox intended for the City to rely on them. *See, e.g.*, X-6 at 3; X-66 at 4. The City

33

also has sufficient evidence of injury/damages as a result because the City would not have signed the 2011 amendment but for Xerox's misrepresentations and would have received millions more in collections as calculated by the City's expert Lochabay. *See* X-42 ¶ 103; X-6 at 4.

Xerox made its promises knowing it could not and would not honor them. That is fraud. In *Aquaplex v. Ranch La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009), the Texas Supreme Court found sufficient evidence of fraud and explained that "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." The court explained that, in addition to breach, only "slight circumstantial evidence of fraud" is required to find fraudulent intent, and intent "may be inferred from the party's subsequent acts after the representation is made." *Id.* Xerox's Ferlita admitted that Xerox did not deliver the promised (and contractually required) data warehouse and reporting capabilities. *See* X-14 at 84:24-85:3; *see also* X-67 at 121:15. Xerox knew it could not deliver the promised reporting capabilities within 90 days, and did *not* intend to use ImageTrend's reporting capability to allow the City to generate its own reports.

- After agreeing in principle to the 2011 amendment, Xerox's division VP internally instructed Xerox's employees to "***remove or minimize any specific references to third-party solutions (e.g. ImageTrend)***" from the draft contract. *See* X-68.

- In May 2013, the City learned that, to save money, Xerox did *not* include ad-hoc reporting capabilities in its contract with ImageTrend. X-69; *see also* X-67 at 195:19-196:20; X-70.

VII.   Summary Judgment Is Not Proper on the City's Declaratory Judgment Claims

Xerox incorrectly says on page 33 that the Court must dismiss the City's declaratory judgment claim "because it is redundant of its other claims." The law does not require *dismissal* of a declaratory judgment claim that is duplicative of a breach of contract claim. In *MBM Financial v. Woodland Operating*, 292 S.W.3d 660, 692 (Tex. 2009) – the case Xerox cites – the Court held that a court cannot award *discretionary attorneys' fees* for a declaratory judgment

claim that is duplicative of a claim for breach of contract. *Id.* The City is not using its declaratory judgment action as a "vehicle to obtain otherwise impermissible attorney's fees" because the City already is entitled to attorneys' fees for its breach of contract claim under Texas Civil Practice and Remedies Code § 38.001.

Xerox says the City's request for a declaratory judgment for indemnity from pending Medicare/Medicaid recoupment proceedings is not ripe. Just last week, however, the City paid the Inspector General $12,449 for "full and final payment of the amount demanded in your Final Notice of Overpayment Determination dated April 14, 2015." X-71. The other Medicare and Medicaid crossover recoupment proceedings for which the City requests indemnification are not yet final, but have been completed through the initial appeals process and the City is currently facing liability of approximately $8,300,000.00. X-72. Although the City may not have finally exhausted all appeals by the time of trial, this Court has the discretion to issue declarations, and the Court should exercise its discretion to avoid piecemeal litigation.

Xerox says the contract's indemnity provision in § III.E does not apply to such liability regardless of Xerox's fault because, Xerox says, it applies only to losses to "persons or property." That is not correct. The contract does not define "property," and the word commonly includes money. "Money is 'property' under Texas law." *Canal Ins. v. Hopkins*, 238 S.W.3d 549, 568 (Tex. App. – Tyler, 2007, pet. denied).[12] The City's repayment of money to the U.S. Inspector General as a result of Xerox's incorrect billing *is* a loss to the City's property (the public fisc) and the indemnity provision applies.

Conclusion

This Court should deny Xerox's motion for summary judgment.

---

[12] *See also* Tex. Pen. Code § 31.01; Tex.Tax Code § 1.04 & §33.21; Merriam-Webster Online Dictionary ("property" is "something that is owned by a person, business, etc...."), *available at* http://www.merriam-webster.com/dictionary/property.

Dated: May 15, 2015                    Respectfully submitted,

                                       By: /s/ Geoffrey Harrison
                                           Geoffrey L. Harrison
                                           Attorney-in-charge
                                           gharrison@susmangodfrey.com
                                           State Bar No. 00785947
                                           S.D. Admissions No. 16690
                                           Alex Kaplan
                                           akaplan@susmangodfrey.com
                                           State Bar No. 24046185
                                           S.D. Admissions No. 602421
                                           J. Hoke Peacock III
                                           tpeacock@susmangodfrey.com
                                           State Bar No. 15673980
                                           S.D. Admissions No. 13529
                                           Matthew Behncke
                                           mbehncke@susmangodfrey.com
                                           State Bar No. 24069355
                                           S.D. Admissions No. 1121174
                                           SUSMAN GODFREY L.L.P.
                                           1000 Louisiana Street, Suite 5100
                                           Houston, Texas 77002-5096
                                           Telephone: (713) 651-9366
                                           Fax: (713) 654-6666

                                           *Attorneys for Plaintiff*

Of Counsel:

Judith L. Ramsey
State Bar No. 16519550
Lisa A. Ketai
State Bar No. 11362400
CITY OF HOUSTON LEGAL DEPARTMENT
900 Bagby Street, Fourth Floor
Houston, Texas 77002
Telephone: (832) 393-6491
Fax: (832) 393-6259


### Certificate of Service

I certify that on May 15, 2015, a true and correct copy of this document properly was served on counsel of record via electronic filing in accordance with the USDC, Southern District of Texas Procedures for Electronic Filing.

Michael W. Mengis
Bradley K. Jones
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
*Counsel for Defendants*

/s/ *Geoffrey Harrison*
Geoffrey L. Harrison

3688201v1/013883